# EXHIBIT  A

## *Comm'n on Human Rights ex rel. Bryan v. Memorial Sloan-Kettering Cancer Center*
### OATH Index No. 183/06 (July 25, 2006)

Respondents did not discriminate against complainant based upon his actual or perceived sexual orientation. Complainant's workplace difficulties were not caused by discrimination. Moreover, because he did not bring the allegations of discrimination to the attention of managers or human resources personnel, there was no retaliation. Dismissal of complaint recommended.

---

### NEW YORK CITY OFFICE OF
### ADMINISTRATIVE TRIALS AND HEARINGS

*In the Matter of*
**COMMISSION ON HUMAN RIGHTS
EX REL.
EDMUND BRYAN**
*Petitioner*
*- against -*
**MEMORIAL SLOAN-KETTERING CANCER CENTER,
JOHN MEGGS, RUPERT GILLETTE,
and SHEILA DONOGHUE**
*Respondents*

---

## REPORT AND RECOMMENDATION

**KEVIN F. CASEY,** *Administrative Law Judge*

The New York City Commission on Human Rights (Commission) referred this case in accordance with title 47, section 1-71, of the Rules of the City of New York (RCNY), based upon allegations that Memorial Sloan-Kettering Cancer Center (Center), John Meggs, Rupert Gillette, and Sheila Donoghue violated sections 8-107(1)(a) and 8-107(7) of the New York City Administrative Code by discriminating in the workplace against Edmund Bryan due to his perceived sexual orientation (ALJ Ex. 1).

At a hearing on June 5 and 6, 2006, Bryan testified on his own behalf, presented the testimony of three other witnesses, and introduced attendance certificates. Respondents called eight witnesses and also relied upon documentary evidence. For the reasons below, the complaint should be dismissed.

MKSCC 00671

- 2 -

## ANALYSIS

The verified complaint alleged that, from November 2000 to June 2001, Gillette subjected Bryan to disparate treatment based upon his perceived sexual orientation. It also alleged that, after Bryan reported these incidents to the Center's human resources department from December 2000 to September 2001, respondents retaliated by creating a hostile work environment and subjecting him to further discrimination.

These claims lacked merit for several reasons. To begin with, Bryan was an incredible witness. There was also no convincing evidence that Bryan was a member of a protected class or that workers were treated differently based upon their perceived sexual orientation. In addition, the Center presented overwhelming evidence that its refusal to promote Bryan had nothing to do with his actual or perceived sexual orientation; he failed to advance because he lacked basic interpersonal skills. Finally, because there was no reliable evidence that he ever complained to Center management about discrimination, there was no retaliation.

At the hearing's outset, respondents sought to introduce evidence of a written settlement agreement pursuant to section 2104 of New York's Civil Practice Law and Rules (CPLR). Although it was not signed by Bryan, his counsel, or the Human Rights Commissioner, respondents claimed that the agreement contained all of the terms that Bryan had accepted in June 2005. To avoid the prospect of the attorneys testifying as witnesses, I reserved judgment on respondents' application and invited the parties to submit written summaries of the circumstances that led to the agreement.

In its submission, respondents argued that the Center had detrimentally relied upon the unexecuted settlement agreement by conducting sensitivity training for its employees and issuing a reprimand to supervisor Gillette. Bryan's counsel denied that there had been an agreement. The Commission's counsel maintained that, under its rules, the agreement was not effective until it was signed by all the parties and the Commissioner.

The CPLR is not binding on this administrative tribunal and only serves as a guide where no other rule is applicable. *See Comm'n on Human Rights ex rel. Jellinghaus v. Roth*, OATH Index No. 171/89, at 2 (June 30, 1989). Here, however, the Commission's rules are clear. A settlement, or reconciliation agreement, is only effective when it is signed by all the parties and

MKSCC 00672

- 3 -

the Commissioner. 47 RCNY § 1-61(b) & (c); *see Silverman v. McGuire*, 51 N.Y.2d 228, 433 N.Y.S.2d 1002 (1980) (police officer's settlement of disciplinary action was not binding without Police Commissioner's approval).

Even if the CPLR was applicable, it would not require admission of the unexecuted agreement. Under the statute, an agreement is not binding unless it is: (1) made orally in open court; (2) in a writing subscribed by the parties or counsel; or (3) entered by the court. CPLR § 2104. None of those requirements were met here.

Nor is this a "rare" occasion where equitable estoppel demands enforcement of an oral agreement. *See Bonnette v. Long Island College Hospital*, 3 N.Y.3d 281, 285, 785 N.Y.S. 2d 738, 740 (2004) (strong public policy arguments in favor of certainty, judicial economy, and encouragement of settlement agreements all weigh against admissibility of oral agreements). Contrary to respondents' suggestion, this matter bears no relationship to *Smith v. Lefrak Org. Inc.*, 142 A.D.2d 725, 531 N.Y.S.2d 305 (2d Dep't 1988). There, an injured party entered into an agreement with a litigation specialist, who had apparent authority to settle the matter. The injured party suffered substantial harm from relying upon an oral settlement agreement by consenting to a judgment and warrant of eviction from his residence and purchasing a limousine. Here, in contrast, agency rules clearly specify that the agreement was not yet effective and respondents' supposed reliance – sensitivity training and issuance of a reprimand – was not so detrimental that it did away with the need for a signed agreement.

Turning to the merits, Bryan testified that he began working at the Center as a technician in 1989 (Tr. 70). A year later, he began working the night shift at the central processing unit where surgical trays are prepared (Tr. 71, 75). He soon became a certified technician (Tr. 74). Other than his supervisor, Gillette, who has worked in the unit for nearly 30 years, Bryan is the most senior worker in the unit. Until a year ago, he was the only certified technician (Tr. 76).

Bryan used to socialize with Gillette and discuss heterosexual pornography (Tr. 80, 136). Prior to converting to Islam a few years ago, Bryan had dated "quite a few" strippers and porn stars. He freely talked about those adventures with his co-workers (Tr. 138-39). Bryan's friendship with Gillette ended in the late 1990s. The split occurred when co-workers told Bryan that people said he was gay (Tr. 80). Comments were supposedly made about the color and fit of his clothing (Tr. 80). Bryan investigated and determined that Gillette, two security guards, a

MKSCC 00673

- 4 -

messenger, and others were making "gay jokes" about him. Although Bryan did not consider the remarks malicious, he asked people to stop repeating them (Tr. 80).

Despite Bryan's request, the comments continued. He recalled one incident in particular. After his girlfriend suggested that he should get circumcised, Bryan mentioned this to a co-worker who had an infant son. As Bryan asked questions, Gillette interjected and said that an uncircumcised penis would eventually become a vagina and turn him into a woman (Tr. 81). Bryan considered this a "gay joke" and inferred that Gillette was calling him a homosexual. According to Bryan, he complained to office manager James Appollo, who dismissed the remark by saying, "I don't think you're gay and (Gillette) has his own way of thinking" (Tr. 82).

Bryan asserted that he complained about this incident to the human resources department. As a result, Bryan claimed, Gillette retaliated by "alienating me and isolating me and putting me in circumstances and situations where he knew I would be uncomfortable" (Tr. 82). Gillette "openly displayed hostility" by telling people that Bryan was gay (Tr. 84). In Gillette's presence, another worker once pointed a finger at Bryan and called him a "faggot" (Tr. 148). Bryan also recalled that Gillette once said that "people who still live at home with their mothers are faggots. Any man who drives a (Toyota) RAV-4 is a faggot" (Tr. 86). Bryan took offense because his brother drove that type of vehicle and he complained to Gillette, who responded by threatening to call security (Tr. 86).

Asked for other examples of harassment, Bryan referred to several incidents that had no apparent connection to sexual orientation. For example, he noted that Gillette's radio blasted "loud rap music" (Tr. 84, 97). This forced Bryan to "wear ear plugs and take Tylenol so [he] can concentrate and perform [his] duties." If anyone turned the radio volume down, Gillette turned it up louder (Tr. 84-85). Colleagues also made comments about Jamaicans, which caused Bryan to file at least one complaint with the police against a co-worker. On another occasion, Bryan claimed, he filed different charges with the police after co-worker Kenneth Williams threatened him (Tr. 96, 140, 142). According to Bryan, security guards at the center called him a "werewolf" and followed him all around the Center (Tr. 143). Bryan even claimed that ambulances from another hospital were "stalking" him near his home in Queens (Tr. 144).[1]

---

[1] Conrad Barclay testified that Bryan, his step-brother, became depressed in 2000 because he was passed up for promotion and his supervisor referred to him as a faggot or homosexual (Tr. 174).

- 5 -

Elsewhere in his testimony, Bryan offered a different version of his rift with Gillette (Tr. 88). In 2000, Bryan performed the work of a more skilled instrument specialist without receiving higher pay. When he complained, Appollo advised him that he would not be promoted because Gillette did not like him (Tr. 88-89). Bryan protested to Gillette, who told him to "stop bitching and whining, acting like a bitch and a pussy" (Tr. 90). "[A]t that point," Bryan recalled, he stopped socializing with Gillette (Tr. 90).

In 2002, a colleague retired and Bryan applied for a promotion to instrument specialist. The job was given to Michael Rodriguez, a less experienced and uncertified technician (Tr. 92). Another promotion opportunity became available in 2004, for the position of lead technician. Bryan did not apply because he was threatened, "getting written up," and told that his work was "unsatisfactory" (Tr. 99). Meanwhile, Rodriguez was sent for a specialized training and promoted. Soon, the complaints against Bryan stopped (Tr. 99). No documentary evidence was offered to confirm Bryan's claim that he had been "written up" in 2004.

Bryan admitted that he also had problems with Gillette's predecessor Mary Smith, her predecessor, Carlton Kerr, and his wife, assistant manager Sharon Kerr (Tr. 114-17, 199). In fact, Bryan conceded, he complained to management about every supervisor that he had ever worked for at the Center (Tr. 114-117).

Bryan's friends, John Arzu and Audwin Fogle, testified on his behalf. Arzu worked at the Center from October 2002 to August 2003 and from December 2004 to March 2006 (Tr. 11). Fogle started at the Center in 2001 and transferred to Bryan's department in February 2002 (Tr. 45). Arzu described Gillette's management style as "abusive" (Tr. 26). Gillette "wrote (him) up" at least once and often called him "slow" (Tr. 29). Fogle claimed that if you did not fit in with Gillette's clique, "you were ostracized" (Tr. 46). Gillette talked down to Fogle and showed a "nasty" attitude (Tr. 49). Fogle complained to the human resources department about the working conditions, including rap music, cursing, and co-workers' extended breaks, but he did not mention any discrimination (Tr. 56, 59, 66). According to Fogle, it was uncomfortable to go to Gillette to ask a question because he might give you a "dirty look" or "blow you off" (Tr. 67).

Most of the workers in the department were young men. Occasionally, while "kidding around," workers referred to each other as "gay" or "faggot" (Arzu: Tr. 31-33; Fogle: Tr. 63). Arzu and Fogle offered conflicting testimony regarding Gillette's use of those terms. Arzu claimed that there were many times when Gillette and several others called Bryan "gay" or

MKSCC 00675

- 6 -

"faggot" (Tr. 14, 36). Although Fogle noted that Gillette generally used those words, there were only limited situations where he aimed them at Bryan (Tr. 50).

With minor variations, Arzu and Gillette recalled three specific incidents. Bryan once wore a pair of yellow shorts that Gillette derided as "pompom" or "hooker" shorts (Arzu: Tr. 14; Fogle: T. 50). Gillette also said that anyone over 30 years' old who lived with his mother was a "faggot" (Arzu: Tr. 14; Fogle: Tr. 60). According to Fogle, Bryan was the only one on the night shift who was over 30 and lived with his mother (Tr. 61). They also heard about an incident where Bryan grabbed someone's buttocks in jest, which prompted Gillette to say "I don't go for that kind of stuff" (Arzu: Tr. 15; Fogle: Tr. 52). Colleagues referred to that act as "squeezing the Charmin" (Arzu: Tr. 15, 20). When Arzu asked Bryan whether he was homosexual, Bryan replied that he was not (Tr. 36). Fogle did not think that Bryan was homosexual (Tr. 62).

Gillette, a night shift supervisor for three years, testified that his friendship with Bryan ended six years ago (Tr. 201-02). In Gillette's view, Bryan was "disrespectful," "combative," and had many problems with co-workers (Tr. 207-08, 212-13, 222-23). Gillette denied saying that "uncircumcised men turn into women" (Tr. 216). He also denied that he harassed Bryan, called him a "faggot," or implied that he was homosexual. Gillette explained, "if you say anything that he thinks is offensive he's - - you know, he's like ready - - you know, like start a fight" (Tr. 211, 214). Gillette conceded that, in the past, workers on the night shift occasionally referred to each other as "nigger," "faggot," and "gay" (218-19, 237). He insisted that such words were "never meant to be taken literally" (Tr. 218-19). It would surprise Gillette if Bryan was homosexual, because he frequently discussed having sex with women (Tr. 205-206). According to Gillette, Bryan "had an album filled with pictures of all the various porn stars that he had taken pictures with" and he would bring it work to "show it around to the guys" (Tr. 207).

Michael Rodriguez and Kenneth Williams testified that Bryan "isolated" himself from co-workers and had occasional outbursts (Rodriguez: Tr. 249; Williams: Tr. 257). They denied that anyone called Bryan a "faggot" or homosexual (Rodriguez: Tr. 250; Williams: Tr. 259). Williams conceded that he had a few altercations with Bryan. For example, Bryan once mistakenly thought that Williams said something disrespectful about Haile Selassie. Bryan ran across the room and confronted Williams (Tr. 258). Co-workers diffused the situation (Tr. 258).

John Meggs, manager of the central processing unit, recalled that Bryan complained to him that an ambulance from the Center parked in front of his house and turned on its siren (Tr.

-7-

267). Meggs insisted, however, that prior to filing a complaint with the Commission, Bryan never mentioned any discrimination by Gillette (Tr. 266). Acknowledging Bryan's technical proficiency, Meggs asserted that he promoted Rodriguez because he worked well with people, an important requirement for a more responsible position. In contrast, Bryan was "not a people person" and he "kept away" from the staff (Tr. 267-268).

James Appollo, a registered nurse at the Center and a former manager, insisted that Bryan never mentioned any discrimination (Tr. 243). Bryan complained to Appollo about the Center, but he never mentioned that Gillette called him homosexual (Tr. 243). Appollo also denied that he ever had a conversation with Bryan concerning Gillette's views on circumcision (Tr. 243).

Sheila Donoghue, a senior employee relations specialist, has worked at the Center for 18 years (Tr. 284). She testified that all employees are advised on the procedures for filing a discrimination complaint (Tr. 285). Although she received several complaints from Bryan about various co-workers, he never reported that he had been subjected to any discrimination because of his perceived or actual sexual orientation (Tr. 288).

Bryan's complaint alleged that he was discriminated against on the basis of his perceived sexual orientation; denied promotional opportunities; subjected to a hostile work environment; and retaliated against for reporting the discriminatory treatment in violation of the New York City Human Rights Law. Section 8-107(1)(a) of the New York City Administrative Code prohibits employers and employees from discriminating against a person because of that person's "actual or perceived...sexual orientation." Section 8-107(7) of the Code prohibits an employer from retaliating against an employee for "opposing any practice forbidden under this chapter."

To prove denial of a promotion was due to discrimination, a complainant needs to show: (1) membership in a protected group; 2) qualification for the position sought; 3) denial of the promotion; and 4) the circumstances of that denial give rise to an inference of discrimination. *See Brennan v. Metropolitan Opera Assn., Inc.*, 284 A.D.2d 66, 70, 729 N.Y.S.2d 77, 82 (1st Dep't 2001), *citing McDonnell Douglas Corp v. Green*, 411 U.S. 792, 802, 93 S. Ct. 1817, 1824 (1973). Once the complainant establishes a prima facie case, the burden shifts to the employer to show that there were legitimate nondiscriminatory reasons for the adverse employment action. The burden then returns to the complainant to show that the proffered explanation was pretextual. *McDonnell Douglas*, 411 U.S. at 804, 93 S.Ct. at 1825.

MKSCC 00677

- 8 -

Here, petitioner failed to prove the first element of its prima facie case. There was no reliable evidence that Bryan was a member of a protected class. Although there were references to remarks made by other co-workers, no witness credibly testified that Bryan was perceived to be homosexual. By all accounts, he openly boasted of his heterosexual exploits. Indeed, the discussion about circumcision began when Bryan mentioned that his girlfriend had recommended the procedure. There was no perception that Bryan was homosexual.

Petitioner also failed to prove the fourth element of its prima facie case. Bryan alleged that similarly-situated employees, not perceived to be homosexuals, were treated more favorably (ALJ Ex. 1, ¶ 7). Yet there was scant evidence regarding the perceived sexual orientation of Bryan's co-workers. There was, for example, no reliable evidence concerning Rodriguez's sexual orientation. Absent such evidence, it cannot be assumed that it was a factor in the promotion decision. *See Brennan v. Metropolitan Opera Assn., Inc.*, 284 A.D.2d at 70, 799 N.Y.S.2d at 82 (rejecting a heterosexual's claim that she was discriminated against because of her sexual orientation, where there was no evidence that homosexuals had been treated more favorably); *Cassidy v. Dep't of Correction*, OATH Index No. 646/98 (Oct. 23, 1997).

Even if Bryan had presented a prima facie case, respondents countered with overwhelming and unrefuted evidence that his inability to obtain a promotion had nothing to do with his perceived sexual orientation. Respondents consistently and credibly maintained that Bryan's failure to advance was due to his lack of necessary interpersonal skills. Several witnesses convincingly testified that Bryan did not work well with others. By his own admission, he had complained to Center management about every one of his supervisors during the course of his lengthy career. He also expressed disdain for many of his co-workers.

Indeed, respondent displayed his lack of "people skills" during his testimony. On direct and cross-examination, he frequently interrupted questions to offer combative and rambling responses (Tr. 121-24, 137-39). He also reiterated his remarkable and illogical claim that he had been stalked by ambulances from another hospital. Based upon this evidence, the Center's unwillingness to give him additional responsibility was entirely understandable.

As for Bryan's claim of a hostile work environment, he needed to prove that the workplace was permeated with harassment so severe or pervasive that it altered the conditions of his employment. *See Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d 295, 786 N.Y.S.2d 382 (2004) (personal animosity in the workplace is not the same as discrimination). The severity of

MKSCC 00678

- 9 -

harassment is evaluated from the view of a reasonable person in the complainant's position. *Oncale v. Sundowner Offshore Services, Inc.*, 523 U.S. 75, 118 S. Ct. 998 (1998). Relevant factors include the frequency of the discriminatory conduct, its severity, whether it was physically threatening or humiliating, and whether it unreasonably interfered with performance of work. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 114 S.Ct. 367 (1993).

Although I believe that Gillette made vulgar comments over the years, I did not credit the testimony of Bryan and his friends that those remarks were pervasive. Bryan, Arzu, and Fogle, shared an obvious bias against Gillette, his protégés, and his management style. If Gillette had uttered a fraction of the crude slurs attributed to him, petitioner's witnesses would have promptly reported those comments to management. Yet there was no credible evidence that they did so.

On this issue, former manager Appollo was pivotal. Because he no longer worked in the department and was not a respondent, he lacked a material interest in the outcome. He clearly and unequivocally testified that Bryan never complained about discrimination or remarks made by Gillette regarding sexual orientation. Moreover, he refuted Bryan's assertion that they had discussed Gillette's views on circumcision. Although Meggs and Donoghue were interested witnesses, they corroborated Appollo's testimony and credibly insisted that Bryan had never complained about discrimination. In contrast, Bryan's testimony, that he had made repeated complaints, was unsupported and unpersuasive.

None of the parties should be proud of the language used at this workplace. The lack of professionalism was particularly inappropriate in light of the Center's important work. But petitioner did not prove that the comments were so severe or pervasive that they violated the City's Human Rights Law. And there was no credible evidence that Gillette's comments interfered in any way with Bryan's job performance. *Forrest v. Jewish Guild for the Blind*, 3 N.Y.3d at 311, 786 N.Y.S.2d at 395. The hostile work environment claim should be dismissed.

For similar reasons, the retaliation claim must fail. As noted, I do not believe that Bryan complained to Gillette's manager or the human resources department that he had been subjected to discrimination. This evidentiary gap is especially telling in light of Bryan's history. He showed no reluctance to complain about supervisors or co-workers. Indeed, he has filed multiple police reports against colleagues, including one against a co-worker for making a bigoted remark about Jamaicans. If Bryan had been discriminated against due to his perceived sexual orientation, he would have promptly protested and documented his actions. But he failed to do

- 10 -

so. Because there were no complaints, there was no retaliation. *See Torge v. New York Society for the Deaf,* 270 A.D.2d 153, 706 N.Y.S.2d 622 (1st Dep't 2000).

## FINDINGS AND CONCLUSIONS

1. The unexecuted settlement agreement was not admissible evidence.

2. Respondents did not discriminate against complainant based on his perceived sexual orientation by failing to promote him.

3. The inappropriate language used and the conduct of respondents were not sufficiently severe or pervasive to subject complainant to a hostile working environment.

4. Petitioner Bryan never complained to the Center's managers or human resources department that he had been discriminated against due to his perceived sexual orientation; hence, there was no retaliation.

## RECOMMENDATION

I recommend dismissal of the complaint.

Kevin F. Casey
Administrative Law Judge

July 25, 2006

SUBMITTED TO:

**PATRICIA GATLING**
*Commissioner*

APPEARANCES:

**MARK WILSON, ESQ.**
*Attorney for Petitioner Commission on Human Rights*

**SAMUEL LANDAU, ESQ.**
*Attorney for Complainant*

**McDERMOTT, WILL & EMERY**
*Attorneys for Respondents*
BY: **JOEL E. COHEN, ESQ.**

MKSCC  00680