# EXHIBIT E

Edmund Bryan
April 21, 2008

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------------x
EDMUND BRYAN,
      Plaintiff,
   -against-   No. 07 Civ. 7300 (SHS)
                    ECF Case
MEMORIAL SLOAN-KETTERING CANCER
CENTER,
      Defendant.
------------------------------------x

        April 21, 2008
        10:08 A.M.

    Deposition of Plaintiff, by

EDMUND BRYAN, taken by Defendant, pursuant to

Notice, at the offices of McDermott, Will &

Emery, LLP, 340 Madison Avenue, New York, New

York 10173, before Charisse Romeo, a Shorthand

Reporter and Notary Public within and for the

State of New York.

Page 2

APPEARANCES:

   THE SCOTT FIRM
      Attorneys for Plaintiff
      55 Washington Street, Suite 705
      Brooklyn, New York 11201
   BY: A. BARAKA SCOTT, ESQ.

   McDERMOTT, WILL & EMERY, LLP
      Attorneys for Defendant
      340 Madison Avenue
      New York, New York 10173
   BY: JOEL E. COHEN, ESQ.
      KATHERINE D. KALE, ESQ.

ALSO PRESENT:

   PAMELA DUDLEY
   Memorial Sloan-Kettering Center
   Human Resources Representative

Page 3

      IT IS HEREBY STIPULATED AND AGREED by
and between the attorneys for the respective
parties herein that the sealing, filing and
certification of the within deposition be waived;
that such deposition may be signed and sworn to
before any officer authorized to administer an
oath, with the same force and effect as if signed
and sworn to before a judge of this court.
      IT IS FURTHER STIPULATED AND AGREED
that all objections, except as to the form, are
reserved to the time of the trial.

Page 4

            E. Bryan
    EDMUND  BRYAN,
      having been first duly sworn by the
      Notary Public (Charisse Romeo), was
      examined and testified as follows:
EXAMINATION BY MR. COHEN:
    Q.  Would you state your name for the
record?
    A.  Edmund Bryan.
    Q.  What is your address?
    A.  41-25 Kissena Boulevard,
Apartment 5N, Flushing, New York 11355.
    Q.  Mr. Bryan, I'm Joel Cohen.
    A.  Hello.
    Q.  I represent Memorial
Sloan-Kettering. I'm going to ask you
questions about your lawsuit. If you don't
understand something I'm asking, please tell
me and I'll try to make it more understandable
for you.
    A.  No problem.
    Q.  Okay. I would ask that you wait
until I finish with my question before you
start answering, so that we are not speaking
over each other and the reporter can get

1 (Pages 1 to 4)

Edmund Bryan
April 21, 2008

Page 5

1      E. Bryan
2  everything clearly. And I will try my best to
3  not speak over you, okay, so that we make life
4  easy for the reporter.
5         The other thing I would ask you
6  is, please listen to my question and answer
7  the question that I ask you. Okay.
8      A.   Okay.
9      Q.   This is not just an opportunity
10 for you to say whatever you want, it is to
11 answer the questions that I ask. So if the
12 answer relates to the question I ask, that's
13 terrific.
14     A.   Okay.
15     Q.   I ask that you concentrate on
16 that so we can get finished as quickly as
17 possible.
18     A.   Okay.
19     Q.   Have you ever gone through this
20 process before, giving a deposition?
21     A.   No, sir.
22     Q.   Okay. Other than the prior
23 hearing before the New York City Commission on
24 Human Rights, have you ever been involved in
25 another legal proceeding?

Page 6

1      E. Bryan
2      A.   In this type of --
3      Q.   In any type of matter.
4      A.   I have had a garnishment placed
5  on my wages by a credit card company.
6      Q.   Other than that, is that the only
7  other legal proceeding other than this one and
8  the proceeding you brought before the New York
9  City Commission on Human Rights?
10     A.   Yes.
11     Q.   I'm going to ask you a bunch of
12 questions concerning your employment with
13 Memorial Sloan-Kettering and when I ask the
14 questions, I'm going to be asking you to focus
15 on the period after June 5, 2006.
16     A.   Okay.
17     Q.   Okay. June 5, 2006 was the
18 beginning of your hearing before the city
19 commission?
20     A.   Yes.
21     Q.   Unless I specifically ask you to
22 go back before June 5, 2006 --
23     A.   Yes, sir.
24     Q.   -- other than that, assume I am
25 always asking after June 5, 2006, all right?

Page 7

1      E. Bryan
2      A.   Yes, sir.
3      Q.   Can you tell me how many times
4  after June 5, 2006, how many times you applied
5  for a promotion, after June 5, 2006 until
6  today?
7      A.   I would say I applied -- I
8  attempted to apply for lead technician
9  position.
10     Q.   Okay.
11     A.   And I was told that Michael
12 Rodriguez was still officially the night shift
13 lead technician and he was standing in as the
14 evening shift supervisor until one was hired.
15     Q.   Okay. What I'm asking right now
16 is how many times. So that's one time?
17     A.   Two.
18     Q.   Two times?
19     A.   Two times, sir.
20     Q.   The first time you mentioned the
21 lead technician, when did you apply for that
22 position?
23     A.   I spoke to John Meggs in June of
24 2006 regarding the position and he said it was
25 not available because Michael was still

Page 8

1      E. Bryan
2  officially the night shift lead technician and
3  he was only on that shift, and so far until he
4  could find a -- you know, a permanent
5  supervisor, so it was not available.
6      Q.   Okay. Did anyone ever fill that
7  position?
8      A.   I found out some time afterwards
9  that Miquel Ruiz was hired for that position.
10     Q.   Did you formerly apply for that
11 position?
12     A.   I saw no posting of it, sir. It
13 was not mentioned and John Meggs had told me
14 that Michael Rodriguez was the night shift
15 lead technician.
16     Q.   Okay.
17     A.   I found out he was the evening
18 shift supervisor when he was on the stand at
19 the city commission.
20     Q.   And what was the other promotion
21 that you sought that you didn't receive?
22     A.   I applied in July of 2007 for the
23 instrument specialist position.
24     Q.   Yes.
25     A.   And three months had passed by,

2 (Pages 5 to 8)

Edmund Bryan
April 21, 2008

### Page 9

```
 1                E. Bryan
 2   John Meggs had seen me frequently and had said
 3   nothing to me. In October of 2007, I asked
 4   the status of the position and he said it had
 5   been closed out for some time and he had
 6   forgotten to tell me.
 7       Q.   Okay. Who got the job?
 8       A.   No, the position was closed out.
 9       Q.   The position was closed, so no
10   one got the position?
11       A.   Right. He just told me he forgot
12   to tell me.
13       Q.   Any other promotions that you
14   applied for and didn't receive from June 5,
15   2006 to today?
16       A.   No, sir.
17       Q.   Okay. Now, I'm specifically
18   asking you before June 5, 2006. Were there
19   promotions that you sought that you didn't
20   receive prior to June 5, 2006?
21       A.   I sought the -- well on September
22   of 2006 Kevin Waldron was promoted to
23   instrument specialist.
24       Q.   When was this?
25       A.   September of 2006, sir.
```

### Page 10

```
 1                E. Bryan
 2       Q.   But I'm asking about --
 3       A.   That position was not posted,
 4   sir.
 5       Q.   That position wasn't posted?
 6       A.   No, sir.
 7       Q.   And what was that job?
 8       A.   That was the instrument
 9   specialist position, sir.
10       Q.   Any other promotions that you
11   claim you should have gotten that you did not
12   receive?
13       A.   I attempted to apply for the lead
14   technician position that Michael Rodriguez had
15   gotten.
16       Q.   When was that?
17       A.   And that was in -- I don't recall
18   the exact year of that, sir.
19       Q.   Was it prior to --
20       A.   -- the city commission hearing?
21       Q.   Yes.
22       A.   Yes sir.
23       Q.   Did you testify at the city
24   commission about a number of positions that
25   you thought you should have received that you
```

### Page 11

```
 1                E. Bryan
 2   didn't receive?
 3       A.   I spoke about the instrument
 4   specialist position, I interviewed for the
 5   instrument specialist position. I believe
 6   that was in 2003, sir?
 7       Q.   Yes.
 8       A.   I did an interview with John
 9   Meggs in his office and I spoke to Sheila
10   Donoghue in person.
11       Q.   Yes.
12       A.   And she told me that I was being
13   considered and I was told that Michael
14   Rodriguez had received the position.
15       Q.   Now, did you testify also that
16   there was another position that was open that
17   you did not apply for? This is before June
18   5th of 2006.
19            You have to allow me to finish.
20   Before June 2006 that you didn't initially
21   apply for because you thought it was futile,
22   did you?
23       A.   Well, that was the position of
24   lead technician that Michael Rodriguez
25   received. I was told by John Meggs that I
```

### Page 12

```
 1                E. Bryan
 2   would have to do an interview with himself and
 3   Eileen, who was the director of the
 4   perioperative services above John Meggs at the
 5   time. I asked him when can we do it and he
 6   said he would set it up. I asked him
 7   practically every time I saw him and he said,
 8   you know, they were busy and they would set it
 9   up. They were busy and they would set it up.
10       Q.   Okay.
11       A.   And eventually I heard that
12   Michael Rodriguez had received the position,
13   sir.
14       Q.   Is it true, Mr. Bryan, for years
15   prior to June 5th of 2006, you had received
16   criticisms on your performance evaluation
17   about your poor communication skills?
18       A.   Prior to?
19       Q.   Prior to June 5th of 2006.
20       A.   Let's see, that began when John
21   Meggs became manager, sir. I had never
22   received low evaluations of that type.
23       Q.   When did John Meggs become
24   manager?
25       A.   I can't recall the exact year.
```

3 (Pages 9 to 12)

Edmund Bryan
April 21, 2008

Page 13

1        E. Bryan
2   It was either 2002 or 2003, sir.
3        Q.   Okay. Would it be fair to say
4   that from that time on, your performance
5   evaluations reflected that your supervisors
6   thought that you did not have good
7   communication skills?
8        A.   Well, I had already had my
9   previous attorney contact the hospital about
10  litigation and when John Meggs came on as
11  manager, the first evaluation he gave me was
12  negative practically, you know, it was
13  negative, sir.
14       Q.   Okay. But he gave you that
15  evaluation before your attorney contacted
16  anyone?
17       A.   No, my attorney Sam Landau had
18  made several contacts to Memorial
19  Sloan-Kettering and we were in the process of
20  filing the complaint with the commission, sir.
21       Q.   Did you receive also a complaint,
22  complaints in your performance evaluations or
23  criticisms, I should say, in your performance
24  evaluations for you not being a team player
25  and your inability to get along with

Page 14

1        E. Bryan
2   co-workers?
3        A.   I've witnessed that written on my
4   evaluation, sir, yes.
5        Q.   How long has that been on your
6   evaluations?
7        A.   Since John Meggs has become
8   manager, sir.
9        Q.   Okay.
10       A.   Since the filing of my complaint
11  with the City Commission on Human Rights, sir.
12       Q.   Just give me one second, please.
13       MR. COHEN: Mark this as
14  Defendant's Exhibit 1.
15       (Document entitled "Memorial
16       Sloan-Kettering Cancer Center
17       Performance Appraisal 2001" of
18       Edmund Bryan bearing production
19       Nos. MKSCC 00223 through MKSCC
20       00230 marked Defendant's Exhibit
21       1 for identification, as of this
22       date.)
23       Q.   Sir, I'm showing you what's been
24  marked as Defendant's Exhibit 1. Is that your
25  2001 evaluation?

Page 15

1        E. Bryan
2        A.   Yes, sir I believe this is the
3   evaluation given to me by John Meggs, his
4   first year there, sir.
5        Q.   That was 2000. It was an
6   evaluation for the year 2000 that was given to
7   you in 2001?
8        A.   By John Meggs, sir.
9        Q.   By John Meggs.
10       Did Mr. Meggs make comments about
11  your problems with communication and teamwork?
12       A.   I had explained to John Meggs
13  what the problems in the department were, sir,
14  and I had clearly explained to him, you know.
15       Q.   Mr. Bryan, I'm not arguing with
16  you. Did he make reference in your
17  performance evaluation with problems in
18  communication and teamwork?
19       MR. SCOTT: Objection. You can
20       answer.
21       Q.   If you could look at the last
22  page in particular, "Supervisor's comments."
23  Do you remember seeing those comments, Mr.
24  Bryan? I'm just asking whether you recall
25  seeing those comments. It is just a yes or

Page 16

1        E. Bryan
2   no.
3        A.   From 2001 I didn't have a copy of
4   it or, you know, until we got -- until my
5   attorney had showed me copies that you had
6   sent to his office.
7        Q.   Yes.
8        A.   But I can't say that I fairly
9   recall this event clearly, sir.
10       Q.   It says that staff refused to
11  sign, staff meaning the employee, you. Did
12  you refuse to sign your evaluation?
13       A.   Yes, sir.
14       Q.   In fact, you refused to sign
15  every one of your evaluations; isn't that
16  right?
17       A.   Since my attorney contacted
18  Sloan-Kettering, yes, yes, sir.
19       MR. COHEN: This will be 2.
20       (Document entitled "Memorial
21       Sloan-Kettering Cancer Center
22       Performance Appraisal" of Edmund
23       Bryan dated 2001 bearing
24       production Nos. MKSCC 00231
25       through MKSCC 00238 marked

4 (Pages 13 to 16)

Edmund Bryan
April 21, 2008

Page 17

1  E. Bryan
2  Defendant's Exhibit 2 for
3  identification, as of this date.)
4  Q.  All right, I'm now showing you,
5  Mr. Bryan, what's been marked as Defendant's
6  Exhibit 2. Is that your 2001 evaluation given
7  to you in 2002?
8  A.  In 2002, sir.
9  Q.  Yes, it was your 2001 evaluation
10 that was given to you in 2002, correct?
11 A.  But isn't this one also labeled
12 2001, sir?
13 Q.  No, that covers the period of
14 2000, it was given to you in 2001.
15    MR. SCOTT: This is not a
16    speaking objection, just for
17    clarification, referring back to
18    Defendant's Exhibit 1.
19    MR. COHEN: Yes.
20    MR. SCOTT: It appears that the
21    date signed on the last page, Bates
22    MKSCC 00230, is November 6th of 2001
23    which is the end of 2001.
24    MR. COHEN: Okay, that's fine.
25 Q.  I said it was for a period

Page 18

1  E. Bryan
2  covering 2000 that was given to you in 2001;
3  is that correct? That was for the first one.
4  The second one was for 2001 that was given to
5  you in 2002?
6  A.  Sir, this one the end of 2001 and
7  this is, you are saying -- this is the end of
8  2000, you are saying, right, sir?
9  Q.  Does it say what period of time
10 it covers, Mr. Bryan? You know what, I'm not
11 going to argue with you.
12    Did you receive Defendant's
13 Exhibit 2?
14 A.  Yes, sir, I received this
15 evaluation, sir.
16 Q.  Did it have criticisms of you
17 about your communication skills and your
18 failure to work as a team with other people in
19 your department?
20 A.  Yes, sir. I saw those comments,
21 sir.
22 Q.  And you, again, refused to sign
23 it; is that correct?
24 A.  Yes, sir.
25 Q.  All right. Next.

Page 19

1  E. Bryan
2  A.  Can I say something, sir?
3  Q.  I have no question pending.
4    MR. COHEN: This is Defendant's
5    Exhibit 3.
6    (Document entitled "H25
7    Performance Appraisal 2003" of
8    Edmund Bryan bearing production
9    Nos. MKSCC 00241 through MKSCC
10   00267 marked Defendant's Exhibit
11   3 for identification, as of this
12   date.)
13 Q.  All right, I'm showing you what's
14 been marked as Defendant's Exhibit 3. Is that
15 the next evaluation you received?
16 A.  Yes, sir, it looks familiar, sir.
17 Q.  It looks familiar.
18    If you look at the bottom
19 right-hand side MSKCC 00249, did it say that:
20 "Mr. Bryan can use a more approachable
21 demeanor"?
22 A.  I see that in writing, sir, yes.
23 Q.  Do you remember receiving this?
24 A.  I can vaguely recall this, sir.
25 Q.  And if you could look at the next

Page 20

1  E. Bryan
2  page, did it say that you have improved your
3  cooperation with other staff?
4  A.  That's what I'm reading here,
5  sir.
6  Q.  Was that after you filed your
7  complaint with the City Commission on Human
8  Rights?
9  A.  Yes, sir, this is -- this is
10 after my complaint was filed with the
11 commission, sir.
12 Q.  And if you could go, again, to I
13 guess it would be the next-to-last page, you
14 refused to sign?
15 A.  Yes, sir.
16 Q.  Okay. We'll go to the next one.
17    MR. COHEN: Mark this as Exhibit
18    4.
19    (Document entitled "H25
20    Performance Appraisal 2004" of
21    Edmund Bryan bearing production
22    Nos. MKSCC 00269 through MKSCC
23    00295 marked Defendant's Exhibit
24    4 for identification, as of this
25    date.)

Edmund Bryan
April 21, 2008

Page 21

1         E. Bryan
2    Q.  All right, I'm showing you
3  Defendant's Exhibit 4, is that the next
4  evaluation you received?
5    A.  It looks familiar, yes, sir.  It
6  looks familiar.
7    Q.  If you could look at page 00291.
8    A.  Okay.
9    Q.  Do you see where it says, bottom
10 line, you need to develop skills as a team
11 member, 291, sir, 00291?
12   A.  Yes, sir, I see that, sir.
13   Q.  If you can turn to page 00294.
14   A.  Yes, sir.
15   Q.  Again, you refused to sign?
16   A.  Yes, sir.
17   Q.  And your supervisor's comment
18 was:
19       "Mr. Bryan refused to sign and
20       had no interest in his evaluation."
21       Do you remember seeing that?
22   A.  Only Mr. Gillette can interpret
23 his own words, sir.
24   Q.  I didn't ask you to interpret his
25 words.  I asked if you remember seeing it.

Page 22

1         E. Bryan
2    A.  I vaguely recall it, sir, but I
3  also acknowledge that I did not sign it, sir.
4    Q.  Just so we are clear, it is not
5  that you did not sign it, you refused to sign
6  it?  You were asked to sign it and you refused
7  to sign it?
8    A.  Yes, sir.  Yes, sir.
9    Q.  All right.  Now let's go to the
10 next one, which is now marked as Defendant's
11 5.
12       (Document entitled "H25
13       Performance Appraisal 2005" of
14       Edmund Bryan bearing production
15       Nos. MKSCC 00305 through MKSCC
16       00331 marked Defendant's Exhibit
17       5 for identification, as of this
18       date.)
19   Q.  If you can look at page 00313.
20   A.  Yes.
21   Q.  Do you see it?
22   A.  Yes.
23   Q.  Do you see where it says:
24       "Mr. Bryan does not maintain an
25       approachable demeanor and sometimes

Page 23

1         E. Bryan
2       displays inflexability."
3       Do you remember seeing that?
4    A.  I vaguely recall this, sir.
5    Q.  Can you turn to page 00314 where
6  it says:
7       "Mr. Bryan does not show team
8       work, he needs to be more
9       productive."
10      Do you see that?
11   A.  I vaguely recall this as well,
12 sir.
13   Q.  And, again, you refused to sign
14 your evaluation, correct?
15   A.  Yes, sir, I did, yes, sir.
16      MR. COHEN:  Okay.  Next one.
17      (Document entitled "H25
18      Performance Appraisal - 2006" of
19      Edmund Bryan bearing production
20      Nos. MKSCC 00334 through MKSCC
21      00360 marked Defendant's Exhibit
22      6 for identification, as of this
23      date.)
24   Q.  By the way, the evaluations we've
25 marked 1 through 5, these were evaluations

Page 24

1         E. Bryan
2  that were done before your hearing before the
3  City Commission on Human Rights?
4    A.  Prior to June of 2006, sir?
5    Q.  Yes.
6    A.  Yes, sir.
7    Q.  Okay.  Now let's look at ones
8  afterwards, so look at the one you have now
9  which is Defendant's Exhibit 6.
10   A.  Okay, sir.
11   Q.  If you can look at page 00343.
12   A.  Yes, sir, I see that.
13   Q.  It says:
14      "Edmund is not a team worker, he
15      does not talk to other staff and
16      constantly changes dept. procedure."
17      Do you remember seeing that?
18   A.  I can vaguely recall this, sir.
19 Yes, I can vaguely recall this.
20   Q.  Okay.
21      MR. COHEN:  Let's have this
22      marked.
23      (Document entitled "Quarterly
24      Review 2007, March-July, MSKCC
25      Central Processing Department"

6 (Pages 21 to 24)

Edmund Bryan
April 21, 2008

Page 25

1   E. Bryan
2   bearing production Nos. MKSCC
3   00437 through MKSCC 00440 marked
4   Defendant's Exhibit 7 for
5   identification, as of this date.)
6   Q.  Do you recall receiving this
7   quarterly review in 2007?
8   A.  I can vaguely recall this, sir.
9   Mr. Gillette does this. Yes, I can vaguely
10  recall this.
11  Q.  Okay. Did it make reference to
12  your communications, problems with your
13  communications and teamwork.
14     MR. SCOTT: Objection.
15     You can answer.
16  Q.  If you look at page 00438, the
17  "Core Competencies," "Teamwork" and
18  "Communication." Do you recall seeing this?
19  A.  I vaguely recall it, sir. I can
20  vaguely recall this.
21  Q.  And you again refused to sign, if
22  you look at the last page 00440?
23  A.  Yes.
24  Q.  Okay.
25  A.  Yes.

Page 26

1   E. Bryan
2   Q.  Would you agree that going back
3   to 2000, at least consistently, you have been
4   criticized by your supervisors for lack of
5   teamwork and communication skills?
6   A.  By Mr. Gillette, sir.
7   Q.  By Mr. Gillette, I understand.
8   He is your supervisor?
9   A.  Yes, sir.
10  Q.  And that consistently since 2001,
11  which is I think the first one we showed you,
12  that you refused to sign that you even
13  received it; isn't that correct?
14  A.  Not in the sense of receiving it,
15  sir, but I just refused to sign the evaluation
16  and any document that reflects on it.
17  Q.  What do you mean by "any document
18  that reflects on it"?
19  A.  Well, when you say receiving it
20  in that context, if it means acknowledging it
21  as a fair, you know, appraisal of my
22  performance, then, you know.
23  Q.  Well if you look at it, all it
24  says is, it says: "Expectations for the next
25  appraisal period."

Page 27

1   E. Bryan
2   Let's just look at the one that's
3   as an example, the one that's listed as 2003
4   which is Exhibit 3. Look at page 00266. I
5   think it is fairly typical of the last page of
6   all the performance evaluations. Let's just
7   look at this performance evaluation.
8   A.  Yes, sir.
9   Q.  It says first on the top there is
10  a column, there is a spacing:
11     "Employee's comments on the
12     evaluation and the evaluation
13     discussion:"
14  So you would have the ability to
15  disagree and put your comments disagreeing
16  with the evaluation there; is that correct?
17  A.  Yes, sir.
18  Q.  And in fact if you look at the
19  bottom, it says:
20     "Expectations for the next
21     appraisal period were reviewed and
22     discussed. A copy of the performance
23     expectations and key behaviors was
24     distributed to employee."
25  Does it say anything about if you

Page 28

1   E. Bryan
2   agree or is it just an acknowledgment where
3   things were reviewed and discussed and given
4   to you?
5     MR. SCOTT: Objection.
6     You can answer.
7     THE WITNESS: What?
8     MR. SCOTT: I objected for the
9     record, but you can answer.
10  A.  Yes, this says expectations for
11  the appraisal period were reviewed and
12  discussed.
13  Q.  All signing meant was that you
14  were acknowledging things that were told to
15  you or given to you, it didn't say anything
16  that you greed with it, did it?
17     MR. SCOTT: Objection.
18  A.  I -- I believe that the
19  supervisor is deliberately using this process
20  to devalue me, sir.
21  Q.  Okay. But that's not the
22  question I asked. The question I asked --
23     MR. SCOTT: Objection.
24     (Cell phone interruption.)
25     THE WITNESS: Sorry. I'll shut

7 (Pages 25 to 28)