# EXHIBIT E – Part 2

Edmund Bryan
April 21, 2008

### Page 29

1  　　　　E. Bryan
2  it off. Sorry. I'm sorry, sir, I
3  apologize.
4  　　　MR. COHEN: It's all right.
5  　Q.　The question I'm asking is, isn't
6  it true that all you were being asked to do
7  was not agree with it, not think that the
8  supervisor was right; you were being asked to
9  acknowledge that you received it and you
10 received the expectations for the next
11 appraisal period? That's all you were being
12 asked to sign?
13 　A.　In -- in writing that's what it
14 says, sir.
15 　Q.　Okay. Now, let me ask you since
16 June of 2006 --
17 　A.　Yes, sir.
18 　Q.　-- has there been any change in
19 your relationship with your fellow employees?
20 　A.　Yes, sir.
21 　　　MR. SCOTT: Objection.
22 　Q.　Yes?
23 　A.　Yes, there has been.
24 　Q.　There has been?
25 　A.　Yes.

### Page 30

1  　　　　E. Bryan
2  　Q.　Tell me what the change has been?
3  　A.　As far as coming from me, sir.
4  　Q.　As opposed to coming from you or
5  coming from them, what change do you believe
6  has taken place since June of 2006?
7  　A.　I've contracted a service of Mr.
8  Scott and his firm and based on his advice and
9  legal counsel, I am allowing him to handle all
10 my legal procedures and he's just told me just
11 go into work and do your job and, you know,
12 whatever is needed from you, just do your job.
13 So I've been following my lawyer's advice and
14 doing my job, sir.
15 　Q.　All right. That is not the
16 question I asked you.
17 　　　MR. COHEN: Can we read back the
18 　　question.
19 　Q.　Again, if you can listen to the
20 question I asked, we can get done a lot
21 quicker.
22 　A.　Yes, sir.
23 　　　(Record read.)
24 　Q.　That's what I'm asking.
25 　A.　Yes, sir.

### Page 31

1  　　　　E. Bryan
2  　Q.　What has been the change in your
3  relationship with your fellow employees?
4  　A.　Well, as I was saying, sir, it
5  has, it has based on my -- it has improved.
6  　Q.　Your relationship with your
7  fellow employees has improved?
8  　A.　Yes, I would say it has improved,
9  sir.
10 　Q.　How has it improved?
11 　A.　Well, when I'm asked to train
12 people, sir, I am not -- you know, I don't
13 feel hesitant to offer my years of experience,
14 you know, and advice to them, you know, as --
15 I had been opposed to that in the past.
16 　Q.　You do recall that at the hearing
17 before the city commission, a number of your
18 fellow employees testified about how difficult
19 you are to get along with, do you recall that?
20 　　　I am not asking you whether you
21 agree with them, I am just asking: Do you
22 recall a number of employees testified about
23 how difficult you are to get along with?
24 　A.　I vaguely recall some employees
25 may have said that, sir.

### Page 32

1  　　　　E. Bryan
2  　Q.　Can you identify any of the
3  employees who testified in June of 2006 that
4  you were difficult to get along with who would
5  now testify that you are now easy to get along
6  with?
7  　　　MR. SCOTT: Objection.
8  　A.　I would say the only person still
9  on the night shift from that proceeding is
10 Rupert Gillette, sir. The others -- Michael
11 Rodriguez is not the evening shift supervisor,
12 Kenneth Williams now works the day shift in
13 the OR. Who else? Yeah, um, those, Rupert
14 Gillette, Michael Rodriguez, Kenneth Williams,
15 sir.
16 　Q.　Okay.
17 　A.　And Rupert Gillette is the night
18 shift supervisor, the others have left.
19 　Q.　Are you still supervised by Mr.
20 Gillette?
21 　A.　Yes, sir.
22 　Q.　Has your relationship with Mr.
23 Gillette improved?
24 　A.　Yes, sir.
25 　Q.　It has?

Page 37

1  E. Bryan
2  MR. SCOTT: And you can be a
3  little more specific with the phrasing
4  of your question.
5  MR. COHEN: Are you directing him
6  not to answer?
7  MR. SCOTT: Yes, I am. You can
8  call the judge.
9  MR. COHEN: I am not going to
10 call the judge. I'll show the
11 transcript to the judge. We will move
12 on.
13 Q. In terms of the jobs that you
14 applied for the time that a job was posted,
15 did it talk about good communication skills
16 being an essential element of?
17 A. It discussed having disciplinary
18 actions and being written up for any -- any
19 type of, you know, excessive absences or
20 anything like that. You cannot have been
21 given a verbal warning or anything of that
22 sort within a certain time frame and you
23 needed certain years of experience, sir.
24 Q. It didn't say anything about good
25 communication?

Page 38

1  E. Bryan
2  A. I don't recall that, sir. I
3  believe that would be discussed face to face
4  between John Meggs and I when I was speaking
5  to him and we discussed that, sir.
6  Q. Mr. Bryan, are you aware that Mr.
7  Meggs and Mr. Gillette testified at your
8  hearing before the City Commission on Human
9  Rights that the reason why you were not
10 promoted was because of your history of poor
11 communication, lack of teamwork, do you recall
12 that?
13 A. I don't recall --
14 Q. You don't recall that?
15 A. I'm not saying it is not true,
16 sir, I am just saying I don't remember their
17 exact testimony, sir. I don't remember their
18 exact testimony.
19 Q. Now, can you explain to me why
20 do you think you're not getting promotions
21 after June 5, 2006 were due to your perceived
22 sexual orientation?
23 A. Mr. Gillette continues to make
24 jokes about men who live at home with their
25 mothers, who are over 40, that have to be gay.

Page 39

1  E. Bryan
2  There is no way any man who is normal would
3  live at home with his mother.
4  Q. He continues to do that?
5  A. He continues to make gay jokes,
6  sir.
7  Q. And you testified about those gay
8  jokes he made at your hearing in June of 2006?
9  A. Yes, jokes concerning -- whenever
10 I walked into the room, he would make jokes
11 about squeezing the Charmin, referring to --
12 and I didn't know what that was at the time
13 and co-workers told me that when I am not in
14 the room, that he's talking about me. He says
15 that, you know, I'm gay and I squeeze men's
16 behinds.
17 Q. You already testified to that in
18 June of 2006.
19 A. Yes. Yes, sir.
20 Q. What other comments has he made
21 since June 2006 that are any different than
22 the comments he made before June of 2006?
23 A. You mean -- he still made -
24 derogatory comments about Jamaicans.
25 Q. I was asking about your perceived

Page 40

1  E. Bryan
2  sexual preference.
3  A. My perceived sexual preference,
4  sir?
5  Q. Yes.
6  A. From what I recall, the comment
7  about men who are over 40 who still live at
8  home with their mothers, they are gay.
9  Q. Didn't you testify that he said
10 that before June of 2006?
11 A. Yes, but he repeated that.
12 Q. He repeated it?
13 A. Yes, in 2007.
14 Q. And the reason you did not
15 receive a promotion after June of 2006 was
16 because you are perceived to be gay?
17 MR. SCOTT: Objection.
18 You can answer.
19 A. He has his own perception of me
20 and I can't speak for him, but he has a
21 negative perception of me and he openly mocks
22 me, sir.
23 Q. Okay. Whether he has a negative
24 perception, I am asking about your perceived
25 sexual preference, okay?

Edmund Bryan
April 21, 2008

## Page 41

```
 1            E. Bryan
 2      A.   That one about the men over 40
 3   who live at home with their mothers, that's
 4   the one I recall, sir.
 5      Q.   And he made that comment before
 6   June of 2006 as well?
 7      A.   Right and then again in 2007,
 8   sir.
 9      Q.   And again in 2007?
10      A.   Yes.
11      Q.   What else makes you believe that
12   you have not received promotions because of
13   your perceived sexual preference?
14      A.   Well, he still talks about people
15   who he believes are gay, sir, and I mean he
16   has -- you know, he isolates people in the
17   hospital, members of staff of the hospital and
18   he discusses them and he talks about them.
19      Q.   But none of them are applying for
20   promotions. I am asking about you.
21           MR. SCOTT: Objection.
22      Q.   I am asking about you. What
23   makes you think, other than what you testified
24   to already, that the reason you haven't
25   received a promotion is because you are
```

## Page 42

```
 1            E. Bryan
 2   perceived to be gay?
 3      A.   Well, he repeated that comment.
 4      Q.   I said other than what you
 5   testified to already. I'm asking, is there
 6   anything else besides that that makes you
 7   believe you are being denied a promotion
 8   because you are perceived to be gay?
 9      A.   Well, he's repeated his past
10   comments.
11      Q.   I just said other that that.
12   Other than that, is there anything else that
13   makes you believe that you are not getting a
14   promotion because you are perceived to be gay?
15      A.   Within the context of sexual
16   orientation, you are saying?
17      Q.   I don't know how much clearer I
18   can make it.
19           MR. SCOTT: Objection.
20      Q.   Other than what you've testified
21   to --
22      A.   Right.
23      Q.   -- what else, if anything, makes
24   you believe you have not received a promotion
25   because you are perceived to be gay?
```

## Page 43

```
 1            E. Bryan
 2      A.   Well, other than the fact that
 3   he's repeated those comments?
 4      Q.   Yes, other than that.
 5      A.   He still has an open bias towards
 6   gays, but he's made that comment in regard to
 7   me, sir, and that's that.
 8      Q.   Okay. What makes you believe
 9   that you have not received a promotion since
10   June of 2006 because of your national origin?
11      A.   He has made several derogatory
12   jokes along with Kevin O'Connor and a TRE
13   instrument repair technician, Miquel Ruiz,
14   Jamal Robinson and, you know, the reason
15   Jamaicans are so crazy is because of all the
16   spicy food we eat.
17           You should take January 2007,
18   they stood around and say, you know, we can
19   solve the Jamaican problem once and for all,
20   we should put all the Jamaicans on top of a
21   high mountain covered with snow and give them
22   one shovel and leave them there.
23      Q.   Who said that?
24      A.   Rupert Gillette and Kevin
25   O'Connor.
```

## Page 44

```
 1            E. Bryan
 2      Q.   Is Rupert Gillette an employee of
 3   Memorial Sloan-Kettering?
 4      A.   He's contracted to perform
 5   services for Memorial.
 6      Q.   Is he an employee of Memorial
 7   Sloan-Kettering?
 8           MR. SCOTT: Objection.
 9      A.   He is a subcontractor and he is
10   authorized to enter the premises and be there.
11      Q.   So am I. Am I an employee of
12   Memorial Sloan-Kettering, Mr. Bryan?
13           Is he an employee of Memorial
14   Sloan-Kettering?
15      A.   Does he have an ID that says
16   MSKCC? No.
17      Q.   Is he a manager at Memorial
18   Sloan-Kettering?
19      A.   No, he is not.
20      Q.   Other than that, what makes you
21   believe that the reason you haven't received a
22   promotion is because of your national origin?
23      A.   Well, I mean, he's displayed that
24   bias before and after the hearings, he
25   displayed it again, sir.
```

11 (Pages 41 to 44)

Page 45

        E. Bryan
1
2    Q.  So this is something that you
3  already testified to at the first hearing, at
4  the hearing before the city commission, that
5  he had a bias against Jamaicans?
6    A.  Yes, sir.
7    Q.  And do you believe that he has
8  the same bias that he had before the hearing
9  after the hearing?
10   A.  Yes.
11   Q.  Anything else you are perceiving
12 that Mr. Gillette has a bias against
13 Jamaicans?
14   A.  Only what I've said to you, sir.
15   Q.  Who makes the decisions about
16 promotions?
17   A.  I believe once you interview with
18 John Meggs --
19   Q.  Yes.
20   A.  -- he receives input directly
21 from Rupert.
22   Q.  Do you know for a fact who makes
23 the decision to promote at Memorial
24 Sloan-Kettering in your department?
25   A.  Um --

Page 46

        E. Bryan
1
2    Q.  Have you been privy to any
3  conversations or to the process by which the
4  head of the department decides who to promote?
5        MR. SCOTT:  Objection.
6    A.  No, I have not be privy.
7    Q.  What knowledge do you have as to
8  who makes the decision to promote?
9    A.  Well, Rupert Gillette is my
10 direct supervisor so his input, he's
11 written -- John Meggs wrote one evaluation on
12 me and since then, Rupert has written all
13 these other evaluations.  John Meggs only did
14 one evaluation his first year there.  All the
15 evaluations presented at this table were
16 written by Rupert Gillette.
17   Q.  I am going to ask you again.
18       MR. COHEN:  Can you read the
19   question back?
20       (Record read.)
21   A.  As I said, Rupert Gillette has
22 been writing my evaluations and he is my
23 direct supervisor.  So if he is writing my
24 evaluations, he has a tremendous input in that
25 decision, sir.

Page 47

        E. Bryan
1
2    Q.  That is a presumption you are
3  making, you do not know for a fact?
4    A.  Well --
5    Q.  Do you know it for a fact or are
6  you assuming that is the case?
7        MR. SCOTT:  Objection.  Let him
8    answer the question.
9    A.  I am merely saying that he has
10 input in the process, sir.
11   Q.  How do you know that he has input
12 in the process?
13   A.  Because he is my direct
14 supervisor and writes my evaluation.
15   Q.  And is that your basis for him
16 having input --
17   A.  Yes.
18   Q.  Anything else that leads you to
19 believe that he has input to promote --
20   A.  Him and John Meggs are very good
21 friends, sir.
22   Q.  They are very good friends.
23 Anything else that makes you believe that?
24   A.  Um --
25   Q.  Has John Meggs had dealings with

Page 48

        E. Bryan
1
2  you over the years?
3    A.  In what capacity, sir?
4    Q.  In your capacity of being an
5  employee in his department.
6    A.  I made several complaints to him
7  regarding the treatment that I received from
8  Rupert Gillette.
9    Q.  Has he had discussions with you
10 over the years?
11   A.  Regarding all aspects of things,
12 including me reporting problems and stuff like
13 that?
14   Q.  Yes.
15   A.  Yes.
16   Q.  And are you aware that Mr. Meggs
17 testified at the hearing in June of 2006 that
18 he finds you to be incredibly argumentative?
19   A.  I don't, I don't recall that
20 direct statement, sir.  I don't recall that.
21   Q.  You don't?
22   A.  No.
23   Q.  Do you recall Mr. Meggs
24 testifying that you have a history of not
25 getting along with supervisors and with

Edmund Bryan
April 21, 2008

Page 49

E. Bryan
co-workers?
A. I don't recall that exact statement, sir, no.
Q. Do you recall your own testimony that there has not been a single supervisor who you have worked with at Memorial Sloan-Kettering that you didn't complain about?
A. I don't recall that, sir.
Q. You don't recall that?
A. I don't recall that, sir.
Q. Which supervisor did you have at Memorial Sloan-Kettering that you got along with, that you didn't complain about?
A. I have a right to complain if somebody does something to me, sir.
Q. I didn't say you didn't. I am just asking, what supervisor did you ever work for that you didn't have any complaints about?
A. Well, if I feel that a supervisor treated me unfairly, sir, I reported that to human resource.
Q. I understand that, but I'll ask the question again. Can you name a supervisor

Page 50

E. Bryan
who you did not make complaints about?
A. No, sir, I believe at some point that some situation occurred that made it necessary for me to report an incident to human resources.
Q. About every single supervisor you've worked for?
A. Yes, sir.
Q. Okay.
Now, you are also claiming that there is a hostile work environment?
A. Yes, sir.
Q. And other than what you've testified to about the comments that you said Mr. Gillette made about your perceived sexual orientation, what other things have contributed to a hostile work environment based on your perceived sexual orientation?
A. Sexual orientation, sir?
Q. Yes.
A. Only the comments that I've reported to you, sir.
Q. Okay. By the way, are you gay?
A. No, I am not, sir.

Page 51

E. Bryan
Q. Did you testify at your hearing in June of 2006 that you are not gay?
A. I don't recall -- I don't remember that exact -- the whole exact procedure, sir. I don't remember all the comments that were made.
Q. You don't remember testifying that you are not gay?
A. Sir, I don't remember every question that was asked, sir.
Q. So your answer is no, you don't remember?
A. I don't recall, sir.
Q. Do you remember every single employee who testified at the hearing, including people who testified on your behalf, testifying that they didn't think you were gay, do you remember that?
A. I remember people testifying on my behalf and people testifying for the hospital, but --
Q. Can you identify one person who testified at your hearing that they thought you were gay?

Page 52

E. Bryan
A. I don't believe anyone said that, sir.
Q. No one said that. In fact, didn't everyone testify that no one thought you were gay?
A. Well, sir, it is not that they think I am gay, sir. It is that they treated me and demeaned me with conduct as if I were a homosexual, sir.
Q. But it doesn't mean they believed you were a homosexual.
A. They treated me that way.
Q. Not they treated you that you as if you were a homosexual, but that they believed you were a homosexual?
MR. SCOTT: Objection.
A. I can only say what I see coming from a person directed towards me, and that behavior was the bias that would be directed at someone who was gay, sir.
Q. Are these the same allegations that you raised in June of 2006 at your hearing?
A. They repeated themselves, sir.

13 (Pages 49 to 52)

Edmund Bryan
April 21, 2008

**Page 53**

1  E. Bryan
2  Q. I understand. Are they the same
3  allegations that you raised in your hearing of
4  June 2006?
5  A. In the same context, sir.
6  Q. Didn't the judge already find
7  that nobody believes you to be gay?
8  MR. SCOTT: Objection.
9  A. The idea is not what people think
10 I am, sir, but the way that I was treated,
11 sir.
12 Q. I see. Okay.
13 Other than the incident that
14 you've already related about, you know, being
15 Jamaican and the comments about Jamaicans,
16 what other things have contributed to your
17 hostile work environment based on national
18 origin?
19 A. I've been mocked by Jamal
20 Robinson.
21 Q. How have you been mocked by Jamal
22 Robinson?
23 A. He made the comment that
24 Jamaicans are crazy because we all eat spicy
25 food and Rupert jumped in and said yeah, yeah,

**Page 54**

1  E. Bryan
2  yeah, that's true. That carried on that
3  conversation.
4  Q. Any other conversations aside
5  from that conversation?
6  A. The one with Kevin O'Connor,
7  Miquel Ruiz, about Jamaicans ending the
8  Jamaican problem by putting us on a
9  snow-covered mountain.
10 Q. Anything else?
11 A. Within that frame sir, no.
12 Q. Okay. Are you the only Jamaican
13 who works in the department?
14 A. Within central processing?
15 Q. Yes.
16 A. On my shift or the department?
17 Q. The department.
18 A. No, sir, I am not.
19 Q. Are you the only Jamaican on your
20 shift?
21 A. Yes, sir.
22 Q. Is there an employee named Lennox
23 Ewrse, E-W-R-S-E?
24 A. I don't know his last name, but I
25 know Lennox.

**Page 55**

1  E. Bryan
2  Q. Is he Jamaican?
3  A. I believe he is, sir, yes.
4  Q. Do you know whether or not he's
5  made comments, he's exchanged jokes with other
6  people about his being Jamaican?
7  MR. SCOTT: Objection.
8  A. I've not be involved in
9  conversations with him and other people, sir.
10 Q. Does he work in your department?
11 A. He works for the building service
12 department, sir, and he maintains the
13 cleanliness of our work environment. He
14 cleans the department, sir.
15 Q. Okay. You also claim that you
16 are being retaliated against because you filed
17 the complaint with the city commission; is
18 that correct?
19 A. Yes, sir.
20 Q. What makes you believe you are
21 being retaliated against because you filed a
22 complaint with the city commission?
23 A. Well, following the filing of the
24 complaint, as I said all these, all these --
25 Q. Evaluations?

**Page 56**

1  E. Bryan
2  A. -- evaluations have been
3  negative.
4  Q. Weren't the evaluations also
5  negative before you filed with the city
6  commission?
7  A. No, I have not had a problem with
8  Jim Appollo, the previous manager.
9  Q. That is not the question I asked
10 you. Didn't you receive negative comments on
11 your evaluations before you filed with the
12 city commission?
13 A. My attorney, Sam Landau, spent
14 several months contacting human resources. So
15 there was a period of time he was contacting
16 the human resources to discuss my situation.
17 During that length of time, you know, he was
18 unable to contact anyone at human resources,
19 then we moved on to filing the complaint with
20 the city commission. During that time, one of
21 these evaluations may have occurred, sir.
22 Q. Well, the evaluations will speak
23 for themselves, but isn't it true before you
24 filed with the city commission, you had
25 negative evaluations?

14 (Pages 53 to 56)

Edmund Bryan
April 21, 2008

Page 57

E. Bryan
2  A. I can't say that I am sure of
3  that, sir.
4  Q. You are not sure of that. You
5  filed with the city commission in 2002; is
6  that correct?
7  A. I would have to refer back to the
8  documents, sir, but 2000-something, sir.
9  Q. And that would have been before
10 your hearing in June of 2006?
11 A. Yes, sir.
12 Q. And did you allege that you were
13 being retaliated against in June of 2006
14 because you filed a complaint with the city
15 commission?
16 A. Yes, sir.
17 Q. You did?
18 A. Yes, sir.
19 Q. Anything other than what you've
20 testified for believing you are being
21 retaliated against because you filed with the
22 city commission?
23 A. In what way, sir?
24 Q. In any way. How are you being
25 retaliated against because you filed with the

Page 58

E. Bryan
2  city commission?
3  A. I've been ridiculed by other
4  co-workers in the presence of Rupert Gillette.
5  Q. Did that take place before June
6  2006?
7  A. After 2006.
8  Q. You didn't testify that you were
9  ridiculed before.
10 A. Oh, you want information before
11 2006?
12 Q. I am asking.
13 A. Kenneth Williams made several
14 derogatory comments about Jamaicans and he
15 would often use a Jamaican accent to curse and
16 tell jokes of that nature.
17 Q. Yes, this was before June of
18 2006?
19 A. Right, sir.
20 Q. Right.
21 A. And on one occasion I had asked
22 him to stop, and he threatened to physically
23 punch me in the face. I stopped, I left him
24 alone. On my lunchtime, I went to the
25 security department and I reported the

Page 59

E. Bryan
2  incident. They called Rupert Gillette. He
3  spoke to the supervisor in the security
4  department and they sent me home.
5  Q. What has happened after 2006,
6  June of 2006, that makes you believe you are
7  being retaliated against?
8  A. Well, in June 2007 he openly --
9  Q. Who is "he"?
10 A. Rupert Gillette -- sorry.
11 Q. Okay.
12 A. -- held a staff meeting and he
13 opened up an instrument set I prepared and he
14 put it on the table and he told everyone that
15 it was sloppy and unprofessional.
16 Q. Yes.
17 A. And in August of 2007, an
18 employee asked me about the availability of an
19 instrument. I was not in the direct area
20 where instrument sets were being prepared, I
21 was in another area of the department, so
22 basically I directed him to where he could
23 find replacement instruments. He placed
24 something else in his instrument set, sir.
25 Q. Who did?

Page 60

E. Bryan
2  A. John Boafo.
3  Q. Is he a manager?
4  A. No, he is a co-worker and he
5  placed, I believe, a daVinci needle holder
6  that was not in the set into the set and the
7  operating room sent back his work, brought it
8  to the attention of Rupert Gillette. And
9  Rupert Gillette spoke to him and he gave
10 Rupert Gillette the impression that I told him
11 to put that instrument into his set and he
12 called me incompetent in front of the night
13 shift, sir.
14 Q. Who called you incompetent?
15 A. Rupert Gillette.
16 Q. Based on the information this
17 other person had given him?
18 A. Yes, sir.
19 Q. Any other examples that you were
20 being retaliated against because you filed
21 your city commission complaint?
22 A. Now before 2006, sir?
23 Q. After June 2006. You've already
24 testified to that.
25 A. Oh, the degrading comments

15 (Pages 57 to 60)