# EXHIBIT E – Part 3

Page 61

1          E. Bryan
2   against -- Omar Borel Soh Fotso, he called me.
3   I asked him to put an item in the elevator and
4   ship it up to the OR and he went back to
5   Rupert Gillette, the supervisor, and asked
6   him, you know, if he should do that.
7          So then I asked him, you know, we
8   are co-workers, you are shipping stuff in the
9   elevator, I am just asking you to ship this
10  one other item.  And he turned around and he
11  yelled at me and said, who asked you to ask me
12  anything, you are a big nothing.
13      Q.   Who asked you this?
14      A.   Omar Borel Soh Fotso.
15      Q.   Is he a manager?
16      A.   A co-worker.
17      Q.   How else have you been retaliated
18  against?
19      A.   In February of 2007.
20      Q.   Yes.
21      A.   On Friday morning Mr. Gillette
22  approached me and asked me to sign the
23  evaluation of the previous year.  I told him
24  no, I had already told you I was not going to
25  sign it, this was February of 2007.  I went to

Page 62

1          E. Bryan
2   lunch.
3          When I came back from lunch, he
4   called me and he said that it was Friday and
5   the next day would be Saturday and then
6   Sunday.  He told me I was working this
7   weekend.  So he tells me on Friday that I am
8   working Saturday and Sunday.  He said Kevin
9   Waldron, W-A-L-D-R-O-N, had stuff to do and he
10  was not going to work that weekend.  So he
11  told me Friday that I was working that
12  weekend.
13      Q.   Okay.
14      A.   And in May of 2007 he again asked
15  me to sign the 2006 evaluation.  Again, I told
16  him that I already discussed this with you
17  and, you know, I refuse to sign, I'm sorry.
18      Q.   Okay.
19      A.   He took a bottle of Wite-Out and
20  he started whiting out my name off the master
21  schedule and off of charts and stuff like that
22  and I reported it to John Meggs and John Meggs
23  spoke to him about it.
24          There was an incident where he
25  threw my hospital benefits package in the

Page 63

1          E. Bryan
2   garbage.  He knew it was mine because it says
3   my name on it in large print and he handed it
4   to me personally and it was in the area where
5   I was assigned to work.
6       Q.   And when did this happen?
7       A.   That exact frame of time?
8       Q.   Didn't you already testify in
9   your hearing of June of 2006 about that
10  incident?
11      A.   That's what I'm saying.  So that
12  exact frame of time on that one, I'm not quite
13  sure pinpointing that time frame, sir.  If it
14  was before or after the hearing, sir.  All
15  right.
16          So, in and around October of 2007
17  I was assigned to work Christmas, December
18  25th and he took his pen and crossed my name
19  out and he said, you are not going to work
20  Christmas.  I have been on the schedule all
21  year to work Christmas.  He said Shaon
22  Truesdale wants to work it and he is going to
23  work, and I reported that to John Meggs also
24  and John Meggs told him he shouldn't have done
25  that and he changed it back.

Page 64

1          E. Bryan
2       Q.   Okay.
3       A.   He also went back again and
4   whited me out again, and I reported that again
5   to John Meggs that he was using Wite-Out to
6   white my name out off of the master schedule.
7       Q.   Anything else that you can state
8   you were being retaliated against because of
9   your complaint to the city commission?
10      A.   This is after June 2006?
11      Q.   Yes.
12      A.   Using Wite-Out, calling me
13  incompetent, the comments about Jamaicans on
14  mountain tops.
15      Q.   I'm asking for anything else, not
16  to repeat anything you've already testified
17  to.
18      A.   I mean I have not -- I have not
19  seen him take any action whatsoever in telling
20  other co-workers to respect me, sir.  It is as
21  if that if you insult me openly, it is okay,
22  you know.
23      Q.   Which co-workers insult you?
24      A.   Omar Borel Soh Fotso and Jamal
25  Robinson and -- let's see.  Yeah, I mean Kevin

Edmund Bryan
April 21, 2008

Page 65

1           E. Bryan
2   Waldrond joins in on the comments about the
3   Jamaicans when they are talking and making
4   jokes and they all sit around and laugh.
5       Q.  Any other retaliation from filing
6   with the city commission?
7       A.  After June 2006 I would have to
8   refer back to notes, sir.
9       Q.  You have notes?
10      A.  What I mean is, I would have to
11  look at what was sent to you and what -- the
12  discovery papers, I would have to look at
13  those. But what I'm telling you, what I know
14  for a fact.
15      Q.  Why don't you tell me anything
16  else that you remember.
17      A.  At this moment --
18      Q.  That's it?
19      A.  -- that's mostly it.
20      Q.  All the things you've described
21  are similarly described that you testified in
22  June of 2006.
23      A.  Yes, it is repetitive behavior by
24  Gillette.
25      Q.  And you had problems with

Page 66

1           E. Bryan
2   co-workers, I am not saying you were wrong but
3   you had problems with co-workers before June
4   2006?
5       A.  Yes. But you should know, I
6   don't confront people, I just report
7   incidents.
8       Q.  I'm not saying you did anything
9   wrong, but you had problems with co-workers
10  before and after June 2006; isn't that right?
11          MR. SCOTT: Objection.
12          You can answer.
13          THE WITNESS: Answer?
14          MR. SCOTT: Yes.
15      A.  Some are problems, sir, and some
16  are just discrepancies of, you know, they are
17  just being rude. Some are worthy of being
18  reported to you right here.
19      Q.  Okay.
20      A.  Some are just incidents of
21  rudeness.
22      Q.  I understand, but it's basically
23  been the same prior to June 2006 and after
24  June of 2006?
25      A.  Yes, Rupert Gillette has

Page 67

1           E. Bryan
2   maintained, I believe, an environment of
3   disrespect towards me, sir.
4       Q.  And he has maintained that
5   environment before June of 2006 and after June
6   2006?
7       A.  Yes, I believe he has, sir.
8       Q.  Okay.
9           Now in terms of complaints that
10  you've made to human resources, to employee
11  relations at Memorial Sloan-Kettering since
12  June of 2006, what complaints have you made?
13      A.  I spoke to Sheila Donaghue after
14  conferring with my attorney at that time, Mr.
15  Landau, and he told me to continue the process
16  of reporting. So I went and spoke to Sheila
17  Donaghue about the incident regarding men over
18  40 who live at home with their mothers are gay
19  and I also reported the incident where you
20  should dump Jamaicans on top of a mountain and
21  give them one shovel and leave them there. I
22  reported that to her.
23      Q.  Okay. Do you know if she
24  investigated it?
25      A.  I saw her in the office speaking

Page 68

1           E. Bryan
2   to Rupert Gillette and John Meggs and I said
3   hello to her and she said hi to me and I
4   believe she was there speaking on my behalf,
5   sir.
6       Q.  Do you know whether anything came
7   of your complaints; do you know whether anyone
8   in employee relations spoke to Mr. Meggs or
9   Mr. Gillette about the incident you talked
10  about?
11      A.  I have not -- I have not received
12  any confirmation of any action taken on my
13  behalf, sir.
14      Q.  Whether you received
15  confirmation, do you know whether anyone was
16  told not to engage in comments like that?
17          MR. SCOTT: Objection.
18      Q.  Do you know?
19      A.  No, sir, what I do know is --
20      Q.  I didn't ask you what you do
21  know. I just asked you whether or not anyone
22  was told not to make comments like that.
23          MR. SCOTT: Objection.
24      A.  There was another in service
25  about harassment in the workplace and that was

17 (Pages 65 to 68)

Page 69

1          E. Bryan
2  done by Mr. Melvin. I forgot his last name,
3  I'm not trying to be rude.
4      Q.  You mean Peter Sanders?
5      A.  Melvin, the director of the
6  operating room.
7      Q.  Was there another in service done
8  by Peter Sanders?
9      A.  I don't recall that. I remember
10 yours that you showed up and you did and then
11 the other one was done by Melvin, an attorney
12 who says he is responsible for internal
13 affairs within Memorial and the new person who
14 represents my department from human resources.
15 That is that Sheila Donaghue was not
16 representing my department, that she was
17 representing my department and they discussed
18 sexual harassment and all types of harassment
19 in the workplace.
20     Q.  And do you know whether or not
21 Mr. Gillette was instructed to make sure that
22 comments like the ones you accused him of
23 should no longer take place in the workplace?
24     A.  I have no knowledge of that, sir.
25     Q.  Now --

Page 70

1          E. Bryan
2      MR. SCOTT: Excuse me, now I
3  think might be a good time for a break.
4      MR. COHEN: Sure.
5      (Recess taken.)
6      MR. COHEN: Back on the record.
7      Q.  Does Kevin Waldrond also live
8  with his mother?
9      A.  I don't have -- I don't have any
10 knowledge of that, sir.
11     Q.  Okay. Do employees kid Kevin
12 Waldrond about living with his mother?
13     A.  I've never heard anyone do that,
14 sir.
15     Q.  Okay.
16     A.  They discuss movies and stuff,
17 things like that.
18     Q.  Did you ever threaten Frank
19 Perez?
20     A.  No, sir.
21     Q.  Did you ever have a conversation
22 with him about his using a Jamaican accent
23 when talking to Lennox, the person you
24 identified earlier?
25     A.  No, not with Lennox with me. I

Page 71

1          E. Bryan
2  don't interfere with other people's
3  conversations.
4      Q.  You don't?
5      A.  He was making jokes with a
6  Jamaican accent and he asked me, Edmund, am I
7  saying it right? And I responded, don't do
8  that to me, if you mock my accent, I'll report
9  you. He told Rupert and a half-hour later I
10 was in the office that I was being told that
11 he was going to document it and send it to
12 human resources and he said he was going to
13 document that I threatened him. And I said, I
14 did not do that and he said, I'm sending it to
15 human resources anyway.
16     Q.  Were you disciplined for that?
17     A.  Rupert was waiting on the
18 response from --
19     Q.  No. I was just asking --
20     MR. SCOTT: Objection. Allow the
21 witness to answer the question.
22     Q.  Please listen to the question.
23 Answer the question I asked you.
24     Were you disciplined for that?
25     A.  Mr. Gillette was waiting on an

Page 72

1          E. Bryan
2  answer from human resources to do that, sir.
3      Q.  Okay. Have you been disciplined
4  as of now for it?
5      A.  For saying --
6      Q.  Have you been disciplined as of
7  this moment for that incident?
8      A.  If he's written me up, I have not
9  seen it, sir.
10     Q.  Okay.
11     Now, in your interrogatory
12 responses you indicate that the following
13 people are witnesses and I want to ask you
14 about them: Michael Harvey. Who is Michael
15 Harvey?
16     A.  He is a co-worker from the night
17 shift. He is no longer employed by Memorial
18 Sloan-Kettering.
19     Q.  What would he testify to?
20     A.  I was present in several
21 occasions when Rupert said that all
22 Rastafarians, all Jamaican Rastafarians are
23 lice heads.
24     Q.  When did Mr. Harvey stop working
25 at Memorial Sloan-Kettering?

Page 93

1          E. Bryan
2   unapproachable because I am teaching you, I am
3   working with you for eight hours showing you
4   procedures and, you know, what needs to be
5   done and I am extremely respectful to people
6   because we work together.
7        Q.   These are things that happened
8   before 2006; isn't that right?
9        A.   And after, during the EEOC, the
10  time of the EEOC, sir.
11       Q.   How have you been treated
12  differently since you filed your EEOC charge?
13  As I understand what you are saying, you
14  basically have been mistreated for a long
15  period of time?
16       A.   Yes, sir.
17       Q.   How has it changed since you
18  filed with the EEOC?
19       A.   Mr. Gillette has somewhat down --
20  down based his aggression towards me and he
21  speaks to me in a more pleasant manner.
22       Q.   Okay.
23       A.   And once I had received the right
24  to sue letter, his demeanor towards me stopped
25  from being -- from aggressive to the way you

Page 94

1          E. Bryan
2   are speaking to me now, very pleasantly,
3   openly. You are asking me something and I
4   respond to him the same way, sir, you know.
5        Q.   How else have you been retaliated
6   against; what else makes you believe you're
7   being retaliated against because you filed the
8   EEOC charge?
9        A.   Well, as I said, I applied for a
10  position with John Meggs.
11       Q.   Yes.
12       A.   And the position was closed
13  shortly after I applied for it and for three
14  months, he said nothing to me and he saw me
15  all the time. So I applied in July and
16  then -- July of 2007 and in October, I called
17  him like three months later and he said oh, I
18  forgot to tell you they closed that position
19  down. It doesn't exist.
20       Q.   Didn't you have similar denials
21  of promotion or not being told about
22  promotions prior to June of 2006?
23       A.   Yes. Yes, sir. Yes, sir.
24       Q.   All right. Did you see a
25  therapist, Dr. Julia Mayo?

Page 95

1          E. Bryan
2        A.   Yes, and I am currently seeing
3   her, still seeing her.
4        Q.   Did Mr. Scott refer you to Dr.
5   Mayo?
6        A.   I asked him if he knew of a
7   therapist that could help me with my
8   depression and he said, yes, he knew one, sir.
9        Q.   How long have you been depressed?
10       A.   I've -- I've had my self-esteem,
11  you know, pretty much stepped on and, you
12  know.
13       Q.   How long have you been depressed?
14       A.   For some time, sir.
15       Q.   How long?
16       A.   Sir, I can't put a frame of time
17  on it.
18       Q.   Did you testify at your hearing
19  in June of 2006 that you were depressed?
20       A.   Yes, sir.
21       Q.   And did you testify that you've
22  been depressed for a number of years?
23       A.   I don't remember. I don't
24  remember saying exactly that, sir, but I do
25  remember saying that my life got displaced to

Page 96

1          E. Bryan
2   some degree where activities that I was
3   involved in -- I took piano lessons for ten
4   years, I stopped taking them, I stopped going
5   to the gym.
6        Q.   Didn't you testify about all of
7   this at your hearing in June of 2006?
8        A.   Yes, sir.
9        Q.   Did you call your stepbrother to
10  tell him how depressed you were?
11       A.   No, he is not my stepbrother, he
12  is my brother.
13       Q.   Did you call your brother to tell
14  him how depressed you were in June of 2006?
15       A.   Yes, he had said I had become
16  distant and I was crying all the time. I
17  don't know if he said this on the stand, but I
18  know that, you know, he's witnessed, you know,
19  me in a state of unhappiness, sir.
20       Q.   Did you go to see a Dr. Murphy?
21       A.   Yes, sir. Dr. Mayo does not have
22  the capacity to provide me with prescription
23  medication, sir.
24       Q.   Yes.
25       A.   So it is necessary to also

Page 97

1  E. Bryan
2  consult with Dr. Murphy and basically I've
3  related, basically, the same information to
4  him that I have related to Dr. Mayo and he
5  confers with her and they both move forward in
6  prescribing what medication I should, you
7  know, take, sir.
8      Q.  Are you on medication?
9      A.  Yes.
10     Q.  What medications are you taking?
11     A.  I am taking Clonazepam, I believe
12 it is called.
13     Q.  And what is that for?
14     A.  It is an antidepressant. It
15 helps me to -- you know, I wasn't sleeping and
16 it helps me to relax and sleep, sir.
17     Q.  Okay.
18     A.  I take it at home. I don't take
19 it when I am at work.
20     Q.  Any other medications Dr. Murphy
21 prescribed for you?
22     A.  Before that, the first one I was
23 prescribed was Loxapine.
24     Q.  And what happen --
25     A.  And after that Gabapentin that

Page 98

1  E. Bryan
2  was prescribed to me, and then I told Dr.
3  Murphy that the insomnia had returned because
4  I believe the Loxapine was too strong. And
5  the Gabapentin, while it did make me feel more
6  relaxed, it didn't help me to get sleep and I
7  would feel all right, but not sleep.
8      And then he -- you know, once I
9  was through with the Gabapentin, sir, he moved
10 me to the Clonazepam. It does the same thing
11 as the Gabapentin does, but it also allows me
12 to relax and fall asleep, sir.
13     Q.  Did you tell Dr. Murphy that you
14 believe people who bump you on the street or
15 the subway have been sent by Memorial
16 Sloan-Kettering?
17     A.  No, I believe I told him that I
18 believe I am being harassed, you know, at
19 work. I told him I believe I am being
20 harassed at work.
21     Q.  You didn't tell him that you
22 believe that people that bump into you --
23     A.  I told him about the incident of
24 ambulances at my home.
25     Q.  What incidents were those?

Page 99

1  E. Bryan
2      A.  I would leave my home and walk
3  down the street and there would be -- the New
4  York Presbyterian ambulance would, you know,
5  roll behind me and, you know, unless I went
6  down a street that was going in the opposite
7  direction from them, they would follow me.
8      And I would go into a store and
9  they would park in front of the store and I --
10 you know, at times I took -- at that time I
11 was looking at their license plates and the
12 ambulance numbers and I didn't say anything to
13 them, I just went about my business.
14     But it happened quite frequently
15 that I would leave my home and New York
16 Presbyterian ambulance would roll around
17 behind me while I would walk around in
18 Flushing, Queens and stuff like that.
19     Q.  And you believe Memorial
20 Sloan-Kettering put New York Presbyterian up
21 to following you?
22     A.  I didn't say I believe Memorial
23 Sloan-Kettering put anybody up to following
24 me, but I have a complaint filed against
25 Sloan-Kettering and, you know, I find the

Page 100

1  E. Bryan
2  behavior peculiar.
3      Q.  So you think it is connected?
4      A.  I believe there is some type of
5  connection, sir. I have no fact to prove
6  that.
7      Q.  Okay.
8      A.  So it is merely speculation on my
9  part that, you know, it's -- you know, I just
10 find it peculiar that these ambulances seem to
11 show up, you know, at my residence when I am
12 leaving and walking down the street, you know.
13     Q.  Are you aware that Dr. Mayo has
14 diagnosed you as being bipolar?
15     A.  I believe she said so to me, sir.
16     MR. COHEN:  Can we have this
17 marked.
18     (Memo to Edmund Bryan dated
19     February 20, 2007 and handwritten
20     notes of Dr. Michael Murphy
21     bearing production Nos. MKSCC
22     00721 through MKSCC 00727 marked
23     Defendant's Exhibit 8 for
24     identification, as of this date.)
25     Q.  I'm showing you what's been

Edmund Bryan
April 21, 2008

Page 101

```
1           E. Bryan
2    marked as Defendant's Exhibit 8, which are
3    notes that were produced to us by your
4    psychiatrist, Dr. Murphy.
5           If you could look at the second
6    page, these are his handwritten notes that he
7    took in sessions with you. Do you see he
8    writes:
9           "Some belief that others who
10          bump him on street/subway sent by MSK"?
11          Do you see that?
12   A.   Yes, I see that.
13   Q.   Where would he get that
14   information?
15          MR. SCOTT: Objection.
16   Q.   If you know.
17   A.   Well, I believe that may have
18   come up during some type of discussion. I
19   can't really rightly recall all these
20   conversations, sir.
21   Q.   Well, I understand that, but what
22   is it that you recall about saying that you
23   have some belief that people who bump you on
24   the street or in the subway have been sent by
25   MSK?
```

Page 102

```
1           E. Bryan
2    A.   No, I never said anybody from MSK
3    sent anyone to bump me.
4    Q.   What did you say?
5    A.   I basically told him that I
6    believe that, you know, there is a pattern of
7    harassment being directed towards me by MSK.
8    Q.   Okay, does that include outside
9    of work?
10   A.   I can't speak for what he
11   interpreted.
12   Q.   Well, he wrote "street/subway,"
13   that would be outside of work, right?
14          MR. SCOTT: Objection.
15   A.   I can't speak for what he's
16   interpreted, sir.
17   Q.   Well, do you --
18   A.   I only know what I told him about
19   the ambulance and that sort of thing, sir.
20   Q.   Okay.
21   A.   I can't speak for what he's
22   interpreting.
23   Q.   Okay.
24          MR. COHEN: Let's take a minute.
25          Let's go outside.
```

Page 103

```
1           E. Bryan
2           (Recess taken.)
3           MR. COHEN: I just have one or
4    two more questions,
5           THE WITNESS: Not a problem, not
6    a problem, Mr. Cohen.
7    Q.   All right, in terms of your
8    damages, Mr. Bryan --
9    A.   Yes, sir.
10   Q.   -- have you gotten a wage
11   increase every year since 2006?
12   A.   Yes, I have, sir.
13   Q.   Now, I assume in terms of your
14   damages, you're claiming that you should get
15   the pay for the positions that you should have
16   been promoted to; is that correct?
17   A.   That is something arbitrarily
18   that you should discuss with my attorney, sir,
19   because, you know, the -- we've discussed the
20   promotion and stuff like that, so I mean, you
21   know, like if there's anything that comes
22   around with that --
23   Q.   Well, I do have a right to ask
24   you what you believe your damages are. So if
25   you could tell me, do you believe other than
```

Page 104

```
1           E. Bryan
2    not receiving the promotion and receiving
3    higher wages, is there any other way you've
4    been damaged since 2006?
5    A.   Do you mean -- yes, the racial
6    slurs, being called a nothing and nobody in
7    front of the entire night shift. I've gotten
8    yelled at by David Rook.
9    Q.   And how have you been damaged by
10   these comments you are talking about?
11   A.   Well, they've -- they've jaded my
12   view of myself, sir. They displaced my life.
13   I mean -- I mean, I spent years practicing
14   piano, now I am in a state of mind where I
15   used to practice six hours a day and now I
16   just like --
17   Q.   Didn't you testify about this in
18   2006, weren't these the damages you sustained
19   prior to 2006?
20   A.   Right, sir, but the behavior
21   persists.
22   Q.   It persists?
23   A.   Yes. And like I said, after I
24   got the right to sue letter, Mr. Gillette's
25   conduct --
```

## Page 105

1  E. Bryan
2  Q. Yes.
3  A. -- became modified. I don't know
4  if someone spoke to him, I don't know if you
5  spoke to him. I don't know if Mr. Melvin
6  spoke to him, but his behavior came down and
7  he started speaking to me more respectfully,
8  the same way he would speak to his other -- to
9  the people he likes, you understand. He would
10 speak to me more respectfully. I detected
11 that and I also reciprocated and I've been
12 treating him with the utmost respect, sir.
13 Q. Okay.
14 A. I've been treating him with the
15 respect that is deserving of someone of his
16 job title.
17 Q. And that's since the right to sue
18 letter?
19 A. He's modified his behavior since
20 then.
21 Q. And you've modified yours?
22 A. I don't see aggression coming
23 towards him and my therapist has basically
24 told me that, you know, I should not behave in
25 certain ways regardless of what is happening

## Page 106

1  E. Bryan
2  to me. I should be professional, do my job.
3  Q. What has your therapist told you
4  about you shouldn't behave in certain ways?
5  A. No, she said don't react. If
6  someone upsets you, demeans you in a certain
7  way, don't react. Don't engage or respond to
8  it. Just say I'm sorry, apologize, and leave
9  the situation alone and don't encourage
10 anything else. Leave it alone. Stop, you
11 know.
12 Q. Is that different from the way
13 you were behaving before you started seeing
14 your therapist?
15 A. Well, I would -- I would ask
16 people like, why are you doing that? And they
17 would interpret that, that I would want to
18 argue with them but I would say stop, I would
19 say stop, sir.
20     I got brought into John Meggs'
21 office and I was being told I was slow and
22 when I came out of the office, I called Henry
23 Resto, R-E-S-T-O, and I pointed out Kenneth
24 Williams with his head down at his workstation
25 and sleeping in plain sight of Rupert

## Page 107

1  E. Bryan
2  Gillette. And I said, he's in the office
3  telling me I am slow and this man has his head
4  down sleeping and no one says anything to me.
5     And Kenneth Williams came over to
6  me and said, came up to me and say
7  something -- should I curse?
8  Q. Tell me what he said.
9  A. Say something, I'll fuck you up
10 and he hit his fist. And I looked and they
11 said, just go back to work, leave it alone.
12     At the end of the day, I filed a
13 police report because I didn't believe John
14 Meggs was going to protect me in any way
15 because, you know, the environment I was in.
16 So I filed a police report to try to get some
17 type of help, sir, you know.
18 Q. You testified about that in your
19 hearing in June of 2006?
20 A. Yes, sir.
21 Q. So since you've started seeing
22 your therapist, you stopped doing things like
23 that?
24 A. Well, she's just basically told
25 me, just do your job, no matter what people

## Page 108

1  E. Bryan
2  say to you, just do your job. No matter what
3  it is, ra, ra, ra, ra, just leave it alone, do
4  your job and go home.
5  Q. Do you think that getting along
6  with people is something that is important
7  being a supervisor?
8  A. Yes, sir, I believe so, sir.
9  Q. Do you believe following
10 instructions and being able to understand the
11 chain of commands is something important for a
12 supervisor?
13 A. Yes, sir, I believe so, sir.
14 Q. Do you believe the ability to
15 avoid confrontations is important for a
16 supervisor?
17 A. Yes. I've deflected aggression
18 with humor, I've deflected potentially, you
19 know, aggressive -- the oncoming of aggressive
20 arguments by just apologizing immediately,
21 whether it is my fault or not, just don't
22 worry about anything, don't worry about
23 anything and I just disappear and leave them
24 alone.
25 Q. And is this as a result of

Edmund Bryan
April 21, 2008

Page 109

```
 1         E. Bryan
 2   working with your psychiatrist and
 3   psychologist?
 4      A.   And my attorney, sir.
 5      Q.   And your attorney?
 6      A.   Right, because basically I've
 7   been advised to continue the process of
 8   reporting and just do your job.
 9      Q.   What do you mean continue the
10   process of reporting?
11      A.   If someone does something to me
12   that I feel is egregious or offensive, like
13   for example the Jamaicans on a snow-covered
14   mountain, I went to Sheila Donaghue and
15   reported that. You know, I would continue the
16   process of reporting but in no way, form or
17   shape respond or engage in any kind of
18   behavior, you know, with anyone that does
19   that. Just leave it alone, shut up, you know.
20   If you can't go anywhere, just sit there and
21   keep your mouth shut.
22      Q.   The comment about putting
23   Jamaicans on the top of a snow-covered
24   mountain, was that comment made to you or to
25   someone else?
```

Page 110

```
 1         E. Bryan
 2      A.   It was said in my presence.
 3      Q.   I understand it was said in your
 4   presence, was it said --
 5      A.   I was sitting here and they were
 6   sitting there and they said it, sir.
 7      Q.   Who was the comment addressed to?
 8      A.   Well, at the time I was the only
 9   Jamaican in the room, sir, so I assume they
10   are referring to me, sir, because I am
11   Jamaican, sir.
12      Q.   You assumed. Was somebody else
13   Jamaican, whether he was in your department or
14   not in your department?
15      A.   I don't recall sir.
16      Q.   So it is possible that it was
17   being directed to someone else?
18      A.   Well, either way it is a
19   demeaning comment and I am Jamaican.
20      Q.   Well, do you know whether or not
21   that Jamaican took it that that person was
22   just kidding around with him?
23      A.   I can't speak for his respect for
24   his national origin, but I can speak for mine.
25      Q.   I understand that. Who is the
```

Page 111

```
 1         E. Bryan
 2   person that made that comment?
 3      A.   They were making jokes about
 4   Jamaicans and Kevin O'Connor --
 5      Q.   Kevin O'Connor?
 6      A.   Yes. Kevin O'Connor came up with
 7   the solution to solve Jamaican problem and
 8   they were all laughing.
 9      Q.   And you don't know what was in
10   Kevin O'Connor's mind?
11      A.   As I said, I don't make attempts
12   to speak to anyone, I just do my work.
13      Q.   Do you think the joke had
14   anything to do with the fact that Jamaicans
15   are not generally familiar with snow because
16   of the climate in Jamaica?
17      A.   To solve the Jamaican problem,
18   sir.
19      Q.   Well, he didn't say to solve the
20   Jamaican problem, did he?
21      A.   Yes, sir, he did.
22      Q.   He did?
23      A.   Here's what you do with
24   Jamaicans.
25      Q.   Here is what you do with
```

Page 112

```
 1         E. Bryan
 2   Jamaicans is not the same thing and saying to
 3   solve the Jamaican problem.
 4      A.   It was part of his comment.
 5      Q.   Do you remember his exact words?
 6      A.   Yeah.
 7      Q.   And did he say, this is what you
 8   do with Jamaicans or did he say to solve the
 9   Jamaican problems?
10      A.   This is what you do with
11   Jamaicans to solve the Jamaican problem.
12      Q.   And you don't know whether or not
13   he was referring to the fact that Jamaicans
14   are not familiar with snow until they come to
15   the United States?
16         MR. SCOTT: Objection.
17      A.   Sir, he said it in a demeaning,
18   derogatory way, sir. It was not a pleasant
19   conversation giving any kind of credence to
20   Jamaicans.
21      Q.   Were you a party to that
22   conversation or were you sitting somewhere
23   nearby?
24      A.   I was sitting across the room,
25   sir.
```

CLASSIC REPORTING, INC.
212-268-2590                                        ClassicReporting@aol.com