# EXHIBIT F

Page 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

----------------------------------x
EDMUND BRYAN,

        Plaintiff,

   -against-          No. 07 Civ. 7300 (SHS)

                         ECF Case

MEMORIAL SLOAN-KETTERING CANCER
CENTER,

        Defendant.
----------------------------------x

        April 24, 2008
        10:20 A.M.


     Deposition of Defendant, by

SHEILA DONOGHUE, taken by Plaintiff, pursuant

to Notice, at the offices of The Scott Firm,

55 Washington Street, Suite 705, Brooklyn, New

York 11201, before Charisse Romeo, a Shorthand

Reporter and Notary Public within and for the

State of New York.

Page 6

```
 1            S. Donoghue
 2      A.   I am an HR consultant/generalist.
 3      Q.   And for how long have you been a
 4  HR consultant/generalist?
 5      A.   Almost a year.
 6      Q.   And prior to that, what was your
 7  job title?
 8      A.   I was a senior employee relations
 9  specialist.
10      Q.   Can you briefly describe what
11  your job responsibilities are now as an HR
12  consultant and generalist?
13      A.   Basically, I am forging a
14  relationship as a strategic partner with our
15  business groups. A work-in-process. I work
16  with assigned departments working with
17  workforce planning, employment strategies,
18  consulting on day-to-day employee relations
19  matters.
20      Q.   In your new title, is there a
21  name to the department under which you report?
22      A.   Human resources.
23      Q.   Human resources, okay.
24           Your previous job title was a
25  senior employment relations --
```

Page 7

```
 1            S. Donoghue
 2      A.   Employee.
 3      Q.   Employee relations specialist,
 4  thank you.
 5      A.   Yes.
 6      Q.   What department did that title
 7  come under?
 8      A.   Under employee relations.
 9      Q.   So --
10      A.   Which is part of human resources,
11  which was part of human resources.
12      Q.   Was there any particular reason
13  why you changed from senior employee relations
14  specialist to your new job title?
15      A.   The department, human resources
16  department underwent a reorganization
17  approximately about a year ago.
18      Q.   Did your change in title result
19  in an increase in pay?
20      A.   Not for me.
21      Q.   Was there an increase in staff
22  that you were responsible for in any way?
23      A.   No, not really.
24      Q.   If you were to describe the
25  change in your overall job responsibilities,
```

Page 8

```
 1            S. Donoghue
 2  how would you describe that from your last
 3  title to the current one you have now?
 4      A.   The previous job did not involve
 5  the expectation that we would become strategic
 6  business partners with the various business
 7  groups that I am assigned to at the hospital.
 8  It was more or less dealing with employee
 9  relations issues, maybe clarifying policy
10  issues. Working day-to-day matters,
11  day-to-day business matters, as opposed now
12  maybe engaging in more long-range planning.
13      Q.   Is it also safe to say that your
14  responsibilities now involve more contact with
15  parties outside of the hospital as opposed to
16  intraoffice issues between management and
17  staff?
18      A.   No, they may be a diminishment
19  because of the role that I've assumed, but I
20  am still working with all the groups within
21  the hospital, a different group than I had
22  worked with when I was employee relations. I
23  have a different assignment.
24      Q.   Prior to your title as a senior
25  employee relations specialist, what was your
```

Page 9

```
 1            S. Donoghue
 2  job title at the hospital?
 3      A.   I was manager of employee
 4  relations.
 5      Q.   And how long were you the manager
 6  of employee relations?
 7      A.   Maybe four years. I'm not sure.
 8      Q.   Okay. This also was a part of
 9  human resources?
10      A.   Correct.
11      Q.   Prior to your manager of employee
12  relations job title, what were you doing at
13  the hospital; what was your title at the
14  hospital?
15      A.   I was a senior employee relations
16  specialist.
17      Q.   The title that --
18      A.   That I had my most recent title,
19  correct.
20      Q.   How long were you in that job
21  title, for what period of time?
22      A.   I don't recall.
23      Q.   Any other job titles with the
24  hospital other than the current one you hold
25  now, senior employee relations specialist and
```

Page 10

```
 1        S. Donoghue
 2  manager of employee relations?
 3      A.   I may have started out as an
 4  employee relations specialist, I think I
 5  did -- when I was first hired, I was an
 6  employee relations specialist.
 7      Q.   It is safe to say for your entire
 8  tenure at the hospital, you were assigned to
 9  the human resources department of Memorial
10  Sloan-Kettering; is that correct?
11      A.   That's correct.  That's correct.
12      Q.   Just briefly your educational
13  background, if you could just state that?
14      A.   I have a master's degree and I
15  have training from Cornell, the School of
16  Labor Relations.
17      Q.   In your present job title, do you
18  have any responsibilities with regards to the
19  hiring or termination of employment for
20  Memorial Sloan-Kettering?
21      A.   I am involved in recruiting.
22      Q.   And in what capacity?
23      A.   Actually I've just begun
24  interviewing candidates for various positions.
25      Q.   If you can, be more specific
```

Page 11

```
 1        S. Donoghue
 2  regarding the positions that you are
 3  recruiting.
 4      A.   We have an area called disease
 5  management so I've interviewed for those jobs.
 6  Recently I was involved in interviewing for
 7  our administrative assistant in the
 8  department, in which I am now currently
 9  working.  I held that interview process.
10      Q.   Any other recruiting
11  responsibilities?
12      A.   No, I attend job fairs.  I've
13  just begun the recruiting aspect of my job.
14      Q.   With regard to termination of
15  employment in your current job title, do you
16  have any authority in that regard?
17      A.   What I do is I may advise, but I
18  don't have the ultimate decision, that would
19  be the department manager that would make the
20  ultimate decision.  But I would have a
21  discussion, I would be involved in discussing
22  the pros and cons and I would make a
23  recommendation, but it may not necessarily be
24  carried through.
25      Q.   Under what circumstances, in your
```

Page 12

```
 1        S. Donoghue
 2  current job title, would you be in a position
 3  to make a recommendation either for or against
 4  the termination of employment of an employee
 5  at Memorial Sloan-Kettering?
 6      A.   Well, if somebody has had a long
 7  history of performance problems, a manager may
 8  call and say, you know, so and so has been in
 9  corrective action, they are on final warning
10  and we've had another incident and we think
11  maybe we need to consider employment
12  termination.  So I would be engaged then in a
13  process with them to review the record, see
14  what the latest incident is, is there a
15  possibility that maybe we should give the
16  person another opportunity.  So it would be
17  like, you know, just kind of problem-solving.
18      Q.   So a manager would in that
19  circumstance initiate communication with you
20  and your office at human resources?
21      A.   Yes, they would possibly call me
22  or come to the office, but it is always
23  initiated by the manager.
24      Q.   You used the term "final
25  warning"?
```

Page 13

```
 1        S. Donoghue
 2      A.   Correct.
 3      Q.   Could you explain in the context
 4  of your employment and your responsibilities
 5  at Memorial Sloan-Kettering what does a final
 6  warning mean, what does it constitute?
 7      A.   We have what we refer to as a
 8  corrective action process.  First step is
 9  counseling, then there is a second step that's
10  called a verbal warning, and then there are
11  two written warning stages.  There is the
12  first written warning and then there is a
13  final written warning.
14      Q.   And at the point in time that an
15  employee has received a final written warning,
16  is that the only time when they would
17  potentially face termination of employment?
18      A.   Not necessarily.  It would depend
19  on the incident.  It could be somebody who has
20  never had any kind of corrective action, but
21  maybe it was a very serious misconduct issue
22  so possibly they could be terminated, their
23  employment could be terminated without going
24  through progressive discipline.
25      Q.   And as far as making that
```

Page 18

```
 1         S. Donoghue
 2   is taken next?
 3       A.   Well, our structure has changed.
 4   When the department was employee relations,
 5   then it would be -- if the complaint came to
 6   my attention, then I would begin looking into
 7   the complaint immediately. Under the current
 8   structure, if it went to an employee affairs,
 9   they would begin looking into that and they
10   would then work with the consultant that was
11   involved, or responsible for that particular
12   business unit.
13       Q.   When you say the structure has
14   changed, when, around what time did this
15   structure as far as action after reporting
16   change?
17       A.   The structure of the department
18   changed in July, but I would say maybe as of
19   January -- and I would have to refer this to
20   Pam Dudley, she may have a better recollection
21   of this than I am because she is in that
22   department at the moment. I would say since
23   that time, I think we are still working out
24   who is responsible for what. But under all
25   situations, somebody would assume
```

Page 19

```
 1         S. Donoghue
 2   responsibilities if a complaint came forward.
 3   It would never not get addressed by anybody.
 4       Q.   And when you say "July," you are
 5   referring to July, 2007?
 6       A.   2007.
 7       Q.   Okay, very good.
 8       A.   Yes.
 9       Q.   This new liaison you are
10   referring to between employee affairs and the
11   hospital consultant --
12       A.   Correct.
13       Q.   -- can you just explain a little
14   more detail how that relationship works now?
15       A.   The way it works now, the belief
16   was with the restructuring, there should be a
17   neutral place for employees to go to, if they
18   chose not to go to their hospital consultant,
19   but the role of employee affairs was very
20   important. So that has remained as an intact
21   group. But there is the expectation that we
22   would work together on any issues that come up
23   from, you know, any of the business units.
24       Q.   And so I'm clear, are you
25   currently a hospital consultant?
```

Page 20

```
 1         S. Donoghue
 2       A.   Yes, I am on the hospital team.
 3       Q.   If you could just give me a quick
 4   schematic as far as, if you could, and
 5   again -- and I mean it so I'm not trying to --
 6       A.   No, I am not taking it that way.
 7       Q.   All right.
 8       A.   Basically there is a team of
 9   three, three generalist teams because the
10   hospital -- I should start out, the hospital
11   is divided into three corporations although,
12   there is an SKI corporation and then there is
13   a Memorial Corporation and then there is what
14   we refer to as the MSKCC unit, that is the
15   business unit of the hospital.
16       Q.   Okay.
17       A.   So there are generalist teams for
18   each of these three entities?
19       Q.   Okay.
20       A.   The team I'm on services the
21   Memorial Hospital group.
22       Q.   Is it safe to say now that
23   employee affairs is an over-arching entity
24   that has certain responsibility to mandate
25   regarding employee relationships with the
```

Page 21

```
 1         S. Donoghue
 2   hospital and then there are these subgroups
 3   with the generalist teams with specific
 4   responsibilities to these various
 5   corporations, SKI, Memorial and MSKCC?
 6       A.   I would say my understanding is
 7   employee affairs is responsible for all -- any
 8   issues pertaining to any employee in either
 9   one of those groups and corporations. And
10   then if a particular issue arises out of one
11   of those groups, then they would work with --
12   like my manager Esther Altman is considered
13   the senior consultant on my team, so she would
14   possibly be the one that would first be spoken
15   to. And then there would be an assignment,
16   depending which business group the complaint
17   came out of, and then it would go to the
18   generalist to work with employee affairs.
19       Q.   During your most recent tenure as
20   a senior employee relations specialist?
21       A.   We vacillate between specialist
22   and generalist. I mean consultant and
23   generalist, sorry.
24       Q.   Senior employee relations?
25       A.   You mean my current role, the one
```

Page 22

1        S. Donoghue
2  I am in now or the previous one?
3      Q.  No, the previous role.
4      A.  Okay.
5      Q.  Did you have any responsibilities
6  with regards to the hiring of employees for
7  Memorial?
8      A.  No, I did not.
9      Q.  Did you have any responsibilities
10 with regard to termination of employees in
11 your most previous incarnation as a senior
12 employee relations generalist?
13     A.  I was in an advisement capacity.
14 I was not authorized to make a determination
15 on my own.
16     Q.  When you say that, is that
17 similar to the earlier example you gave when a
18 manager may bring a situation to you in regard
19 to an employee that is having some issues and
20 you would give advice on what the appropriate
21 steps would be?
22     A.  Correct.
23     Q.  Or have a discussion as to what
24 should happen next?
25     A.  Exactly, it is the same.

Page 23

1        S. Donoghue
2      Q.  To your understanding, because
3  you said ultimately the final decision would
4  not rest with you, who has the final say so on
5  whether or not an employee is terminated?
6      A.  It would be the hiring manager in
7  conjunction with their manager. It would be
8  on the department level, I'll simplify it. It
9  would be on the department level.
10     Q.  Are you familiar with a Memorial
11 employee named Edmund Bryan?
12     A.  Yes, I am.
13     Q.  How did you come to know Mr.
14 Bryan?
15     A.  I first met Mr. Bryan a number of
16 years ago when I worked in employee relations.
17     Q.  If you recall, what were the
18 circumstances, the specific circumstances
19 under which you met?
20     A.  My recollection is that he had
21 some complaints about his workplace
22 specifically, I believe it was his supervisor
23 at the time. I recall looking into an issue
24 regarding his pay advisory being opened before
25 he received the pay advisory directly. Some

Page 24

1        S. Donoghue
2  environmental issues, I believe, regarding
3  somebody was playing a radio too loudly, he
4  found it disturbing.
5      Q.  Okay.
6      A.  At another point he was seeking
7  to move to another position within the
8  department. I looked into issues regarding
9  what, I guess, he would consider to be
10 negative interactions with his co-workers.
11 This is over a period of time. This was not
12 my initial encounter with him.
13     Q.  All right. You referred in that
14 last statement to negative interactions --
15     A.  Yes.
16     Q.  -- with co-workers.
17     A.  Correct.
18     Q.  Do you recall any of the details
19 of any of those particular interactions?
20     A.  My recollection is they were
21 always interpersonal in nature. Either people
22 complaining that he wasn't communicating
23 with -- he was not communicating with the rest
24 of the team. He felt that maybe communication
25 that they had with him, he felt was negative.

Page 25

1        S. Donoghue
2      Q.  And you said on some occasions
3  you looked into these complaints, how would
4  you look into; how did you look into a
5  complaint for Mr. Bryan regarding negative
6  interactions between himself and his
7  co-workers?
8      A.  I recall meeting with the manager
9  of the department, his co-workers and Edmund
10 himself.
11     Q.  Is this a particular specific
12 recollection that you have on one particular
13 occasion?
14     A.  That's my recollection, I think
15 on at least a couple of occasions.
16     Q.  Do you recall the names of the
17 managers with whom you met on any of the
18 occasions?
19     A.  John Meggs.
20     Q.  On the occasion, on occasion when
21 you met with Mr. Meggs, do you recall what the
22 nature of the complaint was that gave rise to
23 your having to meet with Mr. Meggs?
24     A.  It may have been loud music being
25 played in the workplace. People using

```
                                          Page 26
 1            S. Donoghue
 2   inappropriate language.
 3       Q.   And could you be specific with
 4   regards to what was the nature of their
 5   language, the language complaint when he
 6   says --
 7       A.   I know this is stereotype, you
 8   know, construction type. You are in an
 9   environment where a lot of people are working
10   on a construction site and venting, you know,
11   cursing. This is one of things that people
12   may hear. I know it is a stereotype, but it
13   is a common occurrence.
14       Q.   I don't want to put words in your
15   mouth. Are you referring strictly to blue
16   language, foul language?
17       A.   Probably at times, yes.
18       Q.   Any other types of offensive
19   language that he complained to you about?
20       A.   Most recently I recall maybe my
21   last situation with Edmund, there was an
22   incident regarding an employee from another
23   business unit that was in the department and
24   my understanding is that somebody in Edmund's
25   department was trying to cultivate a Jamaican
```

```
                                          Page 27
 1            S. Donoghue
 2   accent, and this individual was teaching him
 3   how to sound as though he, himself, was from
 4   Jamaica.
 5       Q.   Okay.
 6       A.   And Edmund took offense to that.
 7       Q.   Did Mr. Bryan ever complain to
 8   you -- let me take a step back.
 9       A.   Okay.
10       Q.   When Mr. Bryan would make these
11   complaints, how would he make them?
12          MS. KALE: Objection.
13          You can answer if you can.
14       A.   The last time I remember he came
15   to see me, I actually met with him a couple of
16   times. I don't recall if he previously -- if
17   he may have called and then asked for an
18   appointment and then we set something up for
19   me to meet with him. I believe he also may
20   have given me written communication in the
21   form of a letter.
22       Q.   So on occasions he would make
23   complaints verbally, orally to you?
24       A.   Correct.
25       Q.   And then on other occasions he
```

```
                                          Page 28
 1            S. Donoghue
 2   may put something in writing?
 3       A.   I believe.
 4       Q.   And give it to you?
 5       A.   I believe I recall seeing
 6   something in writing.
 7       Q.   Is there any sort of company-wide
 8   requirement with regards to making a complaint
 9   with your department?
10       A.   Would you say a little more about
11   that? I guess explain what you mean.
12       Q.   Is there a form that may have
13   been filled out by an employee when they are
14   coming to your department to make a complaint
15   about some sort of office action that they
16   find objectionable?
17       A.   There are two ways somebody might
18   do that or maybe more, somebody might write a
19   letter, somebody might call or somebody might
20   ask to complete a grievance form and they
21   would go through a formal grievance process.
22       Q.   When you say "a grievance form,"
23   that is something that the employee would
24   request from --
25       A.   They could request or it may be
```

```
                                          Page 29
 1            S. Donoghue
 2   advised that they complete a grievance form.
 3       Q.   Under what circumstances would
 4   someone be advised to complete a grievance
 5   form?
 6       A.   Well, it could be somebody who
 7   might feel that policy hasn't been put into
 8   place fairly.
 9       Q.   Okay.
10       A.   And they've tried maybe working
11   this out with their supervisor through, you,
12   know, numerous discussions and it might be
13   advised that they go through the grievance,
14   which is a very formal process.
15       Q.   Okay.
16          Do you recall if Mr. Bryan ever
17   filled out a grievance form for any complaint?
18       A.   No, I don't.
19       Q.   Going back to our discussion
20   about language, did Mr. Bryan ever make
21   complaints to you about language in the
22   workplace that he found objective because he
23   felt it was homophobic?
24       A.   I know he raised the issue, but I
25   don't know if it was related to language or
```

Page 42

```
 1        S. Donoghue
 2   March of 2007 regarding his complaints about
 3   these particular comments, the one about men
 4   living at home and the one about Jamaicans on
 5   the top of a mountain?
 6        A.  He initiated the complaint.
 7        Q.  So your answer is yes with regard
 8   to you speaking to him?
 9        A.  Yes, he met with me.
10        Q.  Did you take notes during your
11   initial interaction, your initial conference
12   with Mr. Bryan on this particular complaint?
13        A.  I believe I did.
14        Q.  What other action did you take
15   related to your investigation of the complaint
16   made by Mr. Bryan regarding the comment about
17   men living at home and the comment about
18   putting Jamaicans on the top of a mountain
19   with a shovel?
20        A.  I recall that I tried to reach
21   out to Edmund, but I was unable to do so to
22   give him results of my investigation.
23        Q.  And what were the results of your
24   investigation?
25        A.  I could not confirm that anything
```

Page 43

```
 1        S. Donoghue
 2   that he had said took place.
 3        Q.  As part of your investigation?
 4        A.  And may I say something, please?
 5        Q.  Oh, yes, please.
 6        A.  Or maybe a clarification of what
 7   Edmund heard versus what someone may have
 8   intended or maybe people sharing their
 9   experience.
10        Q.  During this particular
11   investigation, this March of 2007
12   investigation, did you also have occasion to
13   review an e-mail exchange between Rupert
14   Gillette and John Meggs regarding a prior
15   incident with the use of a Jamaican accent
16   that Mr. Bryan had taken offense to?
17        A.  I can't say that I recall the
18   e-mail exchange, no.
19        Q.  And as far as your final
20   conclusion, you are saying you couldn't
21   find -- and, you know, I don't want to put
22   words in your mouth, can you just restate
23   again what your finding was after your
24   investigation, if you recall?
25        A.  I don't think I --- my
```

Page 44

```
 1        S. Donoghue
 2   recollection is I couldn't confirm that
 3   anything -- I'm trying to think of the right
 4   word here.  I don't believe I could confirm
 5   that anything offensive took place, but I do
 6   remember speaking again -- and I do this
 7   habitually when I have these investigations if
 8   there was even the possibility of something
 9   happening that couldn't be determined, but
10   just to speak to the manager and the
11   supervisor that in the event something like
12   this could have happened or could have been
13   interpreted as being offensive --
14        Q.  Yes.
15        A.  -- to get them to look at that
16   and get them to remind people about workplace
17   behavior, appropriate workplace behavior, I
18   should say.
19        Q.  Did you also in relation to that
20   last comment, take occasion to specifically
21   inform a supervisor, whether that be Mr. Meggs
22   or Mr. Gillette, to discontinue the use, the
23   mimicking accents and the use of the word
24   "nigga"?
25        MS. KALE:  Objection.
```

Page 45

```
 1        S. Donoghue
 2        A.  No, I remember speaking to them
 3   about the use of the word "nigger," that it
 4   was inappropriate, didn't matter if it was a
 5   slang word or not.  Some generations, it is
 6   not a slang word, it is very offensive, you
 7   need to keep that in mind.
 8            And what was the other piece of
 9   that?  I'm sorry.
10        Q.  Mimicking accents.
11        A.  Yes, that's about the gentleman
12   who was supposedly trying to -- yes, it could
13   be offensive to some people and if someone
14   wanted to do that on their own time, that was
15   fine but, again, not in the workplace.
16        Q.  During this particular
17   investigation, the March 2007 investigation,
18   did you have occasion to review any paperwork,
19   documents of any sort, related to Mr. Bryan's
20   earlier complaint with the human rights
21   commission?
22        A.  I don't know that I would have
23   seen it as being relevant.  I don't recall
24   reviewing it during that investigation.  I did
25   get the complaint as it had come to me.
```