# EXHIBIT F – Part 2

**Page 54**

        S. Donoghue

1  
2   A.  I don't recall.  
3   Q.  If you haven't said it already,  
4  what was the final determination when that  
5  consideration took place, to either  
6  termination or some sort of corrective action  
7  for Mr. Gillette?  
8   A.  Could you repeat the question,  
9  please?  
10   Q.  What was the final determination  
11  regarding whether or not to terminate Mr.  
12  Gillette for his behavior or to allow him some  
13  sort of corrective action?  
14   A.  I believe he got -- he received  
15  some type of corrective memo. I should -- can  
16  I -- I just want to make one clarification?  
17       When I explained the corrective  
18  action to you, that process goes for certain  
19  levels of employees and once you reach what we  
20  call an M 8 level, you don't go through that  
21  formal process. You could just receive a memo  
22  about your performance or your conduct and  
23  there are no steps that you're entitled to and  
24  you're not entitled to the grievance procedure  
25  either at that level and above.

**Page 55**

1       S. Donoghue  
2       So I think Mr. Gillette may have  
3  fit the category that he would not go through  
4  a series of corrective action or even if it  
5  was, it could have been determined that his  
6  behavior was such that we wouldn't take him  
7  step by step. This is something we considered  
8  to be serious, not to be tolerated and not to  
9  happen again. So he would receive a harsher  
10  penalty, which would have been some type of  
11  memo.  
12   Q.  When you say it is a harsher  
13  penalty, what is the effect of receiving one  
14  of these memos; how would that impact someone  
15  in Mr. Gillette's position at the hospital?  
16   A.  Well, he is on notice, his job is  
17  in jeopardy.  
18   Q.  Okay.  
19   A.  Possibly he didn't receive his  
20  annual increase. It would be reflected on his  
21  performance review.  
22   Q.  And does a memo like this have an  
23  effect for a period of time, does it stay on  
24  the record for a year and then get taken off  
25  or how does that work?

**Page 56**

1       S. Donoghue  
2   A.  It never leaves the record. It  
3  is part of the historical record, but say  
4  after a year or so you've demonstrated, you  
5  know, a 360 change in whatever the issue was,  
6  you know, it wouldn't be considered unless  
7  that behavior surfaced again.  
8   Q.  Okay.  
9       In your March 2007 investigation  
10  of Mr. Gillette's conduct, prior conduct as a  
11  supervisor, specifically related to allowing  
12  certain type of language/conversation to take  
13  place in the workplace, was that investigated  
14  or reviewed related to the March 2007  
15  investigation?  
16   A.  I don't believe that it was  
17  reviewed in that context. However, I do  
18  remember speaking to him about specifically  
19  about the incident where the person was trying  
20  to learn how to cultivate this other accent,  
21  that that also was not appropriate in a  
22  workplace setting. If you want to do that, do  
23  that on your own time, your own place, but  
24  just how you have to be aware of those things.  
25  It wasn't to the same degree -- I didn't see

**Page 57**

1       S. Donoghue  
2  it in the same way as previous complaints  
3  about Mr. Gillette had been made.  
4   Q.  Is it fair to say that the reason  
5  why the prior memo given to Mr. Gillette was  
6  not reviewed or considered as part of the  
7  March 2007 investigation was because the  
8  nature of the complaint in March of 2007 was a  
9  different type than the nature of complaints  
10  that gave rise to the previous discipline that  
11  Mr. Gillette may have received?  
12   A.  It had nothing to do with type.  
13  I think it was as a result of my talking to  
14  everybody. They viewed that the particular  
15  situation as being playful, it was at lunch  
16  break and there was no harm intended, there  
17  were -- so it was a totally different nature.  
18       They saw it as being playful,  
19  whereas I thought it was not. Then again,  
20  talking to Mr. Gillette about enlarging his  
21  awareness of issues that could possibly be  
22  offensive to people. Even though it may be  
23  playful to some people, to other people it is  
24  not necessarily playful.  
25   Q.  Okay. Did you have any

Page 58

1      S. Donoghue
2 discussions with Mr. Meggs regarding possible
3 relationship between Mr. Gillette's previous
4 disciplines and this current complaint by Mr.
5 Bryan?
6    A.  I don't recall the specific
7 discussion I had with Mr. Meggs.
8    Q.  I'm sorry, you are saying you
9 don't recall the or a?
10   A.  I don't recall the specific -- I
11 don't recall the specifics of the discussion I
12 had with him offhand.
13      MS. KALE: Can we take a break?
14      MR. SCOTT: Absolutely.
15      (Recess taken.)
16      MR. SCOTT: Read back the last
17 question and answer please.
18      (Record read.)
19      MR. SCOTT: I'm going to ask that
20 these pages -- it is three pages, Bates
21 MKSCC 00105, 00100 and 00107 -- be
22 marked for identification. We'll mark
23 as Plaintiff's -- we will use numbers
24 because they used letters -- A.
25      Off the record.

Page 59

1      S. Donoghue
2      (Discussion off the record.)
3      MR. SCOTT: We will mark MKSCC
4      105, 106 and 107. Back on the record
5      Bates numbers are 105, 106, 107,
6      Plaintiff's A.
7      (Document entitled "Investigation
8      Summary, Investigation Completed
9      3/14/07" bearing production Nos.
10     MKSC 00105 through MKSCC 00107
11     marked Plaintiff's Exhibit A for
12     identification, as of this date.)
13   Q.  Ms. Donoghue, I want you to take
14 a look at the three pages that are placed in
15 front of you. Take your time. When you are
16 ready, just look up and let me know.
17   A.  All right.
18   Q.  Ms. Donoghue, do you recognize
19 that document?
20   A.  Yes, I do.
21   Q.  What is that?
22   A.  It is a summary of an
23 investigation that I conducted as a result of
24 Mr. Bryan meeting with me about some
25 complaints.

Page 60

1      S. Donoghue
2   Q.  Specifically that the
3 investigation that you conducted in March of
4 2007?
5   A.  Yes, correct.
6   Q.  And the allegations that gave
7 rise to this investigation were Mr. Bryan
8 complained of the use of racial slur and
9 homophobic remark by his co-worker, a vendor,
10 and a supervisor?
11   A.  Correct.
12   Q.  And do you recall what the racial
13 slur was that he was complaining of?
14   A.  The use of the word "nigger."
15   Q.  And the homophobic remark?
16   A.  People who live at home, let me
17 see, they are viewed as feminine.
18   Q.  The co-workers that he complained
19 about, who are they; what are their names?
20   A.  As indicated in this report, the
21 second bullet, it would have been -- let's see
22 Kevin O'Connor is not a co-worker. It would
23 be Kevin Walrond, Jamal Robinson, Miguel Ruiz
24 and Rupert Gillette, the supervisor.
25   Q.  Before we move on, Mr. O'Connor,

Page 61

1      S. Donoghue
2 what is his relationship to the hospital?
3   A.  He is a vendor. My understanding
4 is he works with the company from whom we've
5 made some instrument purchases and his job
6 is -- he comes every night to do a specific
7 check on the instruments, to make sure they
8 are operational.
9   Q.  Okay. When you say
10 "instruments," are these like machines that
11 are --
12   A.  They are very sophisticated
13 technological instruments that are used in
14 operating procedures.
15   Q.  And not to diminish what his
16 skills or his title are, so essentially he
17 performs maintenance on hospital equipment?
18   A.  I would say that is probably a
19 good description.
20   Q.  You used the term "vendor" to
21 describe him?
22   A.  Correct, he is not an employee of
23 the hospital.
24   Q.  Would a vendor also be considered
25 a subcontractor?

Page 62

1      S. Donoghue
2   A.  I'm not sure of the official
3   category.
4   Q.  Under the code of conduct as laid
5   out by the Memorial handbook, Memorial
6   employee handbook, who is governed by that
7   code of conduct?
8   A.  Anyone who has any business to do
9   at the hospital, who works at the hospital.
10  Q.  Would a vendor under that
11  definition be governed under the code of
12  conduct?
13  A.  Yes.  Correct.
14  Q.  You interviewed Mr. O'Connor
15  related to this March 2007 investigation?
16  A.  Yes, I did.
17  Q.  And you took notes related to
18  that investigation?
19  A.  Yes, I did.
20  Q.  And you transcribed those
21  handwritten notes into the typewritten final
22  investigative report that you have before you,
23  correct?
24  A.  Yes, I did.
25  Q.  And the same goes for your

Page 63

1      S. Donoghue
2   interaction with Mr. Walrond; is that correct?
3   A.  Yes.
4   Q.  The handwritten notes that you
5   then transcribed into a typewritten report,
6   correct?
7   A.  Correct.
8   Q.  And the same for Mr. Ruiz?
9   A.  Correct.
10  Q.  And Mr. Gillette?
11  A.  Correct.
12  Q.  Mr. Jamal Robinson, he was not
13  interviewed?
14  A.  I believe he was, it states here
15  that he was on medical leave at the time.
16  Q.  Okay.  Yes, very good.  Thank
17  you.
18      Now these interviews, did they
19  occur individually or as a group?
20  A   Individually.
21  Q.  And who was present during each
22  of the interviews?
23  A.  My recollection is except for Mr.
24  O'Connor, Mr. Meggs was with me.
25  Q.  Did Mr. Meggs take any notes

Page 64

1      S. Donoghue
2   related to this investigation?
3   A.  I have no recollection of that.
4       MR. SCOTT:  I am going to mark
5   for identification -- this would be B,
6   Plaintiff's B.
7       (One-page corrective action memo
8       from John Meggs to Rupert
9       Gillette dated August 3, 2006
10      marked Plaintiff's Exhibit B for
11      identification, as of this date.)
12  Q.  Ms. Donoghue, I would like you to
13  take your time, read that document and when
14  you are done, just let me know.
15  A.  All right.
16  Q.  Are you done, ma'am?
17  A.  Yes.
18  Q.  Ms. Donoghue, do you recognize
19  that document?
20  A.  Yes, I do.
21  Q.  What do you recognize it to be?
22  A.  It is what I say, a serious
23  corrective action memo given to Mr. Gillette.
24  Q.  If you can say, what is the date
25  on that memo?

Page 65

1      S. Donoghue
2   A.  August 3rd, 2006.
3   Q.  Who, if you can determine, is
4   responsible for giving that memo to Mr.
5   Gillette?
6   A.  It appears that it was John Meggs
7   who administered this.
8   Q.  Thank you.
9       Are you also cc'd, copied on that
10  memo?
11  A.  Yes, I am.
12  Q.  Who else is copied on that memo?
13  A.  Aileen Killen and Liz McCormick.
14  Q.  If you can state for the record,
15  who is Aileen. Killen and Liz McCormick?
16  A.  Aileen Killen at the time was
17  director of the perioperative department.  Liz
18  McCormick is responsible for the department of
19  nursing under which CPD reports up through.
20  Q.  Would it be safe to say both of
21  those individuals are within the hospital
22  hierarchy above Mr. Meggs in title?
23  A.  Correct.
24  Q.  Is one of those individuals above
25  the other or are they contemporaneous?

Page 70

```
 1          S. Donoghue
 2     Q.   After reading it, could you state
 3  what was the incident that gave rise to this
 4  memo being administered by Mr. Meggs to Mr.
 5  Gillette?
 6     A.   Mr. Bryan had complained that he
 7  had received his benefits package from the
 8  benefits department and he had left it on a
 9  desk or a table, and at some point during the
10  evening the package was gone and I believe he
11  saw it in a garbage pail.
12     Q.   Ultimately, Mr. Bryan found out
13  that Mr. Gillette had actually thrown out his
14  benefits package in the garbage?
15     A.   Correct.
16     Q.   And I would like to direct your
17  attention to that last paragraph --
18     A.   Yes.
19     Q.   -- of the document?
20     A.   Yes, correct.
21     Q.   Specifically the last sentence:
22          "He was made aware that our
23     conversations concerning these
24     counter-productive relations are being
25     monitored by our Employee Relations
```

Page 71

```
 1          S. Donoghue
 2     Specialist, Sheila Donoghue."
 3     A.   I see that.
 4     Q.   Just going back to our earlier
 5  conversation about monitoring, where
 6  monitoring came from --
 7     A.   Yes.
 8     Q.   -- if you can just explain to me
 9  what sort of actual activities were taking
10  place on your part related to this particular
11  incident and other counter-productive
12  relationships vis-a-vis Mr. Gillette?
13     A.   What I can tell you, I was
14  doing -- the word "monitor" is the word that
15  Mr. Meggs chose.
16     Q.   Yes.
17     A.   What I was doing was doing
18  periodic follow-ups to see how things were
19  going in the department.
20     Q.   And when you would do a
21  follow-up, how specifically or logistically
22  would that take place?
23     A.   It could be a phone conversation,
24  where I would pick up a phone and ask John how
25  things were going. It could be as part of
```

Page 72

```
 1          S. Donoghue
 2  another discussion, I might say oh, by the
 3  way, how are things going.
 4     Q.   Did you ever stop into the actual
 5  unit on occasion when Mr. Gillette was on duty
 6  to see how things were going yourself?
 7     A.   Not very often due to the time
 8  that he was working. At other times during
 9  the day, but not specifically at night. Not
10  as often at night as I did during the day.
11     Q.   Just for the record, Mr.
12  Gillette's tour of duty was what time?
13     A.   The night shift. The last shift,
14  if you will.
15     Q.   11 P.M. to 7:00?
16     A.   11:30 to 7:30 or 11:00 to 7:00,
17  I'm not sure.
18     Q.   I'm just going to refer your
19  attention back to Exhibit B, the corrective
20  memo dated August 3rd, 2006.
21     A.   Correct.
22     Q.   Specifically, the use of that
23  last bold-typed phrase in the first paragraph,
24  the use of vulgar language in the workplace --
25     A.   Yes.
```

Page 73

```
 1          S. Donoghue
 2     Q.   -- do you consider the use of the
 3  word "nigger" to be vulgar language in the
 4  terms of this particular memo?
 5     A.   Do you mean for me personally or
 6  as a professional employee? I don't know
 7  how --
 8     Q.   Well, you know what, we're going
 9  to say both. And you can determine which one
10  you'll say first.
11     A.   I would say personally and
12  professionally, I consider it to be offensive,
13  very offensive.
14     Q.   Would you consider it to be
15  vulgar, personally?
16     A.   I would choose to describe it
17  as -- for me, it would be deeply offensive.
18     Q.   As far as professionally now
19  within the context of the employee handbook,
20  and the policy and procedure manual --
21     A.   Yes.
22     Q.   -- is the use of the word
23  "nigger" in the work environment vulgar
24  language?
25     A.   For me, again, I would say it is
```

Page 74

1  S. Donoghue
2  more serious than that, it is deeply
3  offensive. But I would like to say something
4  else.
5      Q.  All right.
6      A.  When I looked in that particular
7  issue about the use of the word "nigger," I
8  was primarily talking to a relatively young
9  group of black males and they were trying to
10 say to me that the word nigger to them was
11 like jerk, stupid, it was a slang expression.
12      And my discussion with them is
13 that may have been how they were using the
14 word, however, there were many people in the
15 workplace who come from a whole different
16 historic perspective and even if not from that
17 perspective, they consider the word, no matter
18 how you spell it, to be offensive. It is not
19 to be used in the workplace. In other words,
20 they didn't mean it to be offensive. This is
21 how they refer to each other.
22      Q.  In your position in the human
23 resources department, did you or do you -- and
24 I won't use the "or," strike the "or."
25      Do you interpret the use of the

Page 75

1  S. Donoghue
2  word "nigger" in the workplace to be a
3  violation of the rules of the employee
4  handbook and/or the policy manual?
5      A.  If someone is complaining it is
6  offensive, I would say yes. My general rule
7  of thumb would be just not to use the word at
8  all because we don't know what is offensive to
9  some people and not to others, but just
10 discontinue using the word. It has the
11 potential to be offensive.
12      Q.  So you would say personally and
13 based on your understanding of the handbook --
14      A.  It is something.
15      Q.  -- it is out of bounds?
16      A.  I think it is.
17      Q.  The last subject --
18      A.  Okay.
19      Q.  -- posting of jobs.
20      A.  Okay.
21      Q.  The employee handbook for
22 Memorial addresses the manner in which job
23 vacancies are posted by the hospital; is that
24 correct?
25      A.  I don't recall specifically

Page 76

1  S. Donoghue
2  details, but I recall there is a section
3  referencing to them.
4      Q.  Do you recall what is the process
5  of posting of jobs?
6      A.  There are two processes,
7  actually.
8      Q.  Thank you.
9      A.  I'll begin with the department.
10 If a department has an opening and they may be
11 due to the particular skills of a job or they
12 sense that maybe they want to encourage
13 promotional opportunities from within, what
14 they are advised to do is to let everybody
15 know that there is a particular -- in their
16 department, that there is a particular job
17 that is about to be opened or created.
18      Q.  Okay.
19      A.  And then they could use a memo,
20 put it someplace, or verbally let people know
21 about this, so that people in that department
22 only would have that ability to post for the
23 job.
24      Q.  To apply?
25      A.  Yes. Sometimes departments do

Page 77

1  S. Donoghue
2  that thinking they'll get an internal
3  candidate and then they don't. So then they
4  will do what we refer to as the external
5  posting, it will be put online so now it is
6  open to the universe, to anyone with the
7  qualifications to apply.
8      Q.  Okay.
9      A.  But sometimes what happens is a
10 manager may know of somebody through
11 connections and then they will work with
12 employment, if they've identified somebody
13 that they may have in mind. If they work with
14 employment, to do the recruiting for this
15 particular individual. That doesn't happen
16 very often.
17      Q.  Have you ever had occasion to
18 receive a complaint from Edmund Bryan about
19 failure to promote him or improper posting of
20 a new job in his unit, did that ever come up?
21      A.  I don't know if Edmund
22 specifically spoke to me about that, I don't
23 recall.
24      Q.  Do you know whether or not he
25 ever made a complaint to your department,

Page 78

1        S. Donoghue
2  maybe not to you specifically, but to your
3  department about the failure to promote or
4  improper posting of a job notice?
5      A.   I am not aware of that.
6      Q.   During your last tenure as an
7  employee relations specialist --
8      A.   Yes.
9      Q.   -- did you ever have occasion to
10 sit in on interviews for the promotion of
11 someone who is already an employee at the
12 hospital?
13     A.   I was not involved in that at
14 that time.
15     Q.   Would you be consulted at any
16 point in time during the interview process
17 when an employee is being considered for a
18 promotion?
19     A.   Possibly.
20     Q.   And under what circumstances
21 would you have been consulted?
22     A.   It could be if they felt that
23 somebody wasn't ready at this moment for that
24 particular job or if somebody didn't have the
25 skills for the job.

Page 79

1        S. Donoghue
2      Q.   Do you recall ever being
3  consulted by a manager or supervisor regarding
4  the potential promotion of Edmund Bryan for
5  another job title?
6      A.   Yes, I do.
7      Q.   What circumstances, when did that
8  occur?
9      A.   Again, I can't tell you
10 specifically when, but I do remember being
11 consulted about it.
12     Q.   Well, do you recall any details
13 about that particular occasion?
14     A.   Yes, I do.
15     Q.   Please.
16     A.   I believe Edmund was looking to
17 move into an equipment specialist-type job in
18 the department and the discussion was Edmund
19 has had a history of communication issues and
20 one of the essential aspects of the equipment
21 specialist position is that you have very good
22 interpersonal skills.  It is a training
23 component.  You are not only training people
24 on your staff, but you are also interacting
25 with other departments such as the whole

Page 80

1        S. Donoghue
2  perioperative department.  So it does require
3  strong personal skills, communication skills.
4      Q.   And who initiated this discussion
5  with you?
6      A.   John Meggs.
7      Q.   What did you have to say with
8  regards to this discussion?
9      A.   I remember telling John that if
10 Edmund were to apply, that he should be
11 interviewed for the position.
12     Q.   Any other input on your behalf in
13 regard to that process?
14     A.   And to inform Edmund why he may
15 not be considered and for him to consider
16 developing his communication skills so that if
17 something should come up in the future, he
18 could be seriously considered for the
19 possibility of moving into that position.
20     Q.   So as far as your communication
21 with Mr. Meggs, is it fair to say that when he
22 contacted you, he raised a concern regarding
23 Edmund Bryan's communication skills to you?
24     A.   I was aware of Edmund's
25 communication skills before that conversation.

Page 81

1        S. Donoghue
2      Q.   How did you become aware of this
3  communication skills before?
4      A.   I believe John Meggs had spoken
5  to me about addressing -- how to address
6  Edmund's deficits in that area with him.
7      Q.   Do you recall when this
8  conversation took place?
9      A.   I couldn't tell you specifically,
10 no.
11     Q.   Any notes related to that
12 particular conversation?
13     A.   If I did, they would have been
14 submitted.  I'm not sure about that.
15     Q.   Do you recall generally, that
16 earlier conversation about, to use your
17 language, Edmund's deficits in communication,
18 what Mr. Meggs said to you in that
19 conversation?
20     A.   Edmund really chose not to
21 interact with the rest of the staff.  He
22 remained apart.  He didn't demonstrate good
23 communication skills.  So based on that, on
24 the observation of that, he would not -- he
25 could not at that point be considered a

Page 82

```
 1         S. Donoghue
 2  candidate.
 3     Q.  And I know you are talking about
 4  when you were considering him for the
 5  position, the promotion.  I am referring to an
 6  earlier conversation that you said you had
 7  when Mr. Meggs approached you about how to
 8  talk to Edmund about his communication skills.
 9     A.  My understanding is that Edmund
10  at some times was very defensive when speaking
11  to him.  So it was just a matter of just
12  coaching Mr. Meggs on how to approach somebody
13  that might be more defensive, but to still
14  hopefully allow them to hear what it was you
15  were trying to counsel them about.
16     Q.  And you don't recall around the
17  time, year, that this conversation took place?
18     A.  It was pretty much an ongoing
19  thing with Edmund over time.
20         (Transcript continues on next
21  page)
22
23
24
25
```

Page 83

```
 1         S. Donoghue
 2         MR. SCOTT:  Thank you for your
 3  time, Ms. Donoghue, it has been a
 4  pleasure.
 5         MS. KALE:  I have no questions.
 6
 7         (Time noted:  12:40 P.M.)
 8
 9         _____
10         Sheila Donoghue
11
12  Subscribed and sworn to
13  before me this_____day
14  of_____2008.
15  _____
```

Page 84

CERTIFICATE
----------

STATE OF NEW YORK  )
                   ) ss.:
COUNTY OF NEW YORK )

I, CHARISSE ROMEO, a Shorthand Reporter and Notary Public within and for the State of New York, do hereby certify:

That I reported the proceedings in the within-entitled matter, and that the within transcript is a true record of such proceedings.

I further certify that I am not related, by blood or marriage, to any of the parties in this matter and that I am in no way interested in the outcome of this matter.

IN WITNESS WHEREOF, I have hereunto set my hand this_____day of_____, 2008.

_____
CHARISSE ROMEO

Page 85

April 24, 2008

INDEX
-----

| WITNESS | PAGE |
|---|---|
| SHEILA DONOGHUE | |
| Examination by Mr. Scott | 4 |

EXHIBITS
--------

PLAINTIFF'S

| FOR IDENTIFICATION | | PAGE |
|---|---|---|
| A | Document entitled "Investigation Summary, Investigation Completed 3/14/07" bearing production Nos. MSKCC 00105 through MSKCC 00107 | 59 |
| B | One-page corrective action memo from John Meggs to Rupert Gillette dated August 3, 2006 | 64 |
| C | Two-page memo from John Meggs to Rupert Gillette dated September 20, 2005, second page bearing production No. MSKCC 0010 | 69 |