# EXHIBIT H

**COPY**                                                                 1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x
EDMUND BRYAN,

                Plaintiff,

        -against-               No. 07 Civ. 7300 (SHS

                                      ECF Case

MEMORIAL SLOAN-KETTERING CANCER
CENTER,

                Defendant.
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - -x

                April 29, 2008
                10:10 A.M.

        Deposition of Defendant, by

RUPERT GILLETTE, taken by Plaintiff, pursuant

to Notice, at the offices of The Scott Firm,

55 Washington Street, Suite 705, Brooklyn, New

York 11201, before Charisse Romeo, a Shorthand

Reporter and Notary Public within and for the

State of New York.



**CLASSIC REPORTING, INC.**
**TOTAL LITIGATION SUPPORT**

ARTA PASCULLO, President       13 West 36th Street • New York, New York 10018
                                    Tel: (212) 268-2590 • Fax: (212) 268-2596

9

R. Gillette

1
2   there were several tasks that are done in the
3   department, the department itself has like
4   several areas.
5           Decontam area, you have the prep
6   and pack area, you have the steam, you have
7   the custom ultrasonic, you have the case room.
8   There are certain tasks to be done in each of
9   those areas and it is my responsibility to
10  make sure they are done each night --
11          Q.   Okay.
12          A.   -- by the staff that are working
13  in those areas.
14          Q.   And if you could just briefly go
15  through those, I believe you named five
16  different areas, or was it six?
17          I'm thinking you said five, five
18  or six areas you just ran through,
19  specifically, what happens in each of those?
20          A.   The decontam area, we receive
21  carts from the OR with soiled trays, it would
22  be bloody trays with blood, you know.
23          Q.   All right.
24          A.   We are to wash those trays,
25  process them, process meaning we send them to

10

1           R. Gillette

2  a tunnel washer. There are other items that

3  are in the decontam area that we are to wash,

4  sometimes we get pumps, patient pumps, IV

5  pumps, commodes, various other items, but the

6  decontam area is basically to clean.

7           Q.   Okay.

8           A.   And to process, meaning send

9  through the tunnel washes. Then you come to

10 the prep and pack area where the tray assembly

11 is done by the staff.

12          Q.   Okay.

13          A.   Meaning all the trays that come

14 from the decontam area, they come into the

15 prep and pack area and we assemble the trays.

16 Pack them up for sterilization. We put them

17 in containers and they are packed and ready

18 for sterilization.

19          Then you go to the sterilization

20 area where that staff would take all the

21 assembled trays that are in the containers,

22 place them on a cart and process them in the

23 steam sterilizer.

24          Then you go from the steam

25 sterilization area, once the trays -- all the

                                                                11

1                    R. Gillette

2       items that are sterilized, that are processed,

3       they are removed, cooled off and then they are

4       taken to the case room area where they are

5       stored.

6                    Also, in addition to the case

7       room area, the staff that works in there, they

8       need to complete the cases that the OR would

9       be using the following day for operations.

10      They need to complete those carts.  By that, I

11      mean, there are missing items on each case and

12      we have to get the missing item, put them on a

13      cart and send the cart up to the OR.

14           Q.      All right.

15           A.      We also have the custom

16      ultrasonic area and that area, we receive

17      flexible scopes also from the decontam area

18      and we are to process the flexible scopes, and

19      in the custom ultrasonic machine, prepare them

20      and have them ready for distribution to the

21      various areas of the hospital.

22           Q.      All right. As a supervisor, how

23      many persons work on your team?

24           A.      I believe it's ten.

25           Q.      Okay. And their job titles would

                                                                    12

1                   R. Gillette

2       be what, their varied job titles would be

3       what?

4              A.    I have one lead technician and

5       the rest of all the staff would be

6       technicians, their title would be.

7              Q.    Do you know what a CPD Tech I is?

8              A.    No.

9              Q.    No?

10             A.    No.

11             Q.    CPD Tech II?

12             A.    No.

13             Q.    Equipment specialist?

14             A.    We did have that position at one

15      point.  I just spoke to the director a couple

16      of days ago and I believe he thinks it is a

17      position that is going to be eliminated.

18             Q.    So, as far as you are aware,

19      other than the distinction between a lead tech

20      and a tech, there is no further distinction

21      between technicians themselves, if you are a

22      tech, you are a tech?

23             A.    They are all the same.

24             Q.    Okay.  As far as job

25      responsibilities, is the hiring of lead tech

13

1       R. Gillette
2  or technicians, does that come under your job
3  description?
4       A.    No.
5       Q.    Training, the training of either
6  lead tech or technicians, does that in any way
7  come under your job description?
8       A.    Could you repeat that?
9       Q.    The training of either lead tech
10 or technicians, does that come under your job
11 description?
12      A.    Yes.
13      Q.    If you could just describe in
14 which way?
15      A.    Well, in terms of training, it is
16 not totally locked into me, the supervisor, to
17 completely train the staff, even though when
18 we get new staff, I always make sure that I do
19 have an input.
20            Generally, what I do with the
21 staff is I would take them around the
22 department, I would show them the final
23 details of what we are doing. I am very exact
24 in what I show them, but after I go through
25 the process with them, I will usually ask

1        R. Gillette

2        A.    I don't have a supervisor.  I do
3   have a director and his name is Melvin
4   McClean.
5        Q.    How long has Mr. McClean been
6   your director?
7        A.    I guess about a year.
8        Q.    And prior to Mr. McClean?
9        A.    I believe it was Carol Cass,
10  C-A-S-S, I'm not sure about that, but she
11  resigned and she was given another position
12  and then Melvin McClean was her replacement
13  and that took place about a year ago.
14       Q.    Who is John Meggs?
15       A.    John Meggs was the manager, used
16  to be.  He is no longer with us.
17       Q.    In the hospital structure,
18  operational structure, did you report to John
19  Meggs before he left the hospital?
20       A.    Yes.
21       Q.    And then, at this present time,
22  there is no one occupying the position that
23  Mr. Meggs previously occupied?
24       A.    No.
25       Q.    Okay.  Do you know why that is?

1          R. Gillette
2  do you also -- is it also one of your
3  responsibilities to complete evaluations of
4  the persons under your supervision?
5          A.    Yes.
6          Q.    And how frequently do you conduct
7  these evaluations?
8          A.    Once a year.
9          Q.    Do you ever have occasion to do
10 quarterly evaluations?
11         A.    Yes.
12         Q.    When would those occasions arise?
13         A.    Every three months.
14         Q.    What would give rise to
15 conducting quarterly evaluations as opposed to
16 yearly?
17         A.    There is no rise.  It is standard
18 procedure that you do a quarterly evaluation
19 to let the employee staff know where they are
20 presently in the department.
21                And the reason for that is when
22 the final evaluation is done, it is not a
23 surprise to them what the outcome of their
24 evaluation would be.  Meaning, during the
25 course of the year if every three months you

1          R. Gillette

2   are barred from using those words, so the
3   night shift is basically it is a shift where
4   there are no specific perimeters that the
5   staff get into to expose themselves to any
6   form of discrimination by the examples I just
7   gave you. We are not permitted to use those
8   words.
9            In addition to that, we are only
10  allowed to listen to one radio station.
11  Generally, it was Light FM. We've switched
12  that to Fresh 102.7, which is maybe a little
13  upgrade from Light FM where the music is a
14  little more later date and that is the only
15  station we are permitted to listen to.
16           We are not permitted to listen to
17  Z100 or 107 or any of the other stations that
18  would play rap music. That is the only
19  station we are permitted to listen to.
20           Within that guideline of a radio
21  station, the words we are permitted to use as
22  far as discrimination goes, it limits us to
23  being able to discriminate from any
24  individual, from one to the next.
25       Q.   As a supervisor, have you ever

42

1                      R. Gillette

2         Q.     There were never any jokes about people's national origin, places of origin?

4         A.     No. No. We spoke about a lot of things. I mean, we cursed, but I do not remember anyone getting -- because the reason for that being, the staff at the time, and it still is, it is quite diverse, and from what I remember, no one would say anything about anyone's national origin and I believe specifically because what was one individual going to say when a lot of the staff were from different places.

            From what I remember, we got in a lot of different discussions, but national origin was never one, and this, I'm talking about way back, I'm not talking about now, I'm talking about back in the days when we cursed and we used the N word and national origin was never a discussion.

21         Q.     And this was five years ago, approximately?

23         A.     Approximately.

24         Q.     And at the time of this meeting, were you a supervisor for the night shift?

1  R. Gillette

2  Q. Why did the two of you stop
3  speaking?
4  A. Well, over the years, I've
5  observed Edmund to be someone who is, I would
6  say, very controlling. Sometimes in the
7  discussion that I mentioned that we had in the
8  department, sometimes other staff would say
9  like to him, Edmund Bryan, like why don't you
10 let me speak.
11         He had a way about him that when
12 he started to speak, he would overpower the
13 person and not, you know, not have a
14 conversation where I speak, you speak, he
15 would be the only one speaking, which to some
16 degree, it was like it is no big deal. People
17 have different ways of being in the world. It
18 never bothered me. But that was a little
19 something that I had kept in mind.
20         And then the night -- it happened
21 two nights where one night at the time, I was
22 in charge of the night shift and I delegated
23 where each staff would be, what their work
24 would be.
25         I remember one night, I was

1                R. Gillette

2   he indicated like, yes, and in the e-mail, I

3   am not getting the point. It led me to the

4   conclusion that from his standpoint, it was,

5   and I, as the supervisor, I needed to stop it.

6          The same night, I read the e-mail

7   in response to the one I sent where he had

8   wrote in the e-mail like I don't get it, but I

9   completed reading what he wanted done and I

10  had a staff meeting.

11       Q.   Okay.

12       A.   In the staff meeting, I explained

13  to everyone, whatever your culture is, that

14  that person is only allowed to speak within

15  the confines of your culture, which means if

16  you are Spanish or Puerto Rican, you can't

17  speak in Jamaican. If you are Jamaican, you

18  can't speak Spanish. Just that everyone had

19  to stay within the confines of their national

20  origin or culture, so to speak.

21          The staff thought it was kind of

22  strange, but anyway, that was the staff

23  meeting that I had and I explained to everyone

24  that this is what needs to be done and this

25  was in response to what John had explained to

58

1       R. Gillette
2  me, had transpired between Efrain and Lennox
3  and what he wanted done.
4       Q.   Do you understand now why that
5  could be viewed as discrimination in the
6  workplace?
7       MS. KALE:  Objection.
8       If you understand the question,
9       you can answer.
10      A.   My personal opinion?
11      Q.   Yes.
12      A.   I believe it depends on how the
13 person choose to deliver it.  In the situation
14 between Efrain and Lennox, I believe the way
15 it was done was not discriminatory.  I know
16 people can take the same words or approach and
17 mean -- and put a different meaning behind it.
18      So to answer your question, it is
19 not a point-blank answer, it is relative to
20 how it is being used and the person's
21 intentions behind it.
22      Q.   Okay.  So your same opinion holds
23 with regards to the use of nigger, it depends
24 on how the person using the word intends it to
25 be used?

66

1              R. Gillette
2    important, then that is the weight it
3    deserves. And in cases and situations like
4    these, the appropriate weight as needed is
5    what I put on it.
6         Q.   And what was the appropriate
7    weight that you placed on the issue of the use
8    of vulgarity in the workplace?
9         A.   Make sure it doesn't happen.
10        Q.   How did you go about making sure
11   it doesn't happen?
12        A.   Staff meetings. I would have a
13   staff meeting and I would explain to staff in
14   like in the same instance where this incident
15   happened with Efrain Perez and the first night
16   I received the e-mail of the incident, I
17   responded back to John Meggs. The following
18   night he responded back to me and that same
19   night, I had a staff meeting.
20        Q.   Do you recall signing a document
21   addressed to you by John Meggs in which you
22   were told that you would be held accountable
23   resulting in termination of employment should
24   a staff member make allegations related to
25   issues of anti-harassment or nondiscrimination

1          R. Gillette
2     A.    You know he spoke with -- he did
3  an Australian accent where I think there was
4  this guy, the Australian outback, I think we
5  are all familiar with.
6     Q.    Crocodile Dundee?
7     A.    Yes.
8     Q.    Right.
9     A.    And he did an accent and the
10 accent, I thought, was pretty exact to the way
11 the guy spoke.  When he did that, I didn't
12 find it offensive.  Then he did an
13 impersonation of Sean Connery, which I thought
14 was really exact.  When he did the
15 impersonation of Sean Connery, I didn't think
16 he was violating hospital policy to do an
17 impersonation to Sean Connery.
18         I could have said, Efrain, you
19 are in violation of Memorial Sloan-Kettering
20 by impersonating Sean Connery, but I did not.
21 I didn't think it was offensive and I didn't
22 think, by me using my common sense to discern
23 his approach, I didn't think he was trying to
24 be.  And at which point, I didn't make it my
25 business to shut him down and to say this is

87

1               R. Gillette

2   not hospital policy, you cannot, in here on

3   hospital property, do an impersonation of Sean

4   Connery. I didn't. I didn't find it

5   offensive. Still don't.

6        Q.   So when you found out that he was

7   doing impersonations of a Jamaican accent, was

8   he doing an impersonation of Bob Marley or was

9   it a generic Jamaican?

10       A.   I never heard him do an

11  impersonation of a Jamaican accent.

12       Q.   Okay.

13       A.   The way I got this information

14  was from John Meggs.

15       Q.   So at the point in time when you

16  got that information, you did not interpret

17  him doing an impersonation or attempting to do

18  an impersonation of a Jamaican as being

19  offensive?

20       A.   No.

21       Q.   And as we sit here today, do you

22  feel that that is appropriate behavior for the

23  workplace?

24            MS. KALE: Objection.

25       A.   My opinion?

CLASSIC REPORTING, INC., 212-268-2590