# EXHIBIT I

**ORIGINAL**

1

```
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
----------------------------------------x
EDMUND BRYAN,

                    Plaintiff,

        -against-                          No. 07 Civ. 7300 (SHS

                                           ECF Case
MEMORIAL SLOAN-KETTERING CANCER
CENTER,

                    Defendant.
----------------------------------------x
```

                    May 6, 2008
                    10:08 A.M.


        Deposition of Non-Party Witness DR. MICHAEL MURPHY, taken by Defendant and Plaintiff, pursuant to Supboena, at the offices of McDermott, Will & Emery, LLP, 340 Madison Avenue, New York, New York 10173, before Charisse Romeo, a Shorthand Reporter and Notary Public within and for the State of New York.



ARTA PASCULLO, President

**CLASSIC REPORTING, INC.**
TOTAL LITIGATION SUPPORT
13 West 36th Street • New York, New York 10018
Tel: (212) 268-2590 • Fax: (212) 268-2596

1           M. Murphy

2                I made no note of the social

3      activities at that time.

4                Mental status examination:  He is

5      a large black male wearing a skull cap and

6      looking his stated age.  He was pleasant and

7      cooperative and also intelligent, continuous

8      circumstantial speech, but distractible.  His

9      concentration was mildly impaired.

10               His thinking concerns activities

11     at the workplace, paranoia, no clear-cut

12     delusions.  His affect was constricted, but

13     could smile.  Was not suicidal or violent

14     ideation.  His insight was moderately impaired

15     and his judgment mildly impaired.

16               My differential diagnosis at the

17     conclusion of the interview was Bipolar

18     Affective Disorder Type II hypomanic, Bipolar

19     Affective Disorder Type II mixed or

20     Schizoaffective Disorder.

21               The plan at that time was to

22     continue seeing Dr. Mayo on an individual

23     basis and I initiated the trial of medication,

24     Loxapine, 10 to 20 milligrams at bedtime.  He

25     was to return to see me on May 21st.

15

   1                      M. Murphy

   2        Q.    So is it -- throughout your
   3  notes, you made reference to paranoia?
   4        A.    Yes.
   5        Q.    Is paranoia a symptom of being
   6  bipolar?
   7        A.    Not necessarily.
   8        Q.    Okay.  Could it be?
   9        A.    It could be.
  10        Q.    Okay.  In Mr. Bryan's case, is
  11  there a relationship between the paranoia you
  12  perceived as his possibly being bipolar?
  13        A.    I don't understand your question.
  14        Q.    Do you think the paranoia you've
  15  described is related to his being bipolar?
  16        A.    Well, they can go hand in hand.
  17        Q.    Um --
  18        A.    But again, not necessarily.
  19        Q.    Not necessarily?
  20        A.    Correct.
  21        Q.    In terms of -- in terms of
  22  getting along with other people, how does
  23  being bipolar affect, if at all, your ability
  24  to get along with other people?
  25        A.    Oh --

1       M. Murphy

2  in there in a generic sense where it is

3  synonymous with suspicious.

4       Q.   So you weren't using it in a

5  medical sense?

6       A.   No.

7       Q.   No?

8       A.   No.

9       Q.   Well, let me ask you this: if you

10  would look at what I have as page 2 of your

11  notes, it is the top of the page.

12       A.   Yes.

13       Q.   He has some belief that others

14  who bump him on the street or in the subway

15  are sent by Memorial Sloan-Kettering, do you

16  remember writing that?

17       A.   Yes.

18       Q.   Do you remember what he told you,

19  how -- why you wrote that?

20       A.   No more than I have noted there.

21       Q.   Okay. Well, did you find it a

22  sign of paranoia that he has some belief that

23  people who bump him on the street or on the

24  subway have been sent by Memorial

25  Sloan-Kettering?

CLASSIC REPORTING, INC., 212-268-2590

```
                                                        20
 1                     M. Murphy
 2         A.    Yes.
 3         Q.    Did you find that to be a
 4   rational observation or an observation of
 5   somebody who has a difficult time
 6   distinguishing between reality and paranoia?
 7              MR. RADOMISLI:  Objection to
 8        form.
 9              You can answer.
10         A.    I think it was questionable.
11         Q.    Questionable?
12         A.    Yes, the rationality of it.
13         Q.    Would those kind of comments the
14   things that caused you to write paranoia, use
15   the term "paranoia" a lot?
16              MR. RADOMISLI:  Objection to
17        form.
18         A.    That would be one example.
19         Q.    Would those kind of statements
20   lead you to doubt whether or not his
21   perception of things was, in fact, reality?
22         A.    Yes, I would --
23              MR. RADOMISLI:  Objection.
24         A.    I would question perception, yes.
25         Q.    In treating him, did you ever
```

                                                                    21

1                       M. Murphy

2    review -- were you ever aware that there had

3    been -- previously been a lawsuit that Mr.

4    Bryan had brought?

5           A.   The only one I have is, again,

6    somewhere within the five years of my seeing

7    him, yes.

8           Q.   If I told you that, in the prior

9    report, in the prior decision, if I told you

10   in the prior court case, Mr. Bryan testified

11   that he believes that ambulances that are

12   owned by New York Presbyterian Hospital follow

13   him around at the behest of Sloan-Kettering,

14   would you, based on that and based on what he

15   told you about people bumping him on the

16   street and subway, would that add to your

17   belief that he has a difficult time with

18   reality?

19          A.   Yes.

20               MR. RADOMISLI:  I'll object to

21          the extent that you are referring to

22          prior testimony.  However, if you want

23          to refer, there is actually an

24          additional note in his original records

25          that is not part of the exhibit.

                CLASSIC REPORTING, INC., 212-268-2590

```
 1                      M. Murphy
 2   illogical?
 3           A.    Yes.
 4           Q.    But he basically repeated the
 5   same kind of remarkable and illogical claim
 6   when he told you that he believed that people
 7   who bump him on the subway or on the street
 8   are sent by Memorial Sloan-Kettering; is that
 9   correct?
10           A.    Yes.  I qualified it with he had
11   some belief.
12           Q.    All right.  Now, do you have --
13   based on your examination, do you believe that
14   Mr. Bryan is, given his condition, is capable
15   of supervising other employees?
16                 MR. RADOMISLI:    Objection.
17           A.    What time are we referring to?
18           Q.    When you -- right now, do you
19   think he is capable of supervising employees?
20           A.    I don't know.
21           Q.    Okay.  And you say -- you asked
22   at what point in time.
23                 Was there a point in time when it
24   would have been different?
25           A.    Well, I've known Mr. Bryan for
```

1        M. Murphy
2   about a year now and there were ups and downs
3   and there would be times when he was not
4   emotionally disposed to supervising other
5   people.
6        Q.   And what do you mean by that, he
7   was not emotionally disposed?
8        A.   Well, he was quite anxious when
9   he was having anxiety attacks, if he was
10  crying, times like that.
11       Q.   Okay.  Did you find anything
12  clinically interesting in the fact that he had
13  fits of crying?
14            MR. RADOMISLI:  Objection to
15       form.
16       Q.   You can answer.
17       A.   Totally understandable, given how
18  he described the work environment and the
19  adverse court decision.
20       Q.   Yes, but as you now, now that
21  you've seen the court decision and based on
22  the comments you've gone over, do you now
23  believe that, in his description of his work
24  environment, that that is something to be
25  taken with a grain of salt?