UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------- X
EDMUND BRYAN,                        :

        Plaintiff,            :
                                          No. 07 Civ. 7300 (SHS)
  -against-                         :
                                          ECF CASE
MEMORIAL SLOAN-KETTERING CANCER    :
CENTER,

        Defendant.            :
------------------------------------- X

## DEFENDANT'S STATEMENT IN COMPLIANCE WITH RULE 56.1

1. Defendant Memorial Sloan-Kettering Cancer Center (the "Center") is a not-for-profit institution devoted to patient care, education and research in cancer. (Dudley Aff. ¶4.)

2. The Center is committed to treating patients with cancer and conducting research to improve treatment options and develop a potential cure for cancer. (Id.)

3. The Center maintains a written Equal Employment Opportunity ("EEO") Policy states, in relevant part, that:

> It is the Center's policy to provide equal opportunity, in accordance with all applicable federal, state and local civil rights laws, to all of its employees and applicants for employment without regard to race, color, religion, gender, age, national origin, marital status, citizenship status, disability, veteran status or sexual orientation of qualified persons consistent with the Center's Affirmative Action Program.
>
> Any complaint of discrimination or harassment based upon race, color, religion, gender, age, national origin, marital status, citizenship status, disability, veteran status, sexual orientation or any other category protected by applicable law is to be referred immediately to an employee's supervisor. The employee's supervisor informs the Employee Relations Department of all discrimination complaints. However, employees may bring their complaints directly to any Employee Relations representative or any other MSKCC management-level employee for investigation and appropriate action. To the extent possible, such matters will

be treated confidentially. There will be no retaliation against any employee who brings a complaint.

(Id. at ¶8, Ex. A.)

4. The Center also maintains a written Anti-Harassment Policy that specifically prohibits retaliation against individuals who make complaints of discrimination or harassment, stating that, "the Center prohibits retaliation against any individual who reports harassment or participates in an investigation of such reports." (Id. at ¶9, Ex. B)(the EEO Policy and the Anti-Harassment Policy are collectively referred to herein as the "Policies").

5. The Center's commitment to the Policies is exhibited by its efforts to make the Policies known to its employees by posting EEO notices on appropriate bulletin boards and by providing employees with copies of its Employee Handbook, which also sets forth the Policies. (Id. at ¶10.)

6. The Center's commitment to the Policies is further demonstrated by its practice of utilizing the Employee Affairs Department ("Employee Affairs"), which is a part of Human Resources, to address complaints of discrimination, retaliation or harassment and to monitor employment decisions. (Id.)

7. On September 13, 2002, Mr. Bryan filed a complaint with the New York City Commission on Human Rights ("City Commission") asserting claims of discrimination, retaliation and harassment on the basis of perceived sexual orientation. (Kale Aff. ¶3.)

8. On June 5-6, 2006, these claims were litigated at a two-day hearing before an Administrative Law Judge ("ALJ") who determined that: (i) Mr. Bryan was not a member of a protected class and the Center did not discriminate against him based on his perceived sexual orientation by failing to promote him; (ii) the complained-of-conduct was not sufficiently severe

or pervasive enough to establish a hostile work environment; and (iii) Mr. Bryan did not engage in protected activity because he never complained of discrimination. (Id. at ¶3, Ex. A pp. 2, 10.)

9. The City Commission adopted the findings of the ALJ and dismissed Mr. Bryan's claims in their entirety. (Id. at ¶3, Ex. B.)

10. Mr. Bryan appealed the City Commission's dismissal by way of a petition to the New York State Supreme Court. (Id. at ¶3.)

11. On April 20, 2007, the New York State Supreme Court upheld the City Commission's dismissal in a final disposition. (Id. ¶3, Ex. C.)

12. On February 20, 2007, and while his claims were still pending before the New York State Supreme Court, Mr. Bryan filed a charge of discrimination ("Charge") against the Center with the Equal Employment Opportunity Commission ("EEOC"). (Id. at ¶4.)

13. The EEOC dismissed the Charge concluding that, based on the evidence presented, no violations had occurred. (Id. at ¶4, Ex. D.)

14. On May 8, 1989, the Center hired Mr. Bryan as a technician in the Central Processing Department ("CPD"), which position he remains in to date. (Dudley Aff. ¶11.)

15. The CPD is responsible for the sterilization of all the reusable surgical instruments and equipment of the Center and its hospitals and clinics. (Dudley Aff. ¶12.)

16. The cleaning and packaging process performed by CPD technicians consists of five steps: (i) decontamination; (ii) preparation and packaging, which requires checking the pieces for cleanliness, ensuring that the instruments are in working order and packaging them in sets; (iii) sterilization using steam, ethylene oxide or sterrad; (iv) Custom Ultra Sonic sterilization for the scopes; and (v) sterile storage for the instruments awaiting return to the hospital or clinics. (Gillette Dep. 9-11.)

17. As a CPD technician, Mr. Bryan's responsibilities consist of decontaminating, packaging and sterilizing reusable hospital surgical instruments and equipment as per established Center and departmental guidelines. (Gillette Dep. 9-11; Ruiz Dep. 8-9.)

18. In this capacity, Mr. Bryan reports directly to Rupert Gillette, who is the CPD night shift Supervisor. (Pl. Dep. 32.)

19. Although Mr. Gillette is responsible for completing Mr. Bryan's -- and all other night shift employees' -- performance evaluations, Mr. Gillette has no decision-making authority with respect to hiring, promotion and termination decisions. (Gillette Dep. 12-13, 25; Donoghue Dep. 11.)

20. John Meggs, the former Manager of the CPD, was the decision-maker concerning the terms and conditions of Mr. Bryan's employment until January 2008, when Mr. Meggs' employment was terminated. (Gillette Dep. 16; Donoghue Dep. 11; Dudley Aff. ¶12.)

21. Throughout the course of his nearly twenty-year employment with the Center, Mr. Bryan has displayed a profound inability to get along with his supervisors and co-workers. (Pl. Dep. 18, 21-25, 31, 106-107; Ruiz Dep. 50-51, 55-56; Donoghue Dep. 81-82; Gillette Dep. 50; Kale Aff., Ex. A p. 8.)

22. Mr. Bryan has complained about every one of his supervisors (and many of his co-workers) during his lengthy employment with the Center, including filing multiple police reports. (Pl. Dep. 49-50, 107; Kale Aff., Ex. A pp. 4, 5.)

23. There has been a factual determination by the ALJ in the prior proceedings before the City Commission that, "Mr. Bryan is immensely disliked in his department, cannot work cooperatively with others, and even by his own admission, appears always to be in the vortex of conflict." (Kale Aff., Ex. C p. 7.)

24. At least five of Mr. Bryan's co-workers on the night shift have reported to CPD management and to Human Resources that Mr. Bryan has created an uncomfortable work environment and that they fear for their safety in continuing to work with him. (Ruiz Dep. 55-59; Dudley Aff. ¶16, Ex. F.)

25. Job vacancies are either filled through the Center's formal job posting and interview process or pursuant to the practice of department managers moving incumbent employees into vacant positions. (Donoghue Dep. 76-77; Dudley Aff. ¶14.)

26. In or around April 2006, the Center had an opening for the position of Lead Technician on the night shift. (Dudley Aff. ¶15.) To solicit applicants, the Center listed the position on its job postings bulletin and verbally announced the vacancy to all shifts of the CPD, including the night shift that Mr. Bryan worked. (Dudley Aff. ¶15, Ex. D.)

27. The Center has no record of Mr. Bryan applying for this position. (Dudley Aff. ¶15, Ex. E.)

28. Mr. Meggs interviewed and selected Miguel Ruiz, who was an outside candidate, to fill the Lead Technician position. (Ruiz Dep. 26; Dudley Aff. ¶15.)

29. Prior to joining the Center, Mr. Ruiz had approximately twenty-two years experience in surgical instrument sterilization and served as Lead Technician and Supervisor at New York University Medical Center. (Ruiz Dep. 6-7.)

30. Mr. Ruiz began his employment on July 24, 2006. (Ruiz Dep. 5, 26; Dudley Aff. ¶15.)

31. In or around September 2006, the CPD had an opening for an Equipment Specialist (also referred to as Instrument Specialist) on the night shift. (Dudley Aff. ¶14.)

32. An Equipment Specialist is required to have excellent interpersonal and communication skills as the position requires significant interaction with other employees and departments throughout the Center (*e.g.*, the Perioperative Department). (Pl. Dep. 108; Donoghue Dep. 79-80.)

33. On September 14, 2006, Mr. Meggs moved Kevin Walrond into the vacant Equipment Specialist position. (Pl. Dep. 9; Donoghue Dep. 79-80; Dudley Aff. ¶14.)

34. In July 2007, the CPD had another opening for an Equipment Specialist on the night shift. (Pl. Dep. 8.) Mr. Bryan applied and interviewed for this position with Mr. Meggs. (Id.)

35. The Equipment Specialist was closed without being filled and is now being eliminated altogether. (Pl. Dep. 9; Gillette Dep. 12.)

36. The CPD employs many employees from diverse racial and ethnic backgrounds. (Gillette Dep. 42; Dudley Aff. ¶13.) For example, the majority of CPD employees are of Caribbean, Central American or African descent. (Dudley Aff. ¶13.)

37. Currently, there are nine employees of Jamaican national origin employed in the CPD (including Mr. Bryan), three of whom have been promoted to the position of Equipment Specialist by Mr. Meggs. (Pl. Dep. 54; Dudley Aff. ¶13.)

38. The ALJ found overwhelming evidence that the reason Mr. Bryan had failed to advance at the Center was because he lacks basic interpersonal skills. (Kale Aff., Ex. A pp. 2, 8.)

39. All of Mr. Bryan's prior complaints concerning his treatment in the workplace have been found to be: (i) unrelated to his membership in a protected class; (ii) not severe or

pervasive enough to constitute a violation of the relevant discrimination laws; or (iii) simply not credible. (Kale Aff., Ex. A pp. 2, 7, 9.)

40. On March 7, 2007, Mr. Bryan made a complaint to Sheila Donoghue in Employee Relations concerning the alleged conduct of the staff members on the night shift. (Donoghue Dep., Ex A.) Specifically, Mr. Bryan complained about the use of foul language and what he perceived to be a homophobic and derogatory remark towards Jamaicans. (Id.)

41. Ms. Donoghue and Mr. Meggs promptly investigated Mr. Bryan's complaint but were unable to confirm any of his specific allegations. (Id. at 42-44, 63, Ex. A.)

42. The investigation concluded that, although there was some joking and banter among the staff -- none of which was directed at Mr. Bryan -- the behavior was neither severe nor pervasive, and was not based on membership in any protected class. (Id.)

43. Ms. Donoghue directed Messrs. Meggs and Gillette to inform the CPD staff to immediately cease any behavior that could be construed as offensive. (Id. at 43-44.)

44. Mr. Bryan never followed up with Ms. Donoghue to learn the results of her investigation. (Id. at 42.)

45. Ms. Donoghue periodically followed-up with CPD management to ensure the department's continued compliance with the Center's workplace standards of tolerance and mutual respect. (Id. at 71-72.)

46. Mr. Bryan testified that his relationships with his fellow employees, particularly Mr. Gillette, have improved since he filed the Charge with the EEOC. (Pl. Dep. 31-32, 93-94, 104-105.)

47. Mr. Bryan maintains that he is not homosexual and there has been a factual determination by the ALJ that no one at the Center perceives Mr. Bryan to be homosexual. (Pl. Dep. 51-52; Kale Aff., Ex. A pp. 2, 8.)

48. Mr. Bryan complains of the exact same comment that he raised in the prior proceedings to the effect that "men who live at home with their mothers are feminine." (Pl. Dep. 38-43, 52; Donoghue Dep., Ex. A; Kale Aff., Ex. A p. 4.)

49. Mr. Bryan makes no allegations of discriminatory comments or conduct against Mr. Meggs, who was the decision-maker with respect to departmental promotions. (Donoghue Dep. 11; Dudley Aff. ¶12.)

50. Mr. Bryan has received wage increases every year of his employment. (Pl. Dep. 103; Dudley Aff. ¶11.)

51. Mr. Bryan believes that the Center uses another hospital's ambulances to stalk him. (Pl. Dep. 98-100; Kale Aff., Ex. A pp. 4, 8.)

Dated: New York, New York
May 30, 2008

                              Respectfully submitted,

                              McDERMOTT WILL & EMERY LLP

By: _____
Joel E. Kale (JC 5312)
Katherine D. Kale (KK 7586)
340 Madison Avenue
New York, New York 10173
(212) 547-5400

Attorneys for Defendant
Memorial Sloan-Kettering Cancer Center

NYK 1162216-1.034164.0066