UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------ X
EDMUND BRYAN,                        :

       Plaintiff,               :
                                      No. 07 Civ. 7300 (SHS)
  -against-                         :
                                     ECF CASE
MEMORIAL SLOAN-KETTERING CANCER    :
CENTER,

       Defendant.               :
------------------------------------ X


# MEMORANDUM OF LAW IN SUPPORT OF
# DEFENDANT'S MOTION FOR SUMMARY JUDGMENT


McDERMOTT WILL & EMERY LLP

340 Madison Avenue
New York, New York  10173-1922
(212) 547-5400

Attorneys for Defendant
Memorial Sloan-Kettering Cancer Center

# TABLE OF CONTENTS

Page

TABLE OF CONTENTS ..................................................................................................................i

TABLE OF AUTHORITIES ........................................................................................................ ii

PRELIMINARY STATEMENT .................................................................................................. 1

STATEMENT OF FACTS ........................................................................................................... 2

    A.    The Center And Its Employment Policies ................................................................. 2

    B.    Procedural History .................................................................................................... 4

    C.    Plaintiff's Employment With The Center ................................................................. 5

    D.    Plaintiff's Long History Of Interpersonal Problems ................................................ 6

    E.    Vacancies In The CPD ............................................................................................. 7

    F.    Plaintiff's Complaints To Employee Relations ........................................................ 8

ARGUMENT ............................................................................................................................... 10

II.    STANDARD FOR SUMMARY JUDGMENT ............................................................... 10

III.    PLAINTIFF'S CLAIMS ARE BARRED BY *RES JUDICATA* AND/OR
*COLLATERAL ESTOPPEL* ........................................................................................ 10

IV.    PLAINTIFF FAILS TO ESTABLISH A CLAIM OF DISCRIMINATION. ................. 11

    A.    Plaintiff Cannot Establish A *Prima Facie* Case Of Discrimination .................... 12

        1.    Plaintiff Is Not A Member Of A Protected Class .................................... 12

        2.    Plaintiff Was Not Qualified To Be An Equipment Specialist ................. 13

        3.    Plaintiff Cannot Establish An Inference Of Discrimination .................... 14

    B.    The Center Has Articulated Legitimate Non-Discriminatory Reasons For
Its Failure To Promote ........................................................................................... 15

    C.    Plaintiff Cannot Show Pretext ................................................................................ 16

V.    PLAINTIFF'S RETALIATION CLAIM ALSO FAILS .................................................. 17

VI.    PLAINTIFF WAS NOT SUBJECT TO A HOSTILE WORK ENVIRONMENT ......... 20

    A.    Plaintiff's Fails To Allege New Allegations. ......................................................... 20

    B.    The Complained-Of-Conduct Is Not Severe Or Pervasive .................................... 21

CONCLUSION ............................................................................................................................ 24

# TABLE OF AUTHORITIES

**Page**

## FEDERAL CASES

Alfano v. Costello,
  294 F.3d 365 (2d Cir. 2002) ............................................................................... 20

Almonord v. Kingsbrook Jewish Med. Ctr.,
  No. 04 Civ. 4071 (NGG)(RML), 2007 U.S. Dist. LEXIS 58529
  (E.D.N.Y. Aug. 10, 2007) ............................................................................ 22, 23

Ancekewicz v. Long Island Univ.,
  No. 02 Civ. 4490 (DRH)(ARL), 2005 U.S. Dist. LEXIS 11662
  (E.D.N.Y. June 15, 2005) .................................................................................. 15

Anderson v. Liberty Lobby, Inc.,
  477 U.S. 242, 106 S. Ct. 2505 (1986) ............................................................... 10

Augustin v. Yale Club,
  No. 06 Civ. 5078, 2008 U.S. App. LEXIS 8775 (2d Cir. Apr. 23, 2008) ......... 23

Bailey v. Frederick Goldman, Inc.,
  No. 02 Civ. 2429 (JPG), 2006 U.S. Dist. LEXIS 12453
  (S.D.N.Y. Mar. 22, 2006) .................................................................................. 20

Burlington Northern & Santa Fe Ry. v. White,
  548 U.S. 53, 126 S. Ct. 2405 (2006) ................................................................. 17

Celotex Corp. v. Catrett,
  477 U.S. 317, 106 S. Ct. 2548 (1986) ............................................................... 10

Cruz v. Coach Stores, Inc.,
  202 F.3d 560 (2d Cir. 2000) .............................................................................. 17

Faragher v. City of Boca Raton,
  524 U.S. 775, 118 S. Ct. 2275 (1998) ............................................................... 15

Forrest v. Jewish Guild for the Blind,
  3 N.Y.3d 295, 786 N.Y.S.2d 382 (2004) .......................................................... 15

Goldman v. Admin. for Children's Servs.,
  No. 04 Civ. 7890 (GEL), 2007 U.S. Dist. LEXIS 39102
  (S.D.N.Y. May 28, 2007) .................................................................................. 14

## TABLE OF AUTHORITIES

                                                                                                                                   **Page**

Gregg v. New York State Dep't of Taxation & Fin.,
    No. 97 Civ. 1408 (MBM), 1999 U.S. Dist. LEXIS 5415
    (S.D.N.Y. Apr. 15, 1999) ............................................................................................... 21

Harris v. Forklift Sys.,
    510 U.S. 17 (1993) ........................................................................................................ 20

Harrison v. North Shore Univ. Hosp.,
    No. 04 Civ. 2033 (WDW), 2008 U.S. Dist. LEXIS 17330
    (E.D.N.Y. Mar. 6, 2008) ........................................................................................... 16, 18

Hollander v. American Cyanamid Co.,
    895 F.2d 80 (2d Cir. 1990) ............................................................................................ 19

Holt v. Roadway Package Sys.,
    506 F. Supp. 2d 194 (W.D.N.Y. 2007) .................................................................... 22, 23

Howley v. Town of Stratford,
    217 F.3d 141 (2d Cir. 2000) .......................................................................................... 12

Jackson v. City Univ. of N.Y.,
    No. 05 Civ. 8712 (JSR), 2006 U.S. Dist. LEXIS 43338
    (S.D.N.Y. June 26, 2006) .............................................................................................. 18

Janneh v. Regal Entm't Group,
    No. 07 Civ. 79, 2007 U.S. Dist. LEXIS 57297 (N.D.N.Y. Aug. 4, 2007) ............. 11, 21

McLee v. Chrysler Corp.,
    109 F.3d 130 (2d Cir. 1997) .......................................................................................... 14

Mody v. GE,
    No. 04 Civ. 358 (JCH), 2006 U.S. Dist. LEXIS 8611
    (D. Conn. Feb. 21, 2006) ............................................................................................... 15

Nicastro v. N.Y. City Dep't of Design & Constr.,
    No. 04 Civ. 2134, 2005 U.S. App. LEXIS 4255 (2d Cir. Mar. 14, 2005) ................... 18

Ofudu v. Barr Labs., Inc.,
    98 F. Supp. 2d 510 (S.D.N.Y. 2000) ............................................................................. 19

Pace v. Paris Maint. Co.,
    107 F. Supp. 2d 251 (S.D.N.Y. 2000), aff'd, 7 Fed. Appx. 94 (2d Cir. 2001) ............ 17

# TABLE OF AUTHORITIES

Page

Perry v. Ethan Allen, Inc.,
　115 F.3d 143 (2d Cir. 1997) .................................................................................. 20, 23

Pikoris v. Mount Sinai Med. Ctr.,
　No. 96 Civ. 1403 (JFK), 2000 U.S. Dist. LEXIS 7350
　(S.D.N.Y. May 30, 2000) ...................................................................................... 17, 19

Ponniah Das v. Our Lady of Mercy Med. Ctr.,
　No. 00 Civ. 2574 (JSM), 2002 U.S. Dist. LEXIS 7771
　(S.D.N.Y. Apr. 29, 2002), aff'd, 2003 U.S. App. LEXIS 1213
　(2d Cir. Jan. 23, 2003) ................................................................................................ 21

Taylor v. MCI, Int'l,
　215 F. Supp. 2d 347 (S.D.N.Y. 2002) ..................................................... 10, 11, 17, 21

Valentine v. Standard & Poor's,
　50 F. Supp. 2d 262 (S.D.N.Y. 1999), aff'd, 205 F.3d 1327 (2d Cir. 2000) ................ 16

Weinstock v. Columbia Univ.,
　224 F.3d 33 (2d Cir. 2000) ......................................................................................... 14

Yarde v. Good Samaritan Hosp.,
　360 F. Supp. 2d 552 (S.D.N.Y. 2005) ........................................................................ 19

## FEDERAL STATUTES

Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ............................................. 1

Fed. R. Civ. P. 56 .............................................................................................................. 10

## STATE STATUTES

New York Executive Law § 296 .......................................................................................... 1

Administrative Code of the City of New York § 8-107 ...................................................... 1

## PRELIMINARY STATEMENT

Defendant Memorial Sloan-Kettering Cancer Center ("Defendant" or the "Center"), submits this Memorandum of Law in support of its Motion, pursuant to Rule 56(c) of the Federal Rules of Civil Procedure, for an Order granting summary judgment in its favor and dismissing the Amended Complaint of Edmund Bryan ("Plaintiff" or "Mr. Bryan").[1] As demonstrated herein, there are no material facts in dispute, and the Center is entitled to summary judgment on Plaintiff's claims that he was discriminated and retaliated against and experienced a hostile work environment based on his perceived sexual orientation and national origin (Jamaican) in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e et seq. ("Title VII"), the New York State Human Rights Law, Executive Law § 296 et seq. and the Administrative Code of the City of New York § 8-107 et seq.

This action is the latest in Plaintiff's nearly seven-year campaign of vexatious litigation against the Center. Plaintiff's allegations regarding discrimination, retaliation and harassment have been tirelessly litigated prior to the filing of the Amended Complaint, being dismissed not once, but *three times*, by an administrative law judge ("ALJ"), the New York City Commission on Human Rights ("City Commission") and the New York State Supreme Court. Lacking any actual evidence to support his claims, Plaintiff instead chooses to re-hash (at times verbatim) his old allegations against the Center that have already been found to be insufficient as a matter of law. Moreover, Plaintiff's old but "new" allegations in the Amended Complaint do not come

---

[1] Defendant also submits: (i) Defendant's Statement In Compliance With Rule 56.1; (ii) Affidavit Of Katherine D. Kale, Esq., sworn to May 30, 2008 ("Kale Aff."), and the exhibits attached thereto; (iii) Affidavit Of Pamela Dudley, sworn to May 28, 2008 ("Dudley Aff."), and the exhibits attached thereto; and (iv) Appendix Of Unreported Cases Submitted In Support of Defendant's Motion For Summary Judgment. Relevant pages of the deposition transcripts of Edmund Bryan ("Pl."), Sheila Donoghue ("Donoghue"), Miguel Ruiz ("Ruiz") and Rupert Gillette ("Gillette") are attached to the Kale Aff. and are designated herein as "[Last Name] Dep. [page number]."

close to rising to the level of constituting actionable discrimination, retaliation or harassment. Indeed, Plaintiff undermines his own allegations of unlawful treatment by his repeated testimony that his treatment in the workplace has *actually improved*. This fatal admission further crystallizes the fact that Plaintiff's claims of perceived sexual orientation and national origin discrimination, retaliation and harassment are wholly without merit. Accordingly, Defendant is entitled to summary judgment and the Court should dismiss the Amended Complaint in its entirety.

## STATEMENT OF FACTS[2]

### A. The Center And Its Employment Policies.

The Center is a not-for-profit institution devoted to patient care, education and research in cancer. (Dudley Aff. ¶4.) The Center has pioneered and established the most advanced standards of care in cancer treatment and is committed to treating patients with cancer and conducting research to develop a potential cure for cancer. (Id.) Patients of the Center receive outstanding care, and the Center prides itself on the compassion and dedication of its doctors, nurses and other healthcare and administrative staff. (Id.)

In addition to its commitment to it patients, the Center is extremely committed to the success and development of its more than 9,000 employees and, in connection therewith, has instituted numerous initiatives and programs to improve the quality of their work and professional lives. (Id. at ¶5.) For example, the Center maintains an extensive Training and Development Department that offers classes to enhance employees' professional development free of charge, and a tuition reimbursement program for those employees who wish to go outside the Center to further develop their job skills. (Id.)

---

[2] Defendant does not concede the truth of Plaintiff's version of the facts, but does accept Plaintiff's factual assertions for the purposes of this Motion.

The Center also maintains a Work/Life Department to help employees enhance their life skills by offering various Work/Life Seminars (*e.g.*, "How to Hire a Nanny" and "How to Navigate the New York City School System") and contracting with LifeCare, an outside vendor, to provide comprehensive referral sources to employees regarding their child care, parenting, education, college planning, financial management and other types of life skills. (Id. at ¶6.) Further, the Center maintains an on-site Employee Assistance Program that provides counselors to confidentially assist employees with personal issues that may arise (*e.g.*, stress, depression). (Id. at ¶7.) Additionally, the Center maintains workers' compensation insurance, a short term disability plan and a long term disability plan, all of which provide a measure of protection and income during any period of a covered medical leave. (Id.)

Consistent with its mission of compassion, the Center also is committed to ensuring that none of its employees are subject to unlawful discrimination. (Id. at ¶8.) To this end, the Center's written Equal Employment Opportunity ("EEO") Policy states, in relevant part, that:

> It is the Center's policy to provide equal opportunity, in accordance with all applicable federal, state and local civil rights laws, to all of its employees and applicants for employment without regard to race, color, religion, gender, age, national origin, marital status, citizenship status, disability, veteran status or sexual orientation of qualified persons consistent with the Center's Affirmative Action Program.
>
> Any complaint of discrimination or harassment based upon race, color, religion, gender, age, national origin, marital status, citizenship status, disability, veteran status, sexual orientation or any other category protected by applicable law is to be referred immediately to an employee's supervisor. The employee's supervisor informs the Employee Relations Department of all discrimination complaints. However, employees may bring their complaints directly to any Employee Relations representative or any other MSKCC management-level employee for investigation and appropriate action. To the extent possible, such matters will be treated confidentially. There will be no retaliation against any employee who brings a complaint.

(Id. at ¶8, Ex. A.) Moreover, the Center's Anti-Harassment Policy specifically prohibits retaliation against individuals who make complaints of discrimination or harassment, stating that, "the Center prohibits retaliation against any individual who reports harassment or participates in an investigation of such reports." (Id. at ¶9, Ex. B)(the EEO Policy and the Anti-Harassment Policy are collectively referred to herein as the "Policies").

The Center's commitment to the Policies is exhibited by its efforts to make the Policies known to its employees by posting EEO notices on appropriate bulletin boards and by providing employees with copies of its Employee Handbook, which also sets forth the Policies. (Id. at ¶10.) The Center's commitment to the Policies is further demonstrated by its practice of utilizing the Employee Affairs Department ("Employee Affairs"), which is a part of Human Resources, to address complaints of discrimination, retaliation or harassment and to monitor employment decisions.[3] (Id.)

B.   Procedural History.

On September 13, 2002, Mr. Bryan filed a complaint with the City Commission premised on faulty allegations of discrimination, retaliation and harassment on the basis of perceived sexual orientation. (Kale Aff. ¶3.) On June 5-6, 2006, these claims were litigated at a two-day hearing before an ALJ who determined that: (i) Mr. Bryan was not a member of a protected class and the Center did not discriminate against him based on his perceived sexual orientation by failing to promote him; (ii) the complained-of-conduct was not sufficiently severe or pervasive enough to establish a hostile work environment; and (iii) Mr. Bryan did not engage in protected activity because he never complained of discrimination. (Id. at ¶3, Ex A pp. 2, 10.) The City

---

[3] In approximately July 2007, Human Resources underwent a re-organization during which the name "Employee Relations" was changed to "Employee Affairs." (Donoghue Dep. 8, 18-19; Dudley Aff. ¶10.)

Commission adopted the findings of the ALJ and dismissed Mr. Bryan's claims in their entirety. (Id. at ¶3, Ex. B.) Mr. Bryan appealed the City Commission's dismissal by way of a petition to the New York State Supreme Court. (Id. at ¶3.) On April 20, 2007, the New York State Supreme Court upheld the City Commission's dismissal in a final disposition. (Id. ¶3, Ex. C.)

While his claims were still pending before the New York State Supreme Court, Mr. Bryan filed a charge of discrimination ("Charge") against the Center with the Equal Employment Opportunity Commission ("EEOC"). (Id. at ¶4.) The EEOC dismissed the Charge concluding that, based on the evidence presented, no violations had occurred. (Id. at ¶4, Ex. D.) Upon receipt of his right to sue letter from the EEOC, Mr. Bryan filed a complaint with this Court, which complaint was subsequently amended to abandon the causes of action related to Mr. Bryan's race and/or color. (Id. at ¶4.) The Center now moves for summary judgment with respect to all remaining claims in the Amended Complaint.

C.    Plaintiff's Employment With The Center.

On May 8, 1989, the Center hired Mr. Bryan as a technician in the Central Processing Department ("CPD"), which position he remains in to date. (Dudley Aff. ¶11.) The CPD is responsible for the sterilization of all the reusable surgical instruments and equipment of the Center and its hospitals and clinics. (Dudley Aff. ¶12.) The cleaning and packaging process performed by CPD technicians consists of five steps: (i) decontamination; (ii) preparation and packaging, which requires checking the pieces for cleanliness, ensuring that the instruments are in working order and packaging them in sets; (iii) sterilization using steam, ethylene oxide or sterrad; (iv) Custom Ultra Sonic sterilization for the scopes; and (v) sterile storage for the instruments awaiting return to the hospital or clinics. (Gillette Dep. 9-11.)

As a CPD technician, Mr. Bryan's responsibilities consist of decontaminating, packaging and sterilizing reusable hospital surgical instruments and equipment as per established Center

and departmental guidelines described above. (Gillette Dep. 9-11; Ruiz Dep. 8-9.) In this capacity, Mr. Bryan reports directly to Rupert Gillette, who is the CPD night shift Supervisor. (Pl. Dep. 32.) Although Mr. Gillette is responsible for completing Mr. Bryan's -- and all other night shift employees' -- performance evaluations, Mr. Gillette has no decision-making authority with respect to hiring, promotion and termination decisions.[4] (Gillette Dep. 12-13, 25; Donoghue Dep. 11.) Rather, John Meggs, the former Manager of the CPD, was the decision-maker concerning the terms and conditions of Mr. Bryan's employment until January 2008, when Mr. Meggs' employment was terminated. (Gillette Dep. 16; Donoghue Dep. 11; Dudley Aff. ¶12.)

D.   Plaintiff's Long History Of Interpersonal Problems.

Throughout the course of his nearly twenty-year employment with the Center, Mr. Bryan has displayed a profound inability to get along with his supervisors and co-workers. (Pl. Dep. 18, 21-25, 31, 106-107; Ruiz Dep. 50-51, 55-56; Donoghue Dep. 81-82; Gillette Dep. 50; Kale Aff., Ex. A p. 8.) Indeed, Mr. Bryan himself admits that he has made complaints about *every one* of his supervisors (and many of his co-workers) during his lengthy employment with the Center, including filing multiple police reports. (Pl. Dep. 49-50, 107; Kale Aff., Ex. A pp. 4, 5.) Additionally, there has been a factual determination by the ALJ in the prior proceedings before the City Commission that, "Mr. Bryan is immensely disliked in his department, cannot work cooperatively with others, and even by his own admission, appears always to be in the vortex of conflict." (Kale Aff., Ex. C p. 7.) Mr. Bryan's lack of interpersonal skills is so readily apparent that at least five of his co-workers on the night shift have reported to CPD management and to

---

[4] Although Mr. Bryan speculated in his deposition that Mr. Gillette (his immediate supervisor) was the decision-maker with respect to departmental promotions, he admitted he has no personal knowledge of this. (Pl. Dep. 45-47.)

Human Resources that Mr. Bryan has created an uncomfortable work environment and that they fear for their safety in continuing to work with him. (Ruiz Dep. 55-59; Dudley Aff. ¶16, Ex. F.)

E.   Vacancies In The CPD.

Job vacancies are either filled through the Center's formal job posting and interview process or pursuant to the practice of department managers moving incumbent employees into vacant positions. (Donoghue Dep. 76-77; Dudley Aff. ¶14.) Such practice is consistent with the Center's Job Posting Policy, which policy provides that *generally* open position will be posted. (Dudley Aff. ¶14, Ex. C.) The word "generally" is used to allow department managers the flexibility to promote incumbent employees into positions when they determine an incumbent is qualified and ready for the promotion. (Id.)

In or around April 2006, the Center had an opening for the position of Lead Technician on the night shift. (Dudley Aff. ¶15.) To solicit applicants, the Center listed the position on its job postings bulletin and verbally announced the vacancy to all shifts of the CPD, including the night shift that Mr. Bryan worked.[5] (Dudley Aff. ¶15, Ex. D.) Thereafter, Mr. Meggs interviewed and selected Miguel Ruiz, who was an outside candidate, to fill the position. (Ruiz Dep. 26; Dudley Aff. ¶15.) Mr. Ruiz began his employment on July 24, 2006 -- *before* the ALJ's decision dismissing Mr. Bryan's claims before the City Commission. (Ruiz Dep. 5, 26; Dudley Aff. ¶15.) Prior to joining the Center, Mr. Ruiz had approximately twenty-two years experience in surgical instrument sterilization and served as Lead Technician and Supervisor at New York University Medical Center. (Ruiz Dep. 6-7.)

In or around September 2006, the CPD had an opening for an Equipment Specialist (also referred to as Instrument Specialist) on the night shift. (Dudley Aff. ¶14.) An Equipment

---

[5] The Center has no record of Mr. Bryan applying for this position. (Dudley Aff. ¶15, Ex. E.)

Specialist is required to have excellent interpersonal and communication skills as the position requires significant interaction with other employees and departments throughout the Center (*e.g.*, the Perioperative Department). (Pl. Dep. 108; Donoghue Dep. 79-80.) On September 14, 2006, in accordance with the above-described practice, Mr. Meggs moved Kevin Walrond into the vacant Equipment Specialist position. (Pl. Dep. 9; Donoghue Dep. 79-80; Dudley Aff. ¶14.) The following year, in July 2007, the CPD had another opening for an Equipment Specialist on the night shift. (Pl. Dep. 8.) Mr. Bryan applied and interviewed for this position with Mr. Meggs. (Id.) Ultimately, however, this position was closed without being filled and is now being eliminated altogether. (Pl. Dep. 9; Gillette Dep. 12.)

Notably, the CPD employs many employees from diverse racial and ethnic backgrounds. (Gillette Dep. 42; Dudley Aff. ¶13.) For example, the majority of CPD employees are of Caribbean, Central American or African descent. (Dudley Aff. ¶13.) Currently, there are nine employees of Jamaican national origin employed in the CPD (including Mr. Bryan), three of whom have been promoted to the position of Equipment Specialist by Mr. Meggs. (Pl. Dep. 54; Dudley Aff. ¶13.)

F. <u>Plaintiff's Complaints To Employee Relations.</u>

Plaintiff's tenure with the Center has been marked by a series of complaints about what are, in essence, mundane occurrences in the workplace. (Pl. Dep. 49-50, 106; Donoghue Dep. 23-24.) For example, one of Mr. Bryan's most frequent complaints concerns the volume and selection of music listened to during the night shift, notwithstanding the fact that the shift is only permitted to listen to "lite" music. (Donoghue Dep. 23-24; Gillette Dep. 32; Dudley Aff., Ex. F; Kale Aff., Ex. A p. 4.) In this regard, all of Mr. Bryan's prior complaints have been found to be: (i) unrelated to his membership in a protected class; (ii) not severe or pervasive enough to constitute a violation of the relevant discrimination laws; or (iii) simply not credible. (Kale Aff.,

Ex. A pp. 2, 7, 9.) Notably, the ALJ who observed Mr. Bryan during days of hearing found his testimony was "illogical," "unsupported" and "unpersuasive." (Id. at Ex. A pp. 8, 9.) Moreover, Mr. Bryan's psychiatrist testified that he would question the rationality of Mr. Bryan's perceptions. (Murphy Dep. 19-21.)

In any event, on March 7, 2007, Mr. Bryan made a complaint to Sheila Donoghue in Employee Relations concerning the alleged conduct of the staff members on the night shift. (Donoghue Dep., Ex A.) Specifically, Mr. Bryan complained about the use of foul language and what he perceived to be a homophobic and derogatory remark towards Jamaicans. (Id.) Ms. Donoghue and Mr. Meggs promptly investigated Mr. Bryan's complaint but were unable to confirm any of his specific allegations. (Id. at 42-44, 63, Ex. A.) More specifically, the investigation concluded that although there was some joking and banter among the staff -- none of which was directed at Mr. Bryan -- the behavior was neither severe nor pervasive, and was not based on membership in any protected class. (Id.) Nonetheless, in an abundance of caution, Ms. Donoghue directed Messrs. Meggs and Gillette to inform the CPD staff to immediately cease any behavior that could be construed as offensive. (Id. at 43-44.) Ms. Donoghue periodically followed-up with CPD management to ensure the department's continued compliance with the Center's workplace standards of tolerance and mutual respect.[6] (Id. at 71-72.)

---

[6] Notably, upon receiving Mr. Bryan's complaint, Ms. Donoghue requested that Mr. Bryan contact her in two days for an update. (Donoghue Dep., Ex. A.) Because Mr. Bryan works the night shift (11:00 p.m. until 7:00 a.m.) -- hours that Ms. Donoghue was not at work -- she had no way to reach him. (Id.) Mr. Bryan, however, failed to contact Ms. Donoghue and, thus, she was unable to reach him to give him the results of her investigation. (Id. at 42.)