# Unreported Case – Das

MATHAI P. PONNIAH DAS, Plaintiff, v. OUR LADY OF MERCY MEDICAL CENTER and RENEE CORTEZ, Defendants.

00 Civ. 2574 (JSM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2002 U.S. Dist. LEXIS 7771; 82 Empl. Prac. Dec. (CCH) P41,027

April 29, 2002, Decided

April 30, 2002, Filed

**DISPOSITION:** {*1} Defendants' motion for summary judgment granted and action dismissed.

**COUNSEL:** For MATHAI P. PONNIAH DAS, plaintiff: David M. Rosoff, Law Offices of Carton & Rosoff, P.C., Harrison, NY.

For OUR LADY OF MERCY MEDICAL CENTER, defendant: Lisa Victoria Moran, McDermott, Will & Emery, New York, NY.

For OUR LADY OF MERCY MEDICAL CENTER, RENEE CORTEZ, defendants: Joel E. Cohen, McDermott, Will & Emery, New York, NY.

**JUDGES:** JOHN S. MARTIN, JR., U. S. D. J.

**OPINION BY:** JOHN S. MARTIN

**OPINION:**
**OPINION AND ORDER**

JOHN S. MARTIN, JR., District Judge:

In this action, Plaintiff, a 60-year old Asian American of Indian national origin, has alleged that Defendants engaged in a three year pattern of harassment, discriminatory treatment, and unfair discipline, culminating in his discharge from his employment as a nurse at Our Lady of Mercy Medical Center, on the basis of his age, race, and national origin, in violation of 42 U.S.C. § 1981, the New York State Human Rights Law, N.Y. Exec. L. § 296, *et seq.*, and the New York City Human Rights Law, N.Y.C. Admin. Code § 8-107. n1 He also claims that his discharge constituted an act of illegal retaliation for his {*2} complaints of discrimination. Defendants now move for summary judgment in their favor, arguing that Plaintiff was disciplined and, ultimately, discharged as a result of his poor job performance, and that Plaintiff has failed to meet his burden of showing that this stated legitimate non-discriminatory reason for his discharge is pretextual. For the reasons that follow, Defendants' motion is granted.

- - -Footnotes- - -

n1 Mr. Das was 58 at the time of his discharge from his employment at Our Lady of Mercy Medical Center.

- - -End Footnotes- - -

The Summary Judgment Standard

Summary judgment may be granted only "if the pleadings, depositions, answers to interrogatories, and admissions . . ., together with the affidavits, . . . show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c); Celotex Corp. v. Catrett, 477 U.S. 317, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986). A dispute regarding a material fact is genuine if the evidence is such that a {*3} reasonable jury could return a verdict for the nonmoving party. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 106 S. Ct. 2505, 2514, 91 L. Ed. 2d 202 (1986). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." Id., 477 U.S. at 248, 106 S. Ct. at 2510. When considering a motion for summary judgment, the Court will consider only admissible evidence. Summary judgment is appropriate when the party opposing the motion relies exclusively on "conclusory allegations or denials." R.G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984).

Although the Second Circuit has suggested caution in granting summary judgment in discrimination cases in which intent is an issue, it has also made clear that: The summary judgment rule would be rendered sterile . . . if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment - avoiding protracted, expensive and harassing {*4} trials - apply no less to discrimination

cases than to commercial or other areas of litigation. **Meiri v. Dacon, 759 F.2d 989, 998 (2d Cir.), cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985).**

The Applicable Legal Standard

Cases brought under 42 U.S.C. § 1981, and the New York State and City Human Rights Laws require the presentation of proof in a three step evidentiary framework that is identical to that applied in cases brought under Title VII, 42 U.S.C. § 2000e. See **Patterson v. McLean Credit Union, 491 U.S. 164, 186, 109 S. Ct. 2363, 2377-78, 105 L. Ed. 2d 132 (1989); Song v. Ives Laboratories, Inc., 957 F.2d 1041, 1045 (2d Cir. 1992); Lopez v. S.B. Thomas, Inc., 831 F.2d 1184, 1188 (2d Cir. 1987); Bennett v. Watson Wyatt & Co., 136 F. Supp. 2d 236, 245 n.4 (S.D.N.Y. 2001); Brennan v. Metropolitan Opera Assoc., Inc., 1998 U.S. Dist. LEXIS 5562,** No. 95 Civ. 2926, 1998 WL 193204, at *7 (S.D.N.Y. Apr. 22, 1998), aff'd, **192 F.3d 310 (2d Cir. 1999)** ("This same burden-shifting analysis applies to {*5} age and sex discrimination claims brought under the State and City Human Rights Laws."); **Hunter v. Citibank, N.A., 862 F. Supp. 902, 908 (E.D.N.Y. 1994),** aff'd, **60 F.3d 810 (2d Cir.), cert. denied, 516 U.S. 978, 133 L. Ed. 2d 410, 116 S. Ct. 483 (1995)** ( § 1981). n2

- - -Footnotes- - -

n2 Plaintiff may not state a claim for age discrimination under 42 U.S.C. § 1981, but may bring such a claim pursuant to the New York State and New York City Human Rights Laws.

- - -End Footnotes- - -

In **Texas Dept. of Community Affairs v. Burdine, 450 U.S. 248, 101 S. Ct. 1089, 67 L. Ed. 2d 207(1981),** the Supreme Court laid out the process to be employed in evaluating employment discrimination cases under Title VII. First, the plaintiff must make out a prima facie case of discrimination. If the plaintiff meets this initial burden, the burden shifts to the defendant employer to articulate a legitimate, nondiscriminatory reason for its decision. Once the defendant has stated such {*6} a reason, the presumption of discrimination falls out of the case and the burden reverts to the plaintiff to prove by a preponderance of the evidence that the defendant's proferred explanations are not truthful, but merely a pretext for discrimination. **Id., 450 U.S. at 252-53, 101 S. Ct. at 1093; James v. New York Racing Assoc., 233 F.3d 149, 153-54 (2d Cir. 2000).** In order to prove pretext, the plaintiff must show "*both* that the [stated] reason was false, *and* that discrimination was the real reason" for the employer's action. **Gallo v. Prudential Residential Services, 22 F.3d 1219, 1225 (2d Cir. 1994)** (quoting **St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. 2742, 2752, 125 L. Ed. 2d 407 (1993))**. The ultimate burden of proving discrimination remains at all times with the plaintiff. **Burdine, 450 U.S. at 253, 101 S. Ct. at 1093.**

In order to make out his prima facie case, a Title VII plaintiff must show: (1) that he belonged to a protected class, (2) that he was qualified for the position, and/or that his job performance was satisfactory, (3) that he was discharged, and (4) that after {*7} his discharge the position remained open and the employer sought applicants with qualifications similar to plaintiff's. **Meiri v. Dacon, 759 F.2d 989, 995 (2d Cir.), cert. denied, 474 U.S. 829, 88 L. Ed. 2d 74, 106 S. Ct. 91 (1985).** Although "the heart of a prima facie case lies in the determination of whether the complained of personnel action occurred under circumstances giving rise to an inference of discrimination," **O'Connor v. Viacom Inc., 1996 U.S. Dist. LEXIS 5289, 1996 WL 194299,** *3 (S.D.N.Y. Apr. 23, 1996), aff'd, **104 F.3d 356 (2d Cir. 1996)** (citing **Spence v. Maryland Casualty Co., 995 F.2d 1147, 1155 (2d Cir. 1993),** the plaintiff is not required to produce any evidence of discrimination at this stage. **James v. New York Racing Assoc., 233 F.3d at 153-54.** Thus, plaintiff's burden in this respect is "de minimis". Id.; **Gallo, 22 F.3d at 1225; Dister v. Continental Group, Inc., 859 F.2d 1108, 1114 (2d Cir. 1988).**

The Facts Before the Court

Plaintiff Das was employed as a Registered Nurse at Our Lady of Mercy Medical Center (the "hospital") from October 6, 1980, until {*8} the date of his discharge, on December 6, 1998. Mr. Das claims that his performance as a Registered Nurse was excellent at all times, but that he began to receive unfavorable evaluations and to be unfairly disciplined in 1993, when Defendant Renee Cortez became his supervisor. He claims that thereafter Ms. Cortez waged a campaign of harassment, discriminatory treatment and unfair discipline, aimed ultimately at justifying his discharge. He alleges that Ms. Cortez's actions and his dismissal were motivated by animus due to his race, national origin, and age. In addition, Mr. Das contends that he was discharged in retaliation for his complaints about Ms. Cortez's discriminatory actions.

Mr. Das stated in his deposition that he believed that he had never made a mistake during his employment with the hospital (Das Dep. 229), and that all evaluations subsequent to the time that Ms. Cortez

became his supervisor, in which his performance was rated "Meets Standard" or "Below Standard", were unfair (Das Dep. 79, 137). n3 Actually, the September 1994 evaluation, which was the first one prepared by Ms. Cortez, was generally positive ("overall, Mr. Das is a very good nurse."). It also stated, {*9} "I would like to see improvement with bedside manners - bedside at times are sloppy. Mr. Das has shown improvement but he can do better. Please continue with the good work." That evaluation also recommended that Mr. Das attend various courses and seminars. In addition, it stated, "Appears to be a trend, ill on Sundays. If this continues contract will be terminated." (Brown Aff., Ex. F.) Mr. Das stated that this evaluation, including the statement, "Please continue the good work," was unfairly negative (Das Dep. 67-69.)

- - -Footnotes- - -3

n3 The employment records submitted in connection with this motion show that although Plaintiff was a satisfactory employee for many years, concerns about Mr. Das's performance were raised from time to time long before Ms. Cortez came on the scene. For example, Mr. Das received an evaluation in March 1988, which stated that the quality of Mr. Das's work was "Sometimes inadequate", that he "needed improvement in delegating direct care responsibilities to ancillary staff, agency", and that he "needed improvement in working cohesively with peers to maintain unit integrity." (Das Aff., Ex. A.) That evaluation also recommended that he complete and be retested on ACLS components. The records indicate that Mr. Das refused to sign this evaluation. Furthermore, the evaluation dated June 24, 1993, which was the last one before Ms. Cortez became his supervisor, was generally positive, but also stated that Mr. Das should attend several courses, and set out other goals for him. (Das Aff., Ex. A).

- - -End Footnotes- - -

{*10} Subsequently, the hospital's records present a picture of deteriorating performance and describe a series of incidents for which Mr. Das received counseling or warnings from Ms. Cortez. His October 25, 1995 review indicated that Mr. Das "Needs Improvement" in a number of areas. The Summary stated that Mr. Das had "shown improvement with use of sick time and improvement with bedside manners."

However, it went on to state, "I am concern [sic] with his duties as a charge nurse. Assignments at times were not made appropriately. . . Another issue is documentation, - incomplete. i.e., initial assessments, skin assessment, and vital signs. Das has been instructed to take more time doing these things & that immediate improvement is expected." Several Future Expected Outcomes were listed, including "Careful assignments when in charge." The Summary of the Performance Appraisal was "Unsatisfactory" (Brown Aff., Ex. H.)

On May 3, 1996, a note was placed in Mr. Das's file, which reflected a verbal warning given him by Ms. Cortez, which stated, "Per-Diems given hardest Assignment, Vital Signs Incomplete, Skin assessment incomplete, You are covering an RN who was transporting a patient for a {*11} test. You never took any vital signs, 0 meds given." (Brown Aff., Ex. I.) This warning is recorded on a Notice of Disciplinary Action dated November 6, 1996, which also stated that Mr. Das had received counseling in July 1996 due to inadequate compliance with nursing care standards. That Notice listed several problems with Mr. Das's performance, including failure to change a feeding bag, resulting in a patient receiving inadequate nutrition, and "Endotracheal tube tape was loose and was not changed - Affecting patient safety." It concluded,

"Mr. Das, we have spoken about your performance in the past, and counseling does not seem to have corrected them. These incidents represent lack of teamwork on your part. . . You are expected to make immediate improvement. Failure to make a sustained correction will lead to further disciplinary action including the possibility of suspension and/or termination from the Medical Center."

(Brown Aff., Ex. J.)

Plaintiff refused to sign this Notice, which was witnessed by another supervisor.

The Registered Nurse Appraisal Record dated December 10, 1996, notes performance "Below Standard" or "Needing Improvement" in a number of areas. It {*12} stated, "Does not provide appropriate patient care as discussed in past. i.e. Leaving the work environment in order and completed for the oncoming shift," and "improvement needed regarding clinical issues." It also stated, "Would like to see improvement in bedside manner." It did note, on the other hand, "Improvement in charge role noted," and "Improvement can be made in order to become a team player. Provides appropriate information during rounds." Plaintiff refused to sign this report, which also was witnessed.

Plaintiff received an additional Notice of Disciplinary Action dated February 10, 1996, n4 due to problems relating to a failure to adequately sedate, or take other measures, to prevent a patient from pulling out his nasogastric tube. The Report concluded:

"Mr. Das, we have spoken about your performance in the past, and counseling does not seem to have corrected them. These incidents do not meet the Standards of the Medical Center regarding patient safety and documentation. It is extremely important to collaborate with the physician regarding patient care when managing patients in the SICU. Also, your documentation must reflect actual events in order to follow up on {*13} a patient's progress in the hospital. . . You are expected to make immediate improvement. Failure to make a sustained correction will lead to suspension and/or termination from the Medical Center.

(Brown Aff., Ex. L.)

- - -Footnotes- - -4

n4 This date appears to be an error, and should be February 10, 1997.

- - -End Footnotes- - -

This Notice, which also was witnessed, states that Mr. Das would not sign to indicate that he had received it.

On April 15, 1997, Ms. Cortez wrote a Memo to Mr. Das, titled "Clinical Goals", stating that Mr. Das needed to:

"1. Maintain a safe environment for the patients on a continuous basis.

2. Increased collaboration with the SICU staff; i.e. leaving work area neat and tasks completed by the end of shift."

It went on to state:

"These goals will be monitored on a continuous basis by the Nurse Manager. You will be responsible to make an appointment with the Nurse Manager on a monthly basis to evaluate your progress."

(Brown Aff., Ex. M.)

On July 14, 1997, Ms. Cortez wrote yet another Memo to Mr. Das, {*14} which stated that he had made no appointments to meet with her as required, and went on to say:

"Deficiencies in your performance continue to be noted in the following areas: Bedside Performance - Work area is not in order for the next shift. Also, patient safety issues continue to be a problem. For example, pressure bags continue to be dry, and incorrect Pressure Bag fluid. . . These issues have been discussed with you in the past with no improvement. A corrective action plan has been outlined with no effort for improvement. The same corrective action plan will be used with the exception that your work will be reviewed each week every Tuesday for the next two months. Possible suspension is the next step, should these problems go uncorrected."

(Brown Aff., Ex. N.)

Mr. Das next was the subject of a Notice of Disciplinary Action on February 10, 1998. This Notice detailed an incident on February 4, 1998, when a patient complained that Mr. Das had not taken action in response to her complaints about pain. According to the Notice, he also had not reported the patient's pain to the doctor and had not completed required documentation. The Notice concluded:

"You have left me {*15} no alternative but to issue you this final warning for your continued failure to perform your job duties to the level of expectation of the Medical Center. If there is another incident involving your failure to provide adequate care for our patients you will be terminated. Mr. Das, this is extremely serious. You are jeopardizing your position at the Medical Center. I am available to discuss with you should you have any issues from preventing you [sic] job duties at the Medical Center."

(Brown Aff., Ex. P.)

Mr. Das refused to sign this Notice, which was witnessed.

In spite of this incident, Mr. Das's Appraisal Record dated May 19, 1998, was somewhat more positive, noting slight improvement in clinical skills and in bedside manner, but stating that additional improvement was expected. It also noted a problem with tardiness. Mr. Das responded in writing only to this latter issue, acknowledging that he was late to work on isolated occasions, but stating that this had not, in his view, been a pervasive problem. (Brown Aff., Ex. O.)

Next, on August 3, 1998, Mr. Das was suspended for three days due to incidents of inappropriate patient care and inadequate documentation on June 22, 1998. The {*16} report, which was witnessed and which Plaintiff refused to sign, concluded:

The above events indicate that your documentation falls below standard, you are not adhering to the policy and procedures related to reassessment, and your patient interventions are inadequate and are jeopardizing patient care. You have received prior

warnings about these issues. However, no improvement has been seen in your performance. You are being given a 3 day suspension with pay for your poor performance. You are a senior critical care nurse and this behavior is not acceptable. Immediate and sustained correction is required for you to maintain your employment status with this Medical Center.

(Brown Aff., Ex. Q.)

Plaintiff responded to this suspension by filing a Grievance with the hospital. In his complaints, dated September 25 and 28, 1998, Plaintiff stated that the reports in which Ms. Cortez had written him up "contained statements that were not truthful or factual." He complained of a "double standard in my unit," that Ms. Cortez used vulgarity in her conversations with him, was unprofessional and threatening, and that he "had to work under very difficult conditions and unnecessary abuse. {*17} " (Brown Aff., Ex. R.)

A grievance meeting was conducted on October 27, 1998. The notes of that meeting indicate that Mr. Das stated that Ms. Cortez falsely accused him of making errors, that he knew what he was doing and had never done anything wrong, that Ms. Cortez belittled him and boxed him into a corner, and that Ms. Cortez used vulgar language. Specifically, he stated that Ms. Cortez once referred to the night staff as "pigs", and that she once said to him, "I don't know what the hell is going on." Mr. Das stated that Ms. Cortez did not like men, and that she was friendly with some of the younger nurses, but not with him. n5 (Das Aff., Ex. D.)

- - -Footnotes- - -5

n5 In this action, Plaintiff has not alleged employment discrimination on the basis of sex.

- - -End Footnotes- - -

On October 30, 1998, Mr. Lee, the grievance hearing Chair, issued a decision upholding the disciplinary actions taken by Ms. Cortez, and denying Plaintiff's grievance. (Brown Aff., Ex. T.) Mr. Das claims that he never received this decision, and assumed that since he hadn't {*18} heard anything, everything was all right. (Das dep. 218-20.)

Subsequently, on November 6, 1998, Plaintiff was discharged due to "Gross misconduct in the form of inappropriate patient care and patient care documentation." The basis for this termination was that on November 2, 1998, at the beginning of the day shift, a patient who had been under Mr. Das's care during the night shift was found with a used, contaminated rectal tube inserted in her vagina. When Ms. Cortez questioned Mr. Das about this incident he stated that the tube had fallen out during his shift and he had reinserted it, but that he did not record that fact in his nursing notes. He denied that he had placed the tube in the patient's vagina. Ms. Cortez then determined that Mr. Das's employment should be terminated, stating,

"You have received prior warnings about similar other patient care issues including a suspension and a final notice as recently as August 3, 1998. No improvement has been seen in your performance, in fact your performance has deteriorated."

(Brown Aff., Ex. U.)

Upon learning of his termination, Mr. Das went to speak to Mr. Sampagnaro in the Human Resources Department. He stated to Mr. Sampagnaro {*19} that he had been treated unfairly and that the charges against him were all false. Subsequently, Plaintiff filed this action in New York State Supreme Court. Defendants removed the action to this Court on April 4, 2000.

Defendants' Motion

Defendants concede that Plaintiff has made out the first, third and fourth elements of his prima facie case. As an Asian American of Indian national origin, Plaintiff is a member of a protected class. Plaintiff was discharged from his position, and presumably was replaced by another Registered Nurse. Obviously, the facts before the Court raise a question as to whether Plaintiff's job performance was satisfactory. In determining whether an individual is qualified for purposes of making out a prima facie case, the "ultimate inquiry" is whether the employee's performance "meets his employer's legitimate expectations." **Meiri v. Dacon, 759 F.2d at 994**.

However, on this motion for summary judgment, we are required to draw all inferences in favor of the nonmovant. Therefore, we will assume, for purposes of this motion, that the fact that Mr. Das was a Registered Nurse and worked at the hospital for 17 years satisfies the second {*20} element of Plaintiff's prima facie case, and find that Plaintiff has carried the *de minimus* burden involved in making out a prima facie case of employment discrimination on the basis of age, race and national origin.

Since the hospital has stated a legitimate, nondiscriminatory reason for its decision to terminate Mr. Das's employment, **Gregory v. Daly, 243 F.3d 687, 696 (2d Cir. 2001)**, the presumption of discrimination falls out of the case, and the burden reverts to Plaintiff to prove by a preponderance of the evidence that the Defendants' proffered explanation is not truthful, but merely a pretext for discrimination.

**Texas Dept. of Community Affairs v. Burdine**, 450 U.S. at 252-53, 101 S. Ct. at 1093.

Mr. Das has raised issues of fact with regard to virtually all of Defendants' stated reasons for terminating his employment, denying that he made any of the mistakes with which he was charged, and claiming that he was at all times an exemplary employee. This is not enough to defeat Defendants' motion, however. In order to prove pretext, Plaintiff must show "*both* that the reason was false, and *that discrimination was the real reason*." **Gallo v. Prudential Residential Services, 22 F.3d 1219, 1225 (2d Cir. 1994)** {*21} (quoting **St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 113 S. Ct. at 2752**). The Court must

"examine the entire record to determine whether the plaintiff could satisfy his ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff." **Schnabel v. Abramson, 232 F.3d 83 (2d Cir. 2000)** (quoting **Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 L. Ed. 2d 105, 120 S. Ct. 2097 (2000))** . . . . once the employer has given an explanation, there is no arbitrary rule or presumption as to sufficiency . the way to tell whether a plaintiff's case is sufficient to sustain a verdict is to analyze the particular evidence to determine whether it reasonably supports an inference of the facts plaintiff must prove - particularly discrimination."

**James v. New York Racing Assoc., 233 F.3d 149, 156-57 (2d Cir. 2000).**

Thus, conclusory allegations of discrimination are not sufficient to defeat summary judgment. **Meiri v. Dacon, 759 F.2d at 998.** The Plaintiff must come forward with "concrete particulars." **R. G. Group, Inc. v. Horn & Hardart Co., 751 F.2d 69, 77 (2d Cir. 1984).** {*22} See also **Ngwu v. The Salvation Army,1998 U.S. Dist. LEXIS 20367, 1999 WL 2873,** *3 (S.D.N.Y. Jan. 4, 1999)("Speculation, conclusory allegations and mere denials are not enough to raise genuine issues of fact.").

Mr. Das has presented no evidence that discrimination was the real reason for his termination. The main incident to which he points in support of his claim of discriminatory animus is one occasion on which Ms. Cortez stated that the nurses on the night shift were "pigs". According to Mr. Das, all of the nurses on the night shift that night were Indian. However, Mr. Das himself testified that Ms. Cortez's remark was made in response to another nurse telling her that the night shift had left the medication room dirty and in disarray. (Das Dep. 202). Moreover, Plaintiff has made no showing, beyond his own speculation, that the statement that the night nurses were "pigs" was related in any way to their race or national origin. See **Denise-Hyppolite v. Turn On Products Inc.,** *N.Y.L.J.,* **2002 U.S. Dist. LEXIS 4732,** April 12, 2002 at 25 (S.D.N.Y. Sweet, J.)(finding that statements that a Black Haitian woman was a "braceros" or "thief" were offensive utterances not related to her nationality, but to her status); **Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 263** {*23} (E.D.N.Y.), aff'd, **201 F.3d 432 (2d Cir. 1999)**("The relationship between being called a 'gossipmonger' in Spanish and discrimination is elusive indeed. Even assuming that a fact finder could find the comment disparaging, it is not actionable. It is well settled that Title VII is not, and was not designed to be, a civility statute.").

In any event, "not all comments that reflect a discriminatory attitude will support an inference that an illegitimate criterion was a motivating factor in an employment decision. . . . In particular, stray remarks in the workplace, . . . and statements by decision makers unrelated to the decisional process are not by themselves sufficient to satisfy plaintiff's burden of proving pretext." **Burrell v. Bentsen, No. 91 Civ. 2654, 1993 U.S. Dist. LEXIS 18005,** at *29-30 (S.D.N.Y. Dec. 21, 1993), aff'd, **50 F.3d 3 (2d Cir. 1995)**(internal quotation marks omitted) (quoting **Price Waterhouse v. Hopkins, 490 U.S. 228, 278, 109 S. Ct. 1775, 104 L. Ed. 2d 268,** (1989)(O'Connor, J., concurring)). See also **Ngwu v. The Salvation Army, 1998 U.S. Dist. LEXIS 20367,** No. 96 Civ. 0058, 1999 WL 2873, at *5 (S.D.N.Y. Jan. 4, 1999); {*24} **O'Connor v. Viacom, Inc., 1996 U.S. Dist. LEXIS 5289,** No. 93 Civ. 2399, 1996 WL 194299, at *5 (S.D.N.Y. April 23, 1996), aff'd, **104 F.3d 356 (2d Cir. 1996).**

In further support of his claims of discrimination, Mr. Das points to Ms. Cortez's statement that she could not understand his accent (Das Aff. P 14.) He also claims that Ms. Cortez treated him in a rude and condescending manner (Das Aff. PP 15, 17, 18, 19), that she treated younger non-Indian employees completely differently from the way she treated him (Das Aff. P 20), that she also treated a female Indian nurse badly (Das Aff. PP 28-30), that less qualified Hispanic and Filipino nurses who were younger than he received equal or higher compensation, better working conditions and better treatment (Das Aff. P21), and were not disciplined when they made mistakes. (Das Aff., PP 32, 56.) Plaintiff also states that Ms. Cortez did not allow him to work as the Charge Nurse, for which duty a nurse would receive an extra 50 cents per hour in pay. (Das Aff. PP 22-23.) Finally, he contends that he never was told of Ms. Cortez's problems with his performance, and did not receive a number of the

warning notices and memos in the record. {*25} (Das Aff. PP 41-43, 55; Das Dep. 158.) He also contests the merits of Ms. Cortez's criticism of his performance at great length. (Das Aff. PP 40-42, 44-54, 56-64.)

None of these allegations is availing. The hospital has presented an extensive record of unsatisfactory job performance to justify its action in terminating Mr. Das's employment. What constitutes satisfactory job performance is measured by the employer's criteria, not by some hypothetical objective criteria. **Thornley v. Penton Publishing, Inc., 104 F.3d 26, 29 (2d Cir. 1997); Taylor v. Polygram Records, No. 94 Civ. 7689, 1999 U.S. Dist. LEXIS 2583**, at *28 (S.D.N.Y. March 5, 1999). Thus, courts may, and often must, rely on evaluations by supervisors. **Meiri v. Dacon, 759 F.2d at 995; Harriot v. Barnard College, 104 F.3d 356 (2d Cir. 1996).**, No. 89 Civ. 5949, 1991 WL 135625, at *4 (S.D.N.Y. July 16, 1991); **Plaisner v. New York City Human Resources Admin., 1989 U.S. Dist. LEXIS 3170**, No. 87 Civ. 4318, 1989 WL 31495, at *5 (S.D.N.Y. March 30, 1989), aff'd, **888 F.2d 1376 (2d Cir. 1989)**. As the Court stated in **Thermidor v. Beth Israel Medical Center, 683 F. Supp. 403, 412 (S.D.N.Y. 1988),** {*26}

The ultimate inquiry in assessing whether an employer's charge of unsatisfactory job performance is legally sufficient to dismiss a Title VII claim at the summary judgment stage is whether an employee's performance met 'his employer's legitimate expectations.' 'In determining whether an employee's job performance is satisfactory, courts may - as they often must - rely on the evaluations rendered by supervisors. . Because plaintiff has provided no evidence sufficient to show that he performed his duties to the satisfaction of his employer, other than mere conclusory allegations, plaintiff has failed to demonstrate that his employer's accusations of poor job performance were only a pretext for race discrimination.

This reliance on employment records is permitted even though Title VII and other employment discrimination cases are rife with allegations that employers and supervisors have evaluated the employee unfairly and/or created a false record to show the employee in the worst light possible and thereby justify their actions. See, e.g., **Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991)** ("The fact that an employee disagrees with an employer's evaluation {*27} of him does not prove pretext."); **Taylor v. Polygram Records, 1999 U.S. Dist. LEXIS 2583**, at *23-32 (S.D.N.Y. March 5, 1999). As the Court stated in **Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d 249, 263 (E.D.N.Y.), aff'd, 201 F.3d 432 (2d Cir. 1999)**(quoting **Moorer v. Grumman Aerospace Corp., 964 F. Supp. 665, 674 (E.D.N.Y. 1997), aff'd, 162 F.3d 1148 (2d Cir. 1998))**, "an employee's opinion that a performance review was unfair, supported only by her own conclusory statements to that effect, cannot bootstrap her claims into a Title VII claim of discrimination." Moreover, prior positive evaluations of the Plaintiff's work performance alone do not prove that later unsatisfactory evaluations are the result of animus or constitute a pretext for unlawful discrimination. **Billet v. CIGNA Corp., 940 F.2d at 826; Ticali v. Roman Catholic Diocese of Brooklyn, 41 F. Supp. 2d at 263; Taylor v. Polygram Records, 1999 U.S. Dist. LEXIS 2583, at *60.**

While it is true that in order to prove pretext, an employee may, in some very limited, extreme circumstances, {*28} demonstrate that the employer's expectations were objectively unreasonable and made in bad faith, **Meiri v. Dacon, 759 F.2d at 995**, Mr. Das has not made any such showing. At most, he has argued his disagreement with certain policies and directives given to him by Ms. Cortez. (Das Dep. 150, 234-45.) Whether or not Mr. Das was correct with respect to these issues is irrelevant, however. Unwillingness to follow a supervisor's orders is a legitimate nondiscriminatory reason for terminating an employee's employment. **Thornley v. Penton Publishing, Inc., 104 F.3d at 30** ("A plaintiff must satisfy the employer's honestly-held expectations.").

It also is significant that Mr. Das has not produced any statements or other evidence from other employees to support his assertions of discrimination, see **Lewis v. Air France Corp., 1990 U.S. Dist. LEXIS 4379**, No. 88 Civ. 4136, 1990 WL 49053, at *5 (S.D.N.Y. April 18, 1990), despite his claim that Ms. Cortez also treated another Indian nurse unfairly. A plaintiff opposing a summary judgment motion cannot rely on hearsay statements to create a genuine issue of fact. **Goenaga v. March of Dimes Birth Defects Fndtn., 51 F.3d 14, 19 (2d Cir. 1995);** {*29} **Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996)**. Moreover, Mr. Das has conceded that he really did not know whether others who made mistakes were not disciplined as he was (Das Dep. 100, 106, 129, 191, 195, 198, 212), or what others' qualifications or compensation were. (Das Dep. 259-60). He also admitted that everyone used the same equipment during a shift, and functioned under the same working conditions. (Das Dep. 268, 272.)

That Ms. Cortez said that she could not understand Mr. Das's accent does not support a claim of discrimination. See **Ghose v. Century 21, Inc., 108 F.**

Supp. 2d 373, 379 (S.D.N.Y. 2000), aff'd, 2001 U.S. App. LEXIS 13748 (2d Cir. 2001). Likewise, Plaintiff's claim that Ms. Cortez was "mean", rude and vulgar (Das Dep. 245) does not further his case. As the Court stated in Ticali,

> Chesnavage may have harassed, insulted and criticized Ticali, but Title VII does not make employers liable for being mean or petty; it makes them liable for discriminating, or firing people or subjecting them to adverse employment determinations on account of their being a member of a protected class. {*30}

41 F. Supp. 2d at 263 (citing **Norton v. Sam's Club, 145 F.3d 114, 120 (2d Cir. 1998)**)("The ADEA does not make employers liable for doing stupid or even wicked things; it makes them liable for *discriminating*." (emphasis in original)).

Mr. Das's claim that Ms. Cortez refused to let him work as a Charge Nurse is undercut by documents in the record that relate to the assignments that he made while Charge Nurse, for which Ms. Cortez faulted him. (Brown Aff., Ex. H, J) Even if it is assumed that this claim, which is denied by Ms. Cortez, is true, such action would not support a claim of discrimination in light of Mr. Das's unwillingness to follow Ms. Cortez's directions, since this would constitute a legitimate nondiscriminatory reason for that action. (Das Dep., 80-83; Das Aff. PP 38-42.)

Finally, Plaintiff's assertion that he never received many of the memoranda and warnings prepared by Ms. Cortez is not only unsupported, but directly contradicted by the signatures of witnesses to his refusal to sign negative documentation, and the fact that subsequent notices listed the dates of previously issued notices and warnings. (See Brown Aff., Ex. {*31} J, K, L, P, Q.)

As in O'Connor v. Viacom, "Plaintiff's completely unsubstantiated claim of a conspiracy to effect [his] termination is not supported by evidence, and provides no support for his claim of . . . discrimination." **1996 U.S. Dist. LEXIS 5289, 1996 WL 194299, at *6 (S.D.N.Y. April 23, 1996)**. Plaintiff has cited no case, and the Court has found none; in which a Plaintiff's statement that he had been the victim of a campaign or conspiracy to create a false negative employment record, without more, was held to be sufficient to overcome the employer's record of unsatisfactory performance on the job. See, e.g., **Gray v. The Robert Plan Corp., 991 F. Supp. 94, 103 (E.D.N.Y. 1998)** ("Plaintiff's conclusory allegation of a conspiracy by RPC to terminate him on account of his age, under the guise of poor work performance, does not constitute evidence that RPC discriminated against him."). Moreover, Plaintiff's contention that he *never* did *anything* wrong during his entire tenure at the hospital (Das Dep. 229) only adds to the conclusory nature of his claims and denials.

Retaliation Claims

In order to make out a prima facie case of retaliation, Plaintiff {*32} must show that (1) he engaged in a protected activity; (2) the employer was aware of that activity; (3) the employer took adverse action against the Plaintiff; and (4) a causal connection existed between the Plaintiff's protected activity and the adverse action. **Raniola v. Bratton, 243 F.3d 610, 624 (2d Cir. 2001)**. Initially, a plaintiff's burden is "a light one, usually demanding only that the protected activity preceded the adverse action in order to satisfy the causation requirement." Id.

Mr. Das filed his grievance on September 28, 1998, and an internal hearing was held with respect to that complaint on October 27, 1998. He was dismissed from his employment shortly thereafter, on November 3, 1998. Making an internal complaint is a protected activity. **Kotcher v. Rosa and Sullivan Appliance Center, Inc., 957 F.2d 59, 65 (2d Cir. 1992)**(an internal complaint to company management is protected under Title VII because "Congress sought to protect a wide range of activity in addition to the filing of a formal complaint."). Therefore, Plaintiff has made out a prima facie case of retaliatory termination.

Once the plaintiff has made out a prima facie {*33} case of retaliation, the burden shifts to the employer to demonstrate that it had a legitimate, nondiscriminatory reason for its action. **Id. 243 F.3d at 625**. Defendants have met this burden, explaining that Mr. Das's employment was terminated because of inappropriate patient care - specifically that he improperly placed a contaminated rectal tube into a patient's vagina, and because of his failure to properly document the events that took place on his shift.

The hospital having proffered a legitimate explanation for its action, "the 'presumption completely drops out of the picture and the employer will be entitled to summary judgment . . . unless plaintiff can point to evidence that reasonably supports a finding of prohibited discrimination.'" **Ogbo v. New York State Dept. of Finance, No. 99 Civ. 9387, 2001 U.S. Dist. LEXIS 12920, *14 (S.D.N.Y. Aug. 24, 2001)** (quoting **James v. New York Racing Assoc., 233 F.3d 149, 154 (2d Cir. 2000)**. See also **Raniola, 243 F.3d at 625** ("The burden shifts, therefore, back to the plaintiff to establish, through either direct or circumstantial evidence, that the employer's action was, in fact, motivated by {*34} discriminatory retaliation.").

This Plaintiff has presented no proof to rebut the hospital's proferred reason for his termination. First,

the interposition of a new incident subsequent to the protected activity undercuts the chain of causal connection with the protected activity that is necessary to a claim of retaliation.

Moreover, although Mr. Das denies that he did in fact place a rectal tube in the patient's vagina, as Defendants claim, what is relevant here is not the truth of the accusation, but the hospital's reasonable belief that the Plaintiff took this negligent action, and that he failed to properly document his actions during his shift. See **Waggoner v. City of Garland, Texas, 1992 U.S. Dist. LEXIS 21327**, No. 91 Civ. 1598, 1992 WL 472368, at *2 (N.D. Tex. Aug. 11, 1992), aff'd, **987 F.2d 1160 (1993)**. In Waggoner, the Court stated:

"When an employer discharges an employee for the stated reason that he engaged in sexual harassment of a fellow employee, the relevant inquiry is whether the decisionmakers believed at the time of discharge that the employee was guilty of harassment and, if so, whether this belief was the reason for discharge. **Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)**. {*35} Whether the charges of harassment are actually true is beyond the scope of the inquiry."

Id.

See also **De Anda v. St. Joseph Hosp., 671 F.2d 850, 854 (5th Cir. 1982)** ("Whether St. Joseph was wrong in its determination that [plaintiff, the staff pharmacist who it discharged] should have checked [the incompatibility of two intravenous solutions] is irrelevant, as long as its belief, though erroneous, was the basis for the termination."). **Minton v. Lenox Hill Hosp., 160 F. Supp. 2d 687 (S.D.N.Y. 2001); Agugliaro v. Brooks Bros., Inc., 927 F. Supp. 741, 747 (S.D.N.Y. 1996)**. As the Court stated in Elrod,

Federal courts "do not sit as a super-personnel department that reexamines an entity's business decisions. No matter how medieval a firm's practices, no matter how high-handed its decisional process, no matter how mistaken the firm's managers, the ADEA does not interfere. Rather, our inquiry is limited to whether the employer gave an honest explanation of its behavior. . ."

**Elrod v. Sears, Roebuck & Co., 939 F.2d 1466, 1470 (11th Cir. 1991)** (quoting **Mechnig v. Sears, Roebuck & Co., 864 F.2d 1359, 1365 (7th Cir. 1988)**). {*36}

Mr. Das's position is undermined further by the fact that he had previously received counseling, warnings, and a suspension due to other instances of alleged inappropriate patient care, and failures of documentation, along with warnings that further incidents of the same sort would result in termination, prior to his filing his grievance. "Criticisms that precede the protected activity are relevant to a finding that there was no causal nexus." **Abbondanzo v. Health Management Systems, Inc., No. 00 Civ. 4353, 2001 U.S. Dist. LEXIS 17567**, at *23 (S.D.N.Y. Oct. 24, 2001) (citing **Lawson v. Getty Terminals Corp., 866 F. Supp. 793, 804 (S.D.N.Y. 1994))**; **Taylor v. Polygram Records, 1999 U.S. Dist. LEXIS 2583**, at *60; **Padob v. Entex Information Service, 960 F. Supp. 806, 814 (S.D.N.Y. 1997)**.

Proximity in time alone will not support a finding (as opposed to making out a minimal prima facie case) that a plaintiff has proved a causal connection between protected activity and an adverse employment action. **Padob v. Entex Information Service, 960 F. Supp. 806, 814 (S.D.N.Y. 1997)**. In this case, Mr. Das has presented {*37} no admissible evidence, other than temporal proximity, to support the claim that his dismissal from his employment was retaliatory. There has been no showing that anything other than the hospital's view of his work performance contributed to its decision to let him go.

Conclusion

For the foregoing reasons, Defendants' motion for summary judgment in their favor is granted and this action is dismissed.

**SO ORDERED.**

Dated: New York, New York

April 29, 2002

JOHN S. MARTIN, JR.

U. S. D. J.