# Unreported Case – Gregg

LEXSEE 1999 U.S. DIST. LEXIS 5415

RONALD A. GREGG, Plaintiff, -against- NEW YORK STATE DEPARTMENT OF TAXATION & FINANCE, OFFICE OF TAX ENFORCEMENT; and TERESA MASON, Defendants.

97 Civ. 1408 (MBM)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

1999 U.S. Dist. LEXIS 5415

April 15, 1999, Decided
April 19, 1999, Filed

**DISPOSITION:** [*1] Defendants' motion for summary judgment granted in part and denied in part.

**COUNSEL:** For Plaintiff: RORY LANCMAN, ESQ., Forest Hills, NY.

For Defendants: ELIOT L. SPITZER, Attorney General of the State of New York, ROSALIE J. HRONSKY, ESQ., AUGUST L. FIETKAU, ESQ., Assistant Attorneys General, New York, NY.

**JUDGES:** Michael B. Mukasey, U.S. District Judge.

**OPINION BY:** Michael B. Mukasey

**OPINION**

OPINION AND ORDER

MICHAEL B. MUKASEY, U.S.D.J.,

Ronald A. Gregg sues the New York State Department of Taxation and Finance ("DTF") and Teresa Mason, former Assistant Deputy Commissioner of DTF's Office of Tax Enforcement ("OTE"), alleging sexual harassment and unlawful retaliation. He raises these claims against DTF pursuant to 42 U.S.C. § 2000 et seq. ("Title VII"), N.Y. Exec. Law § 296 et seq. and N.Y.C. Admin. Code § 8-1-1 et seq. (together, the "nonfederal provisions"). Against Mason, he raises his claims pursuant to 42 U.S.C. § 1983 and the nonfederal provisions. Defendants now move for summary judgment on all claims. For the reasons stated below, defendants' motion is granted in part and denied in part.

I.

Unless otherwise noted, the following relevant facts are taken to be true [*2] for purposes of this motion. DTF is a New York State agency with its principal office in Albany, New York, and regional offices around the state. OTE is a division of DTF devoted to investigating violations of New York's tax laws and to cooperating in criminal prosecutions arising out of those violations. (Shepherd Dep. at 15-16) [1] The Petroleum, Alcohol and Tobacco Bureau ("PATB") is a unit of OTE devoted to regulating and investigating the petroleum, alcohol and tobacco industries. (*Id.* at 20-21)

    1  "Shepherd Dep." refers to the transcript of Robert L. Shepherd's pretrial deposition, which was conducted on April 28, 1998. Selected pages of the transcript are in the record.

Plaintiff, a 48-year-old man, was hired in October 1994 as an associate attorney in OTE's New York City office, where he was assigned primarily to assist PATB. (Gregg Dep. at 7-9; Shepherd Dep. at 34-35; *see* Pl. Ex. H) [2] Upon being hired, in accordance with standard DTF procedures, plaintiff was placed on "probation" for a period [*3] of 26 to 52 weeks. (Shepherd Dep. at 51, 56-57) During that time, plaintiff was subject to quarterly employment evaluations by defendant Mason, his immediate supervisor, and could be fired with or without cause at any time. (*Id.*)

Case 1:07-cv-07300-SHS    Document 25-6    Filed 05/30/2008    Page 3 of 13

Page 2
1999 U.S. Dist. LEXIS 5415, *3

2    "Gregg Dep." refers to the transcript of plaintiff's pretrial deposition, which was conducted on April 27, 1998. Selected pages of the transcript are in the record.

In early November 1994, Mason allegedly informed plaintiff that he would be required to accompany her on a business trip to Buffalo, New York, later that month. (Gregg Dep. at 82-83) Plaintiff was originally booked into the same hotel as Mason, but at some point before the trip, when he changed his airplane reservation to arrive after her, he switched to a different hotel, the Hyatt Regency. (Id. at 83, 94) At his deposition, plaintiff testified that he changed to stay at the Hyatt Regency, with which he was "familiar," because of his "preference" for that hotel. (Id. at 93) He testified also that he did not [*4] believe staying at the Hyatt Regency would be an inconvenience because Mason's hotel "was within walking distance if there was a need to meet." (Id. at 93-94) Nevertheless, according to plaintiff, Mason objected to the change, indicating "that all staff members generally stay at the same hotel, it makes it easier for meetings or get-togethers after work to discuss matters." (Id.)

While in Buffalo, plaintiff attended a meeting with Mason and Melvin Parker, who was in charge of the PATB's Buffalo office. (Id. at 88) Plaintiff testified that he was not informed of why he was asked to attend the meeting, but he recalled that Mason "may have said [the purpose of the meeting was] to meet the Buffalo staff." (Id. at 88-89) During the meeting, Mason said little to plaintiff, restricting herself to "small talk" about his trip, his ride and other such topics. (Id. at 89) Plaintiff himself said little; for the most part, he testified, he "just sat and listened to Ms. Mason and Mr. Parker discuss the office." (Id. at 89)

At the end of the meeting, which lasted about one hour, Mason advised plaintiff "to stay and meet the staff and see how the operation functioned in [*5] Buffalo." (Id. at 89-90) In addition, she inquired about what plaintiff was planning to do "after, saying it appeared we would be able to leave earlier than [five o'clock]." (Id. at 90) According to plaintiff, Mason then asked him about dinner and drinks:

> [Plaintiff]: She asked if I would join her for dinner and drinks and she prefaced it with if I did not have any other plans.

> [Question]: What did you say?

> [Plaintiff]: At first I said, no, I have plans. And she said, okay, fine. She said then we can possibly have lunch before I left. She said, well, if you have dinner plans you can stop by and have a drink. And I asked her where and she gave me a location which was not too far from my hotel, in-between my hotel and Ms. Mason's hotel.

(Id. at 90)

At approximately 4:30 p.m., after returning to his hotel to check in and unpack, plaintiff met Mason at a "local tavern." (Id. at 91) Plaintiff and Mason spent about one hour alone together, at which point they were joined by another man, whose name plaintiff could not recall. (Id. at 92) Plaintiff testified about his conversation with Mason as follows:

> [Plaintiff]: She asked [*6] how was I enjoying being back in Buffalo [where I went to school]. She asked questions about my days in school. Did I still have friends up here, did I have someone to occupy my time after work, did I know anyone, was I going to meet anyone. Generally, my response to those questions were [sic] not really. I hadn't been in Buffalo for over 20 years.

> . . . .

> [Question]: Did Ms. Mason say anything of a sexual nature to you before [the other man] arrived?

> [Plaintiff]: Sexual nature?

> [Question]: Yes.

> [Plaintiff]: No.

(Id. at 91-93) After about two hours total, plaintiff explained to Mason that he was going to go back to his hotel and that, if she needed to discuss anything with him, she should call him or he would call her. (Id. at 93) She did not, at that point, indicate that she was going out to dinner or invite plaintiff again to join her for dinner. (

*Id.*)

According to plaintiff, shortly after the Buffalo trip, Mason began asking "inappropriate questions" about plaintiff's personal life and inviting him to do things with her. (*Id.* at 95; *see* Compl. PP 16-18) [3] Specifically, plaintiff alleges that over the course [*7] of approximately 10-15 conversations between December 1994 and February 1995, Mason asked him questions about, *inter alia*, his "special preferences," his likes and dislikes, whether he was married or had children, and whether he enjoyed "going out dancing" or drinking. (Gregg Dep. at 95-106) According to plaintiff, the conversations "were always followed up with requests to either possibly have -- requests relating to having dinner or lunch." (*Id.* at 103) In addition to such conversations, in February 1995, Mason began requiring plaintiff to report his attendance every day via e-mail. (*Id.* at 114; *see* Compl. P 19) When asked why he had to do so when other attorneys in the office did not, Mason allegedly told plaintiff, while laughing, "Because I want to know where you are all the time." (Gregg Dep. at 114-15)

   3   "Compl." refers to plaintiff's amended complaint, filed on February 4, 1998.

In addition to inviting plaintiff out for meals and drinks, Mason invited plaintiff to her house several times. [*8] In one conversation, for example, in which plaintiff revealed that he liked to cook, Mason allegedly stated to plaintiff: "It sounds like you're a good cook, maybe you should come over to my house and cook for me." (*Id.* at 101) On several other occasions, in February 1995, Mason allegedly invited plaintiff to her house to help her perform repairs -- invitations that plaintiff described in testimony as a "nice gesture." (*Id.* at 105-06) Plaintiff never accepted any of Mason's invitations -- whether for meals, drinks or to her house. (*Id.* at 107) At no point did Mason indicate that she would take some official action against him as a result. (*Id.* at 107)

In addition to making inappropriate comments and repeatedly inviting plaintiff for meals or drinks, Mason is alleged, on at least four occasions, to have touched plaintiff "in an offensive manner." (Compl. P 16) On the first such occasion, in December 1994, she commented on how nice plaintiff looked in a particular suit, "touched" and "stroked" his arm with both hands and said "this is a very nice cut suit." (Gregg Dep. at 99, 108) On the second occasion, in January 1995, Mason again complimented plaintiff on his suit, [*9] "grabbed" his biceps and "moved her hands up and down [his] arms." (*Id.* at 104, 108) Later in January, Mason allegedly complimented plaintiff on the fit of his suit yet again, this time "patt[ing him] on the behind" as he left her office. (*Id.* at 110) Finally, sometime in late January or early February 1995, when plaintiff was seated at a computer, Mason allegedly approached him from behind and began "stroking" his neck. (*Id.* at 111-12) Plaintiff described this episode as follows:

> [Plaintiff]: . . . It was the practice when you used the machine you have to sit down and Ms. Mason came in on one occasion and asked what I was doing. I told her I was doing some research and she was standing behind me and she began to just basically rub my neck with both hands asking me what are you researching.
>
> . . . .
>
> [Question]: And how long did she rub your neck?
>
> [Plaintiff]: I would say no more than 20 seconds or so. It was a stroking. It wasn't a rubbing, it was a stroking type of action.

(*Id.*)

These four episodes of "offensive" touching notwithstanding, plaintiff testified that Mason never asked him to have a sexual relationship with her, [*10] never asked him to touch her and never asked to touch him. (*Id.* 97-99, 101-02, 104, 112) In addition, plaintiff acknowledged that Mason never made "obscene" comments in their conversations and never used "obscene" or "sexually explicit" language with him. (*Id.*) According to plaintiff, however, Mason communicated through means other than language -- through her "appearance and looks." (*Id.* at 102) As he testified, for example: "It was never a specific request that I touch Ms. Mason. It was always something there, an intimation, a look, a comment with a lingering tone, but never a specific request for anything." (*Id.* 104)

Aside from Mason's supposed harassment, beginning in December 1994 plaintiff was allegedly subjected to "ribbing" about his relationship with Mason from coworkers. (*Id.* at 59-67, 118-21) According to plaintiff,

once or twice per week, several male employees with whom he had lunch joked with him about a supposed amorous relationship with Mason. (*Id.*) Plaintiff acknowledged that other members of the group were targeted also for joking, albeit about different matters, and admitted that he would "sometimes . . . join in" such efforts. (*Id.* at [*11] 60-61) Nevertheless, the joking was "so compelling . . . and hurtful" to plaintiff that in late April or early May, he asked a supervisor to request the employees to stop. (*Id.* at 59, 61, 64, 121) The joking did not cease, however, until May 1995, when plaintiff stopped eating lunch with the alleged perpetrators. (*Id.* at 61-63)

Mason's inappropriate comments and offensive touching effectively ceased in March 1995. (*Id.* at 106, 112) In late March or early April, however, allegedly in retaliation for rejecting her advances, Mason began increasing plaintiff's workload. (*Id.* at 117-18, 134-37) At the same time, she took away his state vehicle, which required him to use public transportation to make court appearances around the state. (*Id.* at 135) In May 1995, Mason again assigned additional work to plaintiff, allegedly also in retaliation for rejecting her advances. (*Id.* at 136-37)

In July 1995, Mason and Robert Shepherd, the Deputy Commissioner of OTE and Mason's immediate supervisor, asked plaintiff to move his office nearer to the legal department, which was nearer as well to Mason's office. (Shepherd Dep. at 208; Mason Dep. at 30) [4] Plaintiff objected to [*12] the move, and explained to Mason at a meeting in her office on July 14, 1995, that it was not a "good idea." (Gregg Dep. at 126) Plaintiff described the July 14 meeting as follows:

> I had asked her about my performance and why did she believe it was necessary for me to move my location from PATB over to legal. I explained to her I didn't think it was a good idea. I felt that this would cause additional problems with me being closer to her.
>
> She inquired about what problems. I asked why she believed it was necessary to be continually basically dogging me and have tight reins and controls on my comings and goings when no other employee was subjected to the same type of conduct.
>
> I further told her that I believed it was not appropriate and that I was becoming the brunt of all the jokes here because of what was perceived as my relationship with her. I told her I didn't think it was fair.
>
> And she commented, What's the matter with you, can't take orders from a female boss, something to that nature.
>
> And I said no, I believe that it's not just orders. I believe that I'm totally harassed by you. . . . I said that I believed that this is total sexual harassment. You're subjecting me to [*13] different terms and conditions for no other reason than the fact that I did not want to go out with you.
>
> And at that point Ms. Mason became very irate. . . . She said that I was crazy. She said that she did not harass me. She stated that the only thing I had better do is get in line or I had better change my attitude about her otherwise I would not pass probation.

(*Id.* at 126-27) After arguing about whether or not plaintiff had completed all the work Mason assigned to him, plaintiff objected to the additional work Mason had given him:

> I said it's just not fair what you have done to me. You subjected me to additional work.
>
> . . . .
>
> I mentioned how I felt about the E-mail, which no one else had to be subjected to.
>
> I told her about the comments from other members in staff who perceived us to be having some type of relationship. I told her I didn't believe that her comments and her touching was appropriate.
>
> And then she told me that is enough, that is enough. She told me that she would

resolve this, she's going to speak to [Robert Shepherd, the Deputy Commissioner of OTE and Mason's immediate supervisor] about my performance. At that point she told me she is the [*14] one who has to do my final evaluation.

(*Id.* at 129) Plaintiff then left Mason's office. (*Id.*)

4 "Mason Dep." refers to the transcript of Teresa Mason's pretrial deposition, which was conducted on April 29, 1998. Selected pages of the transcript are included in the record.

After leaving the July 14 meeting with Mason, plaintiff telephoned the DTF Equal Employment Opportunity ("EEO") office and spoke with an EEO officer named Barbara Allen. (*Id.* at 138) According to plaintiff, he asked Allen what he should do if he believed he was being sexually harassed by Mason. (*Id.*) Allen explained the department's policies and procedures with respect to sexual harassment, but then recommended to plaintiff that he wait until his probation period was complete before making a formal complaint. (*Id.*) If he submitted a complaint while on probation, Allen allegedly explained, Mason might retaliate by not approving his probation. (*Id.* at 138-39) Plaintiff decided to heed Allen's advice, and asked [*15] her to keep his complaint confidential. (*Id.* at 139)

As of the July 14, 1995 meeting with Mason, plaintiff had received three quarterly evaluations from Mason as part of his probation. In his first evaluation, dated January 24, 1995, plaintiff was given a "meets expectations" mark in each of eight performance categories and a "meets expectations" rating over all. (Def. Ex. 3) In addition, the first evaluation commented favorably on plaintiff's performance with respect to each category. (*Id.*) In the second evaluation, dated March 29, 1995, plaintiff was given a "meets expectations" mark in six categories and a "needs improvement" mark in two ("management of work assignments" and "productivity"), with a "meets expectations" rating over all. (Def. Ex. 4) The written comments were generally favorable, but noted that plaintiff could improve the quality and punctuality of his written work. (*Id.*) Plaintiff's third evaluation, dated June 26, 1995, was almost identical to the second evaluation, in both ratings and comments. (Def. Ex. 5) As did the first two evaluations, the third recommended that plaintiff continue on probation. (*Id.*)

Plaintiff was not scheduled to receive [*16] another formal evaluation until about September 1995. On July 25, 1995, however, Mason delivered a three-page memorandum to plaintiff regarding issues related to plaintiff's job performance that were discussed at the July 14 meeting. (Def. Ex. 6) The memorandum noted that plaintiff's management of assignments and productivity had not improved despite repeated warnings, given in his second and third evaluations and in meetings, that such improvement was necessary. (*Id.* at 1) The memorandum then described seven alleged instances of poor performance by plaintiff, including failures to complete assignments in a timely fashion and substandard written work. (*Id.* at 1-3) According to the memorandum, for example, Mason and another attorney had to redraft several criminal court informations and affidavits prepared by plaintiff because of errors. (*Id.* at 2) Such errors, Mason stated, "are unacceptable and demonstrate that you cannot be assigned a relatively simple task and relied upon to complete it." (*Id.*) The memorandum ended by identifying seven areas in need of "immediate and substantial improvement," and stated that if plaintiff did not demonstrate "substantive [*sic* [*17] ] improvement" within three weeks, Mason would prepare a final probation evaluation recommending termination. (*Id.* at 3)

Plaintiff responded to Mason's memorandum with an undated five-page memorandum of his own. (Def. Ex. 7) First, labeling Mason's criticisms "new found opinions," plaintiff objected that they were contrary to three prior evaluations by Mason, including the third which was completed only one month earlier. (*Id.* at 1) Next, plaintiff endeavored to explain or rebut each of the seven alleged instances of poor performance identified by Mason in her memorandum. (*Id.* at 1-5) Plaintiff acknowledged that he could use "additional practice" in drafting criminal court informations, explaining that he was "learning" and had no relevant prior experience. (*Id.* at 3) Otherwise, he asserted that there was no factual basis for any of Mason's allegations and speculated that Mason's charges might have been motivated by "personal animus." (*Id.* at 4) In closing, plaintiff questioned Mason's impartiality and requested that another supervisor evaluate him for his last review period:

> For what ever [*sic*] the reasons, I do not believe that you are now evaluating [*18]

my job performance fairly, truthfully and professionally. I am fully confident that my performance has been and will continue to be of the standards necessary .

. . .

Based upon all the facts stated, here within, I respectfully request that my last review period be evaluated by another supervisor to belie [*sic*] any disharmony or hostile work environment.

(*Id.* at 5)

On or about September 1, 1995, Mason herself was discharged from DTF, for reasons apparently unrelated to this suit. (Shepherd Dep. at 248-50) One week later, plaintiff met with Shepherd, who replaced Mason as plaintiff's supervisor, in Shepherd's office. (*Id.* at 274) At the meeting, Shepherd gave plaintiff a copy of his fourth evaluation report, which had been filled out by Mason before she left, and demanded that he sign it. (*Id.* at 260-61, 274-75; Gregg Dep. at 67-69; *see* Def. Exs. 8-9) The evaluation rated plaintiff's performance in six of eight categories and over all as "unsatisfactory," and recommended that his employment be terminated. (Def. Ex. 8) Attached to the report were three typed pages of comments, detailing plaintiff's alleged deficiencies in each of the performance categories. [*19] (Def. Ex. 9) Plaintiff disputed Mason's assessment of his performance, and apparently attributed his negative evaluation to "his friction with Ms. Mason." (Shepherd Dep. at 276) Additionally, at some point in the meeting, plaintiff accused Mason of sexually harassing him. (*Id.*) In response, Shepherd "expressed some disbelief and in sum and substance said that . . . [plaintiff] was rather disingenuous with that assessment." (*Id.*) Plaintiff did not pursue the topic further in the meeting. (*Id.* at 277-78)

On September 14, 1995, Shepherd delivered a letter to plaintiff from the Director of Human Resources Management, dated two days earlier, advising plaintiff that his employment was terminated as of September 26, 1995. (Def. Ex. 10) On or about September 13, 1995, plaintiff submitted a written complaint to the DTF, alleging that between July and September 1995 he was the victim of sexual harassment and unlawful retaliation at the hands of Mason. (Def. Ex. 11) After reviewing plaintiff's complaint, the Office of Affirmative Action concluded there was "no credible basis" on which to pursue an internal investigation. (Def. Ex. 12)

Thereafter, on or about February 14, 1996, [*20] plaintiff filed a complaint with the Equal Employment Opportunity Commission ("EEOC"), alleging harassment and retaliation by Mason and DTF beginning October 6, 1994. (Def. Ex. 14) In a letter dated November 29, 1996, the EEOC rejected plaintiff's claim and gave plaintiff notice of his right to sue. (*Id.*) This action followed.

II.

Summary judgment is mandated when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). In considering a summary judgment motion, "the court must resolve all ambiguities and draw all reasonable inferences in favor of the nonmoving party." *Azrielli v. Cohen Law Offices*, 21 F.3d 512, 517 (2d Cir. 1994). Nevertheless, Rule 56 jurisprudence is clear in "providing that the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 91 L. Ed. [*21] 2d 265, 106 S. Ct. 2548 (1986). The non-moving party, therefore, "must do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986). "Conclusory allegations will not suffice to create a genuine issue." *Delaware & Hudson Ry. v. Consolidated Rail Corp.*, 902 F.2d 174, 178 (2d Cir. 1990).

In employment discrimination cases, where liability often turns on the issue of intent, courts should approach a motion for summary judgment with special caution. *See Gallo v. Prudential Residential Servs., Ltd. Partnership*, 22 F.3d 1219, 1224 (2d Cir. 1994). Because employers rarely leave direct evidence of discriminatory intent, a court must scrutinize all of the available evidence in search of circumstantial proof to rebut the employer's explanation for its actions. *See Hollander v. American Cyanamid Co.*, 895 F.2d 80, 85 (2d Cir. 1990).

That a court should approach discrimination cases with a heightened duty of care, however, does not mean that summary judgment is unavailable in such cases. *See*

*McLee v. Chrysler Corp.*, 38 F.3d 67, 68 (2d Cir. [*22] 1994). When an employer provides convincing evidence explaining its conduct, and the plaintiff's case rests on conclusory allegations of discrimination, the court may properly conclude that there is no genuine issue of material fact and grant summary judgment to the employer. *See Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995).

III.

As an initial matter, DTF argues, and plaintiff concedes, that DTF is, by virtue of the Eleventh Amendment, immune from suit in federal court for violations of the nonfederal provisions. (*See* Pl. Mem. at 10) Accordingly, plaintiff's claims based on these provisions -- claims 2, 3, 5, 6, 8 and 9 -- are dismissed with respect to DTF.

Without the nonfederal claims against DTF, plaintiff's claims are as follows: (1) quid pro quo sexual harassment claims against DTF pursuant to Title VII (Claim 1) and against Mason pursuant to § 1983 (Claim 10) and the nonfederal provisions (Claims 2 and 3); (2) hostile work environment harassment claims against DTF pursuant to Title VII (Claim 4) and against Mason pursuant to § 1983 (Claim 10) and the nonfederal provisions (Claims 5 and 6); and (3) retaliation claims against DTF pursuant to Title [*23] VII (Claim 7) and against Mason pursuant to the nonfederal provisions (Claims 8 and 9). [5] Although the limitations periods for these claims differ from statute to statute, the substantive elements of each category of claims, to the extent relevant here, are the same under Title VII, § 1983 and the nonfederal provisions. *See, e.g., Cohen v. Litt*, 906 F. Supp. 957, 962-65 (S.D.N.Y. 1995) (holding that the Title VII principles governing hostile work environment harassment claims apply, with some slight variation not relevant here, to equal protection claims under § 1983); *Wise v. New York City Police Dep't*, 928 F. Supp. 355, 367 (S.D.N.Y. 1996) (employing Title VII standards to analyze a hostile work environment sexual harassment claim brought under the Equal Protection Clause and § 1983); *Jones v. Clinton*, 990 F. Supp. 657, 668-69 (E.D. Ark. 1998) (holding that Title VII principles apply to both quid pro quo and hostile work environment harassment claims); *Tomka v. Seiler Corp.*, 66 F.3d 1295, 1304 n.4 (2d Cir. 1995) (applying Title VII principles to claims brought under the nonfederal provisions); *Noyer v. Viacom Inc.*, 22 F. Supp. 2d 301, 305 n.2 (S.D.N.Y. 1998) [*24] (same). Accordingly, in the analysis that follows, I apply Title VII jurisprudence to all of plaintiff's claims -- except insofar as the analysis requires consideration of statutes of limitations.

5   Plaintiff does not raise a retaliation claim pursuant to § 1983.

IV.

Defendants seek, first, to dismiss plaintiff's claims of sexual harassment. As noted, plaintiff raises claims of both quid pro quo sexual harassment and hostile work environment sexual harassment. *See, e.g., Gallagher v. Delaney*, 139 F.3d 338, 346 (2d Cir. 1998) (discussing the two theories of sexual harassment); *Karibian v. Columbia Univ.*, 14 F.3d 773, 777 (2d Cir. 1994) (same); *Carrero v. New York City Hous. Auth.*, 890 F.2d 569, 577 (2d Cir. 1989) (same); *see also Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 118 S. Ct. 2257, 2264-65, 141 L. Ed. 2d 633 (1998) (discussing the origins and development of the two theories). Because the respective inquiries differ for each form of harassment, the analysis that follows treats the [*25] two categories of claims separately. As a preliminary matter, however, it is necessary to decide whether any of plaintiff's allegations are time-barred.

A. *Timeliness*

There is no dispute that plaintiff's claims under § 1983 and the nonfederal provisions are timely, as plaintiff filed suit within three years of the date or dates on which those claims accrued. *See, e.g., Owens v. Okure*, 488 U.S. 235, 236, 102 L. Ed. 2d 594, 109 S. Ct. 573 (1989); *Soto v. Brooklyn Correctional Facility*, 80 F.3d 34, 35 (2d Cir. 1996); *Koerner v. State*, 62 N.Y.2d 442, 447, 478 N.Y.S.2d 584, 586, 467 N.E.2d 232 (1984); N.Y.C. Admin. Code § 8-502(d). Under Title VII, however, a plaintiff ordinarily must file his claim with the EEOC within 300 days of the "alleged unlawful employment practice." 42 U.S.C. § 2000e-5(e)(1); *see Quinn v. Green Tree Credit Corp.*, 159 F.3d 759, 765 (2d Cir. 1998). Because plaintiff here did not file his claim with the EEOC until February 14, 1996, DTF argues that plaintiff's Title VII claims are time-barred insofar as they rely on events prior to April 20, 1995. (*See* Def. Mem. at 26) In response, plaintiff invokes the "continuing violation exception," [*26] pursuant to which a plaintiff can, under some circumstances, bring a claim based on acts which would otherwise be untimely. (*See* Pl. Mem.

at 11-13)

The continuing violation exception applies "when there is evidence of an ongoing discriminatory policy or practice, . . . [or] where specific and related instances of discrimination are permitted by the employer to continue unremedied for so long as to amount to a discriminatory policy or practice." *Van Zant v. KLM Royal Dutch Airlines*, 80 F.3d 708, 713 (2d Cir. 1996) (internal quotation marks and citations omitted). If a continuing violation is shown, a plaintiff "is entitled to have a court consider all relevant actions allegedly taken pursuant to the employer's discriminatory policy or practice, including those that would otherwise be time barred." *Id.* (citing *Lambert v. Genesee Hosp.*, 10 F.3d 46, 53 (2d Cir. 1993)).

As discussed further below, the tort of quid pro quo sexual harassment is comprised of both unwanted sexual advances and a tangible change in the plaintiff's employment because of his or her reaction to that intrusive attention. In the present case, none of Mason's alleged unwanted sexual conduct occurred [*27] after April 20, 1995. Nevertheless, plaintiff alleges at least one "tangible change" in the terms, conditions or privileges of his employment because of his reaction to Mason's alleged advances that occurred after April 20, 1995: Mason's assigning additional work to him in May, allegedly in retaliation for his rejection of her advances. (*See* Pl. Mem. at 12; *see also* Gregg Dep. at 136-37) [6] This allegation is closely related, in time and nature, to the evidence that Mason assigned plaintiff additional work in March or April 1995 and to the proof that Mason took away plaintiff's state car, both of which were allegedly also in retaliation for plaintiff's rejection of Mason. All this evidence points to a course of conduct -- that is, a continuing violation -- that continued beyond April 20, 1995. Accordingly, notwithstanding that the unwanted sexual conduct and earlier alleged adverse employment actions occurred before April 20, 1995, plaintiff is entitled to base his quid pro quo claims on all "relevant" evidence.

> 6 Plaintiff cites five other "tangible changes" in his employment that occurred after April 20, 1995 in support of his continuing violation argument: (1) Mason's demand that he move his office closer to hers; (2) Mason's threat on July 14, 1995 that he would not pass probation if he did not "change [his] attitude about her"; (3) Mason's July 25, 1995 memorandum; (4) plaintiff's fourth evaluation, which he received on September 8, 1995; and (5) plaintiff's discharge. (*See* Pl. Mem. at 12) None of these alleged changes supports a finding of a continued violation. The first was not a tangible *change* in plaintiff's employment insofar as it was a threat without more. *See, e.g., Ponticelli v. Zurich Am. Ins. Group*, 16 F. Supp. 2d 414, 428 (S.D.N.Y. 1998) ("[A] threat of a tangible job detriment is insufficient to constitute quid pro quo sexual harassment." (citing *Ellerth*, 118 S. Ct. at 2264). As for the remaining "changes," plaintiff alleges elsewhere that they were in retaliation for his complaint about Mason's alleged harassment, not for his rejection of her advances. To allow plaintiff to bring a quid quo pro sexual harassment claim on the basis of these alleged employment actions would unnecessarily conflate the two causes of action. *Cf. Del Castillo v. Pathmark Stores, Inc.*, 941 F. Supp. 437, 438-39 (S.D.N.Y. 1996) (rejecting a retaliation claim where the alleged "protected activity" consisted "simply of declining a harasser's sexual advances" on the ground that every quid pro quo harassment claim would otherwise "automatically state a retaliation claim as well").

[*28] The continuing violation exception applies also to plaintiff's hostile work environment allegations. "By its nature, a claim of 'hostile environment' discrimination turns on the existence of a continuing violation, rather than on any individual offensive act." *Engelmann v. National Broad. Co.*, 1996 U.S. Dist. LEXIS 1865, *41, No. 94 CIV. 5616 (MBM), 1996 WL 76107, at *15 (S.D.N.Y. Feb. 22, 1996). Thus, so long as at least one act or incident of harassment occurred within the 300-day period before plaintiff's EEOC charge was filed, plaintiff's hostile work environment claim would be timely. In the present case, there are at least four alleged offensive acts that occurred after April 20, 1995: (1) Mason's assigning additional work to plaintiff; (2) the demand that plaintiff move his office closer to Mason's; (3) the ridicule from plaintiff's coworkers; and (4) Mason's requirement that plaintiff check in daily by e-mail, which continued past the relevant date. (*See* Pl. Mem. at 12-13) Accordingly, plaintiff's hostile work environment claims are timely.

That plaintiff's allegations are timely does not,

Case 1:07-cv-07300-SHS    Document 25-6    Filed 05/30/2008    Page 10 of 13

Page 9
1999 U.S. Dist. LEXIS 5415, *28

however, mean that they are sufficient to establish *prima facie* claims of sexual harassment. It is to this [*29] inquiry that I now turn.

B. *Quid Pro Quo Harassment*

Under the Guidelines established by the EEOC, quid pro quo harassment occurs when "submission to or rejection of [unwelcome sexual] conduct by an individual is used as the basis for employment decisions affecting such individual." 29 C.F.R. § 1604.11(a)(2) (1999). To establish a *prima facie* case of quid pro quo sexual harassment, therefore, "a plaintiff must present evidence that [he or] she was subject to unwelcome sexual conduct, and that [his or] her reaction to that conduct was then used as the basis for decisions affecting the compensation, terms, conditions or privileges of [his or] her employment." *Karibian*, 14 F.3d at 777; *accord Gallagher*, 139 F.3d at 346; *Carrero*, 890 F.2d at 577. The relevant inquiry, then, is "whether the supervisor has linked tangible job benefits to the acceptance or rejection of sexual advances." *Karibian*, 14 F.3d at 778.

In the present case, defendants contend, first, that plaintiff cannot establish that he was subjected to unwelcome sexual conduct. Although the question is close, I believe that plaintiff has offered sufficient evidence to establish unwelcome [*30] sexual conduct in view of the Second Circuit's decision in *Gallagher*. In *Gallagher*, as here, the plaintiff was never asked directly by her supervisor to engage in sexual relations. Nevertheless, emphasizing that "'whether particular conduct was . . . unwelcome presents difficult problems of proof,'" the Court held that the plaintiff's evidence -- of repeated invitations to meals and the like, compliments on her physical appearance, gifts and work-related privileges, "personal" questions and a few sexually suggestive comments -- was sufficient to survive summary judgment. *Gallagher*, 139 F.3d at 346 (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 68, 91 L. Ed. 2d 49, 106 S. Ct. 2399 (1986)). Whether such conduct rises to the level of sexual conduct, the Court explained, is a question for the trier of fact: "A jury could find, based on its cumulative perceptions and backgrounds, that requests for sexual activity are not always made explicitly, and that [the defendant's] failure to directly demand sexual favors as a condition of [the plaintiff's] continued terms of employment did not negate indirect pressure." 139 F.3d at 346.

To be sure, plaintiff here has [*31] not alleged that Mason made any sexually suggestive comments or that Mason gave him gifts or other work-related privileges. Otherwise, however, plaintiff's evidence is strikingly similar to the plaintiff's evidence in *Gallagher*: like the plaintiff in *Gallagher*, plaintiff alleges repeated invitations to meals and the like, compliments on his physical appearance and recurring "personal" questions. Beyond the evidence in *Gallagher*, plaintiff here alleges that Mason touched him on at least four occasions in an offensive manner and that she required him to check in via e-mail so she could, in her words, "know where [he was] all the time." A reasonable jury could infer from this evidence taken as a whole -- and from plaintiff's testimony that Mason communicated her interests more through her "appearance and looks" -- that Mason "said and did things of an erotic nature." *Id.* at 346. Further, a reasonable jury could infer from plaintiff's repeated rebuffs of Mason's invitations -- notwithstanding his failure to object explicitly to her purported advances before July 1995 -- that such conduct was unwelcome.

Defendants' argument that plaintiff cannot establish the second element [*32] of a quid pro quo claim -- that is, that his reaction to Mason's conduct was used as the basis for decisions affecting his employment -- must be rejected also. Mason's sexual advances effectively ceased in March 1995. Within only a few weeks of that time, Mason is alleged to have increased plaintiff's workload substantially and to have taken away his state vehicle. Although plaintiff does not establish a connection between his rejection of the sexual conduct and these two adverse employment actions conclusively, defendants do not offer a legitimate, nondiscriminatory reason for either of the adverse actions, merely contesting plaintiff's allegations of increased work and asserting, in the alternative, that if there was an increase in plaintiff's workload, "it is only reasonable that a new employee's workload would increase over a period of time." (Def. Reply Mem. at 23-24 & n.2) A reasonable jury could infer from the timing and nature of Mason's actions that plaintiff's reaction to Mason's conduct was used as the basis for decisions affecting his employment. *Cf. Tomka*, 66 F.3d at 1308 (holding that the timing of an adverse employment action could support an inference of causation [*33] for the purposes of establishing unlawful retaliation); *Davis v. State Univ. of N.Y.*, 802 F.2d 638, 642 (2d Cir. 1986) (same).

It is true, as defendants point out, that Mason never explicitly threatened that she would take action against

plaintiff for rejecting her advances. Where a plaintiff establishes unwanted sexual advances, causation and an adverse employment action, however, it makes little sense to require that he prove additionally that there was a threat, which is usually the factor that establishes causation. *See Ellerth*, 118 S. Ct. at 2265 ("When a plaintiff proves that a tangible employment action resulted from a refusal to submit to a supervisor's sexual demands, he or she establishes that the employment decision itself constitutes a change in the terms and conditions of employment that is actionable under Title VII."). Moreover, where a threat that submission to, or refusal of, sexual advances would be the basis of an employment decision is alleged, that threat need not have been explicit to establish a quid pro quo claim. *See, e.g., Carrero*, 890 F.2d at 573, 579; *see also Fernot v. Crafts Inn., Inc.*, 895 F. Supp. 668, 678 (D. Vt. 1995).

Nor is it material, [*34] as defendants contend, that plaintiff, in his reply memorandum to Mason's July 25, 1995 memorandum, attributed Mason's charges of poor performance to "personal animus." First, read in context, it is plain that this attribution refers to the motivation for Mason's charges in her memorandum, not to her motivation in assigning plaintiff more work or taking away his vehicle. More importantly, attributing Mason's actions to "personal animus" is by no means inconsistent with the view that she was motivated by anger over plaintiff's rejections.

To be sure, plaintiff's evidence with respect to both elements of a *prima facie* case of quid pro quo harassment is not overwhelming. Accepting his allegations as true and drawing all reasonable inferences in his favor, however, it is sufficient to survive summary judgment.

C. *Hostile Work Environment Harassment*

In contrast to quid pro quo sexual harassment, a claim of hostile work environment sexual harassment is based on the totality of circumstances. *See Harris v. Forklift Systems, Inc.*, 510 U.S. 17, 23, 126 L. Ed. 2d 295, 114 S. Ct. 367 (1993). To establish a claim of hostile work environment harassment, the workplace must be [*35] "permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Id.* at 21 (internal quotation marks and citations omitted); *see Oncale v. Sundowner Offshore Servs. Inc.*, 523 U.S. 75, 118 S. Ct. 998, 1003, 140 L. Ed. 2d 201 (1998) (calling this requirement "crucial"). "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment -- an environment that a reasonable person would find hostile or abusive -- is beyond Title VII's purview." *Harris*, 510 U.S. at 21 (citing *Meritor Sav. Bank*, 477 U.S. at 67). Thus, "'simple teasing,' offhand comments, and isolated incidents (unless extremely serious)" are not enough to establish a violation of Title VII. *Faragher v. City of Boca Raton*, 524 U.S. 775, 118 S. Ct. 2275, 2283, 141 L. Ed. 2d 662 (1998) (citation omitted); *see also Carrero*, 890 F.2d at 577 ("The incidents must be more than episodic; they must be sufficiently continuous and concerted in order to be deemed pervasive.").

In the present case, plaintiff's proof falls short of establishing [*36] a hostile work environment. Plaintiff's claims rest, in principal part, on the 10 to 15 allegedly inappropriate conversations with Mason, the four alleged instances of offensive touching and Mason's repeated invitations to meals, drinks and the like -- all of which occurred between December 1994 and March 1995. These alleged incidents, however, were not severe enough to support a hostile work environment claim without regard to frequency. Indeed, with the exception of the four instances of touching -- which were relatively minor in and of themselves -- Mason's behavior would most likely have been unobjectionable but for its frequency. Even when considered in light of the incidents' frequency, however, plaintiff's proof is insufficient to state a claim. Ten to 15 relatively unobjectionable conversations combined with four minor incidents of touching over the course of three to four months is not "sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris*, 510 U.S. at 21; *cf. Quinn*, 159 F.3d at 768.

In his memorandum of law, plaintiff points to several other incidents in support of his hostile work environment [*37] claims, including the November 1994 Buffalo trip, the "ribbing" by coworkers, the requirement that he check in via e-mail every day, the demand that he move his office nearer Mason's, his increased workload, his loss of a state car and Mason's alleged threat on July 14, 1995 that if plaintiff did not "change [his] attitude about her" he would not pass probation. (*See* Pl. Mem. at 17-18) But these incidents do not rescue his claims, either because they were unobjectionable or insufficiently

pervasive and abusive. The Buffalo trip, for example, was unobjectionable. Indeed, notwithstanding plaintiff's current attempt to describe the Buffalo trip as having "no business purpose except to provide Mason company" (*id.* at 17), plaintiff himself testified that he was asked to accompany Mason in order to meet the Buffalo staff. (*See* Gregg Dep. at 88-89) Similarly, although plaintiff now cites Mason's objection to his switching hotels as evidence of harassment (*see* Pl. Mem. at 17), he himself acknowledged a legitimate, nondiscriminatory reason for Mason's objection in his deposition testimony -- namely, that staying in the same hotel made it easier to arrange staff meetings. ( [*38] *See* Gregg Dep. at 93-94) As for plaintiff's "ribbing" by his coworkers, plaintiff conceded that other members of the lunch group were targeted for joking as well, and that he himself joined in the fun. (*See id.* at 60-61) The additional incidents, in short, were not "severe or pervasive enough to create an objectively hostile or abusive work environment" and, therefore, are "beyond Title VII's purview." *Harris,* 510 U.S. at 21.

V.

Defendants move, finally, to dismiss plaintiff's retaliation claims. Section 704(a) of Title VII provides in relevant part that "it shall be an unlawful employment practice for an employer to discriminate against any of his employees . . . because [such employee] has opposed any practice made an unlawful practice by this subchapter." 42 U.S.C. § 2000e-3(a). This provision is violated "when a retaliatory motive plays a part in adverse employment actions toward an employee, whether or not it was the sole cause . . . [or] when an employer is motivated by retaliatory animus, even if valid objective reasons for the discharge exist." *Cosgrove v. Sears, Roebuck & Co.,* 9 F.3d 1033, 1039 (2d Cir. 1993); *accord Distasio v. Perkin Elmer Corp.,* [*39] 157 F.3d 55, 65 (2d Cir. 1998).

Claims under section 704(a) of Title VII, and under the parallel nonfederal provisions, are tested under the three-step burden-shifting formula prescribed by the Supreme Court in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802-05, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973). *See Quinn,* 159 F.3d at 768; *Reed v. A.W. Lawrence & Co.,* 95 F.3d 1170, 1177-78 (2d Cir. 1996). First, a plaintiff must make out a *prima facie* case of retaliation. *See Quinn,* 159 F.3d at 768. Assuming the plaintiff does so, the burden then shifts to the defendant to articulate a legitimate, non-retaliatory reason for its action. *See id.* Finally, if the defendant meets this light burden of production, the plaintiff must establish that the defendant's proffered reason was merely a pretext for retaliation. *See id.* at 768-69.

To establish a *prima facie* case of unlawful retaliation, a plaintiff must show "'[1] participation in a protected activity known to the defendant; [2] an employment action disadvantaging the plaintiff; and [3] a causal connection between the protected activity and the adverse employment action.'" *Id.* at 769 (quoting [*40] *Tomka,* 66 F.3d at 1308); *accord Reed,* 95 F.3d at 1178. A plaintiff need not establish that the conduct he opposed was in fact a violation of Title VII, but he must show a "good faith, reasonable belief" that the underlying challenged actions of the employer violated the law. *Manoharan v. Columbia Univ. College of Physicians & Surgeons,* 842 F.2d 590, 593 (2d Cir. 1988) (internal quotation marks and citation omitted); *accord Reed,* 95 F.3d at 1178.

In the present case, plaintiff has submitted sufficient evidence to establish a *prima facie* case of retaliation. First, plaintiff's complaint to Mason at their July 14, 1995 meeting constituted protected activity known to the defendant. [7] In *Kotcher v. Rosa & Sullivan Appliance Center, Inc.,* 957 F.2d 59, 65 (2d Cir. 1992), the Second Circuit established that an informal complaint to company management constitutes protected activity for the purposes of Title VII. That the complaint in the present case was made directly to plaintiff's supervisor, the alleged harasser, makes no difference to the analysis. There is no reason that an employer should be insulated from liability when an employee seeks, first, to resolve a [*41] problem informally with the alleged offender, particularly when, as here, the offender is that employee's supervisor and the employer's own policy manual urges employees, "prior to initiating a formal written complaint of discrimination," to "resolve complaints informally with their supervisor." (Pl. Ex. K) *But cf. Del Castillo,* 941 F. Supp. at 438-39 (dismissing a retaliation claim where the alleged protected activity consisted "*simply* of declining a harasser's sexual advances" and stating, in *dictum,* that "the knowledge of the harasser cannot fairly be imputed to his employer" (emphasis added)). Second, plaintiff was plainly subjected to adverse employment actions, in the form of negative evaluations and, ultimately, termination. Third, the brief period between the protected activity and the adverse employment actions -- Mason's memorandum detailing plaintiff's

alleged performance deficiencies was written only 11 days after the July 14, 1995 meeting -- arguably raises an inference that those actions were taken to retaliate against plaintiff for his complaint. *See, e.g., Tomka*, 66 F.3d at 1308 (concluding that the time period between the plaintiff's protected activity [*42] and subsequent termination of benefits -- "a few weeks" -- "supported an inference of discrimination sufficient to establish a prima facie case" (citing cases)).

> 7  Although plaintiff complained also to Allen in DTF's EEO office before receiving notice of his termination, there can be no causal connection between that complaint and the subsequent adverse employment actions because he asked her to keep his complaint confidential.

In response, defendants contend that plaintiff's negative evaluations and eventual termination were due to his poor performance. Additionally, they contend that, even if Mason had a retaliatory motive for her actions, summary judgment is warranted because Shepherd, Mason's supervisor and plaintiff's supervisor following Mason's own termination, would have fired plaintiff even without Mason's recommendation.

To be sure, there is evidence in the record to support the conclusion that plaintiff's performance at DTF was something less than stellar. Plaintiff's second and third quarterly evaluations, [*43] for example, both indicate that he needed to improve his written work, his management of assignments and his productivity. Notably, however, those same evaluations gave plaintiff a "meets expectations" rating in six of the eight listed categories and over all; and the written comments were generally favorable. In contrast, on July 25, 1995 -- little more than three weeks after plaintiff's third evaluation -- Mason was prompted to write an extremely critical three-page memorandum detailing alleged inadequacies in plaintiff's performance. This memorandum was followed, only a few weeks later, by plaintiff's fourth performance evaluation, which bears little resemblance to the generally favorable evaluations he had received up to then.

According to Mason, plaintiff's performance did not improve in the few weeks following his third evaluation. (*See* Mason Dep. at 181) By Mason's and Shepherd's own admissions, however, plaintiff's performance in this period did not worsen in any appreciable way either. (*See id.*; Shepherd Dep. at 221) It may be that Mason and DTF had given plaintiff the benefit of the doubt in his first three evaluations and that those evaluations do not accurately [*44] reflect the depth of plaintiff's problems in the relevant periods. But, on the record as it exists, a reasonable jury could conclude that the change in plaintiff's evaluations, and ultimately his discharge, were the result of his having complained to Mason about her allegedly harassing behavior. Accordingly, summary judgment must be denied.

As for defendants' argument that Shepherd would have made the same decision independent of Mason, there is sufficient evidence in the record to support a contrary view -- that Shepherd relied heavily, indeed perhaps exclusively, on Mason's recommendation in firing plaintiff. Further, plaintiff is entitled to base his retaliation claim not only on his ultimate discharge, in which Shepherd may have played a larger role, but also on his critical evaluations following the July 14, 1995 meeting, for which Mason is solely responsible. In sum, plaintiff has submitted evidence that a retaliatory motive "played a part" in DTF's adverse employment actions, and DTF has not shown definitively that it "would have made the same decision[s] based upon the legitimate factor alone." *Cosgrove*, 9 F.3d at 1039-40. "Whether or not [the retaliatory motive] was [*45] the sole cause" of DTF's actions disadvantaging plaintiff is immaterial. *Id.* at 1039.

\* \* \*

For the foregoing reasons, defendants' motion is granted in part and denied in part, and the following claims are dismissed: Claims 2, 3, 8 and 9 as to DTF only; Claims 4, 5 and 6 as to both defendants; and Claim 10 insofar as it alleges hostile work environment sexual harassment.

SO ORDERED:

Dated: New York, New York

April 15, 1999

Michael B. Mukasey,

U.S. District Judge