# Unreported Case – Pikoris

BERNADETTE PIKORIS, Plaintiff, -against- MOUNT SINAI MEDICAL CENTER, Defendant.

96 Civ. 1403 (JFK)

UNITED STATES DISTRICT COURT FOR THE SOUTHERN DISTRICT OF NEW YORK

2000 U.S. Dist. LEXIS 7350

May 30, 2000, Decided

May 30, 2000, Filed

**DISPOSITION:** {*1} Defendant's motion for summary judgment granted in its entirety. Plaintiff's case dismissed.

**COUNSEL:** For Plaintiff: Robert M. Rosen, Of Counsel, ROSEN, LEFF, Hempstead, New York.

For Defendant: Bettina B. Plevan, Of Counsel, PROSKAUER ROSE LLP, New York, New York.

**JUDGES:** JOHN F. KEENAN, United States District Judge.

**OPINION BY:** JOHN F. KEENAN

**OPINION:**
*OPINION and ORDER*

### JOHN F. KEENAN, United States District Judge:

Plaintiff brought this action alleging that Defendant discriminated against her in the terms, conditions, and privileges of employment in violation of the Americans with Disabilities Act of 1990, **42 U.S.C. § 12101**, and New York State Executive Law **§§ 296, 297**. Plaintiff suffered from breast cancer and alleges that Defendant terminated her employment because Defendant perceived her to be disabled. Plaintiff maintains, however, that she was able to perform the essential functions of her position despite her impairment. Before the Court is Defendant's motion for summary judgment dismissing Plaintiff's claims, pursuant to **Fed. R. Civ. P. 56**. For the reasons discussed below, Defendant's motion is granted.

### The Parties

Plaintiff, Dr. Bernadette {*2} Pikoris, is a licensed physician in New York State. Plaintiff was employed by Defendant as a first year resident in Defendant's anesthesiology residency program beginning on July 1, 1991. Plaintiff was discharged from the program on November 23, 1992.

Defendant Mount Sinai Medical Center ("Defendant" or "Mt. Sinai") is an accredited hospital organized under the laws of New York with offices located at One Gustave Levy Place, New York, New York.

*Background*

**Defendant's Anesthesiology Residency Program**

Defendant's Department of Anesthesiology runs a three year residency program that consists of the second through fourth years of residency required by the American Board of Anesthesiology. The residents join Mt. Sinai's program after completing an initial clinical base year at another institution. An anesthesiology resident in the first year at Mt. Sinai is expected to provide anesthesia care for the patients that are assigned to the resident, including the pre-operative, intra-operative, and post-operative management of the patient, under the oversight of an attending physician. The resident is expected to perform other duties assigned to them by their attending physicians {*3} or the attending physician supervising their activities and is expected to participate as a graduate student in all of the education programs of the department and to participate fully and demonstrate their increasing knowledge as they go along. See Daly Aff., Ex. 4 ("Kaplan Dep.") at 30-31. Residents are also expected to adhere to the standards set forth in The American Board of Anesthesiology's "Defining Competence in Anesthesiology," which sets out standards to follow in the categories of character skills, knowledge, judgment, and clinical skills. See Daly Aff., Ex. C.

Dr. Richard Kayne was the Director of Residency Training in the Department of Anesthesiology at Mount Sinai during Plaintiff's employment in 1991 and 1992. Dr. Kayne was responsible for resident selection and recruitment, resident evaluation, scheduling of didactic lectures, overseeing overall hospital rotation schedules, and dealing with other residency-related issues. See Daly Aff., Ex. 3 ("Kayne Dep.") at 11-12. Dr. Joel Kaplan was the Chairman of the Department of Anesthesiology at Mt. Sinai during Plaintiff's employment in 1991 and 1992. See Kaplan Dep. at 10.

**Plaintiff's Employment at** {*4} **Mt. Sinai**

Plaintiff joined Mt. Sinai's staff on July 1, 1991 as a first-year resident in Mt. Sinai's three-year anesthesiology residency program. Plaintiff was assigned to work at Elmhurst Hospital for the month of October 1991. Plaintiff was diagnosed in October 1991 with possibly having breast cancer. *See* Pikoris Aff. P 11. Plaintiff allegedly informed Dr. Kayne on October 14, 1991 of her medical condition and her need for surgery. *See id.* P 13. On or about October 18, Dr. Kayne informed Plaintiff that she was going to be brought back from Elmhurst to Mt. Sinai beginning in November. Defendant alleges that Plaintiff was brought back to Mt. Sinai because she was progressing slowly, only doing one case per day at Elmhurst, and would receive more supervision at Mt. Sinai. *See* Kayne Dep. at 73, 76-77. Plaintiff alleges that she was brought back to Mt. Sinai because there was more medical staff there so she would be able to take time off for medical treatment with less of an impact of the schedule. *See* Pikoris Aff. P 16.

Initially, Plaintiff had intended to work throughout her treatment and Dr. Kayne had approved her plan to do so, but Plaintiff later decided to take {*5} a leave of absence. *See* Daly Aff., Ex. 1 ("Pikoris Dep.") at 280-81. Plaintiff alleges that on or about October 18 n1 Dr. Kayne informed Plaintiff that her independent intubation privileges n2 were being revoked because there was a general feeling that she could not handle the stress of having breast cancer. *See* Pikoris Dep. at 13-14. Plaintiff was the only first year resident not granted intubation privileges. *See* Kayne Dep. at 77. Plaintiff alleges that she decided to take the leave of absence because of this remark, the revocation of those privileges, and because she was scheduled for seven "on-call days" for November. According to Plaintiff, she typically had between five and seven on-call days in a month and in November she had seven on-call days whereas every other resident had six. *See* Pikoris Dep. at 19. Plaintiff alleges that because she had more on-call days for November than any other first year resident, it was difficult to switch her on-calls with others. *See id.* at 15-16. On November 5, 1991, Plaintiff began a medical leave of absence of approximately six months to recover from breast cancer surgery. *See* Daly Aff., Ex. A.

- - -Footnotes- - -1

n1 In Plaintiff's affidavit she indicates that this conversation occurred on October 18. *See* Pikoris Aff. P 14. In her deposition, however, she states that this conversation took place on October 19.

{*6} 2

n2 Intubation privileges are among the privileges that anesthesiology residents at Mt. Sinai typically receive during October of their first year. When a resident has intubation privileges, he or she is permitted to insert an anesthesia tube in a patient without direct supervision. *See* Def.'s 56.1 Stmt. P 48.

- - -End Footnotes- - -

Plaintiff returned to the residency program in May 1992. She requested permission to return to the program part-time in order to continue going to physical therapy and requested that she not have any on-calls for May and June. Dr. Kayne granted both requests. *See* Pikoris Dep. at 338-41. When Plaintiff returned to work full-time, her request for permission to leave work at 5:30 or 6 p.m. one or two days a week to attend her remaining physical therapy sessions was granted by Defendant. *See id.* at 345. Plaintiff's request for additional days off, if needed for follow-up medical treatment, was also granted. *See id.* at 346-47. The parties disagree as to whether Plaintiff started the first year residency program anew, with Defendant maintaining that Plaintiff started the program {*7} over again and Plaintiff maintaining that she continued the program from where she left off. *See* Def.'s 56.1 Stmt. P 19; Pl.'s 56.1 Stmt. P 19. Both parties agree that Plaintiff was awarded academic credit for the period of time she worked during 1991. *See* Def.'s 56.1 Stmt. P 12. Plaintiff allegedly informed Dr. Kayne in September 1992 that she was possibly suffering from a recurrence of breast cancer. *See* Pikoris Aff., P 30. Plaintiff's clinical privileges were withdrawn on October 19, 1992 and she was terminated on November 23, 1992.

**Evaluations of Plaintiff's performance**

The performance of residents in the Department of Anesthesiology is evaluated by the attending physicians they work with in the operating room on a day to day basis. During 1991 and 1992, attending physicians were encouraged to submit evaluations ("Comment Sheets") for the residents they supervised. Comment Sheets were distributed to the attending physicians on a monthly basis, and were typically returned by the attendings to Dr. Kayne within a month after they were distributed. The residents were evaluated on four major categories: knowledge, judgment, clinical skills, and character skills. {*8} *See* Kayne Dep. at 29-33, 49-50. "Character skills" includes honesty, rational planning, communication, performance under stress, reliability, rapport, and neatness. *See* Daly Aff., Ex. F. Dr. Kayne would then

review the evaluations with the Residents' Evaluation Committee ("REC"). The REC is a clinical competence committee within the Department of Anesthesiology that conducted quarterly meetings to monitor the residents' progress. *See* Kayne Dep. at 29-33.

**1. Evaluations of Plaintiff from July 1991 through October 1991**

a. *Dr. Francine Yudkowitz*: Dr. Francine Yudkowitz is an attending physician who evaluated Plaintiff's performance for the first two weeks of Plaintiff's employment as follows:

Knowledge: inadequate. She is listening to anesthesia tapes and not doing text reading. Her choice of material is inappropriate . . .

Clinical Skills: poor--doesn't even know how to correctly hold the laryngoscope . . . IV's adequate. Does a neat chart. Cannot hold a mark properly.

Character Skills: She is capable of setting up a room. She can do a preop but cannot formulate an anesthetic plan. Despite repetitive teaching cannot grasp simple basic {*9} anesthesia material, e.g., (1) fluid management in OR--had to explain numerous times and [she] still needed to refer to notes, (2) drug dosage--does not remember even after 10 minutes . . . . She is an extremely slow learner--I have my doubts about her.

*See* Daly Aff., Ex. F.

b. *Dr. Neil Bodner*: Dr. Bodner also reviewed Plaintiff's performance in July 1991, providing:

Although it was only 1 day in the 2nd week of her residency, my encounter with Dr. Pikoris necessitated . . . these comments. Her medical knowledge is limited and extremely simplistic. Her ability to assimilate knowledge was lacking--something I went over in detail with her in the morning was completely forgotten by the afternoon. Her clinical skills even at this early stage are non-existent. . . . I hope she will improve--she will need a lot of help.

*See* Daly Aff., Ex. G. Plaintiff points out that with regard to the evaluation of her clinical skills by Dr. Yudkowitz and Dr. Bodner, the evaluations of a resident's clinical skills in the first two weeks of their residency are basically ignored because it is expected that they will develop over time. *See* Pl.'s Ex. 3, Kayne Dep. {*10} at 93.

c. *Dr. Pratilis*: Dr. Pratilis provided Comment Sheets for Plaintiff for July 1991 and August 1991. The July comment Sheet provides:

Judgment: Excellent. Mature Calm.

Clinical Skills: Fairly good.

Character Skills: Honest. Good Planning. Good communicating. Neat. Good performance on two emergencies we worked together.

The August Comment Sheet rates Plaintiff as "Excellent" in all four categories. *See* Pl.'s Exhibits, Ex. 11.

d. *Intubation privileges*: In October 1991, Pikoris was denied intubation privileges after six of the attending physicians surveyed in October recommended that she not receive the privilege. The survey responses recommending that Plaintiff not receive intubation privileges were dated October 4, 8, 11, and 14. None of the attendings who completed the intubation recommendation forms supported intubation privileges for Plaintiff. *See* Daly Aff., Ex. H.

**2. Evaluations of Plaintiff from June 1992 through October 1992**

a. *Dr. Andrew Liebowitz*: In June 1992, attending physician Andrew Liebowitz submitted a Comment Sheet for Plaintiff, which states:

Knowledge: Absent

Judgement: Poor

Clinical {*11} Skills: Adequate

Character: Has no foundation of knowledge. Cannot interpret a blood gas--did not even know what the numbers stood for. Should show rapid improvement with even minimal effort.

*See* Daly Aff., Ex. K.

b. *Dr. Niranja Patel*: During the month of July 1992 Plaintiff worked one-on-one with Dr. Niranja Patel for three weeks. *See* Pikoris Dep. at 612. Dr. Patel's evaluation of Plaintiff for July 1992 provides:

Knowledge: Average, basic knowledge, but needs to read . . . literature. Willing to learn.

Judgment: Good.

Clinical Skills: Once taught, she learns fast and was willing to appreciate criticism. Skills improved remarkably and was [sic] pretty good by the end of the rotation.

Character: Honest, had rational planning, communicates well with the patient and colleagues and is reliable. With proper guidance and constructive criticism she will turn out to be a good anesthesiologist.

*See* Pl.'s Ex. 11. Plaintiff alleges that Dr. Patel informed Plaintiff after working with her for the three weeks that Dr. Patel would write a letter approving Plaintiff for intubation privileges but Dr. Patel went on

vacation at the {*12} end of July without writing the letter. *See id.* at 616.

Plaintiff was scheduled to work with Dr. Patel again in late September, 1992. Plaintiff was an hour-and-a-half late to the operating room that day. As a result, Dr. Patel said she would not work with Plaintiff and instructed Plaintiff to go see Dr. Sampson, the Department's Clinical Coordinator, to receive another work assignment. *See* Pikoris Dep. at 619; Patel Dep. at 50-51. Plaintiff alleges that she was late because she was unaware that she was scheduled to work with Dr. Patel, who requires residents to report an hour-and-a-half earlier than other attending physicians. *See* Pikoris Dep. at 619. Plaintiff did not report to Dr. Sampson because Plaintiff became so upset about disappointing Dr. Patel that she developed a migraine headache and went home. *See id.* at 620.

Plaintiff worked with Dr. Patel on one other occasion. On that occasion, Dr. Patel criticized Plaintiff for being unprepared and distracted. Plaintiff maintains that she was prepared and that Dr. Patel may have been influenced in making those comments by someone in the Department but acknowledges that she may not have given the correct answer when {*13} asked a question because she was anxious and embarrassed after the incident when she was late to work with Dr. Patel. *See id.* at 625-26.

c. *Dr. Allen P. Reed*: In July 1992, Dr. Reed, another attending physician in the Anesthesiology Department, submitted an evaluation of Plaintiff based on her performance on July 27, 1992:

I found Dr. Pikoris to be quite pleasant on a personal level. Her technical skills appeared to be adequate.

\* \* \* \*

Bernadette's fund of knowledge is very poor. She was unable to answer basic questions pertaining to . . . pharmacology and physiology . . . . At least a rudimentary understanding of these essential principles is expected from CA I residents at this time. Bernadette's fund of knowledge is lacking compared to what I would expect from a beginning resident at the end of his or her first month.

Bernadette states that she is reading a review book from the Lang series. I suggested to her that [certain other] primers . . . might be more appropriate. Furthermore I recommended that she devote the entire month of August to reading and rereading one of these standard texts in order to better understand important principles.

{*14} *See* Daly Aff., Ex. M. Plaintiff maintains that this evaluation was not accurate because Dr. Reed had been very upset on that day about an anesthesia machine not working. *See* Pikoris Dep. at 654. Plaintiff acknowledges that she was unable to answer questions put to her by Dr. Reed. Plaintiff alleges, however, that she was unable to answer the questions as a result of the anxiety she felt because Dr. Reed was annoyed that the machine was not working properly. *See id.* at 647-48.

On another occasion when Plaintiff worked with Dr. Reed he criticized her performance because she had not noticed that fluids were running low in an IV bag and she had not therefore changed the IV bag of the patient, which could have very serious consequences for the patient. *See* Pikoris Dep. at 638-39, 645.

Dr. Reed filled out another evaluation for Plaintiff in August 1992, stating:Knowledge: She does not know what P.02 measures.

Judgment: She does not recognize and respond to hypovolemia.

Clinical Skills: Intubations O.K.

Character: She arrived late in the a.m. The [operating room] was not set up . . . .

Daly Aff., Ex. N. According to Dr. Reed, hypovolemia {*15} is a state in which the patient's intravascular volume is decreased and is potentially life-threatening. *See* Reed Dep. at 33. Plaintiff concedes that she did not recognize hypovolemia. *See* Pikoris Dep. at 666.

d. *Dr. Howard Bernstein*: Dr. Bernstein evaluated Plaintiff's work during August 1992, stating:

Knowledge: Baseline knowledge is below expected of a first resident. She needs to read more and she needs to attend all conferences. This has been communicated to her in detail.

Judgment: Below level for a CA-1 resident. Needs to exhibit much more self confidence. Becomes very nervous when asked questions.

Clinical Skills: Average technical skills. Needs to spend more time on the labor floor before she will be ready to take ob anesthesia call.

Character: She is a very pleasant person but appears very disorganized on the labor floor. Performance under stress is a weak point for Dr. Pikoris.

Other: I am not sure if Dr. Pikoris will be able to complete her residency in anesthesiology. At times she demonstrates little knowledge and clinical skills, and at other times she performs satisfactorily.

*See* Daly Aff., Ex. O.

e. *Dr.* {*16} *Meg Rosenblatt*: Dr. Rosenblatt wrote an evaluation of Plaintiff for days in August 1992, stating:

While [Plaintiff] has learned to place an uneventful epidural she is totally unable to perform when the procedure does not go smoothly; she looks confused and needs to be coached how to proceed. I asked her about [a procedure] which she had seen every day throughout the month and she replied that she doesn't understand . . . . She showed no evidence of having read nor did she ask pertinent questions about the goings on around her. I feel strongly that Dr. Pikoris not be permitted to have call responsibilities on the labor floor until she demonstrates some proficiency in the field.

*See* Daly Aff., Ex. P.

f. *Dr. Thomas Tagliente*: Dr. Tagliente worked with Dr. Pikoris on September 11, 1992 and evaluated her performance on the same date. Regarding her knowledge of the pharmacology of drugs that were being used during the scheduled procedures, Dr. Tagliente wrote:

In general, Dr. Pikoris did not seem to possess the level of knowledge that is expected for someone who has been training as long as she has been. I began to point out to her the importance {*17} of knowing [this information]. At this point she became emotionally upset and stated that this was the third time this week that she had received this lecture and asked to be excused for a break. On her return about thirty minutes later, she was still visibly upset. When I tried to calm her down and asked her if she was having any personal problems that she needed help with, she just stated again that this was the third time this week that she had heard the same lecture, that this was "ridiculous" and that she didn't feel well and was going to ask to be allowed to go home. . . . I again advised her that if she was having problems that she get help and I also recommended that she speak to [Dr. Kayne] before leaving today.

While Dr. Pikoris has certainly not demonstrated the knowledge that would be expected of her at this point in her training, I believe that the question of her emotional stability is a more important issue at this point. . . . I do not feel that she is emotionally capable of functioning efficiently as an anesthesiologist in the OR and would have to recommend that some type of evaluations be done prior to her returning to the OR and possibly the residency program. {*18}

*See* Daly Aff., Ex. Q. The other two attendings from whom Plaintiff had received "that lecture" were Dr. Lagmey and Dr. Bernstein. *See* Pikoris Dep. at 669. Plaintiff concedes that she stated "this is ridiculous" but maintains that she was referring to the fact that she had been assigned to three attendings in three days although she did not explain that to Dr. Tagliente. *See id.* at 670-71. Plaintiff did not go to speak to Dr. Kayne before she left and did not tell the desk she was leaving. *See id.* at 672, 679.

g. *Dr. Edmund Cohen*: In a Memorandum dated October 6, 1992 to Dr. Kaplan, Dr. Cohen stated that, while he was working with Plaintiff a week earlier,

following a couple of failed attempts to start an IV, Dr. Pikoris asked me to do it, and she handed me the tray . . . . I was searching for the lidocaine syringe on the IV tray, and unfortunately, the lidocaine syringe with its dirty needle was left uncapped in the tray, and my finger was stuck with that needle.

There is absolutely no reason to leave an uncapped dirty needle in the work area. We work in a high risk area, and we depend on each other for proper safety precaution. It is careless, {*19} negligent, and irresponsible to act as such and to endanger the life of a colleague. I personally had . . . to receive a hepatitis booster, and a tetanus injection. In addition, the patient's blood was drawn for HIV and hepatitis titers by the needle-stick coordinator. Fortunately the patient's blood was negative for both titers.

This conduct should not be tolerated and should not be taken lightly. I recommend that serious action against this resident be taken to stress the importance of this kind of incident, and to lessen the chances of it being repeated. This accident could have had an unhappy ending, with possible serious medical and legal implications.

*See* Daly Aff., Ex. R.

**Plaintiff's ability to respond to questions**

Plaintiff concedes that--as many of the attending physicians' evaluations pointed out--she would become very anxious when she was questioned. Plaintiff explains that as a result of this anxiety, and because she thought could learn more on her own, she did not attend Monday morning classes even though she was frequently advised to attend these classes by Dr. Kayne. *See* Pikoris Dep. at 476, 478. Plaintiff similarly did not attend Wednesday {*20} morning faculty-student conference rounds because she was afraid Dr. Kaplan would call on her. *See id.* at 482. Plaintiff would also become anxious when she was asked questions by physicians in the operating room. *See id.* at 485. Plaintiff acknowledges that it was part of Defendant's residency program to question residents in the operating room. *See id.* at 627.

**The REC's Evaluations of Plaintiff**

The REC was a peer review committee of approximately 12 to 15 attending physicians in Mt. Sinai's Department of Anesthesiology that met

quarterly to evaluate the performance of the Department's residents. *See* Kayne Dep. at 54. The members of the REC were board certified anesthesiologists selected by Dr. Kayne and Dr. Kaplan who had experience in evaluating residents. The REC members were representative of the various areas of the Hospital's anesthesiology practice, including the Critical Care unit, the Bronx Veteran's Hospital, and Elmhurst Hospital. *See* Kayne Dep. at 75. Dr. Kayne acted as the chairman of the REC. *See* Kayne Aff. P 1. The REC would make recommendations concerning actions to take with regard to residents with performance problems, but the ultimate {*21} decision-making authority concerning a resident's employment rested with Dr. Kaplan, Chief of Anesthesiology.

Dr. Kayne's notes from the October 1991 REC meeting that relate to Plaintiff include the following comments: "slow start in July with knowledge and learning," "did only one case per day at Elmhurst," "bring her back from Elmhurst," and a comment attributed to Dr. Rosenblatt, "clinical skills improving, asks appropriate questions." *See* Daly Aff., Ex I.

Dr. Kayne's notes from the July 22, 1992 REC meeting, after Plaintiff returned form medical leave, provide that "Dr. Pikoris returned from her medical LOA to full-time work in June. She still is weak but is working one on one with Dr. Patel this month who reports improvement and potential." *See* Daly Aff., Ex. L.

The next REC meeting took place on October 14, 1992. Based on discussion at that meeting, the REC recommended that:(1) Dr. Pikoris did not merit receiving credit for the previous three months of training, (2) since this was really Dr. Pikoris's second chance to demonstrate her abilities (she had been a very weak resident prior to taking her medical LOA last year) it was felt that she should be notified {*22} at this point in time that her contract would not be renewed for next year, (3) for humanitarian reasons we would not terminate her contract immediately so that she could continue receiving health insurance as well as an income to allow her time to find another position (preferably in a different specialty) but (4) in order to ensure the safety of our patients, Dr. Pikoris would not rotate to our affiliate hospitals, would only be assigned to work 1:1 with an attending, would not be allowed to take night call, and would not be granted independent intubating privileges.*See* Daly Aff., Ex. S.

**Plaintiff's termination**

Dr. Kaplan agreed with the recommendation of the REC that Plaintiff's contract should not be renewed but determined, based on the information provided to him by the REC, that it would be unsafe for Plaintiff to have her clinical privileges. *See* Kaplan Dep. at 96. In reaching this decision, Dr. Kaplan relied on the evaluations of the attendings and the information provided to him by the REC. *See id.* at 96, 99-100, 310. According to Dr. Kaplan, he was aware of her medical problem at that time, however, and did not want to see Plaintiff lose her {*23} employment and her health insurance at that point. As a result, Dr. Kaplan consulted with Dr. Kayne and decided that, as they had done in other situations, they would continue her employment and let her work in the department as a research fellow or research assistant until June 30--the end of the residency year. *See id.* at 96-97.

Dr. Kayne met with Plaintiff on October 19, 1992. Dr. Kayne sent Plaintiff a memorandum dated October 21, 1992 which summarized their discussion on October 19. The memorandum states that the REC decided not to renew her contract at the end of the academic year and that Plaintiff's clinical privileges were being withdrawn immediately in the interest of patient safety. *See* Pl.'s Ex. 16. The memorandum states that the Defendant had to notify the State of New York that Plaintiff's privileges had been curtailed but that Defendant would make it clear that Plaintiff's actions had not resulted in harm to any patient. The memorandum also states that "given your medical status and the circumstances of your personal life at this point in time, it is understandable that you have been unable to perform to your fullest potential." *See id.* The memorandum also {*24} notes that Plaintiff had been offered a position through June 1993 as a nonclinical research assistant and that at the end of the October 19 discussion Plaintiff had indicated this was acceptable.

Plaintiff began to work in a medical research position at Mt. Sinai in the area of pain management in or about October 1992. According to Dr. Kayne, after their October 19 meeting, he was informed that, in addition to his October 21 memorandum, a document needed to be drafted which Plaintiff would have to sign indicating that she agreed to the terms set forth in the memorandum. When Plaintiff was presented with the document, however, Plaintiff refused to sign and told Dr. Kayne that she would not agree to resign her residency and that she wanted to discuss the matter with her lawyer. *See* Kayne Dep. at 169; Pikoris Dep. at 738. Plaintiff thereafter refused to meet with Dr. Kayne without an attorney. *See* Pikoris Dep. at 747; Kayne Dep. at 171.

Plaintiff then received a letter from Dr. Kaplan, dated November 23, 1992, terminating her employment. Defendant continued to pay Plaintiff at the same salary she had been earning during her employment until the

end of the residency year on {*25} June 30, 1993. *See* Pikoris Dep. at 748-49. Defendant was required by law to report Plaintiff's discharge to the State Office of Professional Medical Conduct and, following Plaintiff's discharge, it did so. *See* Def.'s 56.1 Stmt. P 127.

### House Staff Affairs Committee Proceedings

Plaintiff appealed her termination to the House Staff Affairs Committee ("HSAC"), a peer review panel established by Mt. Sinai to conduct hearings in connection with house staff disciplinary procedures. A hearing was held on June 9, 1993, at which Plaintiff was given an opportunity to be represented by counsel, to present witnesses and documents on her behalf, and to question witnesses called by the Anesthesiology Department. *See* Daly Aff., Ex. X. n3 Dr. Kaplan, Dr. Kayne, Dr. Bernstein, Dr. Patel, Dr. Reed, and Dr. Tagliente appeared as witnesses at the hearing on behalf of the Department of Anesthesiology. *See* Def.'s 56.1 Stmt. P 131. At the June 9 HSAC hearing, Plaintiff appeared without counsel, presented no witnesses or documents, and declined to testify on her own behalf other than to assert that she was "ready, willing, and able" to continue in the residency program. *See* {*26} Daly Aff., Ex. X. Plaintiff did cross-examine the Department's witnesses.

- - -Footnotes- - -3

n3 The members of the HSAC participating at the hearing were: Kristjan Ragnarsson, M.D. (Vice President of Mount Sinai's Medical Board, Chairman of Department of Rehabilitation Medicine, and Chairman of the HSAC), Jill Fishbane-Mayer, M.D. (Assistant Attending in Department of Obstetrics, Gynecology, and Reproductive Sciences), Daniel Garza, M.D. (Resident in Department of Psychiatry), Steven Gorfine, M.D. (Assisting Attending in Department of Surgery), Lisa Namerow, M.D. (Resident in Department of Psychiatry), and Chandranath Sen, M.D. (Associate Attending in Department of Neurosurgery).

- - -End Footnotes- - -

On July 1, 1993, the HSAC issued a unanimous decision upholding Plaintiff's termination from the residency program. The decision reviewed all of the evidence, made factual findings, and concluded in its decision to Plaintiff that:the evidence presented . . . demonstrated that you lack the clinical knowledge necessary to perform as a first year {*27} resident in the Department and, despite repeated advice to increase your knowledge and preparedness, you demonstrated an unwillingness to improve through study and attendance at daily and weekly Departmental conferences. The Committee further finds that the evidence demonstrated an inability on your part to handle the legitimate demands of the residency program or to respond appropriately to stressful situations. Finally, the Committee finds that, because the evidence established that your inadequate fund of knowledge and inability to handle stress presented a risk to patient safety, the Department properly summarily suspended you and terminated you from its program.

*See id.*

The Committee also noted that during the hearing,despite repeated appeals to you by members of the Committee, you declined to provide any information to the Committee . . . in support of your challenge to the Department's decision. You responded "no comment" to questions from the Committee attempting to elicit your position. . . . You have provided the Committee with no plausible explanation or excuse for your performance and have offered nothing to controvert the Department's reasons for {*28} its decision to terminate you.

*See id.*

### The Executive Committee

Plaintiff appealed the HSAC's decision to the Executive Committee of the Medical Board at Mount Sinai, which reviews the HSAC decisions to determine whether there is a reasonable basis to support the HSAC's conclusions. A hearing was held on September 9, 1993. *See* Daly Aff., Ex. Z. The Executive Committee, in a decision issued on September 29, 1993, unanimously upheld the HSAC's decision. *See id.*

### The Present Action

Plaintiff brought this action on February 22, 1996. The Complaint alleges that Plaintiff was discriminated against in the terms, conditions, and privileges of employment because of a disability, breast cancer, in violation of the Americans with Disabilities Act of 1990 (the "ADA"), 42 U.S.C. § 12101, and New York State Executive Law §§ 296, 297. The Complaint additionally alleges that Defendant is liable pursuant to the theory of respondeat superior.

Defendant now argues that it is entitled to summary judgment on Plaintiff's discrimination claims because: (1) there is no proof that Defendant perceived Plaintiff as disabled within the meaning {*29} of the ADA, (2) even if Plaintiff was perceived as having a disability, she was not qualified to perform the essential functions

of the position, and (3) Plaintiff cannot demonstrate that Defendant's reasons for her discharge are pretext for discrimination.

## Discussion

### Summary Judgment Standards

A motion for summary judgment may be granted under Fed. R. Civ. P. 56 if the entire record demonstrates that "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." *Anderson v. Liberty Lobby*, 477 U.S. 242, 250, 91 L. Ed. 2d 202, 106 S. Ct. 2505 (1986). "In moving for summary judgment against a party who will bear the ultimate burden of proof at trial, the movant's burden will be satisfied if he can point to an absence of evidence to support an essential element of the nonmoving party's claim." *Goenaga v. March of Dimes Birth Defects Found.*, 51 F.3d 14, 18 (2d Cir. 1995) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 2552, 91 L. Ed. 2d 265 (1986)). When viewing the evidence, the Court must "assess the record in the light most favorable to the {*30} non-movant and . . . draw all reasonable inferences in its favor." *Delaware & Hudson Railway Co. v. Consolidated Rail Corp.*, 902 F.2d 174, 177 (2d Cir. 1990); *see McLee v. Chrysler Corp.*, 109 F.3d 130, 134 (2d Cir. 1997). Although the movant initially bears the burden of showing that there are no genuine issues of material fact, once such a showing is made, the opposing party must "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256. Unsupported allegations will not suffice to create a material issue of fact. *See Goenaga*, 51 F.3d at 18. Rather, the party opposing the motion must produce sufficient evidence to permit a reasonable jury to return a verdict in its favor. *Anderson*, 477 U.S. at 248; *Trans Sport, Inc. v. Starter Sportswear*, 964 F.2d 186, 188 (2d Cir. 1992) (finding that the nonmovant must "come forward with enough evidence to support a jury verdict in its favor, and the motion will not be defeated merely . . . on the basis of conjecture or surmise." (citation omitted)).

Although it is necessary to evaluate a party's intent {*31} in discrimination cases, the Second Circuit has held that summary judgment is appropriate in discrimination cases under certain circumstances:

We are of course mindful that summary judgment is ordinarily inappropriate where an individual's intent and state of mind are implicated. The summary judgment rule would be rendered sterile, however, if the mere incantation of intent or state of mind would operate as a talisman to defeat an otherwise valid motion. Indeed, the salutary purposes of summary judgment--avoiding protracted, expensive and harassing trials--apply no less to discrimination cases than to commercial or other areas of litigation.

*Meiri v. Dacon*, 759 F.2d 989, 998 (2d Cir. 1985) (citations omitted); *see, e.g., D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998) (affirming grant of summary judgment for employer in ADA case); *McLee v. Chrysler Corp.*, 109 F.3d 130 (2d Cir. 1997) (affirming grant of summary judgment for employer in race discrimination case); *Shumway v. United Parcel Service*, 118 F.3d 60 (2d Cir. 1997) (affirming grant of summary judgment in sex discrimination case); {*32} *Wernick v. Federal Reserve Bank of New York*, 91 F.3d 379 (2d Cir. 1996) (affirming grant of summary judgment in ADA and Rehabilitation Act case); *Holt v. KMI-Continental, Inc.*, 95 F.3d 123 (2d Cir. 1996) (affirming grant of summary judgment for employer in race and sex discrimination case), *cert. denied*, 520 U.S. 1228, 117 S. Ct. 1819, 137 L. Ed. 2d 1027 (1997); *De La Cruz v. New York City Human Resources Dept.*, 82 F.3d 16 (2d Cir. 1996) (affirming grant of summary judgment for employer in race discrimination case).

### The Americans with Disabilities Act ("ADA")

The ADA provides that "no covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Under the ADA, a "qualified individual with a disability" means "an individual with a disability who, with or without reasonable accommodation, can perform the essential {*33} functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8); *Stone v. City of Mount Vernon*, 118 F.3d 92, 96 (2d Cir. 1997). The "essential functions" of the position include the fundamental duties to be performed in the position in question, but not functions that are merely marginal. *Stone*, 118 F.3d at 97 (citing 29 C.F.R. § 1630.2(n)(1) (1996)); *Ragusa v. Teachers Ins. and Annuity Ass'n*, 1998 U.S. Dist. LEXIS 12697, No. 96-3127, 1998 WL 483461, *2 (S.D.N.Y. Aug. 17, 1998). "A Court must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998).

The plaintiff in a disability discrimination case must first establish a prima facie case of discrimination. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792,

802-04, 93 S. Ct. 1817, 1824-25, 36 L. Ed. 2d 668 (1973); *Greenway v. Buffalo Hilton Hotel*, 143 F.3d 47, 52 (2d Cir. 1998) (applying *McDonnell Douglas* analysis to ADA case); *Abdel-Khalek v. Ernst & Young LLP*, 1999 U.S. Dist. LEXIS 2369, 1999 WL 190790, {*34} at *4 (S.D.N.Y. April 7, 1999) (same). To establish a prima facie case of discriminatory discharge under the ADA, a plaintiff must show that (1) her employer is subject to the ADA; (2) she suffers from a disability within the meaning of the ADA; (3) she could perform the essential functions of her job with or without reasonable accommodation; and (4) she was fired because of her disability. *Reeves v. Johnson Controls World Serv., Inc.*, 140 F.3d 144, 149-50 (2d Cir. 1998). The term "disability" means, with respect to an individual, (a) a physical or mental impairment that substantially limits one or more of the major life activities of such an individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. 42 U.S.C. § 12102(2); *Ryan v. Grae & Rybicki, P.C.*, 135 F.3d 867, 870 (2d Cir. 1998). In this case, Plaintiff claims only that Defendant regarded her as disabled.

If the plaintiff makes a prima facie showing of discrimination, the law creates a presumption that the employer unlawfully discriminated against the plaintiff. *Fisher v. Vassar College*, 114 F.3d 1332, 1335 (2d Cir. 1997) {*35} (en banc), *cert. denied*, 522 U.S. 1075, 118 S. Ct. 851, 139 L. Ed. 2d 752 (1998). The burden then shifts to the defendant to articulate a "legitimate, non-discriminatory reason" for firing the employee to rebut the presumption of discrimination. *See Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S. Ct. 1089, 1093, 67 L. Ed. 2d 207 (1981); *Shumway v. United Parcel Service, Inc.*, 118 F.3d 60, 63 (2d Cir. 1997). "Any legitimate, non-discriminatory reason will rebut the presumption triggered by the prima facie case . . . the defendant need not persuade the court that it was actually motivated by the proffered reason." *Fisher*, 114 F.3d at 1335 (quoting *Burdine*, 450 U.S. at 254, 101 S. Ct. at 1094). If the defendant satisfies this burden of production, the presumption of discrimination "simply drops out of the picture" and the plaintiff has the burden to prove by a preponderance of the evidence that the employer's stated reason was merely a pretext for discrimination. *See Burdine*, 450 U.S. at 253, 101 S. Ct. at 1093; *St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 507-08, 113 S. Ct. 2742, 2747, 125 L. Ed. 2d 407 (1993); {*36} *Fisher*, 114 F.3d at 1336.

1. Whether Plaintiff was regarded as being disabled

Defendant first argues that Plaintiff cannot establish a prima facie case of perceived disability discrimination because Plaintiff was not regarded as having an impairment within the meaning of the ADA. To establish that Plaintiff was regarded as being disabled, it is not sufficient for Plaintiff to show that Mt. Sinai regarded her as somehow disabled; "rather, the plaintiff must show that the employer regarded the individual as disabled within the meaning of the ADA." *Colwell v. Suffolk County Police Dep't*, 158 F.3d 635, 646 (2d Cir. 1998). Under the ADA, a plaintiff is required to show that the defendant regarded the plaintiff as "having an impairment that substantially limited a major life activity." *See id.* In this case, Plaintiff must adduce evidence that she was regarded as substantially limited in her ability to work. "'Substantially limited' in the ability to work means that a plaintiff is 'significantly restricted in the ability to perform either a class of jobs or a broad range of jobs.' 'An impairment that disqualifies a person from only a narrow {*37} range of jobs is not considered a substantially limiting one.'" *Ryan*, 135 F.3d at 872 (citations omitted); *see Lacoparra v. Pergament Home Centers, Inc.*, 982 F. Supp. 213, 229 (S.D.N.Y. 1997) ("That an employer deems an employee incapable of performing a particular job is insufficient; the employer must perceive the employee as generally unable to work").

In *Ryan*, the plaintiff was a secretary with the defendant law firm, Grae & Rybicki ("G& R"). The plaintiff brought suit claiming that she was fired from this position solely because she suffered from colitis even though she had received a number of negative performance evaluations. The plaintiff alleged that when she was fired her employer said to her that "I think this job is too stressful for you because you have colitis." *See Ryan*, 135 F.3d at 869. The employer also allegedly stated that "you're a nice girl, we appreciate what you did with the computer, and we'll give you a good recommendation." *See id.* at 872. The Second Circuit found that, construing these statements in the plaintiff's favor,

> at most, they demonstrate that G & R believed that Ryan's {*38} position was too stressful for her. Rybicki referred only to "this" job, clearly referencing the position at G & R from which Ryan was being fired. Moreover, the fact that G & R was willing to provide Ryan with a good employment recommendation suggests that it did not perceive her as being unable to perform related jobs.

*See id.* at 872-73. The Second Circuit therefore concluded that Ryan had failed to demonstrate that the defendant perceived her as being substantially limited in her ability to work. *See id.* at 873.

Defendant now argues that Plaintiff cannot establish that Mt. Sinai perceived her as substantially limited in her ability to work in a broad range of jobs because of

her breast cancer. The Court agrees. In this case, when the REC recommended that Plaintiff's contract not be renewed for the following year, the Committee recommended that Plaintiff's contract not be terminated immediately, in part, to allow her time to find another position "preferably in a different specialty." When Dr. Kaplan decided in October 1992 to withdraw Plaintiff's clinical privileges, Defendant offered Plaintiff a medical research position through the remaining {*39} eight months of her residency. Pursuant to *Ryan*, Dr. Kayne's alleged comment in October 1991 that Plaintiff's intubation privileges were being revoked because there was a general feeling that she could not handle the stress of breast cancer, and his statement in the October 21, 1992 memorandum that "given your medical status and the circumstances of your personal life at this point in time, it is understandable that you have been unable to perform to your fullest potential," do not demonstrate that Mt. Sinai perceived Plaintiff as being substantially limited in her ability to work. In the same October 21 memorandum, Dr. Kayne stated that Plaintiff had been offered a position through June 1993 as a nonclinical research assistant. Thus, under *Ryan*, Dr. Kayne's comments, at most, indicate that Defendant believed that Plaintiff's clinical responsibilities as an anesthesiology resident were too stressful for her given her personal circumstances at the time, but not that Defendant perceived her as generally unable to work because of her breast cancer. Even if Plaintiff could demonstrate that she was "regarded as" being disabled within the meaning of the ADA, however, the Court finds {*40} that her discrimination claims must fail for the reasons discussed below.

**2. Whether Plaintiff was qualified to perform the essential functions of the position**

Defendant next argues that Plaintiff cannot establish a prima facie case because she cannot show that she was able to perform the essential functions of her position and, therefore, cannot show that she was qualified for the position of anesthesiology resident. As noted above, a court "must give considerable deference to an employer's judgment regarding what functions are essential for service in a particular position." *D'Amico*, **132 F.3d at 151**. According to Dr. Kaplan, an anesthesiology resident in the first year at Mt. Sinai is expected to: provide anesthesia care for the patients that are assigned to the resident under the oversight of an attending physician, to perform other duties assigned to them by their attending physicians or the attending supervising their activities, to participate as a graduate student in all of the education programs of the department, and to participate fully and demonstrate their increasing knowledge as they go along. Residents are also expected to adhere to the standards {*41} set forth in The American Board of Anesthesiology's "Defining Competence in Anesthesiology," which sets out standards to meet in the categories of character skills, knowledge, judgment, and clinical skills. Defendant maintains that, because of Plaintiff's insufficient fund of knowledge and lack of clinical skills, the attendings were unable to rely on Plaintiff in patient care situations without their constant direct supervision. Moreover, Defendant points out that Plaintiff failed to attend many of the educational conferences that were scheduled for residents, despite the fact that several attendings specifically recommended that she attend to improve her performance.

In this case, Plaintiff received only three positive performance evaluations, two from Dr. Pratilis for July and August 1991, and one from Dr. Patel in July 1992. As set out above in great detail, the majority of the evaluations submitted were very negative. Most evaluations commented on Plaintiff's lack of knowledge, including, for example, comments that Plaintiff's knowledge was "absent," "very poor," "inadequate," "limited," "extremely simplistic," "below expected," "despite repetitive teaching cannot grasp simple {*42} basic anesthesia material," "ability to assimilate knowledge was lacking," "no foundation of knowledge," and "showed no evidence of having read," among others. The Comment Sheets also addressed Plaintiff's inability to answer questions and her inability to handle stress, including comments that Plaintiff "was unable to answer basic questions pertaining to . . . pharmacology and physiology," "becomes very nervous when asked questions," and "performance under stress is a weak point." Several evaluations also commented on Plaintiff's inadequate clinical skills, including, for example, comments that Plaintiff's clinical skills were "poor--doesn't even know how to correctly hold the laryngoscope," "non-existent," "totally unable to perform when procedure does not go smoothly." The evaluations also included comments that "I am not sure if Dr. Pikoris will be able to complete her residency in anesthesiology," "I feel strongly that Dr. Pikoris not be permitted to have call responsibilities on the labor floor until she demonstrates some proficiency in the field," and "I do not feel that she is emotionally capable of functioning efficiently as an anesthesiologist in the OR." Plaintiff was also {*43} criticized for failing to notice that fluids in a patient's IV had run low and for failing to recognize and respond to hypovolemia. Moreover, Dr. Cohen recommended that "serious action" be taken against Plaintiff after she left a dirty needle uncapped on a tray and Dr. Cohen was stuck with the needle.

In addition, there were two instances reported where Plaintiff was late, once for Dr. Patel and once for Dr. Reed. Dr. Reed noted that the operating room was not

set up as a result. Because Dr. Patel would not let Plaintiff work with her as a result, Plaintiff became upset and left the hospital and failed to report to Dr. Sampson as Dr. Patel had instructed. On another occasion, Plaintiff became upset while working with Dr. Tagliente and, after taking a 30 minute break, Plaintiff left the hospital without speaking with Dr. Kayne as Dr. Tagliente had recommended. Six attendings recommended against Plaintiff receiving intubation privileges in October 1991 and no attendings recommended that Plaintiff receive these privileges. Although Plaintiff argues that these privileges were taken away on October 18, right after she informed Dr. Kayne on October 14 that she had breast cancer, the Court {*44} notes that all six recommendations against her receiving these privileges were completed prior to or on October 14.

Plaintiff acknowledges that she would become very upset when questioned and acknowledges that sometimes, as with Dr. Patel and Dr. Reed, she was unable to answer the questions correctly as a result. Plaintiff also concedes that it was part of the residency program for attendings to question residents in the operating room. Moreover, Plaintiff concedes that she did not attend Monday morning classes and Wednesday morning conferences in part due to this anxiety even though she was repeatedly advised to attend these classes by Dr. Kayne and other attendings.

Notwithstanding the above, the Court will assume that Plaintiff has met her initial burden of establishing a prima facie case of discrimination. *See, e.g., Lapsley v. Columbia Univ.*, 999 F. Supp. 506, 515 (S.D.N.Y. 1998) (listing a number of cases which have assumed that the plaintiff established a prima facie case of discrimination); *Evans v. Golub Corp.*, 29 F. Supp. 2d 194, 201 (S.D.N.Y. 1998); *Bickerstaff v. Vassar College*, 992 F. Supp. 372, 374 (S.D.N.Y. 1998). {*45} However, even assuming that Plaintiff has met her initial burden, the facts that Defendant relies on to argue that Plaintiff is not qualified for the position of anesthesiology resident "perform double duty in support of [Defendant's] attempt to rebut the prima facie case." *See Ragusa*, 1998 WL 483461, at *3. Defendant may point to Plaintiff's negative performance evaluations as the reason she was terminated. *See Meiri v. Dacon*, 759 F.2d 989, 995 (2d Cir. 1985) (relying on supervisors' evaluations of employee's job performance in considering claim that employee was terminated because of unlawful discrimination); *Dzaba v. Haythe & Curley*, 1996 U.S. Dist. LEXIS 731, No. 94-1767, 1996 WL 31156, at *4-5 (S.D.N.Y. Jan. 26, 1996) (poor evaluations permit inference that employee was terminated for poor performance and not unlawful discrimination); *Stein v. McGraw-Hill, Inc.*, 782 F. Supp. 207, 212-13 (S.D.N.Y. 1992) (same). Because Defendant has articulated a legitimate, non-discriminatory reason for terminating Plaintiff, Plaintiff has the burden of proving by a preponderance of the evidence that Defendant's stated reasons are merely a pretext for {*46} discrimination. *See Greenway*, 143 F.3d at 52.

3. Whether Plaintiff can demonstrate that Defendant's stated reasons for Plaintiff's discharge are pretext for discrimination

Plaintiff has provided absolutely no evidence to suggest that any of the attendings who evaluated Plaintiff's performance were motivated by discriminatory animus. Although Plaintiff claims that Dr. Kayne made some allegedly discriminatory statements, Plaintiff does not dispute that Dr. Kaplan made the decision to remove her clinical privileges and, ultimately, to fire her. Nor has Plaintiff introduced any evidence to suggest that the decisions rendered by the HSAC and the Executive Committee upholding Plaintiff's termination were a pretext for discrimination. Instead, Plaintiff argues that the evaluation process itself is selective and unfair because, while strongly encouraged, evaluation by attending physicians was not mandatory. Plaintiff therefore contends that the evaluation process should not be relied upon to provide an accurate depiction of her performance during her residency. In support of this argument, Plaintiff points out that Dr. Kayne agreed that attendings would be more {*47} likely to fill out evaluation forms if they had either very strong comments negatively or positively regarding a resident. *See* Plaintiff's 56.1 Stmt. P 7; Kayne Dep. 32-33.

The Court disagrees with Plaintiff's contention. According to the Second Circuit, "job performance cannot be assessed in a vacuum; the ultimate inquiry is whether an employee's performance 'meets his employer's legitimate expectations.'" *Meiri*, 759 F.2d at 995 (citations omitted). "Although courts must refrain from intruding into an employer's policy apparatus or second-guessing a business's decision making process, they must also allow employees 'to show that the employer's demands were illegitimate or arbitrary.'" *See id.* (citations omitted). In this case, there is simply no evidence to suggest that Defendant's demands were illegitimate or arbitrary. Dr. Kayne's statement, even if true, does not support an inference that attending physicians were somehow motivated by discriminatory animus in filling out Comment Sheets for residents. As a result, the Court will not second guess Defendant's evaluation process.

Plaintiff next contends that Defendant's failure to provide her with remedial {*48} measures such as assigning her a mentor or putting her on probation

before terminating her is evidence of discrimination. The Court finds that this contention does not suffice to present an issue of material fact, however. In making this argument, Plaintiff relies on the deposition testimony of Dr. Tagliente who stated that he was not aware of any formal mentor policy but that in his eleven years in the program he could recall three instances where the REC had assigned a mentor to a resident though by the REC to need remediation. *See* Tagliente Dep. at 56-58. Dr. Tagliente also testified that the REC has in some instances placed residents on "probation" to notify the resident that their performance is below standard and needs to be improved in order for the resident to get credit for that portion of their training. *See id.* at 72-75. Plaintiff does not allege that there is a formal policy that Defendant failed to follow in terminating her without first providing remedial measures. Moreover, Dr. Kaplan testified that upon Plaintiff's return from her medical leave, she was assigned to Dr. Patel and specifically assigned to some of the senior teachers, such as Dr. Tagliente and {*49} Dr. Bernstein, to try to bring her up to speed and that Dr. Kayne spent as much time with her as possible. *See* Kaplan Dep. at 64. The HSAC similarly found that the evidence demonstrated that the Department had attempted to assist Plaintiff when she returned from her leave of absence. *See* Daly Aff., Ex. X, at 5.

Plaintiff's argument that other residents received poor evaluations without being discharged is equally unavailing. As a predicate for inferring discriminatory motivation from evidence of disparate treatment, Plaintiff would have to submit evidence that other residents who received poor evaluations and were not discharged were "similarly situated in all material aspects." *See Shumway*, 118 F.3d at 64; *Abdullah v. Skandinaviska Enskilda Banken Corp.*, 1999 U.S. Dist. LEXIS 16045, 1999 WL 945238, *7 (S.D.N.Y. Oct. 19, 1999). Plaintiff has adduced no such evidence.

In sum, Plaintiff has produced no evidence to suggest that the reasons Defendant has given for her termination her were a pretext for discrimination. Because Plaintiff's conclusory allegations do not suffice to create a material issue of fact, *see Goenaga*, 51 F.3d at 18; *Trans Sport*, 964 F.2d at 188, {*50} the Court finds that summary judgment on Plaintiff's ADA claim is appropriate.

### Plaintiff's State Law Claim

Plaintiff also alleges that Defendant discriminated against her in violation of New York State Human Rights Law ("NYSHRL"), Executive Law § 296. The NYSHRL makes it unlawful "for an employer . . . because of the . . . disability . . . of any individual . . . to discharge from employment such individual or to discriminate against such individual in compensation or in terms, conditions or privileges of employment." N.Y. Exec. Law § 296(1)(a). "There is no difference between the quantum or elements of proof required by the ADA and the [NYSHRL]." *Mohamed v. Marriott Intern., Inc.*, 905 F. Supp. 141, 156 (S.D.N.Y. 1995); *see Sowemimo v. D.A.O.R. Security Inc.*, 43 F. Supp. 2d 477, 484 (S.D.N.Y. 1999); *Wallengren v. Samuel French, Inc.*, 39 F. Supp. 2d 343, 351 (S.D.N.Y. 1999). Thus, Plaintiff's NYSHRL claim must be dismissed for the same reasons Plaintiff's ADA claim is dismissed.

### *Conclusion*

For the reasons discussed above, Defendant's motion for summary judgment is granted in its entirety. Plaintiff's case {*51} is dismissed. The Clerk of the Court is directed to remove this case from the Court's active docket.

**SO ORDERED.**

**Dated: New York, New York**

**May 30, 2000**
**JOHN F. KEENAN**

**United States District Judge**