1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x
EDMUND BRYAN,

       Plaintiff,

   -against-     No. 07 Civ. 7300 (SHS)

           ECF Case
MEMORIAL SLOAN-KETTERING CANCER
CENTER,

       Defendant.
-----------------------------------x

       April 29, 2008
       10:10 A.M.


     Deposition of Defendant, by

RUPERT GILLETTE, taken by Plaintiff, pursuant

to Notice, at the offices of The Scott Firm,

55 Washington Street, Suite 705, Brooklyn, New

York 11201, before Charisse Romeo, a Shorthand

Reporter and Notary Public within and for the

State of New York.

CLASSIC REPORTING, INC., 212-268-2590

2

1

2        A P P E A R A N C E S:

3            THE SCOTT FIRM
                 Attorneys for Plaintiff
4                55 Washington Street, Suite 705
                 Brooklyn, New York 11201
5
           BY:   A. BARAKA SCOTT, ESQ.
6

7            McDERMOTT, WILL & EMERY, LLP
                 Attorneys for Defendant
8                340 Madison Avenue
                 New York, New York 10173
9
           BY:   KATHERINE D. KALE, ESQ.
10
      ALSO PRESENT:
11
           EDMUND BRYAN
12
           PAMELA DUDLEY
13            Memorial Sloan-Kettering Center
                 Human Resources Representative
14

15

16

17

18

19

20

21

22

23

24

25

CLASSIC REPORTING, INC., 212-268-2590

3

1

2          IT IS HEREBY STIPULATED AND AGREED by

3     and between the attorneys for the respective

4     parties herein that the sealing, filing and

5     certification of the within deposition be waived;

6     that such deposition may be signed and sworn to

7     before any officer authorized to administer an

8     oath, with the same force and effect as if signed

9     and sworn to before a judge of this court.

10          IT IS FURTHER STIPULATED AND AGREED

11      that all objections, except as to the form, are

12      reserved to the time of the trial.

13

14

15

16

17

18

19

20

21

22

23

24

25

CLASSIC REPORTING, INC., 212-268-2590

4

1               R. Gillette

2      R U P E R T    G I L L E T T E,

3           having been first duly sworn by the

4           Notary Public (Charisse Romeo), was

5           examined and testified as follows:

6      EXAMINATION BY MR. SCOTT:

7           Q.   Please state your name and

8      address for the record.

9           A.   Rupert Gillette, business address

10     1275 York Avenue, New York, New York.

11          Q.   Good morning, sir.

12          A.   Good morning.

13          Q.   Okay, my name is Armani Scott.  I

14     am the attorney for Edmund Bryan.  I represent

15     him in the case captioned Edmund Bryan against

16     Memorial Sloan-Kettering Cancer Center.

17               You are appearing here today

18     pursuant to a notice of deposition, correct?

19          A.   Yes.

20          Q.   I'm going to ask you some

21     questions and just some general ground rules.

22     Wait for me to finish the question and then

23     you can respond.  There is a court reporter

24     here, she is taking down everything that is

25     said, so your responses have to be audible and

5

1                  R. Gillette

2        we can't be speaking over each other because

3        she can't take it down.

4             A.   Okay.

5             Q.   So, uh-huh and um-hum, any shakes

6        of the head, she can't take that down.

7             A.   Okay.

8             Q.   In the event that I phrase a

9        question in a way that it is inartful, it

10        doesn't make sense, let me know and I'll

11        rephrase it.  I don't want you to guess at the

12        meaning of my question.

13                 I am not trying to trick you.  If

14        you don't know the answer to the question, I

15        don't want you to guess either.  Just say you

16        don't know, okay?

17             A.   Okay.

18             Q.   Very good.  Mr. Gillette, by whom

19        are you employed?

20             A.   Excuse me?

21          Q.   By whom are you employed?

22          A.   Memorial Sloan-Kettering

23     Hospital.

24          Q.   And for how long have you been

25     employed there?

6

1              R. Gillette

2        A.   Approximately 34 years.

3        Q.   And what is your present job

4    title?

5        A.   I am the night supervisor in the

6    sterilization department.

7        Q.   And how long have you been in

8    that position?

9        A.   Approximately six years.

10       Q.   And prior to that supervisory

11   position?

12       A.   I was a lead tech.

13       Q.   And how long were you a lead tech

14   for?

15       A.   About five years.

16       Q.   And prior to that?

17       A.   Technician.

18       Q.   And how many years?

19       A.   I guess about nine years.

20       Q.   And prior to that, title and how

21     long?

22          A.    I worked in the distribution area

23     for about 13 years.

24          Q.    And what is the distribution

25     area, what did you do there?

CLASSIC REPORTING, INC., 212-268-2590

7

1                   R. Gillette

2          A.   I supplied the floors with

3      supplies.

4          Q.   And how many years, again, I'm

5      sorry?

6          A.   13.

7          Q.   That just about tallies up your

8      entire tenure at Memorial Sloan-Kettering?

9          A.   I believe so.

10         Q.   Very good.  That's fair to say,

11     okay.

12              If you could just briefly run

13     through your educational background, please?

14         A.   High school graduate plus

15     certification in sterilization.

16         Q.   Where did you go to high school?

17         A.   James Madison in Brooklyn.

18         Q.   And when you say you have

19     certifications in sterilization, can you be

20     specific, what certifications do you have,

21     when did you get them?

22          A.   I've been certified, I believe,

23     for about 14 years, okay?

24          Q.   Okay.

25          A.   There is only one sterilization

8

1              R. Gillette

2      certification and that's the only one I have.

3          Q.   Any other certifications?

4          A.   No.

5          Q.   With this certification, is there

6      any requirement that you stay current or

7      recertified any number of years?

8          A.   Um, you need to accumulate 12

9      points during the course of the year to

10      maintain your certification.

11          Q.   And have you done that over the

12      course of your 14 years, approximately 14

13      years of certification?

14          A.   Yes.

15          Q.   And how do you acquire these 12

16      points?

17          A.   Generally, we have in-service

18      videotapes, sometimes physical on-hand

19      in-service inside the department, accumulation

20      of that, and watching videos during the course

21      of the year, that makes up the 12 points.

22          Q.    In your current job title as

23      supervisor, what are your job

24      responsibilities?

25          A.    That would be to make sure --

CLASSIC REPORTING, INC., 212-268-2590

9

1                   R. Gillette

2     there were several tasks that are done in the

3     department, the department itself has like

4     several areas.

5                   Decontam area, you have the prep

6     and pack area, you have the steam, you have

7     the custom ultrasonic, you have the case room.

8     There are certain tasks to be done in each of

9     those areas and it is my responsibility to

10     make sure they are done each night --

11          Q.   Okay.

12          A.   -- by the staff that are working

13     in those areas.

14          Q.   And if you could just briefly go

15     through those, I believe you named five

16     different areas, or was it six?

17                   I'm thinking you said five, five

18     or six areas you just ran through,

19     specifically, what happens in each of those?

20          A.   The decontam area, we receive

21    carts from the OR with soiled trays, it would

22    be bloody trays with blood, you know.

23        Q.   All right.

24        A.   We are to wash those trays,

25    process them, process meaning we send them to

CLASSIC REPORTING, INC., 212-268-2590

10

1                    R. Gillette

2          a tunnel washer.  There are other items that

3          are in the decontam area that we are to wash,

4          sometimes we get pumps, patient pumps, IV

5          pumps, commodes, various other items, but the

6          decontam area is basically to clean.

7               Q.   Okay.

8               A.   And to process, meaning send

9          through the tunnel washes.  Then you come to

10         the prep and pack area where the tray assembly

11         is done by the staff.

12              Q.   Okay.

13              A.   Meaning all the trays that come

14         from the decontam area, they come into the

15         prep and pack area and we assemble the trays.

16         Pack them up for sterilization.  We put them

17         in containers and they are packed and ready

18         for sterilization.

19                   Then you go to the sterilization

20         area where that staff would take all the

21     assembled trays that are in the containers,

22     place them on a cart and process them in the

23     steam sterilizer.

24          Then you go from the steam

25     sterilization area, once the trays -- all the

11

1              R. Gillette

2     items that are sterilized, that are processed,

3     they are removed, cooled off and then they are

4     taken to the case room area where they are

5     stored.

6              Also, in addition to the case

7     room area, the staff that works in there, they

8     need to complete the cases that the OR would

9     be using the following day for operations.

10     They need to complete those carts.  By that, I

11     mean, there are missing items on each case and

12     we have to get the missing item, put them on a

13     cart and send the cart up to the OR.

14          Q.   All right.

15          A.   We also have the custom

16     ultrasonic area and that area, we receive

17     flexible scopes also from the decontam area

18     and we are to process the flexible scopes, and

19     in the custom ultrasonic machine, prepare them

20     and have them ready for distribution to the

21     various areas of the hospital.

22          Q.   All right.  As a supervisor, how

23     many persons work on your team?

24          A.   I believe it's ten.

25          Q.   Okay.  And their job titles would

CLASSIC REPORTING, INC., 212-268-2590

12

1                    R. Gillette

2      be what, their varied job titles would be

3      what?

4           A.   I have one lead technician and

5      the rest of all the staff would be

6      technicians, their title would be.

7           Q.   Do you know what a CPD Tech I is?

8           A.   No.

9           Q.   No?

10          A.   No.

11          Q.   CPD Tech II?

12          A.   No.

13          Q.   Equipment specialist?

14          A.   We did have that position at one

15     point.  I just spoke to the director a couple

16     of days ago and I believe he thinks it is a

17     position that is going to be eliminated.

18          Q.   So, as far as you are aware,

19     other than the distinction between a lead tech

20     and a tech, there is no further distinction

21     between technicians themselves, if you are a

22     tech, you are a tech?

23          A.   They are all the same.

24          Q.   Okay.  As far as job

25     responsibilities, is the hiring of lead tech

CLASSIC REPORTING, INC., 212-268-2590

13

1            R. Gillette

2    or technicians, does that come under your job

3    description?

4        A.   No.

5        Q.   Training, the training of either

6    lead tech or technicians, does that in any way

7    come under your job description?

8        A.   Could you repeat that?

9        Q.   The training of either lead tech

10   or technicians, does that come under your job

11   description?

12       A.   Yes.

13       Q.   If you could just describe in

14   which way?

15       A.   Well, in terms of training, it is

16   not totally locked into me, the supervisor, to

17   completely train the staff, even though when

18   we get new staff, I always make sure that I do

19   have an input.

20            Generally, what I do with the

21    staff is I would take them around the

22    department, I would show them the final

23    details of what we are doing.  I am very exact

24    in what I show them, but after I go through

25    the process with them, I will usually ask

CLASSIC REPORTING, INC., 212-268-2590

14

1                R. Gillette

2    maybe another staff, like lead tech, or

3    sometimes if he is not available, any of the

4    senior technicians, technicians that have been

5    there a while that knows the job very well, I

6    would ask them to help to train the new

7    individual.

8         Q.   And in circumstances that you,

9    such as the one you just mentioned, would that

10   be when a specific issue arose and the new

11   employee needed to be trained on a particular

12   issue or would that be in general?

13        A.   Can you start over with the

14   question?

15        Q.   That situation you just

16   described?

17        A.   What situation?

18        Q.   Where you have a senior

19   technician, the lead tech is not available, a

20   senior technician who knows the job well is

21    asked to train --

22        A.   Okay.

23        Q.   -- a new employee or a new

24    tech --

25        A.   Yes.

CLASSIC REPORTING, INC., 212-268-2590

15

1              R. Gillette

2         Q.    -- the circumstances under which

3    that would arise?

4         A.    What would bring about a

5    circumstances?

6         Q.    Yes, absolutely.

7         A.    Generally, it would be the lead

8    tech would be busy, I don't know, doing

9    something, and myself would be busy doing

10    something, because generally, I move around

11    the department, I do at one point in the

12    night, I would sit and sometimes I would make

13    up the loose instruments myself, but prior to

14    that, I'm moving around the department.

15              So generally, for a new staff, I

16    would set them up, I generally always set them

17    to sit next to the lead technician, but if for

18    some reason, he is not available, maybe he's

19    busy doing something else, I would set them up

20    with another staff.

21          Q.   Who's responsible for hiring in

22     your department?

23          A.   Human resources.

24          Q.   And at present, who is your

25     supervisor?

16

1               R. Gillette

2          A.   I don't have a supervisor.  I do

3     have a director and his name is Melvin

4     McClean.

5          Q.   How long has Mr. McClean been

6     your director?

7          A.   I guess about a year.

8          Q.   And prior to Mr. McClean?

9          A.   I believe it was Carol Cass,

10    C-A-S-S, I'm not sure about that, but she

11    resigned and she was given another position

12    and then Melvin McClean was her replacement

13    and that took place about a year ago.

14         Q.   Who is John Meggs?

15         A.   John Meggs was the manager, used

16    to be.  He is no longer with us.

17         Q.   In the hospital structure,

18    operational structure, did you report to John

19    Meggs before he left the hospital?

20         A.   Yes.

21          Q.   And then, at this present time,

22     there is no one occupying the position that

23     Mr. Meggs previously occupied?

24          A.   No.

25          Q.   Okay.  Do you know why that is?

17

1        R. Gillette

2    A.   Why no one --

3    Q.   Why no one is occupying that

4   position previously held by Mr. Meggs?

5    A.   Why no one?

6    Q.   Is currently occupying that

7   position?

8    A.   Well, they are in the process of

9   hiring someone.

10    Q.   Do you know why Mr. Meggs is no

11   longer with Memorial Sloan-Kettering?

12    A.   No.

13    Q.   Did you have any conversations

14   with Mr. Meggs about why he was leaving

15   Memorial Sloan-Kettering?

16    A.   No.

17    Q.   How long did you work with John

18   Meggs?

19    A.   About six years.

20    Q.   So that's been essentially most

21    of the time that you were the nighttime

22    supervisor?

23         A.   Yes.

24         Q.   And during this period of time,

25    was Mr. Meggs always your manager?

18

1          R. Gillette

2      A.   Yes.

3      Q.   During this time, would you have

4    conversations with Mr. Meggs about business?

5      A.   You're asking if I could?

6      Q.   Would you, did you, did you have

7    conversations with him?

8      A.   About the job?

9    Q.   Yes.

10    A.   Yes.

11    Q.   Every day?

12    A.   No.

13    Q.   How frequently on a weekly basis

14    would you speak with John Meggs?

15      A.   He generally came in early in the

16    morning, sometimes twice a week.  He generally

17    was there every Friday and sometimes he would

18    come in on a Thursday, so I would see him

19    Thursday and Friday.

20          Aside from that, I wouldn't have

21    any contact with him aside from e-mails that

22    he would send out and I would respond to, but

23    generally, I only saw him twice a week at the

24    most.

25        Q.   So you would speak to him twice a

CLASSIC REPORTING, INC., 212-268-2590

19

1              R. Gillette

2    week?

3        A.    Yes, in person.

4        Q.    And as far as this e-mail

5    communication, how frequently would that

6    occur?

7        A.    That would be every night.

8        Q.    Okay.  And the nature of your

9    communication via e-mail, what were they

10    about?

11        A.    The job, if there was a problem,

12    any problems in the department, he would send

13    an e-mail letting me know what the problem

14    was, anything that he -- anything that had

15    come up in the department, changes that were

16    made maybe to trays, if we had received loaner

17    trays, anything that pertained to the

18    department that needed to get done.

19        Q.    Over the six-year period you

20    worked with John Meggs, did you develop any

21     sort of a social relationship with him?

22          A.   No.

23          Q.   You never saw John Meggs outside

24     of work?

25          A.   No.

20

1               R. Gillette

2       Q.   Never went to a bar with him?

3       A.   No.

4           MS. KALE:  Objection.

5           You can answer.

6       Q.   Never went to a barbecue or any

7    sort of social functions --

8           MS. KALE:  Objection.

9       Q.   -- that he also attended?

10      A.   No.

11      Q.   Have you developed a social

12   relationship with any other of the people

13   under your supervision in the past six years?

14      A.   No.

15      Q.   You don't have a social

16   relationship with any of the people whom you

17   supervise at Memorial Sloan-Kettering?

18      A.   No.

19      Q.   You have never gone to a bar with

20   people under your supervision?

21          MS. KALE:  Objection.

22      A.   I have.

23      Q.   You have?

24      A.   Yes.

25      Q.   And how frequently has this

21

1              R. Gillette

2     occurred?

3           A.   Not frequent.  We, in the past, I

4     used to, with some of the other staff that are

5     no longer there, I used to go out with some of

6     the staff, this is years ago.

7           Q.   Okay.

8           A.   Those staff are no longer there.

9     Generally, now, one of the lead techs,

10     sometimes he and I would go out to get pizza

11     on Fridays.  Sometimes we would go by the bar,

12     which of course we don't drink, just go and

13     hang out for a little while and go and get

14     some pizza, but it's not that often.

15           Q.   And this lead tech you are

16     referring to, who is that?

17           A.   Miguel Ruiz.

18           Q.   And on these occasions where you

19     would go and get pizza with Mr. Ruiz, what

20     kind of discussions would you have?

21          A.   Maybe we look up across the

22     street at the new condo they are putting up,

23     talk about it, across from the pizza shop.

24     Can't really remember.

25          Maybe sometimes I would ask him

CLASSIC REPORTING, INC., 212-268-2590

22

1          R. Gillette

2      like, well, what are you doing this weekend,

3      you ask me the same, you would probably talk

4      about where we're going to take our families,

5      you know, if we are going to go to the movies,

6      um, go out to eat.  Just general

7      conversations.  Can't remember anything beyond

8      that specifically.  Generally, the same.

9          Q.   Is there a reason why you no

10     longer, as you say --

11          MR. SCOTT:  Strike that.

12          Q.   Why have you stopped going out

13     with your co-workers other than Mr. Ruiz?

14          A.   They are no longer there.  They

15     are no longer in the department.  They've all

16     left.

17          Q.   So the new group of co-workers,

18     have you made a conscious decision not to

19     develop personal relationships with them?

20          A.   No.

21          Q.   If you can, could you just please

22     list the names of the individuals who are

23     your -- currently under your supervision?

24          A.   I have Padmor Tufo, William

25     Ogree, John Boafo, Isaac Donku, Aymar Soh

CLASSIC REPORTING, INC., 212-268-2590

23

1          R. Gillette

2      Fatso, Efrain Perez, Edwin Adon, Edmund Bryan

3      and Miguel Ruiz and Shawn Truesdale.  I

4      believe that's it.

5          Q.   And how long have you known

6      Edmund Bryan?

7          A.   I guess about 15 years.

8          Q.   In what capacity did you come to

9      know Edmund Bryan?

10         A.   From -- he used to work the

11     evening shift and I knew him then and then he

12     came on the night shift.

13         Q.   When you first met Mr. Bryan,

14     what was your job title?

15         A.   I believe I was the lead tech at

16     the time.

17         Q.   And were you the lead tech on the

18     evening shift at that time?

19         A.   No, but the shift, like I used to

20     overlap with the evening shift and I used to

21      come in at -- my hours were from 10:00 to

22      6:00.

23          Q.   Yes.

24          A.   And the evening shift, their

25      hours were from 3:00 to 11:00.  So I had like

CLASSIC REPORTING, INC., 212-268-2590

24

1               R. Gillette

2      an hour where I was on the evening shift

3      before the night shift had started.

4          Q.   Do you currently have a social

5      relationship with Mr. Edmund Bryan?

6          A.   No.

7          Q.   Is it strictly professional?

8          A.   Yes.

9          Q.   And what is Mr. Bryan's job title

10     currently, if you know?

11         A.   Technician.

12         Q.   Have you ever referred other

13     employees to Mr. Bryan for training?

14         A.   Yes.

15         Q.   If you can recall, who have you

16     had occasion to send to Mr. Bryan for

17     training?

18         A.   I don't really remember.

19         Q.   Have you done it more than once?

20         A.   Yes.

21     Q.   Several times?

22     A.   Yes.

23     Q.   Many times?

24     A.   Many, many would be okay.

25     Q.   As part of your job description,

25

1              R. Gillette

2    do you also -- is it also one of your

3    responsibilities to complete evaluations of

4    the persons under your supervision?

5        A.   Yes.

6        Q.   And how frequently do you conduct

7    these evaluations?

8        A.   Once a year.

9        Q.   Do you ever have occasion to do

10   quarterly evaluations?

11       A.   Yes.

12       Q.   When would those occasions arise?

13       A.   Every three months.

14       Q.   What would give rise to

15   conducting quarterly evaluations as opposed to

16   yearly?

17       A.   There is no rise.  It is standard

18   procedure that you do a quarterly evaluation

19   to let the employee staff know where they are

20   presently in the department.

21          And the reason for that is when

22     the final evaluation is done, it is not a

23     surprise to them what the outcome of their

24     evaluation would be.  Meaning, during the

25     course of the year if every three months you

26

1                    R. Gillette

2        let them know where they are, at the end of

3        the year, there's no surprise.  You know, they

4        knew where they were at each quarter.

5            Q.   Okay.

6            A.   So it is not -- it is nothing

7        that brings it about, it is a standard

8        procedure that you do.

9            Q.   Okay.  Do you conduct quarterly

10       evaluations for all of the persons under your

11       supervision?

12           A.   Yes.

13           Q.   And how long have you been

14       conducting these quarterly evaluations?

15           A.   I would say a couple of years.

16           Q.   And are these evaluations in

17       writing?

18           A.   Yes.

19           Q.   And just so we're clear, when you

20       say a couple of years, are you saying at least

21    two years you've been doing that?

22        A.   Yes.

23        Q.   And these quarterly evaluations,

24    did they arrive out of your own initiative or

25    was it a mandate that came down from someone

27

1               R. Gillette

2       you answered to and then you started these

3       quarterly evaluations?

4           A.    From the manager.

5           Q.    And that would be John Meggs?

6           A.    John Meggs, yes.

7           Q.    Did you receive that mandate in

8       writing or was it a verbal communication?

9           A.    Verbal.

10          Q.    Was there a particular form,

11      format, that the quarterly evaluations were

12      supposed to take?

13          A.    Yes

14          Q.    And what was that, what was the

15      format?

16          A.    The manager, as he told us, at

17      least I need to do this, he gave me a form

18      that outlined each area of the person's areas,

19      depicted areas, that should be evaluated for

20      each staff.

21          Q.   Okay.

22          A.   But it was a form that he gave me

23     and I just followed the guidelines of each

24     specific thing to evaluate about the staff.

25          Q.   And as far as the annual

28

1              R. Gillette

2    evaluations, how long have you been doing

3    those?

4        A.    Since I've been a supervisor.

5        Q.    Is part of your responsibilities

6    as a supervisor, is it also your job to

7    correct mistakes or improper action by one of

8    the people under your supervision?

9              MS. KALE:  Objection.

10       A.    Can you give me a definition of

11   correct?

12       Q.    If one of your -- if one of the

13   individuals under your supervision puts a tray

14   together improperly, it would be your job to

15   inform them, one, that they put that together

16   improperly, and two, the proper way to put the

17   tray together?

18             MS. KALE:  Objection.

19       A.    That would be correct.

20       Q.    Is there a mechanism --

21          MR. SCOTT:  Strike.

22      Q.   Are you familiar with the

23   Memorial Sloan-Kettering Cancer Center

24   employee handbook?

25      A.   Yes.


CLASSIC REPORTING, INC., 212-268-2590

29

1                    R. Gillette

2          Q.    And what is the Memorial employee

3     handbook?

4          A.    What is it?

5          Q.    Yes, what is it?

6          A.    It is a handbook outlining

7     policies and procedures of the institution.

8          Q.    And do some of these policies

9     relate to the hospital's position on

10     discrimination in the workplace?

11          A.    I believe so.

12          Q.    Have you ever read the Memorial

13     Sloan-Kettering employee handbook?

14          A.    Not in detail, no.

15          Q.    Have you ever been provided with

16     the employee handbook?

17          A.    Yes.

18          Q.    As one of your job

19     responsibilities as a supervisor, is it your

20     job to make sure that the people under your

21     supervision are abiding by the policies and

22     procedures in the employee handbook?

23          MS. KALE:  Objection.

24     A.   Yes.

25     Q.   Do you know what the -- what

30

1           R. Gillette

2     Memorial Sloan-Kettering Cancer Center's

3     policy is on harassment and discrimination in

4     the workplace?

5           A.   Yes.

6           Q.   And what is it, what is the

7     hospital's position?

8           A.   I don't remember in detail.

9     There's a -- the hospital has -- I forgot what

10     it is called, but everyone has to go on-line

11     and you actually watch a video and it gives

12     you the details of discrimination in specific,

13     you know, like what not to do, what is not

14     allowed.  As far as discrimination goes, I

15     think I fully understand it, to discriminate

16     against an individual.

17           Presently, we have on the night

18     shift, we -- I know for a fact that within the

19     guidelines, at least in my presence, that we

20     do follow that policy in terms of

21    discrimination, discriminating against any

22    individual.  That, I do know.

23        Q.   Okay.

24        A.   I can't remember to quote you in

25    detail like what this or that is, but if a

CLASSIC REPORTING, INC., 212-268-2590

31

1              R. Gillette

2     question should arise, you know, if this is

3     discrimination, or that isn't, I'm clear on

4     what it is.

5          Q.   And if you could describe in your

6     own words then what constitutes discrimination

7     in the workplace?

8          A.   I guess, presently, the way we

9     work on the night shift is we don't talk about

10    sex, we don't talk about politics, religion.

11    We don't get into national origin of where

12    someone may be from.

13          We don't curse.  There are

14    several words we are not permitted to use,

15    which I believe could lead to some form of

16    discrimination, and that would mean we don't

17    use the N word, the S word, the F word.  We

18    don't use the word "sex," we don't use the

19    word "homosexual."  We don't use the word

20    "gay," and as far as origin of where someone

21     is from, we don't speak upon it.  It is not

22     used.

23          So for any form of discrimination

24     to be applied, any of those words would be

25     necessary to apply to discrimination, so we

32

1               R. Gillette

2      are barred from using those words, so the

3      night shift is basically it is a shift where

4      there are no specific perimeters that the

5      staff get into to expose themselves to any

6      form of discrimination by the examples I just

7      gave you.  We are not permitted to use those

8      words.

9               In addition to that, we are only

10     allowed to listen to one radio station.

11     Generally, it was Light FM.  We've switched

12     that to Fresh 102.7, which is maybe a little

13     upgrade from Light FM where the music is a

14     little more later date and that is the only

15     station we are permitted to listen to.

16               We are not permitted to listen to

17     Z100 or 107 or any of the other stations that

18     would play rap music.  That is the only

19     station we are permitted to listen to.

20               Within that guideline of a radio

21     station, the words we are permitted to use as

22     far as discrimination goes, it limits us to

23     being able to discriminate from any

24     individual, from one to the next.

25          Q.    As a supervisor, have you ever

CLASSIC REPORTING, INC., 212-268-2590

33

1                    R. Gillette

2       had occasion to witness, hear individuals

3       under your supervision engage in acts of

4       discrimination?

5                    MS. KALE:  Objection.

6          A.   No.

7          Q.   During your time as a supervisor,

8       have you ever heard an individual under your

9       supervision use the N word?

10         A.   In the past, yes.

11         Q.   In your opinion, would the use of

12      that word in the workplace be an act of

13      discrimination?

14                   MS. KALE:  Objection.

15         A.   My personal opinion?

16         Q.   Yes, sir.

17         A.   No.

18         Q.   And why is that, sir?

19         A.   It is just my opinion, knowing

20      the fact that how the N word is used by the

21    individuals that uses the word, it is social

22    and known what it is meant and it is not

23    derogatory if a black man should call another

24    black man nigger, everyone socially knows that

25    is not meant to be derogatory.  So opinion

34

1           R. Gillette

2     from myself would be in line with that.

3              However, the institution does not

4     permit it.  So if you were asking me

5     personally, it would be in the same line of

6     how all the individuals socially speaking, how

7     they use the word is how I would also see it.

8         Q.   Okay, so on the occasions when in

9     the past when you've heard that word used in

10    the workplace --

11        A.   In the past.

12        Q.   -- you did not view it as an act

13    of discrimination?

14        A.   No.

15        Q.   And as such, you did nothing to

16    correct the behavior of the person under your

17    supervision to use that word?

18            MS. KALE:  Objection.  There is

19            no testimony that he did or did not do

20            anything.

21          MR. SCOTT:  I'm asking --

22          MS. KALE:  But you just testified

23      for him.

24          MR. SCOTT:  Now, we are on

25      speaking objections.

35

1          R. Gillette

2          MS. KALE:  Well, it is not

3     appropriate.  It needs to be --

4          MR. SCOTT:  It is not appropriate

5     to have speaking objections.  If you

6     want to make an objection --

7          MS. KALE:  Well, I am making my

8     objection.  And I will object more

9     frequently if need be.

10          MR. SCOTT:  You can object to

11     every question, but you cannot coach

12     your witness.

13          MS. KALE:  And I am not.

14          MR. SCOTT:  That's why there are

15     no speaking objections.

16     Q.   Did you understand the question,

17 sir?

18     A.   Yes.

19     Q.   Can you answer it?

20     A.   No.

21          Q.   No, you can't answer it?

22          A.   No, in the past, and this was, I

23     think, prior to his lawsuit.

24          Q.   When you say "his," who are you

25     referring to?

CLASSIC REPORTING, INC., 212-268-2590

36

1          R. Gillette

2      A.   Edmund Bryan.

3      Q.   Okay.

4       A.   This goes way back, not only

5    languages like that acceptable on the night

6    shift as we did speak in the past, all of the

7    other words that I explained that we are no

8    longer permitted to use, were permitted at the

9    time.

10          And generally, all the males that

11    worked on that shift, there was a general

12    consensus to everyone it was that no one

13    objected in how we all spoke.  That was in the

14    past.

15          Then the institution brought it

16    to my attention, managers, that speaking in

17    that manner will no longer be tolerated.

18      Q.   Okay.

19      A.   Since that time, it has changed.

20    And where the N word in the past would have

21    been spoken and I would not object or ask

22    anyone not to speak it, is no longer the

23    process now.

24              So at one point, to answer your

25    question, when the N word was used, I would

CLASSIC REPORTING, INC., 212-268-2590

37

1               R. Gillette

2      not object or I would not say anything to the

3      individual for them not to use it.

4               However, that is no longer the

5      case now, it is no longer appropriate in the

6      workplace.  That's been for some time now.

7          Q.   When you say it is for some time,

8      can you tell me how long has that been the

9      case?

10         A.   It's over five years, I would

11     imagine.

12         Q.   And by what means did management

13     inform you that that type of language was no

14     longer appropriate in the workplace?

15         A.   I sat in a meeting with the

16     manager and the director and I believe at the

17     time it was general management, we had a

18     meeting and they explained on the institutions

19     we have, how we were to conduct ourselves in

20     the department.

21          Q.   If you could remember the

22    individuals who took part in this meeting at

23    the time with you?

24          A.   I believe at that time, it was

25    Melvin McClean, I think it was Jim Appollo, I

CLASSIC REPORTING, INC., 212-268-2590

38

1              R. Gillette

2       don't think John Meggs was there at the time,

3       I don't remember -- I think there were two

4       other individuals, but I don't remember their

5       names.

6          Q.   Anyone from human resources that

7       you can recall?

8          A.   No.

9          Q.   And not to hold you to a specific

10      date, but you're estimating that this meeting

11      took place about five years ago from what you

12      can recall?

13         A.   Yes.

14         Q.   And were you provided with

15      anything in writing that memorialized what was

16      communicated to you in that meeting?

17         A.   No.

18         Q.   So then, since that meeting,

19      if --

20             MR. SCOTT:  Strike.

21          Q.   Since that meeting, have you had

22      occasion to hear persons under your

23      supervision use the N word while in the

24      workplace?

25              MS. KALE:  Objection.

CLASSIC REPORTING, INC., 212-268-2590

39

1                    R. Gillette

2         A.   Yes.

3         Q.   And what have you done?

4            A.    Simply told them we are not

5     allowed to use the N word.  They have also --

6     staff has also cursed, you know, I corrected

7     them.  I says it is not permitted.

8               It is over that period of time

9     people have slipped up, slipped up meaning,

10    you know, I've explained the policy, but they

11    forgot and they would say like a curse word or

12    something, I would correct them.  I would

13    remind them, so to speak, that, you know, we

14    cannot speak like that in the department.  And

15    they would of course acknowledge it, I made a

16    mistake.

17        Q.   Specifically with regards to use

18    of the N word, if you can recall, who has

19    slipped up since this meeting that you had?

20           A.   I don't remember.  It's so long

21     ago.

22          Q.   How frequently have you had

23     occasions where individuals have slipped up

24     and used the N word in your presence since

25     this meeting that you referred to five years

40

1                    R. Gillette

2      ago?

3           A.   Not frequent.  In the beginning,

4      it was more frequent than it is now.

5           Q.   When you say in the beginning?

6           A.   That was like close to five years

7      ago.

8           Q.   In the beginning, subsequent to

9      that meeting five years ago?

10          A.   Yes.

11          Q.   And if you can recall, when is

12     the last time you heard that word, the N word,

13     used in the workplace?

14          A.   Oh, I couldn't even recall.

15          Q.   In the last six months?

16          A.   No, no, absolutely not.

17          Q.   Within the last year?

18          A.   No.

19          Q.   Okay.  I just want to take a step

20     back.

21          You were referring to language

22     that the men in the department used before

23     this meeting five years ago, do you recall

24     that, that part of your testimony?

25          A.   Yes.

CLASSIC REPORTING, INC., 212-268-2590

41

1          R. Gillette

2          Q.    And just so we can be clear on

3     what other kind of language was being used,

4     was the word "faggot" being used back then?

5          A.    Yes.

6          Q.    And you heard this word used in

7     the workplace?

8          A.    Back then, yes.

9          Q.    Did you ever use it yourself?

10         A.    Yes.

11         Q.    And did you yourself use the word

12    "nigger"?

13         A.    Excuse me?

14         Q.    Did you yourself ever use the

15    word "nigger" in the workplace?

16         A.    Yes.

17         Q.    Did you ever use profanity,

18    curse, back then?

19         A.    Yes.

20         Q.    What about discussions related to

21    people's national origin, did those kind of

22    conversations ever take place?

23         MS. KALE:  Objection.

24         A.   No, not really, no.  I don't

25    remember those, no.

42

1           R. Gillette

2       Q.   There were never any jokes about

3   people's national origin, places of origin?

4       A.   No.  No.  We spoke about a lot of

5   things.  I mean, we cursed, but I do not

6   remember anyone getting -- because the reason

7   for that being, the staff at the time, and it

8   still is, it is quite diverse, and from what I

9   remember, no one would say anything about

10  anyone's national origin and I believe

11  specifically because what was one individual

12  going to say when a lot of the staff were from

13  different places.

14          From what I remember, we got in a

15  lot of different discussions, but national

16  origin was never one, and this, I'm talking

17  about way back, I'm not talking about now, I'm

18  talking about back in the days when we cursed

19  and we used the N word and national origin was

20  never a discussion.

21          Q.   And this was five years ago,

22    approximately?

23          A.   Approximately.

24          Q.   And at the time of this meeting,

25    were you a supervisor for the night shift?

43

1              R. Gillette

2      A.   No.

3      Q.   What was your job title then?

4      A.   Lead.

5      Q.   You were the lead technician at

6    the time of this meeting?

7      A.   At the times we spoke and we

8    cursed and as I described going way back many

9    years, I was just a lead technician at the

10   time.  We did not have a supervisor on the

11   night shift and it was John Meggs who had

12   promoted me to supervisor.  At the time, I was

13   just the lead technician.

14     Q.   So at no point in time during

15   your tenure as a supervisor, did you hear --

16          MR. SCOTT:  Well, strike that.

17     Q.   Did you use the word "nigger" in

18   the workplace?

19     A.   No.

20     Q.   Or the word "faggot"?

21          A.   No.

22          Q.   Who is Sheila Donoghue?

23          A.   She's one of the representatives

24   from human resources.

25          Q.   Do you recall an investigation

CLASSIC REPORTING, INC., 212-268-2590

44

1          R. Gillette

2     that she conducted last year around March of

3     2007 into some complaints made by Edmund

4     Bryan?

5          MS. KALE:  Objection.

6          A.   I don't know, I do know of one

7     time she did an investigation, I don't know if

8     it had anything to do with Edmund Bryan.

9          Q.   Do you recall whether or not this

10    investigation occurred around March of 2007?

11         A.   Could be, I'm not sure.

12         Q.   Okay.  You are not sure of the

13    precise month or the year?

14         A.   Either.

15         Q.   This investigation that you are

16    aware of, did Ms. Donoghue interview you --

17         A.   No.

18         Q.   -- as part of the investigation?

19         A.   No.

20         Q.   Have you ever been interviewed by

21     Ms. Donoghue regarding complaints of

22     discrimination made by Edmund Bryan?

23          A.   At some -- yes.

24          Q.   Do you recall when that occurred?

25          A.   No.

45

1          R. Gillette

2          Q.   Is it possible that it occurred

3    last year?

4          MS. KALE:  Objection.

5          A.   I have no idea.  I believe it

6    occurred before -- it is my understanding that

7    Edmund Bryan had filed a lawsuit and sometime

8    before we had gone to court, she had an

9    interview with me.

10         The investigation in question

11   that you asked about before was at some other

12   time she had come into the department and

13   interviewed staff, but not me.

14         Q.   Okay.

15         A.   But to answer your question,

16   there was one time prior to us going to court

17   for Edmund Bryan's lawsuit, she did have an

18   interview with me and it did pertain to Edmund

19   Bryan, yes.

20         Q.   Okay.

21          A.   When that took place, what year,

22     what month, I do not recall.

23          Q.   Do you recall that interview she

24     had with you?

25          A.   Yes.

46

1               R. Gillette

2        Q.   Can you tell me what it was

3    about, what did she ask you?

4        A.   She had stated that Edmund Bryan

5    had made claims of, in details,

6    discrimination.  He perceives, for some

7    reason, is saying that he was perceived as

8    gay, homosexual, and without being specific,

9    she wanted to know if I had said that, if I

10    had made those claims and said that to him or

11    about him.  And she also wanted to know some

12    of the details as to what we spoke about in

13    the department.

14        Q.   Okay.

15        A.   So she was investigating, I

16    believe, he made specific claims, and I don't

17    remember all of them, but to each of his

18    claims, she was asking me, you know, what, um,

19    what my thought was in reaction to his claims,

20    were they true, were they false, and for me to

21      give her in detail what my response would be

22      to all his specific claims.

23          Q.   Okay.

24          A.   Which I did.

25          Q.   So with regards to the one you

CLASSIC REPORTING, INC., 212-268-2590

47

1            R. Gillette

2     did mention, the issue of Mr. Bryan being

3     perceived as gay or being called gay on the

4     job, what was your response?

5          A.   My response was I never --

6              MS. KALE:  Objection.

7          A.   My response was I never said that

8     to him, about him, and it was, to my

9     knowledge, as I explained to her, if in terms

10    of perception goes, it would be -- if he

11    thought in his mind, but as far as I know, the

12    rest of the staff and most of the people that

13    worked on the job, no one spent any time

14    concerning in thought or in action towards

15    Edmund Bryan with reaction to him being gay.

16              What I do know is in the

17    beginning, when, going way back, when Edmund

18    Bryan used to ride in my truck with me, I used

19    to drop him off on 42nd Street, at some point,

20    he and I separated because of specific

21    reasons.

22        Q.   Yes.

23        A.   What I do know is the morning

24    when he came to ride with me, I told him you

25    are not riding with me anymore.

CLASSIC REPORTING, INC., 212-268-2590

48

1               R. Gillette

2               The same night, when he came

3        in -- now, I explained to you, in the past, we

4        would have open discussions with the staff,

5        everyone spoke, that means everyone in the

6        department.

7               The same night, I remember

8        specifically when he came in, he had stopped

9        speaking to everyone in the room, to the point

10        where some of the staff came up to me and they

11        were like, what's wrong with Ed?  I was like,

12        my response was I don't know.

13               The same week of -- once that had

14        happened, other employee staff scattered

15        around the hospital, started to come up to me

16        and they all asked me what's wrong with Ed?

17               What I had noticed and other

18        people had told me is from that night going to

19        now people he had associated with, I believe

20        to be friends or people around the institution

21 that he used to talk to, from that night on,

22 he had stopped talking to everyone.  And

23 people kept -- it continued over the years

24 where people would come over to me and say,

25 well, what's wrong with Ed?

49

1         R. Gillette

2             So as far as perception of him

3     being gay goes, I don't know where he -- where

4     this supposedly belief came from because

5     people were -- everyone used to speak to him

6     like we all did, from -- it is my

7     understanding he was the one that came in that

8     night after he and I had stopped speaking and

9     he had stopped speaking to everyone in the

10     institution, starting from in the department

11     and other people he had known throughout the

12     institution.  For he to be perceived as gay, I

13     don't understand.  It is my knowledge I never

14     said it, I know that.

15         Q.   Okay.

16         A.    Spoken to anyone because no one,

17     I mean, as far as I know, the only reaction

18     people had towards him was like the word would

19     be what's up with Ed, meaning when they said

20     that, I believe they were wondering like why

21      did he stop speaking to them.

22                As far as a gay perception goes,

23      I don't know where that came from.  I never

24      said it, I never told anyone, and that's as

25      far as it goes, as far as I know.


CLASSIC REPORTING, INC., 212-268-2590

50

1              R. Gillette

2         Q.   Why did the two of you stop

3    speaking?

4         A.   Well, over the years, I've

5    observed Edmund to be someone who is, I would

6    say, very controlling.  Sometimes in the

7    discussion that I mentioned that we had in the

8    department, sometimes other staff would say

9    like to him, Edmund Bryan, like why don't you

10   let me speak.

11            He had a way about him that when

12   he started to speak, he would overpower the

13   person and not, you know, not have a

14   conversation where I speak, you speak, he

15   would be the only one speaking, which to some

16   degree, it was like it is no big deal.  People

17   have different ways of being in the world.  It

18   never bothered me.  But that was a little

19   something that I had kept in mind.

20            And then the night -- it happened

21     two nights where one night at the time, I was

22     in charge of the night shift and I delegated

23     where each staff would be, what their work

24     would be.

25          I remember one night, I was

CLASSIC REPORTING, INC., 212-268-2590

51

1            R. Gillette

2      running the steam and he was over in the

3      sterile area and I think some of the staff

4      started to kid him about it, you know, you are

5      so quiet?  And then he pointed over to me and

6      he point-blank told me, I was in charge, he

7      said you should be doing this, meaning I

8      should be working on the steris machine and he

9      should be doing steam.  At the time, I

10      responded like, you know, I was like, yeah,

11      okay, I didn't really say anything.

12          Q.   Okay.

13          A.   The following night, we were

14      working in the same position and he said the

15      same thing to me.  He says I should be working

16      in the steris and he should be working the

17      steam.

18            Well, at that point, my feeling

19      was this is not the job, he is being very

20      personal here and I took it personally.

21          Other little quirks, I used to

22     drop him off at 42nd Street and we were

23     driving down, it is just a ten-minute drive,

24     we go down Second Avenue, turn down 42nd

25     Street, and he appeared to me to be a very

52

1               R. Gillette

2     angry person, look at that white bitch, look

3     at that -- and, you know, things like that

4     made me very uncomfortable, like why he said

5     them.  He had, in my perception, he had a

6     great hostility against white people.

7              It was his opinion, you know, but

8     when I combine a few factors, I combined

9     listening to him in my truck, combining the

10     fact that he spoke over people and tell me

11     what my job should be, and when I combined

12     those things, by that time, I had it.

13              That morning, he came around, he

14     was planning to ride with me, and I said

15     that's it, we are not doing this anymore.

16     Last time I spoke to him.

17         Q.   Well, you spoke to him in a

18     professional capacity?

19         A.   Oh, yes.

20         Q.   Do you recall having a

21     conversation with Sheila Donoghue on or about

22     March of 2007 when you discussed with her a

23     situation between Efraim Terez and someone

24     named Lennox joking about a Jamaican accent?

25          A.    You mean Efrain Perez?

CLASSIC REPORTING, INC., 212-268-2590

53

1                    R. Gillette

2          Q.    Yes.

3              MS. KALE:  Objection.

4              You haven't started answering it

5          yet, so go ahead.

6          Q.    Yes, thank you, Efrain Perez, and

7      Lennox.

8          A.    With Sheila Donoghue, I don't

9      remember having any conversation with Sheila

10      Donoghue.

11              I remember having a conversation

12      with John Meggs and it wasn't -- actually, an

13      e-mail about the situation that I knew nothing

14      about, but John Meggs, the manager at the

15      time, brought it to my attention and gave me

16      specific instructions as to how to handle what

17      had transpired.

18          Q.    And what had transpired?

19          A.    As far as I know, that I was told

20      --

21          Q.   Yes.

22          A.   Efrain Perez had a hobby, if you

23   will, maybe call it a hobby, but he had this

24   process where he likes to impersonate people,

25   like he did an English accent, Australian

CLASSIC REPORTING, INC., 212-268-2590

54

1              R. Gillette

2      accent, a French accent.  I perceived that as

3      impersonation.

4              And as far as that transpired,

5      Lennox, he works in building service and he

6      only covers the CPD department in terms of

7      cleaning up, it is my understanding that

8      Efrain Perez, it was like a general thing

9      between he and Lennox, that when he came in

10      and everyone would meet in the alcove before

11      the department, Efrain Perez would greet

12      Lennox by saying hello and he would speak with

13      a Jamaican accent.

14          Q.   Yes.

15          A.   It is my understanding that

16      Edmund Bryan overheard Efrain Perez doing

17      this, and I don't remember the exact words,

18      but told Efrain Perez something about his

19      culture and not to do that.

20              And so then, the manager had

21     conveyed to me that this had transpired,

22     because I wasn't there at the time when it

23     happened, and that's what I know to be

24     happened, just by the manager telling me.

25          Q.   You are saying you didn't learn

55

1              R. Gillette

2      of this incident from Mr. Perez?

3          A.   No.

4          Q.   You learned about this from John

5      Meggs?

6          A.   Yes.

7          Q.   And what was your response upon

8      initially learning about this incident?

9          A.   I inquired, I asked John Meggs at

10     the time in the department, I guess it

11     evolved, so to speak, with different rules, at

12     the time, I know cursing isn't allowed, the

13     various things I described to you before, at

14     the time, I had no idea that if someone spoke

15     in a particular accent, aside from, let's say,

16     their culture, so to speak, like if you are

17     Spanish, if you are Spanish and you speak with

18     a Jamaican accent, I, at the time, didn't

19     think that that was any form of discrimination

20     because it is my understanding that he was

21    greeting Lennox and the person Lennox works in

22    building service and cleaned the department,

23    he is from Jamaica, I guess he would be

24    Jamaican, and Efrain and I, my understanding,

25    they had a comfortable relationship.

56

1              R. Gillette

2         Q.   Okay.

3         A.   In addition to that, if Efrain

4    had spoken in the department with an

5    Australian accent, I didn't perceive that that

6    he was discriminating against Australians.

7    When he spoke with an English accent, I didn't

8    perceive that he was discriminating against

9    English.

10             There were some other accents

11   that he would impersonate.  When he did that,

12   my perception of him when he did that was he

13   was showing I could do it.  Sometimes people

14   impersonate people or different things and it

15   is kind of like a challenge, you do it, it

16   allows the person to feel a little flexible in

17   their accomplishments.  That's how I perceived

18   it.

19        Q.   Okay.

20        A.   So I sent back an e-mail to John

21    explaining, you know, asking him, like I had

22    no idea that a person owned an accent and

23    would be perceived as a form of

24    discrimination.

25        Well, his response was, I think

CLASSIC REPORTING, INC., 212-268-2590

57

1          R. Gillette

2     he indicated like, yes, and in the e-mail, I

3     am not getting the point.  It led me to the

4     conclusion that from his standpoint, it was,

5     and I, as the supervisor, I needed to stop it.

6          The same night, I read the e-mail

7     in response to the one I sent where he had

8     wrote in the e-mail like I don't get it, but I

9     completed reading what he wanted done and I

10    had a staff meeting.

11    Q.   Okay.

12    A.   In the staff meeting, I explained

13    to everyone, whatever your culture is, that

14    that person is only allowed to speak within

15    the confines of your culture, which means if

16    you are Spanish or Puerto Rican, you can't

17    speak in Jamaican.  If you are Jamaican, you

18    can't speak Spanish.  Just that everyone had

19    to stay within the confines of their national

20    origin or culture, so to speak.

21          The staff thought it was kind of

22     strange, but anyway, that was the staff

23     meeting that I had and I explained to everyone

24     that this is what needs to be done and this

25     was in response to what John had explained to


CLASSIC REPORTING, INC., 212-268-2590

58

1              R. Gillette

2      me, had transpired between Efrain and Lennox

3      and what he wanted done.

4          Q.   Do you understand now why that

5      could be viewed as discrimination in the

6      workplace?

7              MS. KALE:  Objection.

8              If you understand the question,

9          you can answer.

10         A.   My personal opinion?

11         Q.   Yes.

12         A.   I believe it depends on how the

13     person choose to deliver it.  In the situation

14     between Efrain and Lennox, I believe the way

15     it was done was not discriminatory.  I know

16     people can take the same words or approach and

17     mean -- and put a different meaning behind it.

18             So to answer your question, it is

19     not a point-blank answer, it is relative to

20     how it is being used and the person's

21     intentions behind it.

22          Q.   Okay.  So your same opinion holds

23     with regards to the use of nigger, it depends

24     on how the person using the word intends it to

25     be used?

CLASSIC REPORTING, INC., 212-268-2590

59

1          R. Gillette

2          MS. KALE:  Objection.

3          A.    As I explained before, as I

4     explained that to you before.

5          Q.    So your answer would be yes?

6          MS. KALE:  Objection.

7     A.    Yes.

8          MS. KALE:  The witness has to be

9          allowed to testify on his own.

10         Q.    Do you recall around March of

11    2007, acknowledging to Sheila Donoghue that

12    the word "nigger" is used in the department

13    when guys are fooling around?

14         A.    I don't recall.  I may have.

15         Q.    So back around March of 2007,

16    people under your supervision were using the

17    word "nigger" when joking around?

18         A.    No.

19         MS. KALE:  Objection.

20         A.    No.

21          Q.   Were they using it in February of

22     2007?

23               MS. KALE:  Objection.

24          A.   No.

25          Q.   How long has it been since the

CLASSIC REPORTING, INC., 212-268-2590

60

1                    R. Gillette

2        word "nigger" -- you've heard the word

3        "nigger" used in the workplace?

4                    How long has the word --

5                    How long has it been since you've

6        heard the word "nigger" used in the workplace?

7            A.   Oh, sorry, it's been years before

8        I became a supervisor.

9            Q.   Do you recall Ms. Donoghue

10       instructing you in or around March of 2007 for

11       you to speak to your staff about refraining

12       from using the word "nigger" at work?

13           A.   Yes.

14           Q.   You do recall that conversation?

15           A.   Yes.

16           Q.   And what prompted her to tell you

17       to do that?

18               MS. KALE:  Objection.

19           A.   I believe there were some claims

20       that it was being used and she thought she

21    should let me know, to let me know that I

22    enforce it, not to use it, but to my

23    knowledge, anyone using it, they could use it

24    when I am not present.  I am one person and I

25    am not generally in every part of the

CLASSIC REPORTING, INC., 212-268-2590

61

1              R. Gillette

2      department.

3              But if anyone -- I do remember

4      her, you know, letting me know, telling me

5      that.  I believe the way she worded it, it is

6      technically -- she had two sides to the word

7      that I think it is not illegal, but she

8      prompted me, like she didn't want the staff to

9      use it.  In other words, if a staff was to use

10     it, there are no, I think, legal -- it is not

11     a legal form of discrimination, to my

12     understanding.

13         Q.   What is not a legal form of

14     discrimination?

15         A.   The N word.  But the bottom line

16     was she didn't want the staff to use it.

17         Q.   Do you recall the conversation,

18     sometime in the winter of 2007, where a

19     comment was made about placing -- in the

20     workplace, where a comment was made about

21    placing Jamaicans on the top of a mountain and

22    giving them a shovel?

23        A.   No.

24        Q.   You never heard that?

25        A.   Never, ever, ever heard that.

CLASSIC REPORTING, INC., 212-268-2590

62

1               R. Gillette

2        Q.   Do you recall another

3    conversation in the workplace around the same

4    time, maybe the winter of 2007, where it was

5    said that men who live at home are feminine?

6        A.   No.

7        Q.   You have no recollection of any

8    conversation of that nature?

9        A.   No.

10        Q.   Never heard it?

11        A.   No.

12        Q.   Do you recall speaking to Sheila

13    Donoghue about whether or not a conversation

14    about men living at home being feminine ever

15    took place?

16        A.   She might have, at some point

17    before the Edmund Bryan lawsuit, that she may

18    have mentioned to me that that was one of his

19    claims, detailed claims, and that's the only

20    time I believe I heard it.

21          Q.   Did you ever have a conversation

22     with Sheila Donoghue about a claim about the

23     statement about Jamaicans being placed on top

24     of a mountain?

25               MS. KALE:  Objection.


CLASSIC REPORTING, INC., 212-268-2590

63

1                    R. Gillette

2          A.   No.

3              (Recess taken.)

4          Q.   All right, Mr. Gillette, do you

5     recall receiving a memo from your supervisor

6     John Meggs dated August 3, 2006, if you

7     remember, do you remember?

8          A.   A memo?

9          Q.   Yes, a memo.

10          A.   In regard to what?

11          Q.   In regard to the use of vulgar

12     language in the workplace.

13          A.   I don't remember.

14          Q.   Do you recall receiving any

15     documentation in writing from your supervisor

16     John Meggs after Edmund Bryan had a hearing

17     based on his complaints of discrimination?

18          A.   I may have.  Generally, whatever

19     was taken place at the time in regard to

20     Edmund Bryan, I believe John would send an

21     e-mail letting me know what the situation was.

22          Q.   You don't recall receiving a

23     letter from Mr. Meggs in which he said you

24     would be held accountable if a staff member

25     made allegations related to the use of vulgar

CLASSIC REPORTING, INC., 212-268-2590

64

1              R. Gillette

2    language in the workplace and those

3    allegations were found to be meritorious or

4    have some basis in fact?

5              MS. KALE:  Objection.

6         A.   Generally, the word I would be

7    held responsible would be a word that he would

8    use commonly and he used that to describe any

9    staff, you know, once he -- once I was

10    instructed to have staff do things in a

11    particular way.

12              If he found that I did not pass

13    it on to the staff or made sure staff adhered

14    to whatever specific rule or thing he wanted

15    done, then I would be held responsible.

16              So oftentimes, he would send an

17    e-mail about the specific thing, whatever it

18    may be, and he would say I am going to hold

19    you responsible to make sure the staff do so

20    and so, whatever the case may be.

21          I got an e-mail from John every

22    single night, specific e-mails in terms of --

23    I may have received it, I don't recall.

24          Q.    You don't recall receiving a

25    document from your supervisor John Meggs in

65

1          R. Gillette

2     which you were told that you had to set an

3     example to staff in the importance of adhering

4     to the hospital's policies regarding.

5          MS. KALE:  Objection.

6          A.   The words are familiar, I may

7     have received it.  I don't recall

8     specifically, but I may have, I'm not sure.

9     The words sound familiar.

10          Q.   You said that the words "you will

11     be held accountable," those are words you say

12     you heard Mr. Meggs use frequently?

13          A.   Used frequently.

14          Q.   So you didn't attach any special

15     weight or importance to him using those words

16     in connection with the issue of vulgarity in

17     the workplace as opposed to another issue?

18          MS. KALE:  Objection.

19          A.   Wrong.  Even though he used the

20     word "frequently," I used the same weight.

21    There was no difference in weight.

22         Q.   So how much -- I'm sorry, go

23    ahead.

24         A.   Equal weight, the weight equals

25    the effect, meaning, if the thing is

CLASSIC REPORTING, INC., 212-268-2590

66

1               R. Gillette

2      important, then that is the weight it

3      deserves.  And in cases and situations like

4      these, the appropriate weight as needed is

5      what I put on it.

6          Q.   And what was the appropriate

7      weight that you placed on the issue of the use

8      of vulgarity in the workplace?

9          A.   Make sure it doesn't happen.

10         Q.   How did you go about making sure

11     it doesn't happen?

12         A.   Staff meetings.  I would have a

13     staff meeting and I would explain to staff in

14     like in the same instance where this incident

15     happened with Efrain Perez and the first night

16     I received the e-mail of the incident, I

17     responded back to John Meggs.  The following

18     night he responded back to me and that same

19     night, I had a staff meeting.

20         Q.   Do you recall signing a document

21     addressed to you by John Meggs in which you

22     were told that you would be held accountable

23     resulting in termination of employment should

24     a staff member make allegations related to

25     issues of anti-harassment or nondiscrimination

CLASSIC REPORTING, INC., 212-268-2590

67

1                R. Gillette

2       and an investigation into the allegations was

3       found to have merit?

4                MS. KALE:  Objection.

5            A.    No.

6            Q.    You don't remember signing off on

7       a document like that?

8            A.    No.

9            Q.    Did John Meggs speak with you

10      about the use of vulgar language in the

11      workplace?

12           A.    Yes.

13           Q.    Do you recall the first time this

14      occurred?

15           A.    No.

16           Q.    How frequently would you say you

17      and Mr. Meggs had conversations about the use

18      of vulgar language in the workplace?

19           A.    There was no frequency.

20           Q.    Excuse me?

21          A.   There was no frequency.

22          Q.   There was no frequency?

23          A.   I believe, when he first arrived

24   at the institution in the beginning, which is

25   prior to, I believe, the meeting I had with

CLASSIC REPORTING, INC., 212-268-2590

68

1              R. Gillette

2      the other director, manager, before John came,

3      is that when John came to the institution,

4      shortly after that, I think he was brought up

5      to speed with the present situation and early

6      back then, I believe, is when I spoke to John

7      or he spoke to me and we spoke about it, but

8      there was no frequency about it after.

9          Q.   You only spoke with him on one

10     occasion with him about it?

11         A.   And then I believe there was a

12     situation where the situation with Efrain

13     Perez or there may have been another time when

14     some allegations were made as to certain

15     things being said in the department, but over

16     the years, there was no frequency, but it

17     might have been a couple of times.

18         Q.   When you say a couple of times,

19     it could have been more than two?

20         A.   I couldn't say.

21          Q.   Do you recall testifying at a

22     hearing before the New York Human Rights

23     Commission related to complaints made by

24     Edmund Bryan?

25          A.   Yes.

CLASSIC REPORTING, INC., 212-268-2590

69

1                R. Gillette

2         Q.   Do you recall testifying that you

3    had used the word "faggot" in the workplace,

4    if you recall?

5         A.   I believe so.

6         Q.   You also recall testifying that

7    you used the word "nigger" in the workplace?

8         A.   I believe so.

9         Q.   At the point in time that you

10   used this language, in particular, the word

11   "faggot," had you ever directed the word

12   "faggot" to someone who was one of your

13   subordinates?

14        A.   No.

15        Q.   Who is Audley Young?

16        A.   He was one of the staff that used

17   to work with us.

18        Q.   For how long did he work

19   underneath you at the hospital?

20        A.   Maybe five years.

21          Q.  Do you know who Michael Harvey

22     is?

23          A.  Yes.

24          Q.  Who is Michael Harvey?

25          A.  He was also a staff that worked

CLASSIC REPORTING, INC., 212-268-2590

70

1              R. Gillette

2    with me on the night shift.

3        Q.   Do you recall telling Mr. Harvey

4    that Rastafarians had lice?

5        A.   No.

6        Q.   You never made that comment to

7    him?

8        A.   No, absolutely not.

9        Q.   Was Mr. Young one of the people

10   who you used to have a social relationship

11   with that now doesn't work at the hospital?

12       A.   I never had a social relationship

13   with Audley Young.  He no longer works for the

14   institution.

15       Q.   Okay.  And did you have a social

16   relationship with Mr. Harvey?

17       A.   No.  Not to mention the fact, I

18   remember one time, I made the mistake and I

19   spoke to Mr. Harvey, I used the word "dude."

20       Q.   Sorry?

21          A.    The word "dude."

22          Q.    Yes.

23          A.    You know, in speaking to him,

24    like dude -- and he got highly offended and

25    told me never to call him dude or to call him

71

1          R. Gillette

2     by his name.  So for me to tell him that he

3     had lice, he wouldn't take it lightly, so

4     there is no way I could possibly say that to

5     him.

6          If I can't say dude, I don't

7     think I can tell him you have lice.  And when

8     I said dude, it was like he got highly

9     offended.  It was like I've said dude to other

10    guys and I think, in some cases, it is a

11    common word, it is like bro.  With him, he got

12    highly offended.  He told me never to speak to

13    him by that name and call him by his name.

14        Q.   Do you recall receiving a

15    document from John Meggs where he said that it

16    has come to his attention that you've

17    exhibited a propensity to use inappropriate

18    language in the workplace?

19          MS. KALE:  Objection.

20        A.   Not a letter.  I believe what had

21    happened after the Edmund Bryan lawsuit is

22    that the institution had wrote up a letter

23    against me and some of the words in the

24    letter, I believe, that was one of the words

25    "propensity."  And the letter was worded to

72

1           R. Gillette

2    some degree like what you just read.

3       Q.   Uh-huh.

4       A.   It was like a conclusion to the

5    case and what the institution -- what their

6    response was to me.  As far as I know, that is

7    all.

8       Q.   First, what did you understand

9    the word "propensity" to mean in that context?

10      A.   Propensity to mean have a

11   tendency to.

12      Q.   Okay.

13      A.   I didn't agree with it.  I feel

14   like a final conclusion was the end result of

15   something that was concluded from a past

16   practice.  That I don't think years ago, you

17   know, I've been working for the institution

18   for 34 years and I can say the policies that

19   are there now was not there 34 years ago.

20          I perceived the institution as in

21      like socially things evolve, but when the

22      letter was written, it was more written not in

23      an evolutionary response to what I had done,

24      but they had brought me from a past and

25      exacted me to the present.

CLASSIC REPORTING, INC., 212-268-2590

73

1          R. Gillette

2          So there was no, in my perception

3     of myself, there is no propensity.  What I did

4     in the past was not a tendency, it was an

5     exact thing I did deliberately based on the

6     circumstances.

7          The present, as the institution

8     has brought to my attention what their policy

9     is, then from what I did in the past now

10     changed to the future.

11          Well, in conclusion to the

12     lawsuit, the letter, I believe, as it was

13     written with tendency and propensity against

14     me, they were taking a past act and bringing

15     it into the present, not understanding that as

16     time goes on, changes are made in terms of

17     policies and it is an evolutionary process, so

18     I don't believe I have a propensity.

19          It is what I did in the past, it

20     was deliberate, it was conscious, but at the

21    time, I thought it was appropriate, given the

22    fact that everyone as in like the environment,

23    it was all male, and all the males, you know,

24    it was like guys speak to each other, we have

25    a particular language, I don't think women

CLASSIC REPORTING, INC., 212-268-2590

74

1          R. Gillette

2    speak to each other the way guys speak to each

3    other.

4          We didn't take it out of our

5    environment.  It was a closed environment

6    within the institution, but it was a process

7    that's from the past and in conclusion, they

8    brought the past up to the present and exacted

9    me with it.

10        Q.   Okay.

11        A.   And how those words come to be

12   with propensity, tendency, I have no tendency.

13   If the hospital has a policy and they want it

14   as such, that is what I follow.  No tendency,

15   propensity, I don't have it.  I follow the

16   policy as it is described.

17        But at the time, that goes many

18   years back, you know, it's -- I mean, I have

19   an incident where Edmund Bryan, when he first

20   came on the night shift, my back was turned to

21     him and I was wrapping some Mayo trays and he

22     grabbed my ass.  And I turned to him and I

23     said I don't play like that.

24              It is my understanding on the

25     evening shift where he worked prior, other

75

1                    R. Gillette

2       guys told me this, Jim Appollo had like

3       specific people working decontam, as a result

4       of that, they would get to leave early, so it

5       became a specific group of guys, and one of

6       the guys told me that when they worked in

7       decontam, they would walk around and grab each

8       other by the crotch.

9                    Now, I don't know if when he

10      started working nights that he thought that

11      was a common practice, but he grabbed my ass.

12                   Now, at the time, you know,

13      given -- this is like maybe 15 years ago,

14      given a policy like that, I imagine if you

15      were to touch an employee now, you would be

16      terminated.  It is not -- it is a given.

17                   At the time, you know, I didn't

18      think to make a big deal out of it.  I could

19      simply tell the person, which I did, I don't

20      play like that, which is exactly what I told

21    him.  He's never done it again.

22           But it is just to say that I

23    believe, like everything, the institution

24    evolved, but at the end of the lawsuit and the

25    case was over, the letter with propensity

76

1              R. Gillette

2    being put to me, I believe was inaccurate to

3    what I was doing.

4         Q.   Do you know how many different

5    times you had communications in writing from

6    your superiors about the use of inappropriate

7    language in the workplace?

8         A.   No.

9         Q.   So it's possible it's been more

10   than once?

11        A.   Yes.

12        Q.   As far as the timing of this

13   correspondence, has it all been within the

14   past three years?

15        A.   No.

16        Q.   When was the first time you can

17   recall that you received correspondence from

18   your superiors about the use of inappropriate

19   language in the workplace?

20        A.   It was probably shortly after I

21    had told Edmund he couldn't ride with me

22    anymore, I believe.

23         Q.   When was that?

24         A.   I don't know.  It was many years

25    ago.  It was shortly after that, that I

CLASSIC REPORTING, INC., 212-268-2590

77

1          R. Gillette

2     believe complaints started to happen, that's

3     when I had a meeting with, I believe, the

4     manager, the director at the time.

5          Over the years, policies kept

6     changing, you know, like one thing would be

7     picked at, well, you can't do this, you can't

8     do that.  Up until the last situation where I

9     thought we were following the hospital

10     guidelines and then Efrain Perez goes and

11     speak to Lennox.

12          Now, prior to that, there was no

13     way I was going to say to anyone, as I didn't

14     to Efrain Perez, you cannot speak, you know,

15     with an accent.  The thought had not crossed

16     my mind at the time, I didn't know of any

17     institution policy being as such.  You cannot

18     speak to anyone with an accent aside from the

19     perceived origin or culture that you are from.

20          Then the incident happened and as

21    things are brought up from the institution

22    like that, for example, you can't do that.

23    Each time it was brought to my attention, I

24    made the necessary adjustment.

25              As far as policy goes, there was

CLASSIC REPORTING, INC., 212-268-2590

78

1          R. Gillette

2     no way, I think, I would have assumed that the

3     hospital had a policy and I don't think you'll

4     find it in a handbook, but for someone to

5     speak with an accent outside of their culture,

6     origin, that it could be perceived as

7     discrimination or discriminatory remark.  You

8     know, based on the context, I just didn't

9     think an accent would -- would reveal that.

10          So at the time it was brought to

11     my attention, and my point in saying that is

12     there were several points over many years that

13     was brought to my attention to the point where

14     in the same sense you play a radio station and

15     now, we are down to one, you know, you put a

16     radio station, maybe whatever this staff feels

17     like listening to, nothing personal, but

18     broadcast, now, we are narrowed down to one.

19          So I believe it has been a

20     process that has been working for many years

21     where I just continue to get more and more

22     information as to what not to do, not that it

23     was ever laid out in the beginning.  It was

24     and has been over the years a graduating

25     process.

CLASSIC REPORTING, INC., 212-268-2590

79

1          R. Gillette

2          And the last incident is one I

3     described where you cannot speak with an

4     accent outside of your so-called culture or

5     origin, but each time it was brought to my

6     attention, I would address it.  I would fix

7     it.  I would change it to whatever the

8     hospital wanted the policy to be.

9          Q.   Have you ever had sensitivity

10    training for your job?

11         A.   Yes.

12         Q.   When was the last time you had

13    sensitivity training?

14         A.   I think in December.

15         Q.   Of what year, please?

16         A.   '07.

17         Q.   Okay.  Just briefly describe what

18    that training was, if you can.

19         A.   The last one I had, it revolves

20    around respect in the workplace, like people's

21    culture, skin color, all of what would, I

22    guess, another individual would perceive as a

23    form of discrimination or prejudice.  They

24    would define details as to how to react, how

25    to respond and how to perceive things.

CLASSIC REPORTING, INC., 212-268-2590

80

1              R. Gillette

2       Q.   Okay.  Do you believe now that

3    you understand what the hospital's policy is

4    on harassment and antidiscrimination in the

5    workplace?

6       A.   It is not that I don't

7    understand.  It is more of what the hospital

8    policy is.  I don't set them.  It has nothing

9    to do with me.  It is not a matter of my

10   perception.  I have my life and my perception

11   and my opinion, but when you get in the

12   institution, it doesn't count, it doesn't

13   matter, it is what the institution's policy

14   is.

15      Q.   Okay.

16      A.   So I don't make policies, none of

17   what is being worked out of there is a matter

18   of my opinion, it doesn't matter.

19      Q.   Okay.

20      A.   It is the hospital's policy.  So

21     I separate my personal opinions, I separate my

22     personal beliefs from the hospital's policy.

23          Q.   Okay.

24          A.   When the hospital brings it to my

25     attention that they want a particular policy

CLASSIC REPORTING, INC., 212-268-2590

81

1           R. Gillette

2      to be adhered to, I implement it.

3           Q.   Okay.

4           A.   But I don't make policies, I

5      don't give interpretations, I just follow

6      them.

7           Q.   As a supervisor, it is one of

8      your job duties to make sure that the people

9      under your supervision comply with hospital's

10     policies, correct?

11          A.   Correct.

12          Q.   All right.  And as such, it is

13     also part of your job description to

14     understand or to know what the hospital's

15     policies are, correct?

16          A.   Like I explained, that is what I

17     was explaining to you before, the hospital

18     tells me what their policy is, okay?

19          Q.   Okay.

20          A.   I'll take the policy and I'll

21     implement it.  By that, I mean I'll make sure

22     that staff adheres to it, you know, if I see a

23     policy being broken of the institution, I'll

24     remind the staff, whatever, this is the

25     policy, this is the institution's policy and

CLASSIC REPORTING, INC., 212-268-2590

82

1              R. Gillette

2      you need to follow it.

3          Q.   Okay.

4          A.   So I, as the supervisor, make

5      sure that all hospital policies are followed

6      by the staff, all staff.

7          Q.   It is safe to say then, by your

8      definition, that you did not fully grasp what

9      the hospital's non-discrimination and

10      anti-harassment policy was when Efrain Perez

11      was mimicking other people's languages,

12      correct?

13              MS. KALE:  Objection.

14          A.   No.

15          Q.   You --

16          A.   Define fully grasp, you'd have to

17      tell me what fully grasp is for me to answer

18      your question.

19          Q.   Well, if a --

20          A.   The reason I say that, at no

21    point -- the incident with Efrain Perez, and I

22    don't know of it being in any handbook,

23    hospital policy-wise, that if an employee

24    should speak with an accent and he walks in on

25    First Avenue and he speaks with an Australian

CLASSIC REPORTING, INC., 212-268-2590

83

1          R. Gillette

2     accent and he's Puerto Rican, I don't know of

3     any hospital policy handbook that says if you

4     walked in on hospital property and you're an

5     employee and you did not speak Puerto Rican or

6     Spanish, so to speak, and you spoke with an

7     Australian accent, you are in violation.

8     Nowhere in the handbook, no way, shape or form

9     was it to be grasped by me from anything that

10     the institution may have put out in their

11     handbook or explained.

12          Q.   So unless a specific instance

13     occurs that you are told is in violation of

14     the policy, you cannot identify whether or not

15     a specific instance is an indication of

16     discrimination?

17          MS. KALE:  Objection.

18          A.   No.

19          Q.   So how would you know?

20          A.   I am only speaking about this

21    particular incident.

22        Q.   Well, we are talking about you as

23    a supervisor because, as a supervisor, there

24    may be times that instances occur, experiences

25    that occur that you have not heard?

CLASSIC REPORTING, INC., 212-268-2590

84

1            R. Gillette

2        A.   Yes.

3        Q.   And you may have to come to some

4    sorting of decision as to whether or not that

5    new incident falls within the guidelines of

6    the policy, correct?

7            MS. KALE:  Objection.

8        A.   Yes.

9        Q.   All right.

10           So how do you apply, how do you

11    go about determining whether or not an

12    incident, and we're specifically talking about

13    discrimination and -- well, discrimination in

14    the workplace, how do you go about determining

15    whether or not an incident is -- goes against

16    the hospital's policies on discrimination in

17    the workplace?

18           MS. KALE:  Objection.

19        A.   I have -- I have the hospital

20    policy, but I also have the sense that I can

21     also use intentions of a said individual

22     against another individual and whatever may

23     transpire between the two.  I believe I can

24     exact anything that would be inappropriate for

25     maybe one staff to say or do to another staff

85

1                    R. Gillette

2       that could be new, as you asked.

3              Q.    Yes.

4              A.    Not an incident that was

5       established by the institution, but I am open,

6       and I do believe I have the senses to be able

7       to discern a situation that is offensive and

8       that's totally open, it could be anything, but

9       I do believe, outside the guideline, I can

10      tell that if one staff should be offensive to

11      another staff, whatever that may be, I believe

12      I have the ability to discern the

13      offensiveness of it and at that time, do

14      something about it.

15             Q.    You were unable to do that in the

16      case of Efrain Perez, correct?

17             A.    I was not there at the time.

18             Q.    Okay.  But you stated before that

19      you had heard him -- strike that.

20             A.    That's not what I said.

21          Q.   Had you heard him in the past use

22     other accents in the workplace?

23          A.   Yes, Australian, English, when he

24     did that, I didn't find it offensive.

25          Q.   You didn't -- all right, okay.

86

1          R. Gillette

2          A.   You know he spoke with -- he did

3     an Australian accent where I think there was

4     this guy, the Australian outback, I think we

5     are all familiar with.

6          Q.   Crocodile Dundee?

7          A.   Yes.

8          Q.   Right.

9          A.   And he did an accent and the

10    accent, I thought, was pretty exact to the way

11    the guy spoke.  When he did that, I didn't

12    find it offensive.  Then he did an

13    impersonation of Sean Connery, which I thought

14    was really exact.  When he did the

15    impersonation of Sean Connery, I didn't think

16    he was violating hospital policy to do an

17    impersonation to Sean Connery.

18          I could have said, Efrain, you

19    are in violation of Memorial Sloan-Kettering

20    by impersonating Sean Connery, but I did not.

21    I didn't think it was offensive and I didn't

22    think, by me using my common sense to discern

23    his approach, I didn't think he was trying to

24    be.  And at which point, I didn't make it my

25    business to shut him down and to say this is

CLASSIC REPORTING, INC., 212-268-2590

87

1           R. Gillette

2     not hospital policy, you cannot, in here on

3     hospital property, do an impersonation of Sean

4     Connery.  I didn't.  I didn't find it

5     offensive.  Still don't.

6           Q.   So when you found out that he was

7     doing impersonations of a Jamaican accent, was

8     he doing an impersonation of Bob Marley or was

9     it a generic Jamaican?

10          A.   I never heard him do an

11    impersonation of a Jamaican accent.

12          Q.   Okay.

13          A.   The way I got this information

14    was from John Meggs.

15          Q.   So at the point in time when you

16    got that information, you did not interpret

17    him doing an impersonation or attempting to do

18    an impersonation of a Jamaican as being

19    offensive?

20          A.   No.

21          Q.    And as we sit here today, do you

22    feel that that is appropriate behavior for the

23    workplace?

24            MS. KALE:  Objection.

25          A.    My opinion?

88

1           R. Gillette

2      Q.   Yes, your opinion.

3      A.   If the person -- if the person's

4    intention is not to be offensive, it is okay.

5      Q.   So based on, and this is just

6    what I wanted to get to, based on what you

7    said, the manner in which you determine

8    whether or not someone's behavior violates the

9    hospital's antidiscrimination policy, is based

10    on the person who is engaging in the

11    activity's intention?

12        MS. KALE:  Objection.  The

13        witness answered the question.  We

14        can't have a summary.  You asked him,

15        he answered.  That's it.

16        MR. SCOTT:  Again, that is

17        another speaking objection.  Either he

18        can answer the question or he can't.

19      A.   I explained to you before how I

20    see it and what my response would be.

21          Q.   What I am looking for is clarity.

22               You focus on the intention on the

23   person engaging in the activity, correct?

24          A.   No, what I explained to you

25   before is it depends.  I never said how I

CLASSIC REPORTING, INC., 212-268-2590

89

1          R. Gillette

2     would discern it.  I was specific in response

3     to one specific reality, but in prior

4     question, what I explained to you is --

5          Q.   Go ahead.

6          A.   At the given time, relative, it

7     is a relative situation and I cannot say how

8     the situation would be, depending on what the

9     situation is, is how I would -- whatever tool

10    I would use to discern it is relative, but I

11    never gave you a formal -- an exact one that

12    would cover all.

13         Q.   Well, could you --

14         A.   It is a relative situation and I

15    cannot.

16         Q.   Could you try?

17         A.   No, I cannot.

18              MS. KALE:  Objection.

19         A.   I don't know what each situation

20    would call -- I don't know, it could be this

21    specific, that specific, I don't know, but it

22    would be relative, but I did respond to this

23    specific one.

24         Q.    And in this one, it was the

25    intention of Efrain towards Lennox, correct?

CLASSIC REPORTING, INC., 212-268-2590

90

1               R. Gillette

2      A.   Yes.

3      Q.   Okay.

4        A.   And as far as I know, I've

5   witnessed Lennox, which is a staff at Memorial

6   Sloan-Kettering, and Efrain every night when

7   they come in, they are friends, I would

8   consider them friends, they greet each other

9   with a hello and there is no, and I believe

10   other staff can back this up, there is no

11   animosity between the two.

12          I believe if you were to ask

13   Lennox how did he perceive Efrain's approach,

14   was it offensive, did Efrain mean to offend

15   him, I believe Lennox would say no.  I know

16   within the context of their experience, it is

17   my perception there were no ill intentions

18   from Efrain Perez towards Lennox.

19        Q.   And using that same logic, two

20   African-American males using the word "nigger"

21     in the workplace as well is not a violation of

22     the hospital's antidiscrimination or

23     harassment policy, if the two using the

24     language don't find it offensive to one

25     another?

CLASSIC REPORTING, INC., 212-268-2590

91

1              R. Gillette

2              MS. KALE:  Objection.

3          A.   I thought that was established.

4     Yes, it is.  That is the policy now.  Sheila

5     Donoghue, I had explained that to you before,

6     she explained to me she doesn't want it used

7     in the workplace, so it would be in violation.

8          Q.   So the intent wouldn't matter in

9     that circumstance?

10             MS. KALE:  Objection.

11         A.   No, it wouldn't, because the

12     policy was exact.

13         Q.   What is a Corrective Action

14     Process form?

15         A.   It is a form where an employee,

16     for whatever reason, can be written up, you

17     get a verbal warning, you get a written

18     warning, and then I think the final step would

19     be a written warning that can result in

20     suspension and final would be termination.

21          Q.   Have you ever written up Edmund

22     Bryan for not training other employees?

23          A.   I believe there was a note in his

24     file as to that matter, yes.

25          Q.   Do you recall the specifics of

CLASSIC REPORTING, INC., 212-268-2590

92

1                R. Gillette

2      that?

3            A.    I believe, as part of your job,

4      for all staff, is that staff has been there

5      longer and know the job, a part of their job

6      is to train new staff and I believe I had

7      asked Edmund Bryan to train someone and he

8      refused.

9            Q.    Okay.

10           A.    I passed the information along to

11     a manager, which I believe at which point, the

12     manager told me that I should tell him that

13     this is a part of his job and I believe the

14     matter was settled.  He then understood it was

15     a part of his job.

16                I believe, it is my

17     understanding, that the manager had spoken to

18     Sheila Donoghue from human resources and, you

19     know, had spoken to her and this is a part of

20     your job, so he is an employee, so if this is

21     what is requested of him, he needs to do.  I

22     believe the matter was settled.  John had

23     explained to me to explain to him that this is

24     part of your job.

25          Q.   Did you write him up on that

CLASSIC REPORTING, INC., 212-268-2590

93

1               R. Gillette

2    occasion?

3        A.    I think I had put a note in his

4    file that he refused.

5        Q.    When you say you put a note, did

6    you fill out a Corrective Action Process form?

7        A.    No.  Before you use a formal form

8    to write someone up, you can make notations

9    about a situation that may transpire and put

10   it in their file before you go to a write-up.

11            I believe I had just written a

12   note, maybe I -- I don't remember exactly what

13   I did, maybe I wrote it up, who knows, I don't

14   know, but either way, I believe something went

15   in his file in regard to him refusing to train

16   another employee.

17       Q.    Do you recall who this employee

18   was?

19       A.    No.

20       Q.    Have you ever asked Edmund Bryan

21      to train Miguel Ruiz?

22          A.    Who?

23          Q.    Miguel Ruiz?

24          A.    I don't think so, no.

25          Q.    And other than that one occasion

94

1           R. Gillette

2     that you are referring to, you don't have any

3     other recollections of Edmund Bryan refusing

4     to train other employees?

5         A.   I don't think -- I think that is

6     the one incident.  I believe it was that one

7     time, I believe.

8         MR. SCOTT:  I just need a few

9           minutes.

10          (Recess taken.)

11        MR. SCOTT:  Back on the record.

12        Q.   Mr. Gillette, we want to just

13    show you a couple of documents, we want to go

14    through them and have a quick little

15    conversation about each of them, okay?

16        MR. SCOTT:  Mark this for

17          identification.

18          (Sterilization record marked

19          Plaintiff's Exhibit E for

20          identification, as of this date.)

21          Q.   Mr. Gillette, I'd like you to

22     take a look at that document and just look up

23     when you are done looking at it.

24          A.   Okay.

25          Q.   Mr. Gillette, do you recognize

CLASSIC REPORTING, INC., 212-268-2590

95

1                    R. Gillette

2      what that document is?

3           A.   Uh-huh.  Yes.

4           Q.   What is it?

5           A.   It is a sterilization record.

6           Q.   This sterilization record, is

7      that an entire document or is it a portion of

8      it?

9           A.   It is a portion of it.

10          Q.   Which portion is the

11     sterilization record?

12          A.   I believe the bottom part.

13          Q.   Okay.  Just so we can get some --

14     when you say the bottom part, are you

15     distinguishing just between the top and the

16     bottom or the typewritten and handwritten

17     portions?

18          A.   No, there is more, the whole

19     document, the printout, should be from about

20     here to here.

21          Q.   Okay.

22          A.   So the top half is missing.

23          Q.   Do all sterilization records have

24     the handwritten -- there's handwritten

25     information on the left and right and then

CLASSIC REPORTING, INC., 212-268-2590

96

1              R. Gillette

2      typewritten?

3          A.   No, that is something I wrote.  I

4      think it was brought to my attention that the

5      sterilize time was wrong and I think the

6      number I put on the side should be different.

7      It should be 10 minutes.

8              I think the morning shift had

9      brought it to my attention that the load ran

10     at the wrong cycle, so I wrote on the paper

11     that they left me and I believe I showed it to

12     Edmund.

13         Q.   So the -- and just so we are

14     clear, there is a column of typewritten

15     numbers and then words in the middle of this

16     page, correct?

17         A.   Um.

18         Q.   Was that a yes, sir?

19         A.   What are you asking?

20         Q.   Just so we are clear, there is a

21    typewritten column in the middle of the page

22    with numbers and words, correct?

23        A.    Yes.

24        Q.    On the right and left of that is

25    handwriting?

CLASSIC REPORTING, INC., 212-268-2590

97

1              R. Gillette

2        A.   That is my handwriting.

3        Q.   And it is your handwriting on

4    both sides, right and left?

5        A.   Yes.

6        Q.   And you're saying that this

7    was -- I won't put words in your mouth.

8            Why did you put the handwriting

9    on either side of this, sir?

10        A.   I believe the sterilization time

11    should have been different.

12        Q.   Okay.  And you referenced, you

13    said you showed this to Edmund Bryan.

14            Why did you do that?

15        A.   I believe the morning shift had

16    brought it to my attention that it was wrong.

17    Generally, we run loads at night and all the

18    load sheets are initialed by two people, two

19    staff, and from time to time, a load can be

20    wrong in terms of its sterilization perimeters

21          There is a staff, staff on the day

22     shift, they come in at 7:00 in the morning and

23     their job, specific staff, is to go over all

24     the records, all the steam or gas sterrad

25     sterilization records and to check them for

CLASSIC REPORTING, INC., 212-268-2590

98

1              R. Gillette

2      accuracy.  If it is inaccurate, they will let

3      me know.

4          Q.   Okay.

5          A.   And I believe, for some reason,

6      this sterilization time, I believe, I think it

7      is a gas load, and the sterilization is saying

8      30 minutes, which is wrong.  A gas load should

9      run presently with the sterilizer we have,

10     now, if you run a gas load, it will run

11     minimum of one hour sterilization time.  If

12     you see here, it is saying 30 minutes.

13         Q.   Okay.

14         A.   And I believe, I mean, I have

15     seen this at the time when the load was

16     unloaded and I believe it is general, like I

17     usually get the information from the day

18     shift.

19         Q.   Okay.

20         A.   What I did, I believe I wrote

21     this and I showed it to Edmund Bryan, that the

22     perimeters were wrong.

23          Q.   After showing it to Edmund Bryan,

24     what did you do with it?

25          A.   I just keep a record.

99

1              R. Gillette

2        Q.    When you say keep a record?

3        A.    Of all mistakes that staff makes,

4    I'll get a copy of like sometimes they will

5    assemble trays or like in a situation like

6    this, the day shift will give me a copy,

7    something like that.

8        Q.    Okay.

9        A.    And I have a file that I just

10   keep all the files in.  Reason for keeping

11   that is that if a particular staff continues

12   to make mistakes, you know, I have copies of

13   and I can show the staff all the mistakes they

14   have made, so it is just -- I just keep it in

15   a file, all right?

16       Q.    Did you tape this up on a wall

17   somewhere in the unit?

18       A.    No.  There is no reason to do

19   that, no.

20       Q.    Did you give a copy of this to

21     Edmund Bryan?

22          A.   No.  I don't give staff -- if

23     staff makes a mistake and I get a copy of

24     whatever the mistake is, I would show the

25     staff, but I would keep it in a file.

100

1           R. Gillette

2               And I have a file, presently all

3       the, for example, I get a lot of like

4       sometimes, we have problems with like tray

5       assembly and I would get a copy from the day

6       supervisor because what they do on days is

7       they make rounds in the operating room and all

8       the charge nurses, they keep copies of

9       mistakes that are made on tray assembly and

10      the supervisor would collect all the mistakes.

11          Q.   Okay.

12          A.   She would bring them down and

13      distribute them for like mistakes for the

14      night shift and she would distribute mistakes

15      for the evening shift and so on.

16              I would take the specific

17      mistake, because generally in the OR, they

18      would write this is missing or this is added

19      or this was bent or this was dirty, and they

20      note it next to the specific instrument, the

21     problem.

22          Q.   Okay.

23          A.   So what I would do is I would

24     take that copy of whatever it is and I would

25     speak to the staff and I would show them

CLASSIC REPORTING, INC., 212-268-2590

101

1          R. Gillette

2     whatever the mistake is.  They'll understand

3     and I'll take this specific paper and I'll

4     file it.

5          Q.   So this was never taped up in the

6     unit?

7          A.   Absolutely not.  No reason to.

8          Q.   And you didn't take it down after

9     Mr. Bryan received his right to sue letter

10     from the EEOC?

11          MS. KALE:  Objection.

12          A.   Take what down?

13          Q.   Take the document that is in your

14     hand down?

15          A.   It was never taped up or pasted

16     up in the unit.

17          MR. SCOTT:  Mark this for

18          identification.

19          (Document marked Plaintiff's

20          Exhibit F for identification, as

21          of this date.)

22          Q.   Mr. Gillette, take a look at that

23     document, it has been marked as Plaintiff's

24     Exhibit F, and let me know when you are done.

25               MS. KALE:  I would just like the

CLASSIC REPORTING, INC., 212-268-2590

102

1          R. Gillette

2      record to reflect that this is an

3      attachment or an exhibit and we have

4      not -- it is not a complete document,

5      whatever it is, it is an exhibit to, it

6      is not in front of us.

7          MR. SCOTT:  Okay.

8      A.   Okay.

9      Q.   Mr. Gillette, have you seen this

10     document before?

11         A.   I've seen these words in

12     something other than -- I believe this -- I've

13     seen these words before.

14         Q.   When have you seen them before?

15         A.   I don't remember.  At some point

16     in time, I have.  I believe it might have been

17     before the actual lawsuit that -- these words

18     are the same words I see in after the lawsuit

19     that was written, it looks pretty much the

20     same to me.

21          Q.   Okay.

22          A.   There is one letter I know of

23    that had these words in it.

24          Q.   You haven't seen this on a

25    separate occasion?

103

1           R. Gillette

2      A.   I don't remember.

3      Q.   Do you recall having any

4  conversations with John Meggs about your use

5  of references to employee's sex, race, age,

6  religion, national origin or sexual

7  preference?

8      A.   No.

9      Q.   You never had any conversations

10  with John Meggs about that?

11      A.   No.  The conversations I had with

12  John Meggs was when John Meggs told me what

13  the hospital policy was.  We never had a

14  conversation where he said did you say or

15  there were conversations where he said, I

16  believe, Edmund Bryan made certain

17  accusations, but as far as John Meggs and I

18  goes having a conversation as to like he

19  asking me or -- he basically explained to me

20  what he had heard and what he wanted me to

21    adhere to.

22        Q.    And when you say what he had

23    heard, what are you referring to?

24        A.    Allegations, I believe, on what

25    Edmund Bryan had gone to human resources and

CLASSIC REPORTING, INC., 212-268-2590

104

1          R. Gillette

2     complained about, which got back to John

3     Meggs, whatever those accusations were.

4          Q.   Are you aware -- sorry?

5          A.   He told me accusations, I vaguely

6     remember some, and as a result of that, what

7     he wanted me to do in terms of policy,

8     hospital policy.

9          Q.   Did any of those accusations

10    claim that you had used inappropriate language

11    towards Mr. Bryan?

12         A.   Yes, I think I remember one time

13    that he claimed -- I believe he told me one

14    time Edmund Bryan said that I cursed him or I

15    spoke to him -- I guess you would say it is a

16    curse word, which totally contradicts my

17    approach to all staff.

18          I even, one time, I was speaking

19    to John and I believe in trying to bring about

20    a clarity about this accusation, this one from

21    Edmund Bryan, and in trying to clarify to him

22    what kind of person that I am, I told him it

23    has always been my business ever since from

24    when I became in charge nights as a lead

25    technician, is me, as a person, I've always

CLASSIC REPORTING, INC., 212-268-2590

105

1                    R. Gillette

2      made it my business to never, ever, and this

3      is a conscious effort on my behalf, to tell a

4      staff what to do.

5              I've always had the approach out

6      of respect, I would say, to a staff and this

7      continues to date and this is, I guess, been

8      going on for 15 years, where I would ask a

9      staff, I would say can you do this, can -- I

10     always use the word "can" out of respect to

11     know that, in truth, you cannot tell a person

12     what to do.

13             I could tell you and you can turn

14     around and walk out of the institution, so

15     when we work in the workplace, it has always

16     been my respect to other people, staff, that

17     we are here under an agreement, not with I, as

18     a person, having any authority over you.  You

19     are in agreement here that I, the supervisor,

20     will be the person to make requests out of

21     various staff for them to do this and that.

22          I try to explain this to John.  I

23     remember at one point, he said to me, no, tell

24     them what to do, you know, which I, of course,

25     I ignored, which I think is within my process

106

1           R. Gillette

2     as a supervisor.  I don't think I am in any

3     violation to request a staff to do something

4     as opposed to tell them to do something.

5           So my point is for me to curse to

6     any staff, Edmund Bryan or any staff, I

7     wouldn't do it.  I have too much respect for

8     staff, people in the world, which is how I

9     explained to you I approach staff.  That would

10    be in contradiction to me.  Because I have

11    made a conscious effort in my life to treating

12    people, staff, anyone I work with, I've never

13    told people what to do, I've always asked.

14          So for me to curse Edmund Bryan

15    would be way out of the scope of the way I

16    approach people.  That was the point I used in

17    trying to explain to John Meggs what the

18    accusation that Edmund Bryan had made against

19    me, that I am not that kind of a person to do

20    that.

21          Q.    Were you ever put on notice that

22     if you used inappropriate language in the

23     workplace, you could be disciplined, including

24     terminated?

25             MS. KALE:  Objection.

CLASSIC REPORTING, INC., 212-268-2590

107

1              R. Gillette

2          A.   That was a given.  I don't think

3      at any point, I was put on notice, but I

4      believe it was understood that, as a

5      supervisor, if I'll be the one to make sure to

6      implement hospital policy, I would be

7      subjected to it also.  It is not that staff

8      would be subjected to it and I'm not.  So,

9      whatever the consequences are that any staff

10      would face in violation, I am equal to face in

11      violation, also.

12          Q.   Okay.

13              MR. SCOTT:  This was previously

14          marked, but we'll mark it as G.

15              MS. KALE:  Do you want to keep it

16      as C?

17          Q.   I'm showing you what was

18      previously marked as Plaintiff's C.

19              Would you take a look at that

20      document and read it.

21          Mr. Gillette, have you ever seen

22     that document before?

23          A.   Yes.

24          Q.   What is it?

25          A.   It is a document going over the

108

1              R. Gillette

2     same process about inappropriate language,

3     playing the radio, the same things, and I

4     believe this was in the beginning -- I believe

5     this was in response to complaints made by

6     Edmund Bryan.

7              MS. KALE:  I apologize it was B,

8        not C.

9              MR. SCOTT:  This document was

10        previously marked as B.

11        Q.    You've read the first paragraph

12     of this document?

13        A.    Okay.

14        Q.    It states, essentially, this

15     document was written after a hearing was had

16     related to Mr. Bryan's complaints against or

17     complaints for discrimination involving the

18     hospital.

19        A.    Okay.

20        Q.    Do you see that, do you see that

21      in there, sir?

22           A.   Yes, I do.

23           Q.   Do you see the date of this, of

24      this letter?

25           A.   8/3/06.

109

1               R. Gillette

2        Q.    Does that -- did you receive this

3    letter around that time?

4        A.    I believe so.

5        Q.    In the lower right-hand corner,

6    it has your name typed, typed up, Rupert

7    Gillette; is that correct?

8        A.    Yes.

9        Q.    And underneath that, there is a

10   title, Supervisor CPD, is that your title?

11       A.    Yes.

12       Q.    And underneath that title, there

13   is a signature?

14       A.    Yes.

15       Q.    And whose signature is that, sir?

16       A.    That's mine.

17       Q.    And to the left, there is a name,

18   John Meggs, correct?

19       A.    Yes.

20       Q.    And underneath his name, title,

21    Manager, CPD?

22        A.   Yes.

23        Q.   Was that his title when he was

24    working with you at the hospital?

25        A.   Yes.

110

1            R. Gillette

2        Q.   Okay.  There is a signature next

3    to that, do you recognize his signature at

4    all, or no?

5        A.   It looks like John Meggs'

6    signature.

7        Q.   All right.  How did you come to

8    get this document, how did you -- yes, how did

9    you come to get it?

10        A.   I believe it was the summer after

11    the lawsuit.  My perception of this letter is

12    the institution felt like they had to respond

13    to the court and in all of what's written here

14    about me, I don't think -- like I was

15    explaining before, the department has evolved

16    and we started in the past where we had

17    certain practices.

18            And the institution, in their

19    response to me, they exacted me from the past

20    to the now and they -- and in this letter, as

21      I said before, it is something that I've done

22      in the past, the lawsuit was over and

23      finished, and I think this was a letter that

24      went against me in my file.

25          Q.   Uh-huh.

CLASSIC REPORTING, INC., 212-268-2590

111

1            R. Gillette

2        A.   Which I don't believe it was

3    really a point in sense of how things had

4    transpired from the past, you know, I mean, if

5    we did one thing in the past and this is the

6    present, they brought the past into the

7    present and held it against me.

8        Q.   And what about the past was

9    brought into the present in this letter?

10        A.   Vulgar language.  This was

11    written -- let me look at it, discussion,

12    vulgar language in the workplace, things of

13    that nature, the radio, I mean, in the past,

14    we used to play -- we used to play the

15    radio -- okay?  Now, you can't, so in the past

16    we were able to put on various radio stations,

17    now that's being held against me, I mean

18    that's the past.  But it is being held against

19    me now.

20            So, you know, I'm not one to

21     haggle and, you know, they saw this, they

22     wrote it, I signed it, you know, if it makes

23     them happy, fine.

24          Q.    You see the first clause of the

25     first sentence in the third paragraph, where

CLASSIC REPORTING, INC., 212-268-2590

112

1               R. Gillette

2     it says:

3               "You and I have had many

4          discussions not only on the use of

5          vulgar language in the workplace".

6               Do you see that?

7     A.   Not true.  Not true.

8     Q.   You state that is not true?

9     A.   That is totally not true.  The

10    way the letter is worded, I remember reading

11    it, that the perception of the letter is as to

12    the exact detail as to how the department had

13    evolved.  This letter, in the way John had

14    worded it, he is saying in this letter that to

15    the exact detail, it says if he had taken

16    now -- oh, we spoke about this in the past and

17    here, we have Efrain Perez doing a Jamaican

18    accent.

19               It isn't like the letter reads --

20    because a lot of what got established, got

21     established over a period of time, not one

22     time, but the letter, the way he wrote it, I

23     don't know who wrote the letter, I imagine he

24     did, it is inaccurate in its presentation as

25     to how things had transpired over the years.

CLASSIC REPORTING, INC., 212-268-2590

113

1          R. Gillette

2     So for him to say we have had many

3     discussions, it is inaccurate.

4          Q.   Okay.

5          A.   What had taken place is, I

6     believe, over the years, Edmund Bryan had gone

7     in for every little thing you can think of.

8          Q.   Uh-huh.

9          A.   He had gone and complained about

10    it and it didn't happen all at once.  I

11    believe the complaints kept coming up until

12    the last complaint, it was like, okay, he

13    complained about this, over a period, this,

14    time go by, this, time go by, this, so it is

15    being narrowed.

16          So John and I could not speak

17    over a period of time about this, but he did

18    word it like that to the point where now, the

19    last complaint is Efrain Perez is speaking

20    with a Jamaican accent.  So if you read this,

21     you would think, well, we spoke about that

22     also, which we did not.

23          And I believe John, what he

24     addressed was as each complaint came up from

25     Edmund Bryan is he would then address the

114

1          R. Gillette

2     issue.  As in like the last problem that came

3     up from Edmund Bryan was Efrain Perez speaking

4     with a Jamaican accent, there goes another

5     one, we've never spoken about it.  He did

6     speak to me, but not like we spoke about all

7     this, but he spoke to me and I addressed it.

8          So what I believe happened over

9     the years is each of Edmund Bryan's complaints

10     continued to happen over a period of time and

11     each time it happened, but the accumulation

12     was not like he stated, so that's not

13     accurate.

14          So I am saying in the way he

15     wrote the letter, which I, you know, I wasn't

16     going to waste my time like, it is not

17     accurate as to how things had transpired.

18     Q.   Okay.  There is a -- in the

19     second full sentence of that third paragraph

20     begins:

21          "These incidents have decreased

22      within the past few months and you must

23      be commended."

24          Is that also not accurate?

25      A.   I would say --


CLASSIC REPORTING, INC., 212-268-2590

115

1         R. Gillette

2     Q.    You would say it is not accurate?

3     A.    Inaccurate.  The reason why I

4  would say it is inaccurate is I believe after

5  he -- after the first statement, we spoke

6  about it, to close the statement and to show

7  some result in the last few months.  This has

8  been going on gradually for years.  It didn't

9  just happen in a few months, as he stated.

10     Q.    Well, he said that it's decreased

11  in the last few months?

12     A.    No, it's decreased over the years

13  for each complaint, so that is inaccurate,

14  what he stated there.  It is not how it

15  happened, namely, in the last few months, no.

16     Q.    You said Mr. Bryan would complain

17  over every little thing?

18     A.    Every little thing.

19     Q.    Would you view many of his

20  complaints as nuisances?

21          MS. KALE:  Objection.

22          A.   They were counterproductive for

23     the institution and for the department.  We

24     wasted a lot of time in debates, discussions

25     about a lot of these things that, you know,

CLASSIC REPORTING, INC., 212-268-2590

116

1                R. Gillette

2    were his complaints.

3        Q.   For example, which of his

4    complaints were a waste of time?

5        A.   I asked him to train another

6    staff and that turned into like a two or

7    three-night ordeal, total waste of time.

8        Q.   Okay.

9        A.   There were incidents where one of

10   the staff was singing out loud or to himself

11   and he was singing something Selassie, I don't

12   know how you want to spell it.

13           I believe there is some relation

14   to that name, some kind of political leader.

15       Q.   He was the first Crown Prince of

16   Ethiopia.  Many Rastafarians --

17           MS. KALE:  Wait.

18           MR. SCOTT:  We are having a

19        conversation.  Is there an objection?

20           MS. KALE:  Yes, this is a

21          deposition not a conversation.

22              Q.   Were you aware of that at all,

23      who Haile Selassie is?

24              A.   I couldn't remember, but just

25      now, when you brought it to my attention, it

CLASSIC REPORTING, INC., 212-268-2590

117

1              R. Gillette

2      comes back to me.

3          Q.   Are you aware that many Jamaican

4      Rastafarians view him in very high regard?

5          A.   Yes.

6          Q.   Thank you.  You can continue,

7      please.

8          A.   Now, Kenneth Williams was just

9      doing like a rap and he said

10     Selassie-something, which led to something

11     else.  Edmund Bryan, from his workstation,

12     which is like all the way in the back, all the

13     way to the corner to the right, jumped up in

14     an extremely menacing way, like he was going

15     to attack Kenneth Williams.

16         Q.   Yes.

17         A.   And said like, don't mess with my

18     culture.  Now, he's about 2 inches away from

19     Kenneth's face, like this, like they are going

20     to fight.  That's the only thing I can think

21    of.

22        At which point, I stepped in, I

23    got Ken, I pulled Ken back and I said, Ken,

24    just wait here.  I called security and that

25    particular night security had to come in and

118

1             R. Gillette

2     defuse Edmund Bryan and Kenneth Williams and

3     there have been incidents with Edmund Bryan

4     and Mike Rodriguez.

5         Q.   What incident?

6         A.   They argued, they started

7     shouting.  One night, Mike Rodriguez came up

8     to him, and this was shortly after I stopped

9     speaking to him, and was asking him something

10     about a computer and he just went off verbally

11     on Mike Rodriguez, at which point, Mike

12     Rodriguez was very shocked at his response and

13     he responded back.  I had to defuse that.

14         There have been other situations

15     where Edmund Bryan and Carol Grima, where I

16     think there was another incident where he also

17     did not want to help Carol Grima in the case

18     room.

19         There have been other situations,

20     I don't recall, I don't remember what

21     incident, but incident of complaints and

22     situations where he would respond, I believe,

23     is counterproductive to the department.

24          Q.   Do you view any of his complaints

25     about harassment or discrimination based on

CLASSIC REPORTING, INC., 212-268-2590

119

1          R. Gillette

2     his national origin, do you believe those are

3     counterproductive?

4          MS. KALE:  Objection.

5          A.   I first have to acknowledge that

6     it is before I say it is counterproductive.

7          Q.   You have to say it is what?

8          A.   That it is a discrimination.

9          Q.   No.  Do you feel his complaint is

10    counterproductive?

11         A.   What is the complaint?  I would

12    have to know that first.

13         Q.   A complaint that Jamaicans should

14    be put on the top of a mountain and given a

15    shovel, do you feel that complaint was

16    counterproductive?

17         MS. KALE:  Objection.

18         A.   I don't know of it, as you say,

19    existing and never heard it.  If it is true, I

20    would say no.

21          Q.    Okay.  Any other complaints by

22     Mr. Bryan that you felt were

23     counterproductive?

24          A.    Just what I spoke about, and if

25     there are any more, I don't remember them

CLASSIC REPORTING, INC., 212-268-2590

120

1                    R. Gillette

2     right now.

3          Q.    You also said that this

4     particular letter, it went against you,

5     correct?

6          A.    I believe so, yes.  In how you

7     read the letter and the details of it, I don't

8     think it went in my file that enhanced my

9     record, but actually went against it.

10          Q.    Did it affect your pay in any

11     way?

12          A.    Yes.

13          Q.    In what way?

14          A.    I didn't get a raise.

15          Q.    Did it have any other effects on

16     your employment other than the effect on your

17     pay?

18          A.    I can't think of any, I mean, I

19     am still a supervisor.  I am a supervisor,

20     that is the position I've been in, still am

21      in, I told you what the details of what was

22      the cost of that.  Beyond that, I can't think

23      of anything else.

24            MR. SCOTT:  This document has

25         been previously marked as well.

CLASSIC REPORTING, INC., 212-268-2590

121

1               R. Gillette

2          MS. KALE:  I think that is the

3     one that's C.

4          MR. SCOTT:  Yes, C.

5     A.   Okay.

6     Q.   Mr. Gillette, have you ever seen

7     that document before?

8     A.   Yes.

9     Q.   What is it?

10     A.   I believe it is in regard to some

11     information that the institution gives out to

12     all employees, that I had given to Mr. Bryan

13     two nights prior to the third night, where the

14     item got thrown out.

15     Q.   And what information is this that

16     got thrown out?

17     A.   I really don't remember.

18     Q.   Do you see in the first paragraph

19     of that document, where it says in the second

20     line:

21          "Edmund Bryan, who informed me

22     that his benefits package" --

23     A.   No, it wasn't a benefits package.

24     Q.   It wasn't the benefits package?

25     A.   No.  I know that for sure.  It

CLASSIC REPORTING, INC., 212-268-2590

122

1          R. Gillette

2     was some kind of -- I think it was a single

3     paper of something, of some sort, one single

4     sheet.

5          A benefit package, there are

6     several papers involved, because I remember

7     the exact envelope was very thin and everybody

8     gotten that, including myself, but it was a

9     single piece of paper from the hospital.  I

10     don't remember exactly what it was, but I do

11     know for sure, a benefit package is a lot

12     thicker, it has a lot more information to it,

13     but so, it was not a benefit package, I knew

14     that for sure.

15          Q.   Okay.  Who wrote this document?

16          A.   It was given out from the

17     institution, everyone got it.

18          Q.   No, the document we are looking

19     at now, what was marked as C.

20          A.   I believe John wrote this.

21          Q.   It has your name in the top

22     left-hand corner?

23          A.   Yes.

24          Q.   It has your name in the top

25     left-hand corner, correct?

CLASSIC REPORTING, INC., 212-268-2590

123

1           R. Gillette

2      A.   Yes.

3      Q.   7501, it has a number next to it?

4      A.   Yes.

5      Q.   What is that number, if you know?

6      A.   That is my employee number.

7      Q.   And at the bottom left-hand

8   corner, it has John Meggs' name typed up?

9      A.   Yes.

10      Q.   And a signature underneath that?

11      A.   Yes.

12      Q.   And there is a date underneath

13   that signature?

14      A.   Yes.

15      Q.   Can you make that date out?

16      A.   9/20 of '05.

17      Q.   Okay.  Immediately then to the

18   right of that date, is another signature,

19   correct?

20      A.   Correct.

21          Q.   Whose signature is that?

22          A.   That would be mine.

23          Q.   Okay.  And there is a date under

24    that, correct?

25          A.   Correct.

124

1              R. Gillette

2      Q.    What is that date?

3      A.    3/9/06.

4      Q.    Did you review and sign this

5    document on March 9th of 2006?

6      A.    I guess, yes.

7      Q.    At the time you reviewed and

8    signed this document, did you see that in the

9    top paragraph, it said that Mr. Bryan said

10    that his benefits package was thrown in the

11    garbage?

12      A.    I probably didn't read that in

13    detail or perceived it.  If I did, I must have

14    perceived it as something different.  I didn't

15    think it was important.  The document in

16    question was, like I said, I don't -- from

17    what I remember, I do not believe it was a

18    benefit package.

19              It was a document that I had

20    given him and all of the staff the night, two

21     nights before, I remember Edmund leaving the

22     document around and the second night he came

23     in, I gave it to him again.  The third night

24     when I came in, without looking at whose name

25     was on the document, because a lot of times

CLASSIC REPORTING, INC., 212-268-2590

125

1            R. Gillette

2    staff will get documents.

3        Q.   Yes.

4        A.   They are not perceived as being

5    so important from the hospital and they leave

6    them lying around the department.

7            And the night shift, including

8    myself, we clean up the department and what I

9    did was I saw the document and I put it in the

10    garbage, not knowing who the document belonged

11    to.

12            The following day I came in, I

13    received an e-mail from John saying that

14    Edmund had complained that I had taken, this

15    is the third night, and I asked John, well, if

16    I give someone a document two nights before

17    and they continue to leave it in the

18    department, what should I do?  He told me to

19    leave it in his office.

20            And once again, when something is

21     established and he gave me an answer.  Now,

22     when staff leave documents lying around the

23     department, I'll gather them up and put them

24     in his office.

25          Q.   Okay.


CLASSIC REPORTING, INC., 212-268-2590

126

1          R. Gillette

2          A.   But I thought, as I got it done

3     in the past with other documents, a lot of

4     times staff don't want it, they really don't

5     care, and when I clean up the department, I

6     throw it out.

7          So it isn't to think that Edmund

8     Bryan was singled out in this act, he was not.

9     It was thrown out, as I had thrown out many

10     other documents that staff had received and,

11     you know, they sit on the cabinet or whatever

12     for days until I throw it out.  They don't

13     want it so -- but in no way, shape or form was

14     he -- because we have total of maybe 52

15     employees working in that department, and to

16     think that when 52 documents comes in, 52

17     staff will make sure they take it, they leave

18     it lying around all the time.

19          We are the shift that cleans up

20     and other staff that leave it lying around, it

21    is no way that only Edmund Bryan is the only

22    one to leave a document behind.  Other staff

23    do it all the time.  So no way, shape or form

24    that he is singled out.  I just cleaned the

25    department up and that's what I did.

127

1              R. Gillette

2         Q.   At this point in time, had Edmund

3    Bryan -- were you aware of any complaints that

4    Edmund Bryan made against harassment or

5    discrimination in the workplace?

6         A.   The lawsuit.

7         Q.   I'd like you to look at the last

8    paragraph of this document, that first

9    sentence:

10             "Mr. Gillette and I continue to

11             have many discussions on the job

12             working relationships he has with

13             several of his staff members."

14        A.   Okay.

15        Q.   Is that an accurate sentence, was

16   that an accurate sentence as of September 20,

17   2005?

18        A.   Yes.

19        Q.   What kind of discussions would

20   you have with Mr. Meggs about your job working

21    relationships?

22        A.   I think this letter, at the time

23    there were -- we had two -- we had three

24    ladies on the shift and when you work in

25    central, part of what we do is we have carts

CLASSIC REPORTING, INC., 212-268-2590

128

1                   R. Gillette

2       that we load trays on and the carts can weigh

3       like up to 5, 600 pounds.

4                   And we had reached a point, based

5       on Edmund Bryan's complaints, continuous

6       complaints, that John was trying to make sure

7       that everything on the shift is done

8       equitably, like everyone is treated fairly and

9       so on.

10                  So what we did at this point was

11      we had three women, I never had three, but I

12      went two, three, but at one point, I had two,

13      and the ladies, what I had them do, was they

14      did a rotation, they did everything the men

15      did.  These two ladies in particular, when it

16      came to them working in the steam area where

17      they had to push the heavy carts, they didn't

18      like it, they complained.  When they worked in

19      the case room and they had to push carts, they

20      didn't like it, they complained.

21          So there was a lot of issue back

22     and forth where they continuously went to John

23     and complained about what I was asking them to

24     do.  And I think what he's referring to is

25     like several -- several is about these other

CLASSIC REPORTING, INC., 212-268-2590

129

1                R. Gillette

2    staff that had gone to complain about the job

3    that I'm asking them to do this, but at that

4    time, it was not my call, what I did was I

5    said, okay, John, we have ladies working on

6    the shift, how am I supposed to handle this?

7                I mean it may be my opinion that

8    I wouldn't ask a woman to push a 600-pound

9    cart in the sterilization area, but I'm not

10    the institution and I want to follow the

11    rules.

12                John told me that everything that

13    the men did, the women would also have to do.

14    That became a problem.  It was a little rough,

15    I think, for the ladies and they would

16    complain and then finally, they were removed

17    from the shift.  I believe one had outright

18    quit.

19          Q.   What were the names of these

20    three women?

21          A.    Alma Antwi and Comfort -- I don't

22    know her last name, and so generally, they

23    complained because I guess the job was a

24    little rough on them.  So I think that's what

25    part of the letter -- several, meaning other

CLASSIC REPORTING, INC., 212-268-2590

130

1              R. Gillette

2     staff.

3         Q.   That's several other staff.

4              What about the word "many," many

5     discussions, how many times?

6         A.   I have no idea how many times.

7     The word "many," it is a continuing process.

8     People are continually being written up.

9              When you work in central, it

10    isn't a calm place.  People are continuously

11    being written up, mistakes are continuously

12    being made.  Readjustment in the department,

13    as far as how things are done, are

14    continuously being up dated.  As far as those

15    words goes, if he was still working with us,

16    we would still be doing it.  It is a

17    continuing process.

18        Q.   And this last sentence:

19             "He was made aware that our

20         conversations concerning these

21       counterproductive relationships are

22       being monitored."

23        What did you understand that

24  phrase "counterproductive relationships" to

25  mean?

CLASSIC REPORTING, INC., 212-268-2590

131

1               R. Gillette

2          A.   I think he's trying to say that I

3    think in many ways, when I had discussions

4    with John, especially about the ladies, John

5    was not as detailed in understanding certain

6    things that I believe he could have been.

7               And counterproductive is, I

8    think, the way the ladies went and complained

9    about what I had asked them to do, he

10   perceived it to be different and interpreted

11   it as such, counterproductive, when I was just

12   doing what he had instructed me to do.

13         Q.   Did you have any conversations

14   with Sheila Donoghue about these

15   relationships?

16         A.   One time, one time, Sheila

17   Donoghue had come down and Carol Grima made a

18   complaint and I spoke to Sheila Donoghue about

19   that.  That's about it.

20         Q.   What was her complaint, Carol

21    Grima?

22        A.   She was complaining the various

23    places that also -- the workplace where she

24    worked, she claims I was harassing her.

25        Q.   Specifically what was she

CLASSIC REPORTING, INC., 212-268-2590

132

1          R. Gillette

2     claiming?

3          A.   She claimed sexual harassment,

4     which was like an open word, not any detail as

5     to like what I had did.  Her, myself, Carol

6     and Sheila Donoghue sat down and spoke about

7     this and when Carol was removed from the shift

8     and it was later found out that her

9     accusations were false.

10          Q.   What were the accusations?

11          A.   What I just told you.

12          Q.   Well, you didn't.  There were no

13     details, it was just sexual harassment?

14          A.   Yes, and that's when we sat down,

15     myself, Carol Grima, Sheila Donoghue, she

16     could not say specifically what I had done.

17          Q.   And when you say they were later

18     found out to be false, how did that happen?

19          A.   Well, for example, Mike

20     Rodriguez, who Carol Grima had called one

21    night and threatened me with physical

22    violence, it was later on that I had various

23    witnesses, Mike Rodriguez and so on, to verify

24    that her claims were false and presently, with

25    all that being said, Carol and I, we right

CLASSIC REPORTING, INC., 212-268-2590

133

1            R. Gillette

2     now, we talk, so she later on told me that she

3     was frustrated with the shift and her

4     accusations and the things she had said was

5     out of anger, she had made them up.

6            Q.   And Ms. Donoghue told you this?

7            A.   No, Carol.  Carol and I now

8     speak, is what I am saying.  You know, it is

9     not enemies, presently, now.  She calls, she

10    generally called me, not every night, but she

11    calls a lot, you know, and, you know, talk

12    about the department and so on, but generally,

13    what she did was false and if you were to ask

14    her right now, she would tell you.  So all of

15    that it was false, but then, on the other

16    hand, that's John with her accusation, the

17    other two ladies, how they claimed I presented

18    a job to them.

19            Q.   How were they claiming you

20    presented the job to them?

21          A.    They were -- I am asking them to

22    do things that they felt they shouldn't be

23    doing, you know, like in the steam room.  I

24    would, you know, ask them certain things and

25    there were certain areas where they didn't

CLASSIC REPORTING, INC., 212-268-2590

134

1           R. Gillette

2      complete their job and I would speak to them

3      about it and they got offended to the things I

4      said, you know.

5           So it basically added up that

6      they did not want to do the job as I was

7      presenting it, because there was no separation

8      in they being ladies and the rest being males,

9      you know.  Everyone did the same thing.  They

10     didn't want to do that.

11           And I think in many ways, John

12     never really -- John has always been more of a

13     person that his mind was made up, you know,

14     assume a lot of things and, you know, if he

15     thought it was like this, it was like that.

16     There was really no explaining to him the

17     final details as to what transpired.

18         Q.    Any other complaints of sexual

19     harassment lodged against you by any other

20     people under your supervision?

21          A.   No.

22          Q.   Any other complaints of

23   harassment of any type lodged against you by

24   people under your supervision?

25          A.   No.

CLASSIC REPORTING, INC., 212-268-2590

135

1                 R. Gillette

2           Q.   In the evaluations that you've

3     done for Edmund Bryan, have you said that he

4     needs to improve his communication skills?

5           A.   Yes.

6           Q.   Have you also said that he needs

7     to be more of a team player?

8           A.   Yes.

9           Q.   Has Edmund Bryan worked the

10    weekends and holidays for pretty much everyone

11    in the department for several years?

12           A.   In the past, he requested, he had

13    asked the manager Jim Appollo and all the

14    guys, two of his staff that would normally

15    rotate weekends, if he could work all the

16    weekends and then everybody else would be off

17    and he did that for years.

18           Q.   Everyone, including you?

19           A.   No, I was the lead at the time, I

20    don't work weekends.  He's never worked a

21     weekend that I had to work.

22          Q.   All these times, he worked

23     weekends and allowed other people to have

24     their weekends off?

25          MS. KALE:  Objection.

CLASSIC REPORTING, INC., 212-268-2590

136

1                    R. Gillette

2        A.   Yes.

3        Q.   Did you ever take that into

4    account when evaluating him as being a team

5    player?

6              MS. KALE:  Objection.

7        A.   When he did work weekends for

8    other staff, I was not a supervisor, which

9    means I would not be doing his evaluation.

10             When I was the supervisor or

11   became the supervisor, John Meggs, the

12   manager, had put a stop to Edmund Bryan

13   working weekends for other staff.  John Meggs

14   had stopped him from doing that and told every

15   staff, all the staff that you are going to

16   need to work your own weekends, but Edmund

17   Bryan will no longer be permitted to do that.

18       Q.   Do you know why that was?

19       A.   No, I don't.

20       Q.   Did other staff request that they

21    be allowed to work weekends?

22              MS. KALE:  Objection.

23        A.    I don't understand the question.

24        Q.    All right.  Have you ever seen

25    Jamal Robinson sleeping on the job?


CLASSIC REPORTING, INC., 212-268-2590

137

1                    R. Gillette

2          A.   Yes.

3             MS. KALE:  Objection.

4          Q.   Did you write him up?

5          A.   Yes.

6          Q.   Did you ever see Kevin Waldron

7    sleeping on the job?

8          A.   Yes.

9          Q.   Did you write him up?

10         A.   Yes.

11         Q.   Did you ever see Kenneth Williams

12   sleeping on the job?

13         A.   Yes.

14         Q.   Did you ever write him up?

15         A.   Yes.

16         Q.   Did you ever see Michael

17   Rodriguez sleeping on the job?

18         A.   No.

19         Q.   How frequently had you seen Jamal

20   Robinson sleeping on the job?

21          A.   Not frequently.

22          Q.   Every time you saw him sleeping

23     on the job, would you write him up?

24          A.   No.

25          Q.   What about Kevin Waldron, how

CLASSIC REPORTING, INC., 212-268-2590

138

1              R. Gillette

2     frequently?

3         A.   Not frequent.

4         Q.   Every time you saw himsleeping on

5     the job would you write him up?

6         A.   No.

7         Q.   How about Kenneth Williams, how

8     frequently did you see him sleeping on the

9     job?

10        A.   Not frequently.

11        Q.   Every time you saw him sleeping

12    on the job would you write him up?

13        A.   No.

14        Q.   Would sleeping on the job be

15    considered a violation of the hospital's

16    policies and procedures?

17        A.   Yes.

18        Q.   And on the occasions when you

19    didn't write up any of these gentleman, why

20    would you not write them up?

21          A.   They would be terminated.

22          Q.   So you didn't write them up so

23    they wouldn't lose their job?

24          A.   No, I didn't write them up,

25    because my process was to try to work with

139

1              R. Gillette

2      them, but not -- if they were -- definition of

3      sleeping was not -- or I'll give you my

4      definition of sleeping is where they would sit

5      at a workstation and for a few seconds doze

6      off, to the word "sleeping" that you are

7      asking isn't where someone like sprawls out

8      and just go to sleep.  Sleeping, the

9      definition to the question you are asking me

10      is where someone would be at a workstation and

11      they would like, you know, nod off for like a

12      few seconds or so and I would come by and I

13      would wake them up, I would like, you know....

14          Q.    Have you ever gone to a bar with

15      workers under your supervision and consumed

16      alcohol?

17          A.    In the past.

18          Q.    When was the last time you did

19      that?

20          A.    Years ago.

21       Q.   And you --

22       A.   That was before, I would say,

23   before the lawsuit.

24       Q.   What are the names of some of

25   these individuals who you would go to the bar

CLASSIC REPORTING, INC., 212-268-2590

140

1                    R. Gillette

2      with?

3          A.   Kenneth Williams, Bosh, I forgot

4      his last name, Kevin Waldron, Mike Rodriguez,

5          Q.   Did you ever order Edmund Bryan

6      to work weekends for Kevin Waldron?

7          A.   Well, first of all, I have never

8      ordered anyone to do anything.

9          Q.   Okay.

10         A.    But I've never asked Edmund

11     Bryan, no, to work any weekend for anyone.

12         Q.    Did you ever instruct Edmund

13     Bryan to simplify the list of instrument trays

14     so that everyone can learn from it?

15             MS. KALE:  Objection.

16         A.   Simplify the list?

17     Q.   Yes.

18         A.   Could you be more a little more

19     clear as to what that would be, simplifying

20     the list.

21          Q.   Or reorganize it such that it is

22     easier to learn the items on the list?

23              MS. KALE:  Objection.

24          A.   Reorganize a list?

25          Q.   Yes.

CLASSIC REPORTING, INC., 212-268-2590

141

1          R. Gillette

2          A.   I, as a supervisor, don't have

3     the authority to do that.  I don't know how I

4     could under -- I don't understand how I could

5     ask Edmund Bryan to do that.

6               When you get a list, the manager

7     makes up the list and it is organized format,

8     that list is sent off to Abacus and it is put

9     in the system, but I, as a supervisor, don't

10     have the authority to do that and I would not

11     ask Edmund Bryan to do that.

12          Q.   And were you ever asked by John

13     Meggs to instruct Edmund Bryan to create a

14     list of the instruments for the purpose of

15     assisting people in learning the instruments?

16               MS. KALE:  Objection.

17          A.   No.

18          Q.   No?

19          A.   No.

20          Q.   Okay.  Did you ever tell Edmund

21     Bryan that if he did not teach Miguel Ruiz

22     whatever he needed to know, that you would

23     call security and send him home?

24          MS. KALE:  Objection.

25          A.   No.


CLASSIC REPORTING, INC., 212-268-2590

142

1               R. Gillette

2        Q.   Have you ever threatened to call

3    security to send Mr. Bryan home if he did not

4    train someone?

5               MS. KALE:  Objection.

6        A.   No.

7               MR. SCOTT:  I just need a moment.

8               (Recess taken.)

9               MR. SCOTT:  I have no further

10        questions, Mr. Gillette.

11               MS. KALE:  I have a few

12        questions.

13    EXAMINATION BY MS. KALE:

14        Q.   If we can show the witness

15    Plaintiff's Exhibit E.

16               Mr. Gillette, do you see a date

17    on this document?

18        A.   Yes, I do.  The date is 12/22/02.

19        Q.   And was this report generated, to

20    your knowledge, was the report generated on

21     the day printed?

22          A.   Yes.

23             (Transcript continues on next

24     page)

25

CLASSIC REPORTING, INC., 212-268-2590

143

1          R. Gillette

2          MS. KALE:  That's all.

3          (Time noted:  1:43 P.M.)

4          _____

5          Rupert Gillette

6

7     Subscribed and sworn to

8     before me this_____day

9     of_____2008.

10         _____

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLASSIC REPORTING, INC., 212-268-2590

144

1

2

C E R T I F I C A T E
– – – – – – – – – –

3

STATE OF NEW YORK     )

4                              ) ss.:

COUNTY OF NEW YORK     )

5

I, CHARISSE ROMEO, a Shorthand

6

Reporter and Notary Public within and

7

for the State of New York, do hereby

8

certify:

9

That I reported the proceedings in

10

the within-entitled matter, and that the

11

within transcript is a true record of

12

such proceedings.

13

I further certify that I am not

14

related, by blood or marriage, to any of

15

the parties in this matter and that I am

16

in no way interested in the outcome of

17

this matter.

18

IN WITNESS WHEREOF, I have hereunto

19

set my hand this___9th___day of_May__,
            ___        ___

20
    2008.

21

22         _____
                CHARISSE ROMEO

23

24

25

145

1

2    April 29, 2008

3            I N D E X
            − − − − −

4    WITNESS                    PAGE
     ‾‾‾‾‾‾‾                    ‾‾‾‾
     RUPERT GILLETTE
5        Examination by Mr. Scott        4
         Examination by Ms. Kale      142
6
              E X H I B I T S
            − − − − − − − −
7
     PLAINTIFF'S
     ‾‾‾‾‾‾‾‾‾‾
8    FOR_IDENTIFICATION                PAGE
     ‾‾‾ ‾‾‾‾‾‾‾‾‾‾‾‾‾‾               ‾‾‾‾
     E    Sterilization record      94
9
     F    Document            101
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CLASSIC REPORTING, INC., 212-268-2590