1

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-----------------------------------x
EDMUND BRYAN,

        Plaintiff,

   -against-     No. 07 Civ. 7300 (SHS)

            ECF Case
MEMORIAL SLOAN-KETTERING CANCER
CENTER,

        Defendant.
-----------------------------------x

       April 24, 2008
       10:20 A.M.


    Deposition of Defendant, by

SHEILA DONOGHUE, taken by Plaintiff, pursuant

to Notice, at the offices of The Scott Firm,

55 Washington Street, Suite 705, Brooklyn, New

York 11201, before Charisse Romeo, a Shorthand

Reporter and Notary Public within and for the

State of New York.

2

1

2          A P P E A R A N C E S:

3

           THE SCOTT FIRM
4               Attorneys for Plaintiff
                55 Washington Street, Suite 705
5               Brooklyn, New York  11201

6          BY:   A. BARAKA SCOTT, ESQ.

7

8          McDERMOTT, WILL & EMERY, LLP
               Attorneys for Defendant
9               340 Madison Avenue
                New York, New York  10173
10
           BY:   KATHERINE D. KALE, ESQ.
11

12         ALSO PRESENT:

13              PAMELA DUDLEY
               Memorial Sloan-Kettering Center
14               Human Resources Representative

15

16

17

18

19

20

21

22

23

24

25

3

1

2         IT IS HEREBY STIPULATED AND AGREED by

3    and between the attorneys for the respective

4    parties herein that the sealing, filing and

5    certification of the within deposition be waived;

6    that such deposition may be signed and sworn to

7    before any officer authorized to administer an

8    oath, with the same force and effect as if signed

9    and sworn to before a judge of this court.

10         IT IS FURTHER STIPULATED AND AGREED

11    that all objections, except as to the form, are

12    reserved to the time of the trial.

13

14

15

16

17

18

19

20

21

22

23

24

25

4

1                    S. Donoghue

2      S H E I L A   D O N O G H U E,

3              having been first duly sworn by the

4              Notary Public (Charisse Romeo), was

5              examined and testified as follows:

6      EXAMINATION BY MR. SCOTT:

7              Q.    Would you state your name for the

8      record?

9              A.    Sheila Donoghue.

10             Q.    What is your address?

11             A.    633 Third Avenue, 5th Floor, New

12     York, New York 10017.

13             Q.    Good morning, Ms. Donoghue.  How

14     are you?

15             A.    Fine, thank you.

16             Q.    My name is Armani Scott.  I am

17     the attorney for Edmund Bryan in the case

18     captioned Edmund Bryan versus Memorial

19     Sloan-Kettering Cancer Center.

20                  You are appearing here pursuant

21    to a notice of deposition; is that correct?

22        A.   Correct.

23        Q.   I'm going to ask you some

24    questions related to Mr. Bryan's claim against

25    the Memorial Sloan-Kettering Cancer Center and

5

1                    S. Donoghue

2       I just want to lay down some ground rules.

3                    As you can see, there is a court

4       reporter here taking down everything that is

5       said so that we can properly record it.  So I

6       would like you to wait for me to complete my

7       question and then you can answer.

8                    In the event that I phrase a

9       question in an inartful fashion, confusing in

10      any way, please feel free to say I don't

11      understand what you are saying and I'll

12      rephrase it so we can move along.  If you

13      don't know an answer to a question, feel free

14      to say I don't know or I don't remember.  I

15      don't want you to guess on anything, okay?

16          A.   All right.

17          Q.   Ms. Donoghue, by whom are you

18      employed?

19          A.   Memorial Sloan-Kettering Cancer

20      Center.

21          Q.   For how long have you been so

22      employed?

23          A.   Almost 20 years.

24          Q.   And what is your title at the

25      hospital?

6

1              S. Donoghue

2         A.   I am an HR consultant/generalist.

3         Q.   And for how long have you been a

4    HR consultant/generalist?

5         A.   Almost a year.

6         Q.   And prior to that, what was your

7    job title?

8         A.   I was a senior employee relations

9    specialist.

10        Q.   Can you briefly describe what

11   your job responsibilities are now as an HR

12   consultant and generalist?

13        A.   Basically, I am forging a

14   relationship as a strategic partner with our

15   business groups.  A work-in-process.  I work

16   with assigned departments working with

17   workforce planning, employment strategies,

18   consulting on day-to-day employee relations

19   matters.

20        Q.   In your new title, is there a

21     name to the department under which you report?

22         A.   Human resources.

23         Q.   Human resources, okay.

24             Your previous job title was a

25     senior employment relations --

7

1                    S. Donoghue

2          A.   Employee.

3          Q.   Employee relations specialist,

4     thank you.

5          A.   Yes.

6          Q.   What department did that title

7     come under?

8          A.   Under employee relations.

9          Q.   So --

10         A.    Which is part of human resources,

11    which was part of human resources.

12         Q.    Was there any particular reason

13    why you changed from senior employee relations

14    specialist to your new job title?

15         A.    The department, human resources

16    department underwent a reorganization

17    approximately about a year ago.

18         Q.    Did your change in title result

19    in an increase in pay?

20         A.    Not for me.

21          Q.   Was there an increase in staff

22      that you were responsible for in any way?

23          A.   No, not really.

24          Q.   If you were to describe the

25      change in your overall job responsibilities,

8

1                S. Donoghue

2       how would you describe that from your last

3       title to the current one you have now?

4              A.   The previous job did not involve

5       the expectation that we would become strategic

6       business partners with the various business

7       groups that I am assigned to at the hospital.

8       It was more or less dealing with employee

9       relations issues, maybe clarifying policy

10      issues.  Working day-to-day matters,

11      day-to-day business matters, as opposed now

12      maybe engaging in more long-range planning.

13             Q.   Is it also safe to say that your

14      responsibilities now involve more contact with

15      parties outside of the hospital as opposed to

16      intraoffice issues between management and

17      staff?

18             A.   No, they may be a diminishment

19      because of the role that I've assumed, but I

20      am still working with all the groups within

21     the hospital, a different group than I had

22     worked with when I was employee relations.  I

23     have a different assignment.

24          Q.   Prior to your title as a senior

25     employee relations specialist, what was your

9

1                    S. Donoghue

2     job title at the hospital?

3          A.   I was manager of employee

4     relations.

5          Q.   And how long were you the manager

6     of employee relations?

7          A.   Maybe four years.  I'm not sure.

8          Q.   Okay.  This also was a part of

9     human resources?

10         A.   Correct.

11         Q.   Prior to your manager of employee

12    relations job title, what were you doing at

13    the hospital; what was your title at the

14    hospital?

15         A.   I was a senior employee relations

16    specialist.

17         Q.   The title that --

18         A.   That I had my most recent title,

19    correct.

20         Q.   How long were you in that job

21     title, for what period of time?

22          A.   I don't recall.

23          Q.   Any other job titles with the

24     hospital other than the current one you hold

25     now, senior employee relations specialist and

10

1              S. Donoghue

2      manager of employee relations?

3          A.   I may have started out as an

4      employee relations specialist, I think I

5      did -- when I was first hired, I was an

6      employee relations specialist.

7          Q.   It is safe to say for your entire

8      tenure at the hospital, you were assigned to

9      the human resources department of Memorial

10     Sloan-Kettering; is that correct?

11         A.   That's correct.  That's correct.

12         Q.   Just briefly your educational

13     background, if you could just state that?

14         A.   I have a master's degree and I

15     have training from Cornell, the School of

16     Labor Relations.

17         Q.   In your present job title, do you

18     have any responsibilities with regards to the

19     hiring or termination of employment for

20     Memorial Sloan-Kettering?

21          A.   I am involved in recruiting.

22          Q.   And in what capacity?

23          A.   Actually I've just begun

24   interviewing candidates for various positions.

25          Q.   If you can, be more specific

11

1           S. Donoghue

2    regarding the positions that you are

3    recruiting.

4        A.   We have an area called disease

5    management so I've interviewed for those jobs.

6    Recently I was involved in interviewing for

7    our administrative assistant in the

8    department, in which I am now currently

9    working.  I held that interview process.

10       Q.   Any other recruiting

11   responsibilities?

12       A.   No, I attend job fairs.  I've

13   just begun the recruiting aspect of my job.

14       Q.   With regard to termination of

15   employment in your current job title, do you

16   have any authority in that regard?

17       A.   What I do is I may advise, but I

18   don't have the ultimate decision, that would

19   be the department manager that would make the

20   ultimate decision.  But I would have a

21     discussion, I would be involved in discussing

22     the pros and cons and I would make a

23     recommendation, but it may not necessarily be

24     carried through.

25          Q.   Under what circumstances, in your

12

1                S. Donoghue

2      current job title, would you be in a position

3      to make a recommendation either for or against

4      the termination of employment of an employee

5      at Memorial Sloan-Kettering?

6           A.   Well, if somebody has had a long

7      history of performance problems, a manager may

8      call and say, you know, so and so has been in

9      corrective action, they are on final warning

10      and we've had another incident and we think

11      maybe we need to consider employment

12      termination.  So I would be engaged then in a

13      process with them to review the record, see

14      what the latest incident is, is there a

15      possibility that maybe we should give the

16      person another opportunity.  So it would be

17      like, you know, just kind of problem-solving.

18           Q.   So a manager would in that

19      circumstance initiate communication with you

20      and your office at human resources?

21          A.   Yes, they would possibly call me

22     or come to the office, but it is always

23     initiated by the manager.

24          Q.   You used the term "final

25     warning"?

13

1                  S. Donoghue

2        A.    Correct.

3        Q.    Could you explain in the context

4    of your employment and your responsibilities

5    at Memorial Sloan-Kettering what does a final

6    warning mean, what does it constitute?

7        A.    We have what we refer to as a

8    corrective action process.  First step is

9    counseling, then there is a second step that's

10   called a verbal warning, and then there are

11   two written warning stages.  There is the

12   first written warning and then there is a

13   final written warning.

14       Q.    And at the point in time that an

15   employee has received a final written warning,

16   is that the only time when they would

17   potentially face termination of employment?

18       A.    Not necessarily.  It would depend

19   on the incident.  It could be somebody who has

20   never had any kind of corrective action, but

21    maybe it was a very serious misconduct issue

22    so possibly they could be terminated, their

23    employment could be terminated without going

24    through progressive discipline.

25          Q.   And as far as making that

14

1            S. Donoghue

2     determination whether or not a particular

3     conduct, or type of conduct, warrants

4     progressive discipline or more acute action,

5     consideration of termination, who makes the

6     determination on how to handle a particular

7     infraction, misconduct.

8            A.    Again I would be working with the

9     department manager, possibly my manager

10     because we consider this to be very serious,

11     it isn't something that's done like

12     automatically.

13            Q.    And the name of your manager at

14     this point in time?

15            A.    Esther Altman, A-L-T-M-A-N.

16            Q.    Are you familiar with the

17     Memorial Sloan-Kettering Cancer Center

18     employee handbook?

19            A.    Yes, I am.

20            Q.    How are you familiar with that

21    handbook; how did you come to be familiar with

22    it?

23        A.    As an employee, it was given to

24    me and then in my job very frequently I have

25    to guide employees, if they have some

15

1                S. Donoghue

2    questions pertaining -- you know, whatever

3    question they may have.

4        Q.    At any time during your tenure as

5    an employee at Memorial Sloan-Kettering, have

6    you had occasion yourself to make any

7    additions, amendments, changes, comments to

8    the actual employee handbook?

9        A.    When the current one was being

10   revised, I was on the committee regarding the

11   revision.

12       Q.    And what year was that?

13       A.    I don't recall.  It might have

14   been four, five years ago.  I truly don't

15   know.

16       Q.    That's fine.  Do you recall any

17   particular comments or suggestions that you

18   made that actually made it into the revision?

19       A.    No, I don't.

20       Q.    Are you aware of whether or not

21     the Memorial Sloan-Kettering Cancer Center

22     employee handbook makes any sort of comments

23     or mandates with regards to discrimination in

24     the workplace?

25          A.   I believe so.

16

1           S. Donoghue

2           Q.   And if you could just state, what

3     is your understanding of the handbook's

4     position on discrimination in the workplace?

5           A.   It is not tolerated.

6           Q.   And is it your understanding that

7     the employee handbook is the official policy

8     position of Memorial Sloan-Kettering Cancer

9     Center?

10          A.   We have a policy and procedure

11    manual and the handbook reflects -- I would

12    say it is a skeletal version of what is in

13    this very large procedures and policies

14    manager, but it parallels the essence of the

15    policy and procedure manual.  It is just not

16    as detailed as what the policies would be.

17          Q.   Does the employee handbook

18    contain guidelines for the reporting of

19    complaints with regards to discrimination in

20    the workplace?

21          A.   I don't recall if it is in there

22     or the policy, but I know somewhere it does

23     exist, it directs employees as to what to do.

24          Q.   If you can state, whether or not

25     it occurs in the handbook or on the policies

17

1               S. Donoghue

2       and procedures manual, what is the directive

3       from Memorial with regards to the reporting of

4       actions with respect to discrimination?

5               A.   The general guidelines is for an

6       employee to first discuss the situation with

7       their direct supervisor or manager and if they

8       are not comfortable to do that, then to

9       escalate it, go to somebody else.  If that

10       doesn't make them feel comfortable or they

11       choose not to do that, then to come directly

12       what is now called employee affairs, that was

13       employee relations, or to speak to their

14       hospital.

15               In my case, I am a hospital

16       consultant.  I work on the hospital side to

17       speak to the hospital consultant who is

18       responsible for their business unit.

19               If a supervisor is made aware of

20       an issue such as discrimination, possible

21      discrimination charge, they are to alert

22      either the hospital consultant or employee

23      relations -- employee affairs, excuse me.

24          Q.   When employee affairs is notified

25      of a complaint of discrimination, what action

18

1          S. Donoghue

2     is taken next?

3          A.   Well, our structure has changed.

4     When the department was employee relations,

5     then it would be -- if the complaint came to

6     my attention, then I would begin looking into

7     the complaint immediately.  Under the current

8     structure, if it went to an employee affairs,

9     they would begin looking into that and they

10     would then work with the consultant that was

11     involved, or responsible for that particular

12     business unit.

13          Q.   When you say the structure has

14     changed, when, around what time did this

15     structure as far as action after reporting

16     change?

17          A.   The structure of the department

18     changed in July, but I would say maybe as of

19     January -- and I would have to refer this to

20     Pam Dudley, she may have a better recollection

21    of this than I am because she is in that

22    department at the moment.  I would say since

23    that time, I think we are still working out

24    who is responsible for what.  But under all

25    situations, somebody would assume

19

1              S. Donoghue

2    responsibilities if a complaint came forward.

3    It would never not get addressed by anybody.

4        Q.    And when you say "July," you are

5    referring to July, 2007?

6        A.    2007.

7        Q.    Okay, very good.

8        A.    Yes.

9        Q.    This new liaison you are

10    referring to between employee affairs and the

11    hospital consultant --

12        A.    Correct.

13        Q.    -- can you just explain a little

14    more detail how that relationship works now?

15        A.    The way it works now, the belief

16    was with the restructuring, there should be a

17    neutral place for employees to go to, if they

18    chose not to go to their hospital consultant,

19    but the role of employee affairs was very

20    important.  So that has remained as an intact

21     group.  But there is the expectation that we

22     would work together on any issues that come up

23     from, you know, any of the business units.

24          Q.    And so I'm clear, are you

25     currently a hospital consultant?

20

1               S. Donoghue

2        A.   Yes, I am on the hospital team.

3        Q.   If you could just give me a quick

4    schematic as far as, if you could, and

5    again -- and I mean it so I'm not trying to --

6        A.   No, I am not taking it that way.

7        Q.   All right.

8        A.   Basically there is a team of

9    three, three generalist teams because the

10   hospital -- I should start out, the hospital

11   is divided into three corporations although,

12   there is an SKI corporation and then there is

13   a Memorial Corporation and then there is what

14   we refer to as the MSKCC unit, that is the

15   business unit of the hospital.

16       Q.   Okay.

17       A.   So there are generalist teams for

18   each of these three entities?

19       Q.   Okay.

20       A.   The team I'm on services the

21    Memorial Hospital group.

22        Q.    Is it safe to say now that

23    employee affairs is an over-arching entity

24    that has certain responsibility to mandate

25    regarding employee relationships with the

21

1             S. Donoghue

2      hospital and then there are these subgroups

3      with the generalist teams with specific

4      responsibilities to these various

5      corporations, SKI, Memorial and MSKCC?

6             A.   I would say my understanding is

7      employee affairs is responsible for all -- any

8      issues pertaining to any employee in either

9      one of those groups and corporations.  And

10     then if a particular issue arises out of one

11     of those groups, then they would work with --

12     like my manager Esther Altman is considered

13     the senior consultant on my team, so she would

14     possibly be the one that would first be spoken

15     to.  And then there would be an assignment,

16     depending which business group the complaint

17     came out of, and then it would go to the

18     generalist to work with employee affairs.

19            Q.   During your most recent tenure as

20     a senior employee relations specialist?

21          A.   We vacillate between specialist

22     and generalist.  I mean consultant and

23     generalist, sorry.

24          Q.   Senior employee relations?

25          A.   You mean my current role, the one

22

1               S. Donoghue

2     I am in now or the previous one?

3          Q.   No, the previous role.

4          A.   Okay.

5          Q.   Did you have any responsibilities

6     with regards to the hiring of employees for

7     Memorial?

8          A.   No, I did not.

9          Q.   Did you have any responsibilities

10    with regard to termination of employees in

11    your most previous incarnation as a senior

12    employee relations generalist?

13         A.   I was in an advisement capacity.

14    I was not authorized to make a determination

15    on my own.

16         Q.   When you say that, is that

17    similar to the earlier example you gave when a

18    manager may bring a situation to you in regard

19    to an employee that is having some issues and

20    you would give advice on what the appropriate

21     steps would be?

22          A.   Correct.

23          Q.   Or have a discussion as to what

24     should happen next?

25          A.   Exactly, it is the same.

23

1           S. Donoghue

2      Q.   To your understanding, because

3   you said ultimately the final decision would

4   not rest with you, who has the final say so on

5   whether or not an employee is terminated?

6      A.   It would be the hiring manager in

7   conjunction with their manager.  It would be

8   on the department level, I'll simplify it.  It

9   would be on the department level.

10     Q.   Are you familiar with a Memorial

11   employee named Edmund Bryan?

12     A.   Yes, I am.

13     Q.   How did you come to know Mr.

14   Bryan?

15     A.   I first met Mr. Bryan a number of

16   years ago when I worked in employee relations.

17     Q.   If you recall, what were the

18   circumstances, the specific circumstances

19   under which you met?

20     A.   My recollection is that he had

21      some complaints about his workplace

22      specifically, I believe it was his supervisor

23      at the time.  I recall looking into an issue

24      regarding his pay advisory being opened before

25      he received the pay advisory directly.  Some

24

1              S. Donoghue

2    environmental issues, I believe, regarding

3    somebody was playing a radio too loudly, he

4    found it disturbing.

5         Q.   Okay.

6         A.   At another point he was seeking

7    to move to another position within the

8    department.  I looked into issues regarding

9    what, I guess, he would consider to be

10    negative interactions with his co-workers.

11    This is over a period of time.  This was not

12    my initial encounter with him.

13         Q.   All right.  You referred in that

14    last statement to negative interactions --

15         A.   Yes.

16         Q.   -- with co-workers.

17         A.   Correct.

18         Q.   Do you recall any of the details

19    of any of those particular interactions?

20         A.   My recollection is they were

21     always interpersonal in nature.  Either people

22     complaining that he wasn't communicating

23     with -- he was not communicating with the rest

24     of the team.  He felt that maybe communication

25     that they had with him, he felt was negative.

25

1           S. Donoghue

2       Q.   And you said on some occasions

3    you looked into these complaints, how would

4    you look into; how did you look into a

5    complaint for Mr. Bryan regarding negative

6    interactions between himself and his

7    co-workers?

8       A.   I recall meeting with the manager

9    of the department, his co-workers and Edmund

10   himself.

11      Q.   Is this a particular specific

12   recollection that you have on one particular

13   occasion?

14      A.   That's my recollection, I think

15   on at least a couple of occasions.

16      Q.   Do you recall the names of the

17   managers with whom you met on any of the

18   occasions?

19      A.   John Meggs.

20      Q.   On the occasion, on occasion when

21     you met with Mr. Meggs, do you recall what the

22     nature of the complaint was that gave rise to

23     your having to meet with Mr. Meggs?

24          A.   It may have been loud music being

25     played in the workplace.  People using

26

1          S. Donoghue

2    inappropriate language.

3          Q.   And could you be specific with

4    regards to what was the nature of their

5    language, the language complaint when he

6    says --

7          A.   I know this is stereotype, you

8    know, construction type.  You are in an

9    environment where a lot of people are working

10   on a construction site and venting, you know,

11   cursing.  This is one of things that people

12   may hear.  I know it is a stereotype, but it

13   is a common occurrence.

14         Q.   I don't want to put words in your

15   mouth.  Are you referring strictly to blue

16   language, foul language?

17         A.   Probably at times, yes.

18         Q.   Any other types of offensive

19   language that he complained to you about?

20         A.   Most recently I recall maybe my

21    last situation with Edmund, there was an

22    incident regarding an employee from another

23    business unit that was in the department and

24    my understanding is that somebody in Edmund's

25    department was trying to cultivate a Jamaican

27

1          S. Donoghue

2     accent, and this individual was teaching him

3     how to sound as though he, himself, was from

4     Jamaica.

5          Q.   Okay.

6          A.   And Edmund took offense to that.

7          Q.   Did Mr. Bryan ever complain to

8     you -- let me take a step back.

9          A.   Okay.

10          Q.   When Mr. Bryan would make these

11     complaints, how would he make them?

12          MS. KALE:  Objection.

13          You can answer if you can.

14          A.   The last time I remember he came

15     to see me, I actually met with him a couple of

16     times.  I don't recall if he previously -- if

17     he may have called and then asked for an

18     appointment and then we set something up for

19     me to meet with him.  I believe he also may

20     have given me written communication in the

21     form of a letter.

22          Q.   So on occasions he would make

23     complaints verbally, orally to you?

24          A.   Correct.

25          Q.   And then on other occasions he

28

1              S. Donoghue

2     may put something in writing?

3          A.   I believe.

4          Q.   And give it to you?

5          A.   I believe I recall seeing

6     something in writing.

7          Q.   Is there any sort of company-wide

8     requirement with regards to making a complaint

9     with your department?

10          A.   Would you say a little more about

11     that?  I guess explain what you mean.

12          Q.   Is there a form that may have

13     been filled out by an employee when they are

14     coming to your department to make a complaint

15     about some sort of office action that they

16     find objectionable?

17          A.   There are two ways somebody might

18     do that or maybe more, somebody might write a

19     letter, somebody might call or somebody might

20     ask to complete a grievance form and they

21      would go through a formal grievance process.

22          Q.    When you say "a grievance form,"

23      that is something that the employee would

24      request from --

25          A.    They could request or it may be

29

1                S. Donoghue

2     advised that they complete a grievance form.

3         Q.   Under what circumstances would

4     someone be advised to complete a grievance

5     form?

6         A.   Well, it could be somebody who

7     might feel that policy hasn't been put into

8     place fairly.

9         Q.   Okay.

10        A.   And they've tried maybe working

11    this out with their supervisor through, you,

12    know, numerous discussions and it might be

13    advised that they go through the grievance,

14    which is a very formal process.

15        Q.   Okay.

16             Do you recall if Mr. Bryan ever

17    filled out a grievance form for any complaint?

18        A.   No, I don't.

19        Q.   Going back to our discussion

20    about language, did Mr. Bryan ever make

21    complaints to you about language in the

22    workplace that he found objective because he

23    felt it was homophobic?

24             A.   I know he raised the issue, but I

25    don't know if it was related to language or

30

1          S. Donoghue

2     just an experience that he was having, I don't

3     recall specifically about the language.

4          Q.   Do you ever recall Mr. Bryan

5     lodging complaints because he, himself, was

6     being referred to as a faggot?

7          A.   I know he filed a charge on which

8     he stated that, but I don't recall that that,

9     that he -- he didn't speak to me directly

10     about hearing that language in the workplace.

11          Q.   When you say "he filed a charge,"

12     what specifically are you referring to?

13          A.   It was a discrimination charge

14     that he had filed a couple of years ago.  I

15     don't remember specifically when.

16          Q.   So, to your recollection, when

17     the first you heard of Mr. Bryan's complaint

18     regarding being called a faggot was after he

19     had filed a complaint with some sort of

20     outside agency?

21          A.   Yes.

22               MS. KALE:  Objection.

23               Go ahead, you can answer.

24          A.   Yes, I believe that is the first

25     time I heard about it or read about it, I

31

1                    S. Donoghue

2       should say.

3            Q.    Okay.

4                    After you read about it, did you

5       have any involvement with the complaint in

6       your capacity, in whatever your job title was

7       in human resources department?

8            A.    Our practice is once we get an

9       official charge of discrimination, we

10      immediately contact our law firm, so I would

11      be working with the attorney and looking into

12      the issue.

13           Q.    Did you look into that particular

14      issue with regards to Mr. Bryan?

15           A.    I believe I recall being part of

16      interviewing people.

17           Q.    And who did you interview?

18           A.    I don't recall.

19           Q.    Did you take notes in those

20      interviews?

21         A.   If I did, they would have to --

22    they would have been submitted.

23         Q.   Who would you have submitted them

24    to?

25         A.   I would have submitted them to

32

1          S. Donoghue

2     our attorney, but I don't believe I took the

3     note-taking.  I was not the official, I was

4     there in a different capacity.

5          MS. KALE:  Can we clarify whether

6          we are referring to -- because there

7          are multiple actions, if we are

8          speaking of the EEOC charge or the

9          prior charge?  If we can try to put

10          dates or something to try to

11          distinguish.

12          MR. SCOTT:  Sure.

13     Q.   Do you recall in the year 2002

14     reading information related to a complaint

15     that Edmund Bryan filed with the City of New

16     York Commission on Human Rights in which he

17     complained being called a faggot on the job?

18     A.   I recall -- I don't know the

19     date, the year, but I do recall reading

20     complaints that he had about perceived sexual

21    orientation.

22         Q.   Okay.

23         A.   That's when I first heard about

24    that.

25         Q.   And was part of that perceived

33

1              S. Donoghue

2    sexual orientation complaint language directed

3    towards him in which he was called a faggot?

4         A.   I don't remember the specifics, I

5    would have to read that again to refresh my

6    memory, it was so long ago.

7         Q.   You do recall sitting in on

8    interviews with Memorial employees related to

9    complaints by Edmund Bryan about being called

10   a fag; is that right?

11        A.   I believe so.

12        Q.   You don't recall the year,

13   whether it was 2002, 2003, 2004?

14        A.   I don't.

15        Q.   Okay.  Do you recall who took the

16   meetings with you, as far as on the human

17   resources' side?

18        A.   It wouldn't have been anybody

19   else on the human resources' side.  It would

20   have been one of our attorneys.

21      Q.   Okay.

22           Do you recall if you ever had an

23   interview with a Mr. Rupert Gillette regarding

24   complaints by Mr. Edmund Bryan about being

25   called a faggot in the workplace, whether it

34

1              S. Donoghue

2     was in 2002, 2003, 2004, 2005 or any time

3     thereafter?

4         A.   I recall meeting with Mr.

5     Gillette, but I don't recall the specifics.

6         Q.   Do you recall any other

7     complaints?  We've talked about complaints

8     about music made by Mr. Bryan, complaints

9     about language made by Mr. Bryan, any other

10    complaints that you recall as far as you

11    receiving from Mr. Bryan, complaints about

12    problems in the workplace?

13        A.   There was a complaint about the

14    use of the word "nigger" and it was N-I-G-G-A,

15    a slang term.

16        Q.   How did Mr. Bryan lodge this

17    complaint?

18        A.   I don't recall the mechanism.

19        Q.   Did you handle this complaint as

20    far as your responsibilities in human

21    resources?

22         A.   Yes, I remember speaking to Mr.

23    Meggs and Mr. Gillette about that.

24         Q.   And just so we're clear, you gave

25    a spelling just now N-I-G-G-A?

35

1           S. Donoghue

2      A.   Yes.

3      Q.   Is there some sort of different

4   connotation with regards to that word based on

5   the spelling?

6           MS. KALE:  Objection.

7           THE WITNESS:  Should I answer it?

8           MS. KALE:  You can answer if you

9       have an answer.

10           THE WITNESS:  Yes, I do have an

11       answer.

12      A.   When I first heard about it, I

13   took it as N-I-G-G-E-R and then when I was

14   talking to -- and I don't recall if it was Mr.

15   Gillette or Mr. Meggs, we didn't mean nigger,

16   we meant nigga.  It doesn't matter what you

17   mean, the word is still offensive.  I am not

18   interested that it is a slang word, it is

19   still offensive in the workplace so cease and

20   desist, so that's what I meant.

21          Q.   Okay.

22                  As far as your meetings with Mr.

23     Meggs and Mr. Gillette regarding this

24     particular complaint, do you recall taking

25     notes?

36

1               S. Donoghue

2        A.   If I did, I would have submitted

3    those.

4        Q.   And who would you have submitted

5    those to?

6        A.   To our attorney.

7        Q.   Do you recall the year that that

8    meeting or those meetings may have taken

9    place?

10       A.   No, I don't.

11       Q.   That meeting or those meetings,

12   did they take place with both Mr. Gillette and

13   Mr. Meggs present at the same time or were

14   they separate meetings on separate occasions?

15       A.   You know, I don't recall.

16       Q.   Do you recall conducting an

17   investigation into some complaints made by

18   Edmund Bryan in March, meaning the

19   investigation took place in March of 2007?

20       A.   Yes, I do.

21          Q.   And based on what you can recall,

22   what was the nature of those complaints that

23   Mr. Bryan made at that time?

24          A.   I would have to refer to my

25   notes.  I'm sorry I don't recall the

37

1            S. Donoghue

2    specifics.

3        Q.   Do you recall whether or not one

4    of the complaints was Mr. Bryan saying there

5    was a lewd conversation on the job and people

6    on the job were saying that who men live at

7    home are viewed as feminine and Mr. Bryan

8    interpreted that as being a slight against him

9    because he lives at home with his mother?

10           MS. KALE:  Objection.  The

11              witness can't interpret how Mr. Bryan

12              understood something, but if you can

13              answer.

14        A.   I remember looking into the

15    statement about living at home.

16        Q.   Would you, without commenting on

17    whether or not Mr. Bryan actually felt that --

18        A.   I'm talking about the words, that

19    literally looking at the complaint, somebody

20    was making fun of somebody living at home.

21       Q.   You do recall that?

22       A.   Yes, I do.

23       Q.   You also recall as part of that

24   March, 2007 investigation a complaint made by

25   Mr. Bryan about jokes being made about putting

38

1          S. Donoghue

2     Jamaicans on the top of snow-covered mountains

3     and giving them shovels and leaving them

4     there?

5          A.   I remember that remark being

6     made.

7          Q.   And you conducted the

8     investigation related to those comments as

9     well?

10          A.   Yes, I did.

11          Q.   And how did you go about

12     conducting your investigation into these

13     comments?

14          A.   I believe I interviewed people on

15     his work team.

16          Q.   Did you interview a John Meggs?

17          A.   As the manager of the department,

18     I probably did.

19          Q.   And just so we can get for the

20     record, who is John Meggs?

21          A.   John Meggs was the manager of the

22     department.

23          Q.   And when you say "of the

24     department," which department are we referring

25     to?

39

1               S. Donoghue

2        A.   Central processing.

3        Q.   And how long have you known John

4    Meggs for?

5        A.   I don't know him personally.

6        Q.   In his capacity as manager of

7    central processing at Memorial, how long have

8    you known John Meggs?

9        A.   Oh, gosh, I probably knew him for

10   maybe four or five years.  I was trying to

11   remember when I had that assignment to that

12   work group.  Possibly four to five years.

13       Q.   And it's only in his capacity as

14   the manager of this unit that you came to know

15   Mr. Meggs?

16       A.   Correct.

17       Q.   And it is only in his capacity as

18   manager of this unit that you had any

19   interaction with Mr. Meggs?

20       A.   Correct.

21          Q.    You interviewed a Kevin Walrond?

22          A.    Yes, I don't remember the names

23    of the people specifically.

24          Q.    Do you recall anything about

25    Kevin Walrond?

40

1          S. Donoghue

2     A.   No, I don't.

3     Q.   What about Miguel Ruiz?

4     A.   If he was in the department at

5  the time, I would have interviewed him.

6     Q.   And Rupert Gillette?

7     A.   I may have interviewed him as the

8  supervisor.

9     Q.   And when you say he is the

10  supervisor, could you just briefly explain the

11  hierarchy, the office hierarchy between Mr.

12  Meggs, Mr. Gillette and Mr. Bryan; how is that

13  set up?

14     A.   There are several shifts within

15  that department.  It is a 24 by 7 operation.

16  Mr. Meggs would have been the overall manager

17  responsible for all of the shifts and Mr.

18  Gillette would have been the supervisor of the

19  night shift.

20     Q.   And, if you know, what is Mr.

21    Bryan's job title?

22          A.   He might -- I think they refer to

23    that particular work group as CPD specialist,

24    I believe.

25          Q.   What about Kevin O'Connor; do you

41

1          S. Donoghue

2     recall interviewing Kevin O'Connor with

3     regards to these comments?

4          A.    The name is vaguely familiar, but

5     I would have to look at the report.

6          Q.    Did you take notes related to

7     your investigation back in March of 2007?

8          A.    Yes, I did.

9          Q.    And what was your note-taking

10    process, literally, how did you go about doing

11    it?

12         A.    I generally handwrite my notes, I

13    handwrite them and then I submit them.  We

14    have a required -- we've devised a report form

15    and then I would put that into a Word

16    document.

17         Q.    When you say a report form has

18    been devised, when did that occur?

19         A.    Maybe a year or two ago.

20         Q.    And this process then results in

21    you taking handwritten notes from an

22    investigation and typing them up into some

23    sort of format; is that correct?

24        A.   Correct.

25        Q.   Did you interview Edmund Bryan in

42

1              S. Donoghue

2      March of 2007 regarding his complaints about

3      these particular comments, the one about men

4      living at home and the one about Jamaicans on

5      the top of a mountain?

6          A.   He initiated the complaint.

7          Q.   So your answer is yes with regard

8      to you speaking to him?

9          A.   Yes, he met with me.

10         Q.   Did you take notes during your

11     initial interaction, your initial conference

12     with Mr. Bryan on this particular complaint?

13         A.   I believe I did.

14         Q.   What other action did you take

15     related to your investigation of the complaint

16     made by Mr. Bryan regarding the comment about

17     men living at home and the comment about

18     putting Jamaicans on the top of a mountain

19     with a shovel?

20         A.   I recall that I tried to reach

21     out to Edmund, but I was unable to do so to

22     give him results of my investigation.

23          Q.   And what were the results of your

24     investigation?

25          A.   I could not confirm that anything

43

1                S. Donoghue

2    that he had said took place.

3        Q.   As part of your investigation?

4        A.   And may I say something, please?

5        Q.   Oh, yes, please.

6        A.   Or maybe a clarification of what

7    Edmund heard versus what someone may have

8    intended or maybe people sharing their

9    experience.

10       Q.   During this particular

11   investigation, this March of 2007

12   investigation, did you also have occasion to

13   review an e-mail exchange between Rupert

14   Gillette and John Meggs regarding a prior

15   incident with the use of a Jamaican accent

16   that Mr. Bryan had taken offense to?

17       A.   I can't say that I recall the

18   e-mail exchange, no.

19       Q.   And as far as your final

20   conclusion, you are saying you couldn't

21    find -- and, you know, I don't want to put

22    words in your mouth, can you just restate

23    again what your finding was after your

24    investigation, if you recall?

25          A.   I don't think I --- my

44

1              S. Donoghue

2    recollection is I couldn't confirm that

3    anything -- I'm trying to think of the right

4    word here.  I don't believe I could confirm

5    that anything offensive took place, but I do

6    remember speaking again -- and I do this

7    habitually when I have these investigations if

8    there was even the possibility of something

9    happening that couldn't be determined, but

10    just to speak to the manager and the

11    supervisor that in the event something like

12    this could have happened or could have been

13    interpreted as being offensive --

14        Q.   Yes.

15        A.   -- to get them to look at that

16    and get them to remind people about workplace

17    behavior, appropriate workplace behavior, I

18    should say.

19        Q.   Did you also in relation to that

20    last comment, take occasion to specifically

21    inform a supervisor, whether that be Mr. Meggs

22    or Mr. Gillette, to discontinue the use, the

23    mimicking accents and the use of the word

24    "nigga"?

25            MS. KALE:  Objection.

45

1              S. Donoghue

2       A.   No, I remember speaking to them

3    about the use of the word "nigger," that it

4    was inappropriate, didn't matter if it was a

5    slang word or not.  Some generations, it is

6    not a slang word, it is very offensive, you

7    need to keep that in mind.

8             And what was the other piece of

9    that?  I'm sorry.

10      Q.   Mimicking accents.

11      A.   Yes, that's about the gentleman

12   who was supposedly trying to -- yes, it could

13   be offensive to some people and if someone

14   wanted to do that on their own time, that was

15   fine but, again, not in the workplace.

16      Q.   During this particular

17   investigation, the March 2007 investigation,

18   did you have occasion to review any paperwork,

19   documents of any sort, related to Mr. Bryan's

20   earlier complaint with the human rights

21    commission?

22         A.   I don't know that I would have

23    seen it as being relevant.  I don't recall

24    reviewing it during that investigation.  I did

25    get the complaint as it had come to me.

46

1            S. Donoghue

2      That's my recollection.

3         Q.   Okay.  At the point in time when

4      you were conducting this March of 2007

5      investigation, were you aware that Mr. Bryan

6      had made specific complaints about his

7      supervisor, Rupert Gillette, related to

8      discrimination vis-a-vis his national origin,

9      the fact that he is a Jamaican?

10         A.   I don't believe so.

11         Q.   At the time that you conducted

12      your investigation in 2007, March 2007, were

13      you monitoring Rupert Gillette for

14      counterproductive relationships with people in

15      his staff?

16            MS. KALE:  Objection.

17            If you understand the question,

18         you can answer.

19            THE WITNESS:  I do understand the

20         question.

21          A.   I wasn't monitoring Mr. Gillette.

22          Q.   In September of 2005, were you

23     monitoring the working relationships of Mr.

24     Rupert Gillette with staff members for any

25     reason?

47

1          S. Donoghue

2          A.   It is the word "monitoring" that

3     I'm having difficulty with.

4          Q.   Thank you.  Very good.

5               In September of 2005, had you

6     been made aware, by either John Meggs or any

7     other employees of Memorial, working

8     relationships involving Rupert Gillette that

9     may have been in violation of the employee

10    handbook or the policy handbook for Memorial?

11         A.   I am aware of issues, but I can't

12    say, I don't recall the date or the year.  But

13    I do know that there were complaints about Mr.

14    Gillette and his interaction with his staff.

15         Q.   If you can recall, what was the

16    nature of those complaints?

17         A.   I think the overall thing was it

18    was perceived that Mr. Gillette favored some

19    staff as opposed to other staff members.

20         Q.   And this favoritism that you

21     referred to, how did it manifest itself

22     literally with the employees under Mr.

23     Gillette's supervision?

24          A.   I think there was the feeling

25     that some people may have gotten extended

48

1          S. Donoghue

2     lunch break periodically or meal break, I

3     should say.  He permitted loud music and some

4     of which people -- I think specifically rap

5     music, and some people took offense to that

6     being played in the workplace.  And then maybe

7     also we did address inappropriate language

8     that could have been used from time to time.

9          Q.   The inappropriate language that

10     we are referring to, did that include language

11     like use of the N word?

12          A.   I think it was referencing more,

13     what I would call, street language cursing.  I

14     only remember the N word as a one-time

15     occurrence, but I could be mistaken on that.

16          Q.   What about when you say street

17     language, was the word or term --

18          A.   Profanities.

19          Q.   Was the word "faggot" included in

20     those, in that profanity, was that one of the

21    terms?

22         A.    I can't remember specifically.

23         Q.    Did you ever have occasion to sit

24    down and talk with Mr. Gillette with regards

25    to this particular issue of favoritism with

49

1              S. Donoghue

2     staff in his supervision and the language in

3     the department when he is the supervisor in

4     charge?

5          A.   Yes, I did.

6          Q.   And do you recall when, how many

7     times -- first of all, how many times did you

8     have conversations with Mr. Gillette with

9     regards to those particular issues?

10         A.   Maybe a couple of times.

11         Q.   More than twice?

12         A.   I don't recall, but I know it was

13    more than once.

14         Q.   And do you recall the years or

15    the time frame in which these meetings

16    occurred?

17         A.   I'm going to say maybe within the

18    last three or four years possibly, but I don't

19    really remember specifically the years.

20         Q.   And as far as these locations of

21     these meetings, did these meetings occur in

22     your office or another location?

23          A.   Up at 1275 York Avenue where Mr.

24     Gillette works.

25          Q.   Did you take notes at these

50

1              S. Donoghue

2      meetings?

3           A.   If I did, I would have submitted

4      those.  I don't recall.

5           Q.   To your best recollection, what

6      did you discuss with Mr. Gillette the first

7      time you sat down with him and discussed these

8      issues, favoritism, inappropriate language in

9      the workplace?

10          A.   I brought the issues to his

11     attention.  Regarding the favoritism, he said

12     he found Edmund difficult to work with and

13     since Edmund tended to isolate himself, was

14     not part of the team.  So he didn't feel he

15     was exhibiting favoritism, but he probably had

16     a different relationship with people because

17     there was probably a different interaction

18     with team members.

19              I think at some point he and

20     Edmund had been friendly, but there had been a

21     falling out of some sort so sometime in

22     history that relationship changed.

23          Q.   Okay.

24          A.   But I remember talking to him

25     about, you know, he was a supervisor and his

51

1              S. Donoghue

2    relationship really had to exhibit that of a

3    supervisor and not to be -- to be weary of

4    showing favoritism to one or other people.

5              Same thing with the radio

6    playing, you know, the music, that type of

7    thing, to talk to him about that.  It was --

8    not everybody appreciated the same type of

9    music and that he had to control that.

10       Q.    As far as the use of

11    inappropriate language?

12       A.    I spoke to him about that too.

13       Q.    What did you tell him?

14       A.    That, I remember him telling me

15    it was a very stressful job that they have to

16    do in that department, cleaning medical

17    instruments, seeing a lot of blood and gore

18    and that it was exasperating and frustrating,

19    but to deal with it however they could deal

20    with it and that, talk it out but --

21        Q.    Did you ever commit to writing

22     your admonitions to Mr. Gillette?

23        A.    I believe he did get some type of

24     warning, but I don't remember if it was a

25     memo.  I do recall there was something

52

1          S. Donoghue

2    administered to him at some point in time, but

3    I can't tell you when.  I just remember he was

4    spoken to and he was given a warning of some

5    sort.

6          Q.   Do you recall if the warning was

7    administered by you or by someone else?

8          A.   I don't have the ability to

9    administer the warning.

10         Q.   Okay.  Is it possible that John

11    Meggs had administered the warning?

12         A.   That would have been the

13    appropriate person, but I don't know

14    specifically if he is the one that did it.

15         Q.   Was there ever a discussion of

16    termination, around this time as far as your

17    conversation with Mr. Gillette?  When I say

18    "this time," meaning the time frame where you

19    had these conversations with him about

20    favoritism, inappropriate language in the

21     workplace, was his termination ever

22     considered?

23          A.   Mr. Gillette's termination?

24          Q.   Yes.

25          A.   At one point, it was considered.

53

1           S. Donoghue

2      Q.    When you say "at one point," when

3    was that?

4      A.    I don't remember specifically.

5      Q.    Was it during the time you were

6    having these conversations with him?

7      A.    I would say it probably was

8    around the time he got some type of warning.

9      Q.    And was this because after

10    initially speaking with him, the behavior that

11    he had been admonished about had continued?

12      A.    My recollection was, I think,

13    whether to terminate his employment or to give

14    him some type of corrective action.

15      Q.    That was the discussion?

16      A.    I believe that, and so he had

17    never had any type of warning before, so the

18    decision was to give him the opportunity to

19    change his behavior.

20      Q.    And the reason that this

21    consideration took place between termination

22    and corrective action, was that because he had

23    not responded to initial verbal admonitions?

24    When I say "responded," he hasn't changed his

25    behavior?

54

1                    S. Donoghue

2         A.   I don't recall.

3         Q.   If you haven't said it already,

4    what was the final determination when that

5    consideration took place, to either

6    termination or some sort of corrective action

7    for Mr. Gillette?

8         A.   Could you repeat the question,

9    please?

10        Q.   What was the final determination

11   regarding whether or not to terminate Mr.

12   Gillette for his behavior or to allow him some

13   sort of corrective action?

14        A.   I believe he got -- he received

15   some type of corrective memo.  I should -- can

16   I -- I just want to make one clarification?

17             When I explained the corrective

18   action to you, that process goes for certain

19   levels of employees and once you reach what we

20   call an M 8 level, you don't go through that

21      formal process.  You could just receive a memo

22      about your performance or your conduct and

23      there are no steps that you're entitled to and

24      you're not entitled to the grievance procedure

25      either at that level and above.

55

1           S. Donoghue

2           So I think Mr. Gillette may have

3    fit the category that he would not go through

4    a series of corrective action or even if it

5    was, it could have been determined that his

6    behavior was such that we wouldn't take him

7    step by step.  This is something we considered

8    to be serious, not to be tolerated and not to

9    happen again.  So he would receive a harsher

10    penalty, which would have been some type of

11    memo.

12        Q.    When you say it is a harsher

13    penalty, what is the effect of receiving one

14    of these memos; how would that impact someone

15    in Mr. Gillette's position at the hospital?

16        A.    Well, he is on notice, his job is

17    in jeopardy.

18        Q.    Okay.

19        A.    Possibly he didn't receive his

20    annual increase.  It would be reflected on his

21     performance review.

22          Q.   And does a memo like this have an

23     effect for a period of time, does it stay on

24     the record for a year and then get taken off

25     or how does that work?

56

1            S. Donoghue

2        A.   It never leaves the record.  It

3    is part of the historical record, but say

4    after a year or so you've demonstrated, you

5    know, a 360 change in whatever the issue was,

6    you know, it wouldn't be considered unless

7    that behavior surfaced again.

8        Q.   Okay.

9            In your March 2007 investigation

10    of Mr. Gillette's conduct, prior conduct as a

11    supervisor, specifically related to allowing

12    certain type of language/conversation to take

13    place in the workplace, was that investigated

14    or reviewed related to the March 2007

15    investigation?

16        A.   I don't believe that it was

17    reviewed in that context.  However, I do

18    remember speaking to him about specifically

19    about the incident where the person was trying

20    to learn how to cultivate this other accent,

21      that that also was not appropriate in a

22      workplace setting.  If you want to do that, do

23      that on your own time, your own place, but

24      just how you have to be aware of those things.

25      It wasn't to the same degree -- I didn't see

57

1          S. Donoghue

2     it in the same way as previous complaints

3     about Mr. Gillette had been made.

4          Q.    Is it fair to say that the reason

5     why the prior memo given to Mr. Gillette was

6     not reviewed or considered as part of the

7     March 2007 investigation was because the

8     nature of the complaint in March of 2007 was a

9     different type than the nature of complaints

10     that gave rise to the previous discipline that

11     Mr. Gillette may have received?

12          A.    It had nothing to do with type.

13     I think it was as a result of my talking to

14     everybody.  They viewed that the particular

15     situation as being playful, it was at lunch

16     break and there was no harm intended, there

17     were -- so it was a totally different nature.

18          They saw it as being playful,

19     whereas I thought it was not.  Then again,

20     talking to Mr. Gillette about enlarging his

21     awareness of issues that could possibly be

22     offensive to people.  Even though it may be

23     playful to some people, to other people it is

24     not necessarily playful.

25          Q.   Okay.  Did you have any

58

1              S. Donoghue

2     discussions with Mr. Meggs regarding possible

3     relationship between Mr. Gillette's previous

4     disciplines and this current complaint by Mr.

5     Bryan?

6          A.   I don't recall the specific

7     discussion I had with Mr. Meggs.

8          Q.   I'm sorry, you are saying you

9     don't recall the or a?

10          A.   I don't recall the specific -- I

11     don't recall the specifics of the discussion I

12     had with him offhand.

13          MS. KALE:  Can we take a break?

14          MR. SCOTT:  Absolutely.

15          (Recess taken.)

16          MR. SCOTT:  Read back the last

17     question and answer please.

18          (Record read.)

19          MR. SCOTT:  I'm going to ask that

20     these pages -- it is three pages, Bates

21          MKSCC 00105, 00100 and 00107 -- be

22          marked for identification.  We'll mark

23          as Plaintiff's -- we will use numbers

24          because they used letters --  A.

25                  Off the record.

59

1              S. Donoghue

2          (Discussion off the record.)

3          MR. SCOTT:  We will mark MKSCC

4      105, 106 and 107.  Back on the record

5      Bates numbers are 105, 106, 107,

6      Plaintiff's A.

7              (Document entitled "Investigation

8              Summary, Investigation Completed

9              3/14/07" bearing production Nos.

10             MKSC 00105 through MKSCC 00107

11             marked Plaintiff's Exhibit A for

12             identification, as of this date.)

13      Q.   Ms. Donoghue, I want you to take

14   a look at the three pages that are placed in

15   front of you.  Take your time.  When you are

16   ready, just look up and let me know.

17      A.   All right.

18      Q.   Ms. Donoghue, do you recognize

19   that document?

20      A.   Yes, I do.

21      Q.   What is that?

22      A.   It is a summary of an

23   investigation that I conducted as a result of

24   Mr. Bryan meeting with me about some

25   complaints.

60

1          S. Donoghue

2     Q.   Specifically that the

3   investigation that you conducted in March of

4   2007?

5     A.   Yes, correct.

6     Q.   And the allegations that gave

7   rise to this investigation were Mr. Bryan

8   complained of the use of racial slur and

9   homophobic remark by his co-worker, a vendor,

10   and a supervisor?

11     A.   Correct.

12     Q.   And do you recall what the racial

13   slur was that he was complaining of?

14     A.   The use of the word "nigger."

15     Q.   And the homophobic remark?

16     A.   People who live at home, let me

17   see, they are viewed as feminine.

18     Q.   The co-workers that he complained

19   about, who are they; what are their names?

20     A.   As indicated in this report, the

21    second bullet, it would have been -- let's see

22    Kevin O'Connor is not a co-worker.  It would

23    be Kevin Walrond, Jamal Robinson, Miguel Ruiz

24    and Rupert Gillette, the supervisor.

25         Q.   Before we move on, Mr. O'Connor,

61

1           S. Donoghue

2     what is his relationship to the hospital?

3          A.   He is a vendor.  My understanding

4     is he works with the company from whom we've

5     made some instrument purchases and his job

6     is -- he comes every night to do a specific

7     check on the instruments, to make sure they

8     are operational.

9          Q.   Okay.  When you say

10     "instruments," are these like machines that

11     are --

12          A.   They are very sophisticated

13     technological instruments that are used in

14     operating procedures.

15          Q.   And not to diminish what his

16     skills or his title are, so essentially he

17     performs maintenance on hospital equipment?

18          A.   I would say that is probably a

19     good description.

20          Q.   You used the term "vendor" to

21     describe him?

22          A.   Correct, he is not an employee of

23     the hospital.

24          Q.   Would a vendor also be considered

25     a subcontractor?

62

1            S. Donoghue

2        A.   I'm not sure of the official

3    category.

4        Q.   Under the code of conduct as laid

5    out by the Memorial handbook, Memorial

6    employee handbook, who is governed by that

7    code of conduct?

8        A.   Anyone who has any business to do

9    at the hospital, who works at the hospital.

10       Q.   Would a vendor under that

11    definition be governed under the code of

12    conduct?

13       A.   Yes.  Correct.

14       Q.   You interviewed Mr. O'Connor

15    related to this March 2007 investigation?

16       A.   Yes, I did.

17       Q.   And you took notes related to

18    that investigation?

19       A.   Yes, I did.

20       Q.   And you transcribed those

21      handwritten notes into the typewritten final

22      investigative report that you have before you,

23      correct?

24            A.   Yes, I did.

25            Q.   And the same goes for your

63

1              S. Donoghue

2      interaction with Mr. Walrond; is that correct?

3          A.   Yes.

4          Q.   The handwritten notes that you

5      then transcribed into a typewritten report,

6      correct?

7          A.   Correct.

8          Q.   And the same for Mr. Ruiz?

9          A.   Correct.

10         Q.   And Mr. Gillette?

11         A.   Correct.

12         Q.   Mr. Jamal Robinson, he was not

13     interviewed?

14         A.   I believe he was, it states here

15     that he was on medical leave at the time.

16         Q.   Okay.  Yes, very good.  Thank

17     you.

18             Now these interviews, did they

19     occur individually or as a group?

20         A    Individually.

21          Q.   And who was present during each

22     of the interviews?

23          A.   My recollection is except for Mr.

24     O'Connor, Mr. Meggs was with me.

25          Q.   Did Mr. Meggs take any notes

64

1              S. Donoghue

2     related to this investigation?

3          A.   I have no recollection of that.

4              MR. SCOTT:  I am going to mark

5          for identification -- this would be B,

6          Plaintiff's B.

7              (One-page corrective action memo

8               from John Meggs to Rupert

9               Gillette dated August 3, 2006

10              marked Plaintiff's Exhibit B for

11              identification, as of this date.)

12         Q.   Ms. Donoghue, I would like you to

13    take your time, read that document and when

14    you are done, just let me know.

15         A.   All right.

16         Q.   Are you done, ma'am?

17         A.   Yes.

18         Q.   Ms. Donoghue, do you recognize

19    that document?

20         A.   Yes, I do.

21          Q.   What do you recognize it to be?

22          A.   It is what I say, a serious

23    corrective action memo given to Mr. Gillette.

24          Q.   If you can say, what is the date

25    on that memo?

65

1          S. Donoghue

2       A.   August 3rd, 2006.

3       Q.   Who, if you can determine, is

4    responsible for giving that memo to Mr.

5    Gillette?

6       A.   It appears that it was John Meggs

7    who administered this.

8       Q.   Thank you.

9          Are you also cc'd, copied on that

10   memo?

11      A.   Yes, I am.

12      Q.   Who else is copied on that memo?

13      A.   Aileen Killen and Liz McCormick.

14      Q.   If you can state for the record,

15   who is Aileen. Killen and Liz McCormick?

16      A.   Aileen Killen at the time was

17   director of the perioperative department.  Liz

18   McCormick is responsible for the department of

19   nursing under which CPD reports up through.

20      Q.   Would it be safe to say both of

21     those individuals are within the hospital

22     hierarchy above Mr. Meggs in title?

23          A.   Correct.

24          Q.   Is one of those individuals above

25     the other or are they contemporaneous?

66

1          S. Donoghue

2          A.   No, they are not.  Liz McCormick

3     would be the overall manager, director.

4     Aileen would have reported up to her and John

5     Meggs would have reported to Aileen Killen.

6          Q.   All right.  Very good.

7               Are you aware whether or not

8     prior to the administration of this memo,

9     whether or not any discussions took place

10    between Mr. Meggs, Ms. Killen and/or Ms.

11    McCormick related to this memo?

12         A.   Yes, there were discussions.

13         Q.   Were you a party to those

14    discussions?

15         A.   Yes, I was.

16         Q.   When did those discussions take

17    place, if you can recall?

18         A.   I cannot recall the exact time,

19    but I believe it was after we had gotten the

20    administrative law judge's ruling on the city

21     commission case.

22          Q.   If you recall, how many

23     discussions took place?

24          A.   I couldn't tell you that.

25          Q.   Do you recall where, geography,

67

1              S. Donoghue

2     where did they take place?

3          A.   They would have taken place at

4     1275 York Avenue.

5          Q.   Any one particular office?

6          A.   I couldn't tell you the exact

7     location.

8          Q.   Did you take notes at any meeting

9     related to those discussions?

10         A.   I don't recall doing so.

11         Q.   Okay.  What were the sum and

12     substance of the meetings that took place

13     between yourself, Mr. Meggs, Ms. Killen and

14     Ms. McCormick related to this particular memo

15     regarding Mr. Gillette?

16         A.   We took the judge's ruling very

17     seriously and we felt that we would have to

18     administer some type of disciplinary action.

19         Q.   Was anyone else present at these

20     meetings or at this meeting?

21          A.   I don't recall specifically.

22          Q.   And when you referred to the

23   disciplinary action that should be taken, what

24   ultimately was the disciplinary action that

25   was taken?

68

1                    S. Donoghue

2          A.    The memo that she you just gave

3      me, the August 3rd, 2006 document.

4          Q.    Do you know who was responsible

5      for actually drafting up, writing that memo?

6          A.    I don't remember specifically.

7          Q.    Did you take any part in the

8      actual drafting of the letter yourself, did

9      you suggest language for the memo?

10         A.    I believe I may have done so.

11         Q.    If you recall what language in

12     there, in particular, that you feel you were

13     responsible for or you suggested?

14         A.    I couldn't tell you that.

15         Q.    As far as the overall letter

16     itself, do you agree, were you in complete

17     agreement with that memo?

18         A.    That it should be administered?

19         Q.    Yes.

20         A.    Yes, I do agree that it should

21     have been administered.

22          Q.   Do you agree with the sum and

23     substance of the memo, the content of the

24     memo?

25          A.   Yes, I do.

69

1              S. Donoghue

2              MR. SCOTT:  We'll have this

3        marked as Plaintiff's C.

4              (Two-page memo from John Meggs to

5              Rupert Gillette dated September

6              20, 2005, second page bearing

7              production No. MKSCC 0010 marked

8              Plaintiff's Exhibit C for

9              identification, as of this date.)

10       Q.    Again, Ms. Donoghue, I would like

11   you to take your time, read that document and

12   when you are done, look up and let me know.

13       A.    Yes.

14       Q.    Ms. Donoghue, do you recognize

15   this document?

16       A.    Yes, I do.

17       Q.    What do you recognize it to be?

18       A.    I recognize it to be a memo that

19   was given to Mr. Gillette by Mr. Meggs.

20       Q.    Have you seen this document

21    before?

22          A.   I recall seeing it before, yes.

23          Q.   Do you recall when you first saw

24    it?

25          A.   Specifically, no, I don't.

70

1          S. Donoghue

2      Q.    After reading it, could you state

3    what was the incident that gave rise to this

4    memo being administered by Mr. Meggs to Mr.

5    Gillette?

6      A.    Mr. Bryan had complained that he

7    had received his benefits package from the

8    benefits department and he had left it on a

9    desk or a table, and at some point during the

10    evening the package was gone and I believe he

11    saw it in a garbage pail.

12      Q.    Ultimately, Mr. Bryan found out

13    that Mr. Gillette had actually thrown out his

14    benefits package in the garbage?

15      A.    Correct.

16      Q.    And I would like to direct your

17    attention to that last paragraph --

18      A.    Yes.

19      Q.    -- of the document?

20      A.    Yes, correct.

21     Q.   Specifically the last sentence:

22          "He was made aware that our

23     conversations concerning these

24     counter-productive relations are being

25     monitored by our Employee Relations

71

1          S. Donoghue

2          Specialist, Sheila Donoghue."

3          A.   I see that.

4          Q.   Just going back to our earlier

5     conversation about monitoring, where

6     monitoring came from --

7          A.   Yes.

8          Q.   -- if you can just explain to me

9     what sort of actual activities were taking

10    place on your part related to this particular

11    incident and other counter-productive

12    relationships vis-a-vis Mr. Gillette?

13          A.   What I can tell you, I was

14    doing -- the word "monitor" is the word that

15    Mr. Meggs chose.

16          Q.   Yes.

17          A.   What I was doing was doing

18    periodic follow-ups to see how things were

19    going in the department.

20          Q.   And when you would do a

21    follow-up, how specifically or logistically

22    would that take place?

23        A.    It could be a phone conversation,

24    where I would pick up a phone and ask John how

25    things were going.  It could be as part of

72

1          S. Donoghue

2     another discussion, I might say oh, by the

3     way, how are things going.

4          Q.   Did you ever stop into the actual

5     unit on occasion when Mr. Gillette was on duty

6     to see how things were going yourself?

7          A.   Not very often due to the time

8     that he was working.  At other times during

9     the day, but not specifically at night.  Not

10    as often at night as I did during the day.

11         Q.   Just for the record, Mr.

12    Gillette's tour of duty was what time?

13         A.   The night shift.  The last shift,

14    if you will.

15         Q.   11 P.M. to 7:00?

16         A.   11:30 to 7:30 or 11:00 to 7:00,

17    I'm not sure.

18         Q.   I'm just going to refer your

19    attention back to Exhibit B, the corrective

20    memo dated August 3rd, 2006.

21          A.    Correct.

22          Q.    Specifically, the use of that

23     last bold-typed phrase in the first paragraph,

24     the use of vulgar language in the workplace --

25          A.    Yes.

73

1          S. Donoghue

2          Q.    -- do you consider the use of the

3     word "nigger" to be vulgar language in the

4     terms of this particular memo?

5          A.    Do you mean for me personally or

6     as a professional employee?  I don't know

7     how --

8          Q.    Well, you know what, we're going

9     to say both.  And you can determine which one

10    you'll say first.

11         A.    I would say personally and

12    professionally, I consider it to be offensive,

13    very offensive.

14         Q.    Would you consider it to be

15    vulgar, personally?

16         A.    I would choose to describe it

17    as -- for me, it would be deeply offensive.

18         Q.    As far as professionally now

19    within the context of the employee handbook,

20    and the policy and procedure manual --

21          A.   Yes.

22          Q.   -- is the use of the word

23     "nigger" in the work environment vulgar

24     language?

25          A.   For me, again, I would say it is

74

1              S. Donoghue

2      more serious than that, it is deeply

3      offensive.  But I would like to say something

4      else.

5              Q.    All right.

6              A.    When I looked in that particular

7      issue about the use of the word "nigger," I

8      was primarily talking to a relatively young

9      group of black males and they were trying to

10      say to me that the word nigger to them was

11      like jerk, stupid, it was a slang expression.

12              And my discussion with them is

13      that may have been how they were using the

14      word, however, there were many people in the

15      workplace who come from a whole different

16      historic perspective and even if not from that

17      perspective, they consider the word, no matter

18      how you spell it, to be offensive.  It is not

19      to be used in the workplace.  In other words,

20      they didn't mean it to be offensive.  This is

21     how they refer to each other.

22          Q.   In your position in the human

23     resources department, did you or do you -- and

24     I won't use the "or," strike the "or."

25          Do you interpret the use of the

75

1          S. Donoghue

2    word "nigger" in the workplace to be a

3    violation of the rules of the employee

4    handbook and/or the policy manual?

5        A.   If someone is complaining it is

6    offensive, I would say yes.  My general rule

7    of thumb would be just not to use the word at

8    all because we don't know what is offensive to

9    some people and not to others, but just

10    discontinue using the word.  It has the

11    potential to be offensive.

12        Q.   So you would say personally and

13    based on your understanding of the handbook --

14        A.   It is something.

15        Q.   -- it is out of bounds?

16        A.   I think it is.

17        Q.   The last subject --

18        A.   Okay.

19        Q.   -- posting of jobs.

20        A.   Okay.

21          Q.    The employee handbook for

22    Memorial addresses the manner in which job

23    vacancies are posted by the hospital; is that

24    correct?

25          A.    I don't recall specifically

76

1            S. Donoghue

2    details, but I recall there is a section

3    referencing to them.

4        Q.    Do you recall what is the process

5    of posting of jobs?

6        A.    There are two processes,

7    actually.

8        Q.    Thank you.

9        A.    I'll begin with the department.

10    If a department has an opening and they may be

11    due to the particular skills of a job or they

12    sense that maybe they want to encourage

13    promotional opportunities from within, what

14    they are advised to do is to let everybody

15    know that there is a particular -- in their

16    department, that there is a particular job

17    that is about to be opened or created.

18        Q.    Okay.

19        A.    And then they could use a memo,

20    put it someplace, or verbally let people know

21      about this, so that people in that department

22      only would have that ability to post for the

23      job.

24          Q.   To apply?

25          A.   Yes.  Sometimes departments do

77

1          S. Donoghue

2     that thinking they'll get an internal

3     candidate and then they don't.  So then they

4     will do what we refer to as the external

5     posting, it will be put online so now it is

6     open to the universe, to anyone with the

7     qualifications to apply.

8          Q.   Okay.

9          A.   But sometimes what happens is a

10    manager may know of somebody through

11    connections and then they will work with

12    employment, if they've identified somebody

13    that they may have in mind.  If they work with

14    employment, to do the recruiting for this

15    particular individual.  That doesn't happen

16    very often.

17         Q.   Have you ever had occasion to

18    receive a complaint from Edmund Bryan about

19    failure to promote him or improper posting of

20    a new job in his unit, did that ever come up?

21          A.   I don't know if Edmund

22   specifically spoke to me about that, I don't

23   recall.

24          Q.   Do you know whether or not he

25   ever made a complaint to your department,

78

1           S. Donoghue

2      maybe not to you specifically, but to your

3      department about the failure to promote or

4      improper posting of a job notice?

5           A.   I am not aware of that.

6           Q.   During your last tenure as an

7      employee relations specialist --

8           A.   Yes.

9           Q.   -- did you ever have occasion to

10     sit in on interviews for the promotion of

11     someone who is already an employee at the

12     hospital?

13          A.   I was not involved in that at

14     that time.

15          Q.   Would you be consulted at any

16     point in time during the interview process

17     when an employee is being considered for a

18     promotion?

19          A.   Possibly.

20          Q.   And under what circumstances

21     would you have been consulted?

22          A.   It could be if they felt that

23     somebody wasn't ready at this moment for that

24     particular job or if somebody didn't have the

25     skills for the job.

79

1          S. Donoghue

2     Q.   Do you recall ever being

3   consulted by a manager or supervisor regarding

4   the potential promotion of Edmund Bryan for

5   another job title?

6     A.   Yes, I do.

7     Q.   What circumstances, when did that

8   occur?

9     A.   Again, I can't tell you

10  specifically when, but I do remember being

11  consulted about it.

12    Q.   Well, do you recall any details

13  about that particular occasion?

14    A.   Yes, I do.

15    Q.   Please.

16    A.   I believe Edmund was looking to

17  move into an equipment specialist-type job in

18  the department and the discussion was Edmund

19  has had a history of communication issues and

20  one of the essential aspects of the equipment

21     specialist position is that you have very good

22     interpersonal skills.  It is a training

23     component.  You are not only training people

24     on your staff, but you are also interacting

25     with other departments such as the whole

80

1                S. Donoghue

2      perioperative department.  So it does require

3      strong personal skills, communication skills.

4           Q.    And who initiated this discussion

5      with you?

6           A.    John Meggs.

7           Q.    What did you have to say with

8      regards to this discussion?

9           A.    I remember telling John that if

10     Edmund were to apply, that he should be

11     interviewed for the position.

12          Q.    Any other input on your behalf in

13     regard to that process?

14          A.    And to inform Edmund why he may

15     not be considered and for him to consider

16     developing his communication skills so that if

17     something should come up in the future, he

18     could be seriously considered for the

19     possibility of moving into that position.

20          Q.    So as far as your communication

21     with Mr. Meggs, is it fair to say that when he

22     contacted you, he raised a concern regarding

23     Edmund Bryan's communication skills to you?

24          A.   I was aware of Edmund's

25     communication skills before that conversation.

81

1          S. Donoghue

2     Q.   How did you become aware of this

3     communication skills before?

4     A.   I believe John Meggs had spoken

5     to me about addressing -- how to address

6     Edmund's deficits in that area with him.

7     Q.   Do you recall when this

8     conversation took place?

9     A.   I couldn't tell you specifically,

10    no.

11    Q.   Any notes related to that

12    particular conversation?

13    A.   If I did, they would have been

14    submitted.  I'm not sure about that.

15    Q.   Do you recall generally, that

16    earlier conversation about, to use your

17    language, Edmund's deficits in communication,

18    what Mr. Meggs said to you in that

19    conversation?

20    A.   Edmund really chose not to

21     interact with the rest of the staff.  He

22     remained apart.  He didn't demonstrate good

23     communication skills.  So based on that, on

24     the observation of that, he would not -- he

25     could not at that point be considered a

82

1               S. Donoghue

2      candidate.

3          Q.   And I know you are talking about

4      when you were considering him for the

5      position, the promotion.  I am referring to an

6      earlier conversation that you said you had

7      when Mr. Meggs approached you about how to

8      talk to Edmund about his communication skills.

9          A.   My understanding is that Edmund

10     at some times was very defensive when speaking

11     to him.  So it was just a matter of just

12     coaching Mr. Meggs on how to approach somebody

13     that might be more defensive, but to still

14     hopefully allow them to hear what it was you

15     were trying to counsel them about.

16         Q.   And you don't recall around the

17     time, year, that this conversation took place?

18         A.   It was pretty much an ongoing

19     thing with Edmund over time.

20             (Transcript continues on next

21          page)

22

23

24

25

83

1            S. Donoghue

2            MR. SCOTT:  Thank you for your

3      time, Ms. Donoghue, it has been a

4      pleasure.

5            MS. KALE:  I have no questions.

6

7            (Time noted:  12:40 P.M.)

8

9      _____

10            Sheila Donoghue

11

12     Subscribed and sworn to

13     before me this_____day

14     of_____2008.

15     _____

16

17

18

19

20

21

22

23

24

25

84

1

2
CERTIFICATE
_ _ _ _ _ _ _ _ _ _

3
STATE OF NEW YORK    )

4
) ss.:
COUNTY OF NEW YORK    )

5
I, CHARISSE ROMEO, a Shorthand

6
Reporter and Notary Public within and

7
for the State of New York, do hereby

8
certify:

9
That I reported the proceedings in

10
the within-entitled matter, and that the

11
within transcript is a true record of

12
such proceedings.

13
I further certify that I am not

14
related, by blood or marriage, to any of

15
the parties in this matter and that I am

16
in no way interested in the outcome of

17
this matter.

18
IN WITNESS WHEREOF, I have hereunto

19
set my hand this_____day of_____,

20

2008.

21

22            _____

              CHARISSE ROMEO

23

24

25

85

1

2     April 24, 2008

3                 I N D E X
                − − − − −

4     WITNESS                         PAGE
      _____                         ____
      SHEILA DONOGHUE
5          Examination by Mr. Scott          4

6

7              E X H I B I T S
              − − − − − − − −

8     PLAINTIFF'S
      _____

      FOR_IDENTIFICATION                PAGE
      ___ _____                 ____

9     A    Document entitled "Investigation
           Summary, Investigation Completed
10         3/14/07" bearing production Nos.
           MSKCC 00105 through MSKCC 00107      59

11

      B    One-page corrective action memo
12         from John Meggs to Rupert Gillette
           dated August 3, 2006             64

13

      C    Two-page memo from John Meggs to
14         Rupert Gillette dated September 20,
           2005, second page bearing production
15         No. MSKCC 0010                  69

16

17

18

19

20

21

22

23

24

25